IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOSEPH MEEHAN,                                )
                                              )
        Plaintiff,                            )
                                              )
v.                                            )        Case No: 4:17-cv-02876-PLC
                                              )
PNC FINANCIAL SERVICES GROUP, INC.            )
                                              )
        Defendant.                            )
                                              )

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      PNC Financial Services Group, Inc. ("PNC") is a corporation organized under the laws of the Commonwealth of Pennsylvania, with headquarters in Pittsburgh, Pennsylvania. (Dkt. 34, ¶2.)

        **Admit.**

2.      Joseph Meehan is a state certified general appraiser for the State of Missouri. (Meehan Dep. at 8, attached as Exhibit 1.)

        **Admit.**

3.      Beginning in August 2004, Meehan began employment with National City Bank in St. Louis, Missouri as a Senior Commercial Real Estate Appraisal Reviewer. (Meehan Dep. at 9- 10.)

        **Admit.**

4.      In his position with National City Bank, Meehan ordered real estate appraisals,

1

scoped appraisals, reviewed appraisals, and performed some market research work. (Meehan Dep. at 11-13.)

**Admit.**

5.    In 2009, PNC purchased National City Bank. PNC transitioned over the approximately 12 to 15 real estate appraisers from National City to PNC. (Exhibit 1, Meehan Dep. at 25-26, 31; Barone Dep. at 162, attached as Exhibit 2.) This included Meehan. (*Id.*)

**Admit.**

6.    Meehan transitioned to PNC as a Senior Real Estate Appraisal Reviewer where he was responsible for performing reviews of appraisals only, instead of performing or ordering appraisals as he had done at National City. (Meehan Dep. 21-22.)

**Admit.**

**REAL ESTATE APPRAISAL PROCESS AND REGULATORY STANDARDS**

7.    Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") requires certain federal financial agencies to prescribe appropriate standards for the performance of real estate appraisals in connection with "federally related transactions," which are defined as those real estate-related financial transactions that a federal agency engages in, contracts for, or regulates and that require the services of an appraiser. 12 U.S.C. §§ 1101-1122 (FIRREA); *see also* 12 U.S.C. §§ 3339, 3350(4).

**Admit.**

8.    Title IX of FIRREA requires that real estate appraisals be written and performed in accordance with general accepted standards outlined in the Uniform Standards of Professional Appraisal Practice ("USPAP"). (Exhibit 1, Meehan Dep. at 13-14.)

**Admit.**

9.      USPAP requires that a real estate appraisal be "credible," meaning "worthy of belief." (*See* USPAP, available at: http://www.uspap.org/files/assets/basic-html; *see also* 2014-2015 USPAP excerpt, attached as Exhibit 3.) USPAP does not require that a real estate appraisal be "perfect." (Exhibit 1, Meehan Dep. at 173-174.)

**Admit in part. The comment to the definition cited by Defendant states, "[c]redible assignment results require support, by relevant evidence and logic, to the degree necessary for the intended use." (USPAP 2014-2015, Exhibit F, p. U-2)**

10.      Similarly, the Appraisal Institute promulgates its own standards of ethics, in accordance with USPAP, requiring that an appraisal be "credible." (Meehan Dep. at 70-76; Meehan Dep. Exs. 4, 5, attached as Exhibits 4, 5.)

**Admit.**

11.      Based on these standards, a real estate appraisal needs to be credible. The certified appraiser providing the appraisal to PNC is being asked to provide a credible appraisal on a piece of real estate. The Real Estate Appraisal Reviewer's job is to review the appraisal report and make sure it addresses basic requirements and ultimately, is credible. (Exhibit 2, Barone Dep. 138-140.)

**Deny in part. The Real Estate Appraisal Reviewer's job is more than make sure appraisals address basic requirements. There is a complex regulatory structure that prescribes what must be included in the kinds of commercial appraisals that Meehan was**

3

**required to review while at PNC. (*See* Defendant's Statement of Undisputed Material Facts ("SUMF"), ¶¶ 7, 8, 10, 13; Plaintiff's Statement of Additional Material Facts ("SAMF") ¶¶ 1–3) Also, Defendant does not cite to any evidence that whether an appraisal is credible is the ultimate determination. (*See Id.*)**

12. To be USPAP compliant, a real estate appraisal must contain certain minimum information, including, but not limited to: (a) identification of client requesting appraisal; (b) intended user of the appraisal; (c) market value of the property; (d) scope of the assignment for the appraisal; (e) property location and address; (f) the highest and best use of the property; (g) zoning information and legal use of the property; (h) the date of report and effective date of appraisal; and (i) extraordinary assumptions and hypothetical conditions, if any. (Meehan Dep. 14-15; *see also* Exhibit 3.)

**Admit.**

13. PNC is regulated by a host of regulatory agencies, including the Office of Comptroller of the Currency ("OCC"), the FDIC, and the Federal Reserve. In December 2010, the federal agencies created the Interagency Appraisal and Evaluation Guidelines https://www.fdic.gov/news/news/financial/2010/fil10082a.pdf to provide full details about when appraisals and evaluations are required, who can provide them, and how they must be performed. (Barone Dep. 26-27.)

**Admit.**

14. There is no one way to conduct a real estate appraisal of a piece of property. (Meehan Dep. 15-17.) For example, if five certified appraisers analyzed the same property, each appraiser would likely arrive at a different value for that property. (Meehan Dep. at 168-171.)

Thus, an appraisal report for a property can have different values depending on what that appraiser deems to be relevant or appropriate in accordance with USPAP. (*Id.*)

**Deny in part. There is a proper way to conduct a real estate appraisal, and Defendant misrepresents Plaintiff's testimony. Plaintiff stated that five certified appraisers "could" arrive at different values for a particular property, but it is not likely, nor is the value the only thing that matters. (Meehan Deposition, Exhibit A, 170:22–171:2. It is also the process and the methodology used to provide guidance to others that may rely upon the appraisal. (See USPAP 2014-2015, Exhibit F, Ethics Rule at U-7)**

15.    The real estate appraisal process is subjective and ultimately, an opinion rendered by the third party appraiser on the value of a piece of property. (Meehan Dep. 170-171; Barone Dep. at 58-59, 64-65.)

**Deny in part. The real estate appraisal process is objective (Def. SUMF ¶ 12; USPAP 2014-2015, Exhibit F, Ethics Rule at U-7). Plaintiff admits there are subjective parts of an appraisal. However, regulations, rules, statutes, and the consensus of peers make the appraisal process more than "ultimately, an opinion" of an appraiser. (*Id.*; Plaintiff's SAMF, ¶¶ 1–3)**

16.    The USPAP requires a real estate appraisal include all information that is "relevant" to the property. (Meehan Dep. at 167-69.) USPAP does not define "relevant" but rather, it is a term determined by one's appraisal peers. (*Id.* at 168.)

**Admit.**

**PNC Real Estate Valuation Services (REVS) Group**

17.    After PNC purchased National City Bank, PNC developed and reorganized the real estate appraisal review team, renamed as the Real Estate Valuation Services (REVS) group. (Meehan Dep. at 28-29; Barone Dep. at 17, 29-32.)

**Admit.**

18.    The REVS group was organized into two teams to serve as a system of checks and balances to avoid any improper indication of bias in the real estate valuation process: the Procurement team and the Review team. (Barone Dep. at 30-31; 55-56, 58-59.)

**Admit.**

19.    The Procurement team was responsible for ordering the real estate appraisals from a list of approved third party certified appraisers and for managing the process from beginning to end, utilizing the Review team at a certain point of the process before final submission. (Meehan Dep. 108-109; Barone Dep. 30-31).

**Admit.**

20.    The Review team was solely responsible for reviewing the appraisals to ensure compliance with federal regulations. (Exhibit 2, Barone Dep. 30-31.)

**Objection. Defendant's citation does not support the proposition. The only relevant statement from those pages is, "So we have a procurement group and we have a review group. . . . The review team consists of the folks that are responsible for reviewing our appraisals that we order. The procurement team's responsible for managing the process from beginning to end, utilizing the review team at a certain point in the process." (PNC Corp. Rep. Deposition by Adam Barone, Exhibit B, 30:24–31:8) Plaintiff does not deny this**

**statement.**

21.    Once the real estate appraisal comes to PNC, it is assigned to a Reviewer through the internal PNC LINKS system. (Exhibit 1, Meehan Dep. 38.) Typically, the appraisals are assigned based on availability, but also takes into account whether a Reviewer is particularly qualified to review a certain type of property (i.e. an affordable housing project.) (Exhibit 2, Barone Dep. at 87-89.)

**Admit.**

22.    On January 2, 2009, Jeffrey Mazur authored and distributed a memorandum to PNC Real Estate Review Appraisers, including Meehan, with the subject "Expectations." (*See* Exhibit 6, Meehan005015, hereafter the "Mazur memorandum"; *see also* Exhibit 1 at pp. 62-65). The purpose of the memorandum was to "highlight a few of the expectations PNC has of [Real Estate Review Appraisers.]" *Id.*

**Admit.**

23.    The Mazur memorandum outlined items to be checked during an appraisal review, and gave general guidance for the PNC process. The items to be checked during an appraisal review included: (a) math calculations; (b) methodology; (c) definition of market value; (d) property rights appraised; (e) narrative property description; and that (f) the appraiser engaged must sign the final appraisal report (in accordance with USPAP). (Exhibit 6.)

**Admit.**

24.    In addition, to adhere to both FIRREA and USPAP requirements, PNC developed the REVS Commercial Real Estate Appraisal Procedures guide ("REVS Procedures"), which was updated and distributed within the REVS group. (Meehan003706-3744, at Exhibit 7;

Meehan Dep. at 50-51.)

**Admit.**

25.     The REVS Procedures are summarized in the following preamble: "PNC has established a policy, which conforms to the appraisal policies and standards of the federal regulatory bodies. This Policy and related Procedures set forth the minimum standards for obtaining valuation products (appraisal & non-appraisal) applicable to all commercial loans secured with real property." (Exhibit 7, at Meehan003710.)

**Admit.**

26.     Between 2012 and 2015, the REVS Procedures did not significantly change such that it affected how a real estate appraisal reviewer, such as Meehan, performed job function at PNC. (Exhibit 1, Meehan Dep. at 51.)

**Deny in part. Plaintiff was asked about receiving notice of any changes, and his full answer was, "I don't recall any particular changes at this time. I don't think it would have." (Meehan Deposition, Exhibit A, 51:11-16) Plaintiff admits that he did not recall receiving any notices that indicated substantial changes to how he performed his duties and responsibilities.**

27.     The purpose of a real estate appraisal review is to "ensure that the appraisal report conforms to regulations, USPAP, [PNC] Policy and provides a reasonable opinion(s) of value. The appraisal review will be documented utilizing the appropriate form or acceptable narrative equivalent. (Exhibit 7, REVS Procedures 6.4.1 at Meehan003737.)

**Admit.**

28.     Upon completion of a Real Estate Appraiser Reviewer's review of an appraisal,

one of three things can occur: (a) acceptance of the Report; (b) addressing of concerns with the Appraiser; or (c) a rejection of the Report. (Exhibit 7, REVS Procedures 6.4.2 at Meehan003737.)

**Admit.**

29.    The REVS Procedures details how a Real Estate Appraisal Reviewer should proceed in the event there is not an acceptance, but rather a challenge to, or rejection of the report. (*Id.*)

**Admit.**

30.    If the Appraisal Reviewer identifies "manageable concerns with the appraisal report, any significant issues must be communicated to the appraiser. (Although, verbal transmission of the concerns may be appropriate, written correspondence is recommended and should be retained in the appraisal file.) The appraisers response should also be in written form and might include clarification and additional support, corrected pages, and/or a revised report.

i.   If an appraisal report is being revised by the appraiser, a copy of the original report should be maintained until the review is completed.

ii.  In the event that the appraiser's revisions have no impact on the original value conclusion, the appraiser may address the reviewer's concerns in a letter or e-mail.

iii. In the event that the report complies with federal regulations but there exists an unresolved issue which impacts the conclusion of value, and the appraiser will not or cannot participate in the revision process, the reviewer may recommend a field review be completed. All value changes require a field review performed by a state certified appraiser or a new appraisal/evaluation. Internal value changes are prohibited."

(Exhibit 7, REVS Procedures 6.4.4 at Meehan003737.)

**Admit in part. Defendant has properly cited to the 2014 REVS Procedures.**

**However, the 2011 REVS Procedures' § 6.4.4 is slightly different. The 2011 version's 6.4.4(c) required value changes to only be made by a state certified appraiser. (PNC Commercial Real Estate Appraisal Procedures July 2011, Exhibit G, § 6.4.4, at Meehan03498–3499). The 2014 version—enumerated as 6.4.4(iii)—also permits value changes to be made by a new appraisal/evaluation. (PNC Commercial Real Estate Appraisal Procedures November 2014, Exhibit U, § 6.4.4, at Meehan3737)**

31.     Each time a reviewer recommends an appraisal report for acceptance, the review is then reviewed by a supervising appraiser, so that there is another check in the process to ensure that "all the things that were necessary to be addressed were addressed." (Exhibit 2, Barone Dep. 143-144, 145-148.)

**Admit.**

32.     The certified appraiser performing the appraisal that is delivered to PNC is required to provide an appraisal in compliance with USPAP and FIRREA, because if they perform inadequate work that does not meet those federal standards, or are simply not "credible", they are risking their licensure and livelihood as a result. (Exhibit 2, Barone Dep. 155-156.)

**Admit.**

33.     On the other hand, an appraisal reviewer could reject an appraisal report altogether. REVS Procedures provide that "[w]hen a reasonable attempt to bring an appraisal into compliance or to correct problems within the report does not result in an acceptable report according to regulations, USPAP, and/or PNC Real Estate Appraisal Policy and Procedures, then the recommendation to reject the report must be documented and one of the following actions should be taken:

10

1. Another appraiser should be engaged; or

2. A senior appraiser may authorize a field review, which complies with USPAP (specifically Standard 3).

3. A senior appraiser must approve the rejection of an appraisal report.

4. If it is deemed appropriate to file a complaint against an appraiser or evaluator for a fraudulent appraisal or evaluation the Detection and Resolution Unit (DRU) / Fraud Investigation Support (FIS) Creating and Processing Suspicious Activity Reports (SARs) policy will be utilized (Reference # DRU-4-0558).

(Exhibit 7, REVS Procedures 6.4.5 at Meehan003738, emphasis in original; *see also* Exhibit 1,

Meehan Dep. 61-62.)

**Objection. None of Defendant's citations provide support for its assertion that "an appraisal reviewer could reject an appraisal report altogether," and Plaintiff denies that PNC would have allowed a single reviewer to proceed through the procedures of 6.4.5 on his own, as rejections of a report required supervisor approval. Plaintiff admits that the quoted portions are from 2014 REVS Procedures, but denies that the procedures remained consistent during Plaintiff's employment. 2011 REVS Procedures do not include subsection 4, and there are other minor differences. (PNC Commercial Real Estate Appraisal Procedures July 2011, Exhibit G, § 6.4.4, at Meehan03499)**

34.    PNC also published and distributed its Code of Business Conduct and Ethics to employees, including Meehan. (Exhibit 8, Meehan004055-4090.)

**Admit.**

35.    The PNC Code of Business Conduct and Ethics states: "Our Values reflect PNC's

culture and serve to direct our day-to-day actions with customers and colleagues. Similarly, PNC's Code of Business Conduct and Ethics and related policies provide important guidance in conducting our daily affairs. **They apply to all employees and directors of PNC. As a team, we have worked very hard to build a successful and well-respected company. We simply cannot and will not tolerate unethical or inappropriate behavior.**" (Exhibit 8 at Meehan004059, emphasis added.)

**Admit.**

36.    The Code of Business Conduct and Ethics goes on to direct PNC employees on what to do in the event of an ethical concern. "Remember, if you have a question or concern about what is proper conduct for you or anyone else, you may always talk to your supervisor, the Employee Relations Information Center ("ERIC") at 1-877-968-7762, or the Corporate Ethics Office at 412-768-8507. You may also report possible violations by calling the PNC Business Conduct and Ethics Hotline at 1-866-785-9753, where you may choose to remain anonymous." (Exhibit 8 at Meehan004059; *see also* Exhibit 2, Barone Dep. 160-161; Exhibit 1, Meehan Dep. 44-46, 72-73, 93, 176.)

**Admit.**

37.    All Real Estate Appraisal Reviewers in the REVS group were required to complete annual training and certification on the PNC Code of Business Conduct and Ethics. (Exhibit 1, Meehan Dep. 44-46.)

**Admit.**

**MEEHAN'S EMPLOYMENT AS A REAL ESTATE APPRAISAL REVIEWER FOR PNC (2011-2015)**

38.    As a Real Estate Appraisal Reviewer on the Review team for the REVS group, Meehan had two main duties. First, was to review real estate appraisals. In addition, there was a secondary function where they would update the PNC system of approved certified appraisers, licensed by state, and would confirm and update certification based on each appraiser. (Exhibit 1, Meehan Dep. 97-99; Exhibit 2, Barone Dep. at 134-136.)

**Admit.**

39.    From 2010 to present, the Group Manager for REVS was Adam Barone ("Barone"). (Barone Dep. 17; Meehan Dep. at 29.) This included both the Procurement team and the Review team. (Barone Dep. 26-28.)

**Admit.**

40.    Jeffrey Mazur ("Mazur") reported to Barone, and managed the entire Review team. (Exhibit 2, Barone Dep. at 27; Exhibit 1, Meehan Dep. at 32.) Fred Petrie and Laura Laurent managed the Procurement team. (Barone Dep. at 32, 37.)

**Objection. Defendant's citation to Page 27 of Barone's deposition or Meehan's deposition at 32 does not support any of the facts alleged regarding Jeffrey Mazur. Admit the second sentence regarding Fred Petrie and Laura Laurant.**

41.    After the transition from National City, from 2010 to 2012, Meehan's direct supervisor was Tom Silnes. (Exhibit 1, Meehan Dep. at 46-47.)

**Objection. Defendant's citation does not support the alleged fact. Plaintiff admits that Steve Mustain was Meehan's supervisor from approximately early 2010 to about**

13

**March 2011 and Tom Silnes was his supervisor from about March 2011 to July 2012.**

**(Meehan Deposition, Exhibit A, 32–34)**

42.      From 2012 to 2015, Meehan's direct supervisor and manager was Douglas Schoenberg ("Schoenberg"). (Meehan Dep. at 46-47.)

**Admit.**

43.      From 2012 through 2015, Meehan's duties and responsibilities as a Real Estate Appraisal Reviewer did not change. (Meehan Dep. at 42-23.)

**Objection. Defendant's citation to the record (pp. 42-23) is confusing and does not allow Plaintiff to adequately respond. Neither pages 42 or 23 support Defendant's alleged statement. If Defendant is also referring to pages 43, then Plaintiff admits.**

44.      Even though based in St. Louis, Missouri, Meehan would review appraisal reports from commercial properties located in a variety of states across the country. (Exhibit 1, Meehan Dep. at 175.)

**Admit.**

45.      As a Real Estate Appraisal Reviewer, Meehan would not travel to personally visit or assess the appraised properties for which he was charged with reviewing, but rather, relied on the firsthand knowledge and expertise of the state certified appraiser who had performed the appraisal on the property. (Exhibit 1, Meehan Dep. at 175-76.)

**Admit.**

46.      All Real Estate Appraisal Reviewers on the Review team were subject to annual reviews, which included a self-evaluation and a managerial evaluation. (Exhibit 1, Meehan Dep. at 85-86.)

**Admit.**

14

47.    At the beginning of each year, the REVS Group would develop certain goals for each role within the group, which are portrayed as targeted metrics in the evaluations. (Exhibit 2, Barone Dep. at 85.) Every person in a similar role, such as Real Estate Appraisal Reviewer, would be assigned the same goals and those are the goals to which the employee would be held accountable for a given year. (*Id.*)

**Admit.**

48.    For example, in 2011, each Reviewer in the REVS Group had a monthly production goal of $10,000, or $120,000 annually. (Meehan Dep. 36-37; Exhibit 9, PNCMeehan00204-207.)

**Admit.**

49.    In Meehan's 2011 annual review, Tom Silnes completed a Manager Evaluation stating that "Joe's productivity goal was $10,000 per month in 2011. Joe completed 265 reviews and achieved 94% of his productivity goal. 2011 was a challenging year and productivity was mixed within the group. Joe's performance met some expectations in 2011. Joe needs to work more efficiently in order to achieve his productivity goal." (Exhibit 9, at PNCMeehan00205.)

**Admit.**

50.    In addition, Meehan's 2011 Manager Evaluation stated that "Joe provided a level of customer service in 2011 that met some expectations. Our business partners rely upon us to resolve matters quickly and effectively and to provide timely communication on the status of any issues raised during the course of an assignment. Joe needs to improve his organizational skills and work more diligently to resolve issues quickly in order to complete tasks in a timelier manner." (Exhibit 9, at PNCMeehan00205.)

**Admit.**

51.     Even though Meehan did not meet his production goal in 2011, he continued to be employed for the following year in the same role as a Real Estate Appraisal Reviewer. (Exhibit 9; *see also* Exhibit 1 at 95-97.)

**Admit.**

52.     In 2012, the annual production goal had changed from $120,000 to $108,000. (Exhibit 1, Meehan Dep. at 97.) This remained the annual production goal, along with other performance benchmarks for Real Estate Appraisal Reviewers for 2013, 2014, and 2015. (*Id.* at 116-117, 135-36.)

**Objection. None of Defendant's citations mention anything regarding the year 2015. Plaintiff admits the rest, apart from any assertions regarding the year 2015.**

53.     In 2012, after Silnes left PNC, Schoenberg completed a Manager Evaluation of Meehan. Schoenberg stated that: "Joe's production goal was $108,000 for 2012 and his production was $96,710 or 90%. Joe completed 289 reviews, which was as many as several of his cohorts who did reach the goal, but his average fee per review was only $335. We will work in the coming year to bring this number up; however, Joe needs to seek out more work when times are slow." (Exhibit 10, PNCMeehan00193-198.)

**Admit.**

54.     The 2012 Manager Evaluation acknowledged that "Joe is very diligent in making sure the appraisals [PNC uses] and his own reviews are compliant with USPAP and banking regulations. He communicates effectively with both the Supervisory Appraiser and his Supervisor." (Exhibit 10 at PNCMeehan00197.)

**Admit.**

55.   In other words, PNC acknowledged and commended Meehan for his adherence to USPAP and banking regulations in completing the work assigned to him. (Exhibit 10.)

**Deny that such a statement in the evaluation "commended" Meehan. Admits the rest.**

56.   Even though Meehan's productivity was low in 2012 and he did not meet his annual production goal, he continued to be employed for the following year. (Exhibit 1, Meehan Dep. 186-187.)

**Deny in part. There is no evidence that Meehan's productivity was "low in 2012," as stated by Defendant. Defendant's citation to Meehan's deposition does not support it's assertions that his productivity was low. Plaintiff admits that he did not meet his production goals for 2012, but there is no discussion in the cited pages regarding whether his productivity was low in 2012. Defendant has never provided any evidence showing that Defendant's production was "low," nor have they provided comparable numbers from other reviewers. Moreover, his supervisor noted that Meehan completed as many reviews as co-workers. (Meehan Deposition, Exhibit A, 102:2-11, 140:16-25, and 141:1-6; Meehan 2012 Manager Evaluation, Exhibit N, at PNCMeehan0197) Admit that Meehan continued to be employed by Defendant the following year.**

57.   In 2013, Meehan met and exceeded his production goal of $108,000.00. (Exhibit 11, PNCMeehan00184-188; Exhibit 1, Meehan Dep. at 187.)

**Admit.**

58.     In his 2013 Managerial Evaluation of Meehan, Schoenberg commented that: "Joe indicates in his self-assessment that he is "exceptionally demanding" in the review process. My perception is that this is correct. His analysis of appraisal technique and methodology is very strong. However, he needs to concentrate on critical issues, especially in more non-complex assignments. For example, errors in the Sales Comparison Approach might be overlooked if the Income Approach is done correctly and given the most weight in the value conclusion." (Exhibit 11, PNCMeehan00186.)

**Admit.**

59.     If Meehan took any issue with the comments in his 2013 Review, he had an opportunity to address such issues and write a response in Section 9 of the review. (Exhibit 11, PNCMeehan00187; *see also* Exhibit 1, Meehan Dep. 110-111.)

**Admit.**

60.     Meehan did not make any comments to his 2013 Review and instead, read and accepted them as written on February 6, 2014. (Exhibit 11, PNCMeehan00188.)

**Admit.**

61.     Meehan continued to be employed as a Real Estate Appraisal Reviewer for the 2014 calendar year. (Exhibit 1, Meehan Dep. at 141-142, 187.)

**Admit.**

62.     In 2014, Meehan completed a self-evaluation, where he stated: "I have performed my job duties in a timely manner. My performance has been consistent with Bank Policies and USPAP requirements. However, I appear to spend more time on potential valuation concerns and questions than my colleagues. For example, I often hear appraisers saying they did it that way

last year and it was approved when questioned about something that is theoretically incorrect or in error." (Exhibit 12, at PNCMeehan00182.)

**Admit.**

63.    Notably, Meehan did not provide any example in his 2014 Self-Evaluation of something in an appraisal that is "theoretically incorrect or in error." (Exhibit 12, PNCMeehan00179-182.)

**Deny that this is notable. Defendant provides no citation to support that it is notable. Admit the rest.**

64.    Meehan testified that an appraisal he believed was "theoretically incorrect," because the comparable sales used by the appraiser to value a commercial property were not sales figures from an "arm's length transaction." (Exhibit 1, Meehan Dep. at 120-122.) While nothing in the USPAP requires a valuation based on comparable sales to be from an "arm's length transaction," Meehan believed the appraisal was "theoretically incorrect." (*Id.* at 123-126.)

**Admit that Meehan testified that it is improper for appraisers to use comparable sales that were not from an "arm's length transaction," and admit that USPAP does not explicitly require such comparables to never be from arm's length transactions. Deny that "nothing in the USPAP requires" comparable sales be from arm's length transactions, as USPAP consistently reaffirms that appraisals must not be misleading and using comparable sales for appraisals that are not at arm's length, distorts the true market value of a property. (Meehan Deposition, Exhibit A, 120-123). Also, Plaintiff denies PNC's assertion that Meehan's position regarding arm's length transactions in comparable sales**

*only* **be viewed regarding USPAP's explicit requirements, when Meehan was to adhere to all applicable laws. (Id.)**

65.     Schoenberg again completed a Manager Evaluation for Meehan for the 2014 calendar year. (Exhibit 13, PNCMeehan00174-178.) In the review, Schoenberg commented: "Joe will not likely meet the production goal for the year; however, this is not for a lack of effort on his part. He is a very thorough and technical reviewer and is not afraid to challenge appraisers regarding regulatory, USPAP or valuation issues." (*Id.* at PNCMeehan00177.)

**Admit.**

66.     Similar to years prior, Meehan had the opportunity to read the Manager Evaluation and provide comments. For his 2014 Review, Meehan wrote "I agree with my supervisor's comments and review. I have proven I can exceed my monthly production goal when review assignment volume is sufficient." (Exhibit 13, PNCMeehan00178.)

**Admit.**

67.     Despite not meeting his 2014 production goal, Meehan continued to work as a Real Estate Appraisal Reviewer for the REVS group in 2015. (Exhibit 1, Meehan Dep. at 140-141, 234-235.)

**Deny in part. There is no evidence that Meehan did not meet his 2014 production goal. (Meehan Deposition, Exhibit A, 187:15–188:20) Plaintiff is clear in his testimony that he didn't know if he met his production goal, and Defendant has not provided any other evidence to demonstrate Plaintiff did not meet his 2014 production goal. Admit that Meehan continued to work at PNC until his termination in October 2015.**

68.     Absent from any of Meehan's self-evaluations or Manager Evaluations are

comments or criticisms related to complaints about alleged non-compliance with USPAP or violations of federal regulations related to real estate appraisals. (*See* Exhibits 9-12.)

**Objection. Defendant's statement is confusing as Plaintiff is not sure if Defendant is referring to comments or criticisms made by Plaintiff or anyone regarding violations. Regardless, Plaintiff denies the statement. There are multiple comments or criticisms related to complaints about alleged non-compliance with USPAP or violations of federal regulations related to real estate appraisals. (Plaintiff's SAMF ¶¶ 31, 32, 33, 40, 44, 46, 49).**

**MEEHAN'S ALLEGATIONS OF NON-COMPLIANCE WITH USPAP AND FEDERAL REGULATIONS**

69.     Meehan claims that PNC had a "culture" to ignore USPAP and federal regulatory standards with respect to real estate appraisals and was repeatedly told to "let things go." (Dkt. 1-1, at ¶ 13; Exhibit 1, Meehan Dep. at 179-180, 183, 200.)

**Admit.**

70.     Yet, Meehan testified that while he was a Real Estate Appraisal Reviewer with PNC, he was never forced to sign an appraisal report that he believed to be in violation of USPAP. (Exhibit 1, Meehan Dep. 203.)

**Admit.**

71.     In September 2015, Meehan was assigned to review the appraisal of two New Jersey childcare properties. (Dkt. 1-1, ¶ 14; *see also* Exhibit 1, Meehan Dep. 144-45.) Meehan took issue with the appraiser's original evaluation of the daycare facilities because he claimed the appraiser failed to "address or identify the licensed capacity of the facility as regulated and authorized by the State of New Jersey" and similarly failed to "apply the most appropriate

methodology for analyzing the market value, price per licensed child." (*Id*.)

**Admit.**

72.    Despite claims that Meehan was ordered to "ignore" and "let go" of his potential concerns regarding the New Jersey childcare properties, the Supervisory Appraiser from PNC, Diana Pockar, wrote to Meehan to address his concerns as follows:

Hi Joe, I was thinking more about this report over the last day and actually called the vendors based on our conversation last evening that properties in this market do not sell on a per child licensed basis. I'm concerned that the valuation is not significantly supported as the analysis appears to not be supported.

My suggestion is to revert back to the original analysis and accept the basis for which the appraisers originally included. **This is a strong market and I am afraid that if the appraisers have not seen analysis like this, ever, it's just not credible.** I am not able to get my arms around it entirely, but was just thinking, what if the number of licenses change, either for the property or the comparables, the value is a moving target. Do the licenses get issued to the business or do they run with the real estate? One of the comps, page 50 states that the property is licensed for 457 children, but rent is based on actual enrollment, which we know can change at any time.

**Please let me know if we have your approval to just go back to the original analysis, which is what was completed last year.**

(Exhibit 14, Meehan002231-33, emphasis added.)

**Deny that Plaintiff has ever alleged that he was "ordered" to ignore his concerns. However, after Meehan refused to comply, the review was taken away from him the next day, and he was told he was to be terminated a week later. (Plaintiff's SAMF, ¶¶ 16–24)**

73.    Based on this email, Meehan conceded he was never directed to "ignore" his concerns and never commanded to "revert back to the original analysis." (Exhibit 1, Meehan Dep. at 151-154.) On the contrary, the PNC Manager offered a "suggestion" and sought Meehan's "permission" with respect to the review of the appraisal, citing overall concerns of credibility (*Id.*)

**Deny. Again, he has never claimed that he was "directed" to ignore his concerns. Also, deny that it was a suggestion or that PNC truly respected Meehan's opinion as after Meehan refused to comply, the review was taken away from him the next day, and he was told he was to be terminated a week later. (Plaintiff's SAMF, ¶¶ 16–24)**

74.    Further, at no time between 2012 and 2015, did Meehan report to anyone in the REVS "chain of command" (i.e., Jeffrey Mazur or Adam Barone) that he believed there were ethical violations, violations of USPAP, or violations of federal banking regulations related to real estate appraisals. (Exhibit 1, Meehan Dep. at 82-85, 176-179, 202-204.)

**Deny. He repeatedly made complaints to his supervisor and other REVS members. There is no evidence presented that the REVS supervisory "chain of command" only consisted of Adam Barone and Jeffrey Mazur, nor has Defendant provided any citation that these two individuals were the only members to receive complaints. (Plaintiff's SAMF, ¶¶ 16–24) Admits that he did not make direct complaints to Adam Barone and Jeffrey Mazur because he was told to go through supervisors for any problems. (See Plaintiff's SAMF, ¶ 42)**

75.    Instead, Meehan testified that he "didn't feel like [he] was supposed to bother [Barone or Mazur]" and "did not think it was [his] duty to report it to everyone." (*Id.* at 84-85, 179, 209.)

**Deny in part and admit in part. Deny that this statement is contingent upon Paragraph 74, above, by Defendant's use of the word, "Instead," in which Meehan has demonstrated that repeated complaints were made to supervisors and other REVS members. Admits that he did not make direct complaints to Adam Barone and Jeffrey**

**Mazur because he was told to go through supervisors for any problems. (See Plaintiff's**

**SAMF, ¶ 42)**

76.     Finally, in the entire time that Barone was in charge of the REVS Group, there have not been any ethical complaints regarding employees or work performed by the Group, nor has any REVS employee been disciplined for an ethical violation between 2008 and 2018. (Exhibit 2, Barone Dep. at 77-79.)

**Deny. In approximately 2014, PNC supervisor Greg Camburn left the appraisal group for another group within PNC after he reported PNC Manager Jeff Mazur to the HR Department for a violation of USPAP, and as Meehan believes, federal banking guidelines. (Meehan Interrogatory, Exhibit C, at p. 3)**

**REVS GROUP 2015 WORK RESTRUCTURING PLAN**

77.     Around August 2015, the REVS group determined that it needed to restructure the work allocation among Reviewers based on the reduced volume of appraisals to allocate across the Review team. (Exhibit 15, PNCMeehan 00250-254; Exhibit 16, PNCMeehan00281.)

**Objection. Lack of foundation. Exhibit 16 does not provide data for "appraisal assignments," as Defendant asserts. Exhibit 16 only speaks to the number of valuation requests, which compose of appraisal and non-appraisal assignment. (PNC Corp. Rep. Deposition by Adam Barone, Exhibit B, 81–83) The REVS group is responsible for valuation products, which includes appraisal and non-appraisal products. (PNC Corp. Rep. Deposition by Adam Barone, Exhibit B, 27–28 and 81–83) Review appraisers, like**

**Meehan, were only tasked with reviewing appraisal products. (Id.) Therefore, because Exhibit 16 combines appraisal and non-appraisal products it is not helpful in determining whether the REVS group experienced any decline in appraisal requests. Defendant has never provided any data showing a reduction in appraisal reviews or appraisal review requests.**

**Admit in part. The Work Restructuring Plan Summary states that there had been a decrease in the volume of appraisal reports for the prior year.**

78.     To that end, in August 2015, Schoenberg discussed with Meehan that there had been a decrease in work flow and a reduction in force was being considered. (Exhibit 1, Meehan Dep. at 231-233.)

**Deny in part and admit in part. Schoenberg only stated that he would not be surprised if there was a reduction in force. He never indicated to Meehan that such a reduction was being considered. (Meehan Deposition, Exhibit A, 230–231)**

79.     Barone and Mazur, working with PNC Human Resources, recognized that there was a decrease in workflow with the expectation that it would likely continue to decrease. Barone, Mazur, and Human Resources reviewed the work volume and the staffing available, and "came away with the understanding that [REVS Group] no longer needed three positions." (Exhibit 2, Barone Dep. 109.)

**Admit.**

80.     Together with PNC Human Resources, Barone and Mazur were tasked with assigning "weights" to certain core competencies across the Review team. (Exhibit 15, PNCMeehan00250-254; Exhibit 2, Barone Dep. 114-115.)

**Admit.**

81.    These core competencies and the weights assigned to them were similar to those outlined in the annual performance reviews for the Appraisal Reviewers: managing risk, productivity, customer, orientation, teamwork, and leading change. (Exhibit 2, Barone Dep. 116-118, 120-122.)

**Deny insofar as Defendant may have made a typographical error, intending to write "customer orientation," instead of "customer, orientation[.]" Also, the full name of this core competency was "Customer Orientation/Service/Satisfaction." (Restructuring Plan, Def. Sealed Ex. 17, at PNCMeehan00265) Admit the rest.**

82.    After the core competencies were determined, Paul Higgins, a supervisory manager for the Real Estate Appraisal Reviewers on the Review team, took the criteria and performed a ratings assessment for the members of the REVS Review team, which he gave to Human Resources. (Exhibit 2, Barone Dep. 114-115, 117-118.)

**Admit.**

83.    Each of the Real Estate Appraisal Reviewers and Administrative Assistants on the Review Team -- a total of 13 individuals -- was analyzed based on the agreed upon core competencies. (Exhibit 17, PNCMeehan00255-265.)

**Deny in part. Insofar as Defendant relied upon Paul Higgins' ratings assessments, PNC is not aware of how each individual was analyzed based on the agreed upon core competencies.  Plaintiff admits that individuals were analyzed, but denies that Defendant has put forward any evidence to demonstrate that the analysis was "based on the agreed upon core competencies." (See Plaintiff's SAMF, ¶¶ 50–55) Plaintiff also denies that all 13**

**individuals were analyzed based on the agreed upon core competencies, as evidence was only provided regarding the ten individuals in Meehan's Review Group. (Id.)**

84.    Ultimately, on September 23, 2015, a final memorandum outlining the results and the reasons for the Work Restructuring Plan, was finalized and signed between Human Resources and the REVS group. (Exhibit 17, PNCMeehan00255-265.)

**Deny. There is no evidence that the documents cited by Defendant were finalized or even submitted for review on September 23, 2015. Plaintiff denies that there is any evidence showing that Paul Higgins' ratings assessment was completed by September 23, 2015. Plaintiff denies the use of the terms "ultimately," "final," and "finalized."**

85.    The Work Restructuring Plan Summary stated:

PNC Bank supports a continuous improvement philosophy within our processes, services, and organizational structure to increase efficiencies and reduce expenses. **The Real Estate Valuations group has experienced a decrease in the volume of appraisal reviews over the past year and it is currently anticipated there will be no near term increases in volume.** The primary job duties of the Real Estate Valuations group is to perform technical reviews of real estate appraisals. In an effort to provide sufficient review work for our appraisal review staff a reduction of Real Estate Valuation Specialist Sr. positions is necessary.

Additionally, a part-time Administrative Assistant position in Cleveland was created to provide clerical support for the REVS Cleveland Team, This position handled overflow administrative duties created by work volume in excess of what the full time Administrative Assistant position could effectively manage. With the decrease in work volume, the clerical support by this part-time position in Cleveland is no longer needed and can be eliminated.

(Exhibit 17, PNCMeehan00255, emphasis added.)

**Admit.**

86.    As a result, PNC eliminated the positions of two Real Estate Appraisal Reviewers (Joseph Meehan and Matthew Green) and an administrative assistant in the REVS Group. (Exhibit 17, PNCMeehan00255-265; Exhibit 2, Barone Dep. at 124-125.)

**Deny in part regarding "as a result," as it is uncertain to what Defendant is referring.  Admit that the given reason for these eliminations was a Work Restructuring Plan.**

87.   To date, appraisal volume has continued to decrease.   (Exhibit 16, PNCMeehan00281; Exhibit 2 at 163-164.) Specifically, in 2013 the REVS Group processed 14,324 appraisal assignments. In 2017, the REVS group processed only 5,159 appraisal assignments. (Exhibit 16.)

**Objection. Lack of foundation. Exhibit 16 does not provide data for "appraisal assignments," as Defendant asserts. Exhibit 16 only speaks to the number of valuation requests, which compose of appraisal and non-appraisal assignment. (PNC Corp. Rep. Deposition by Adam Barone, Exhibit B, 81–83) The REVS group is responsible for valuation products, which includes appraisal and non-appraisal products. (PNC Corp. Rep. Deposition by Adam Barone, Exhibit B, 27–28 and 81–83) Review appraisers, like Meehan, were only tasked with reviewing appraisal products. (Id.) Therefore, because Exhibit 16 combines appraisal and non-appraisal products it is not helpful in determining whether the REVS group experienced any decline in appraisal requests. Defendant has never provided any data showing a reduction in appraisal reviews or appraisal review requests.**

**Admit in part. The Work Restructuring Plan Summary states that there had been a decrease in the volume of appraisal reports for the prior year.**

88.   In addition, not only has the REVS group not replaced or hired employees since

the elimination of Mr. Meehan's position; two other REVS employees have had their positions eliminated, and the REVS group has continued to downsize as employees have retired or taken positions with other banks. (Exhibit 2, Barone Dep. at 165-66; Exhibit 1, Meehan Dep. 208-209, 216-217.)

**Deny in part. Defendant's only evidence has been through Defendant's testimony. Admit that the appraisal reviewer group has less persons than when Plaintiff worked for Defendant.**

89.    Despite this, Meehan maintains that the reason for the elimination of his position within the REVS group was that he was "not given an equal share of appraisals to review and equal dollar value, and therefore [his] production was low because those assignments were late because [he] wouldn't approve them, and [he] wasn't production oriented as the way PNC would have [liked him] to have been." (Exhibit 1, Meehan Dep. at 146-147; *see also* 204-205.) Because Meehan would not "let things go through" he believes "[PNC] saw a way to get rid of [him]." (*Id.* at 147; 206.)

**Deny regarding the phrase, "Despite this," and for any suggestion that such a statement encompasses all of Meehan's claims. Admit that these statements reflect elements of Plaintiff's claims of wrongful discharge in violation of public policy.**

Respectfully submitted,

**CARTER LAW FIRM, LLC**

/s/ Jase Carter
Jase Carter, #63752
3407 S. Jefferson Ave., #109
St. Louis, MO 63118
(314) 675-1882
jase@carterfirm.law

29

*Attorney for Plaintiff Joseph Meehan*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on March 20, 2019, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification to all counsel of record.

/s/ Jase Carter
*Attorney for Plaintiff*