# EXHIBIT A

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOSEPH MEEHAN,                )
                             )
        Plaintiff,           )
                             )
v.                           ) No. 4:17-cv-02876-PLC
                             )
PNC FINANCIAL SERVICES       )
GROUP, INC.,                 )
                             )
        Defendant.           )

DEPOSITION OF JOSEPH MEEHAN

December 6, 2018
10:28 a.m.

Reporter:  John Arndt, CSR, CCR, RDR, CRR
CSR No. 084-004605
CCR No. 1186

**Page 2**

DEPOSITION OF JOSEPH MEEHAN, taken pursuant to Notice of Taking Deposition, before John Arndt, a Certified Shorthand Reporter and Certified Court Reporter, at The Carter Law Firm, 3407 South Jefferson Avenue, Suite 109, in the City of St. Louis, State of Missouri, commencing at approximately 10:28 a.m., on December 6, 2018.

APPEARANCES OF COUNSEL

On Behalf of Plaintiff:
        Carter Law Firm
        3407 South Jefferson, Suite 109
        St. Louis MO 63118
        (314) 675-1882
        BY:  MR. JASE C. CARTER
            jase@carterfirm.law
On Behalf of Defendant:
        Seyfarth Shaw LLP
        233 South Wacker Drive, Suite 8000
        Chicago, IL  60606
        (312) 460-5000
        BY:  MS. ROBYN E. MARSH
            rmarsh@seyfarth.com

**Page 3**

INDEX OF INTERROGATION
Examination by Ms. Marsh            Page 4
Examination by Mr. Carter           Page 244

INDEX OF EXHIBITS
Exhibit 1                           Page 50
Exhibit 2                           Page 62
Exhibit 3                           Page 65
Exhibit 4                           Page 71
Exhibit 5                           Page 74
Exhibit 6                           Page 88
Exhibit 7                           Page 95
Exhibit 8                           Page 102
Exhibit 9                           Page 106
Exhibit 10                          Page 116
Exhibit 11                          Page 116
Exhibit 12                          Page 139
Exhibit 13                          Page 143
Exhibit 14                          Page 148
Exhibit 15                          Page 151
Exhibit 16                          Page 160
Exhibit 17                          Page 190
Exhibit 18                          Page 205
Exhibit 19                          Page 215
Exhibit 20                          Page 222

(Exhibits are attached.)

**Page 4**

The witness, JOSEPH MEEHAN, first having been duly sworn, testified as follows:

QUESTIONS BY MS. MARSH:

Q.   Good morning, Mr. Meehan.  My name is Robyn Marsh.  I previously introduced myself.  I represent PNC in this matter.

A.   Uh-huh.

Q.   Have you ever been deposed before?

A.   Yes.

Q.   And what was the nature of your deposition?

A.   I had appraised some real estate property. I was being deposed for my value opinion for tax appeal purposes.

Q.   And when was that deposition?

A.   Mid-1990s.

Q.   So several years ago?

A.   Yes.

Q.   And have you ever been deposed in a personal capacity such as you were a plaintiff or a defendant in a lawsuit?

A.   No.

Q.   Is that the only time you've been deposed?

A.   It was two real estate appraisals.  So I was deposed twice.



JOSEPH MEEHAN
MEEHAN vs PNC FINANCIAL

December 06, 2018
5–8

Page 5

Q. And was it for the same matter or they were --

A. Two different properties.

Q. Two different properties? And since it was quite a long time ago I just want to refresh -- you've probably gone over this with your counsel, but I'd like you and I to be on the same page with respect to the rules of the deposition.

A. Uh-huh.

Q. Okay? A couple of things. As you can see, we have a court reporter here today taking down everything we say. It's really important that your answers be verbal and not uh-huhs, huh-uhs, shakes of the head, shrugs of the shoulder.

A. Okay. Uh-huh.

Q. So --

A. Just did it.

Q. We all do it.

A. Okay.

Q. And from time to time I may have to remind you. And I'm not trying to influence or change your answer. I just want to make sure that we have a clear record. Okay?

A. Yes.

Q. Secondly, because we want a clear record

Page 6

it's really important that you wait until I finish asking my question before you start your answer. Even though you might anticipate what my question is going to be we need to have a clear record, and hopefully I can do the same courtesy as well, but when we're having a conversation there is a tendency to speak over each other, so let's just be careful about that. Okay?

A. Yes.

Q. If you don't understand a question that I've asked you, please ask me to repeat it or rephrase it. I'm happy to do so.

A. Yes.

Q. If you do answer the question, I'm going to assume that you understood it as phrased. Is that fair?

A. Yes.

Q. And I don't know how long we're going to be here today. I don't anticipate it being until the midnight hour. But if you need a break, of course that is -- I'm happy to accommodate that. Just let me know, just so long as a question isn't pending. Okay?

A. Yes.

Q. You understand that you are under oath today?

A. Yes.

Page 7

Q. Do you understand what it means to be under oath?

A. Yes.

Q. What does it mean to you?

A. It means I have to tell the truth and I could be held responsible if I do not tell the truth.

Q. And are you under any medication or illness that would affect your testimony here today?

A. No.

Q. Mr. Meehan, what is your highest level of education?

A. I have a master's degree in business administration.

Q. And where did you earn that degree from?

A. The University of Missouri Columbia.

Q. And what year did you receive your MBA?

A. 1986.

Q. And your undergraduate degree?

A. I have a bachelor's degree in journalism.

Q. And where did you receive that from?

A. The University of Missouri Columbia.

Q. And the year?

A. 1977.

Q. Do you hold any other degrees aside from these two?

Page 8

A. No.

Q. Let's talk about any certifications you hold. What certifications do you hold?

A. State-certified general appraiser in the State of Missouri.

Q. And when did you receive that certification?

A. The early 1990s.

Q. And how did you receive that certification? Did you have to take certain qualifying classes or an exam?

A. You had to take an exam.

Q. And to maintain that certification what do you have to do?

A. You have to take continuing education classes every two years.

Q. Anything else?

A. No -- recall.

Q. Do you have to submit some sort of proof that you are taking those continuing education classes with the State of Missouri?

A. You just have to state that you're taking the classes. You don't have to prove that you did unless they ask for --

Q. Mr. Meehan, what did you do to prepare for



Page 9

this deposition today?

A.    Spoke to my attorney about this and watched a video on depositions.

Q.    And I don't want to know the content of your conversations with counsel, but did you review any materials related to this litigation prior to your deposition?

A.    Yes.

Q.    And what did you review?

A.    My interrogatory statements I made.

Q.    Anything else?

A.    Some files I had.

Q.    Personal files that you had?

A.    Information that we turn in to you guys.

Q.    I see.  Documents that were produced to us in discovery?

A.    Yes.  Yes.

Q.    Aside from meeting with your counsel, did you discuss your deposition testimony with anybody?

A.    No.

Q.    Mr. Meehan, are you currently employed?

A.    No.

Q.    I want to talk about your job history, starting with National City.  When did you start with National City?

Page 10

A.    2004.

Q.    And in what capacity?

A.    Real estate appraisal reviewer.

Q.    And by then you already had your certification, of course, from the early 1990s; correct?

A.    Yes.

Q.    Prior -- before we get into National City, where did you work prior to National City?

A.    I was a fee appraiser.  I also had my own corporation.

Q.    And how long did you have your own corporation?

A.    Approximately 1995.

Q.    Was that through 2004?

A.    Yes.

Q.    And why did you decide to join National City in lieu of continuing with your personal corporation?

A.    Interest rates were rising, business was slowing down, and had an opportunity to increase my income level.

Q.    Did National City approach you, or did you seek out employment with National City?

A.    I heard they were looking for appraisal

Page 11

reviewers in St. Louis.

Q.    And was your corporation from 1995 to 2004 also based in St. Louis?

A.    Yes.

Q.    So as I understand what you're saying, you applied to the job at National City?

A.    Yes.

Q.    And you started as a real estate appraiser; is that correct?

A.    Appraisal reviewer.

Q.    Pardon me.  A real estate appraisal reviewer; correct?

A.    Yes.

Q.    And that was in 2004.  How long did you hold that position for?

A.    Until National City was acquired by PNC Bank.

Q.    And when was that?

A.    Officially I believe it was 2010, but I think PNC took over in 2009.

Q.    What were your duties and responsibilities as a real estate appraisal reviewer at National City between 2004 and 2009?

A.    I ordered appraisals, scoped appraisals, reviewed appraisals.  Did some market research work.

Page 12

And we had to do appraisals -- a certain amount of appraisals.

Q.    You had to perform your own appraisals?

A.    Yes.

Q.    When you ordered appraisals, how would you do that?  Would you have a list of appraisers that you would go to that was approved by National City, or did you have your own contact list?

A.    We had a list approved by National City.

Q.    Were you assigned a circuit -- pardon me. Were you assigned a certain market territory?

A.    No.

Q.    Was it nationwide?

A.    It was mostly St. Louis.

Q.    Were you in any states outside of Missouri?

A.    I believe I order some -- maybe from Illinois.

Q.    Is it safe to say you were typically in the midwest area?

A.    Yes.

Q.    You also said you scoped appraisals?

A.    Yes.

Q.    What does that mean?

A.    Set up the parameters for what we wanted



Page 13

from an appraisal, such as do we want as is market value, as complete market value, as stabilized market value. Whether we needed the fee simple interest or the leased fee interest. Just describe the assignment -- what we expected.

Q. And then you would review appraisals, and what would that entail?

A. Entail reading the appraisal and checking for compliance with USPAP.

Q. And for the record, USPAP stands for?

A. Uniform standards of professional appraisal practices.

Q. And who sets those standards?

A. The government. Officially appraisal standards boards.

Q. The federal government?

A. The federal government. Yes.

Q. And so from time to time we're probably going to call it U-S-P-A-P. In fact, I will probably call it U-S-P-A-P and you will say "use-pap." Pardon me?

A. Yes.

Q. And so we'll understand we're talking about the USPAP, the uniform standards --

A. Of professional appraisal practices.

Page 14

Q. -- professional appraisal practices; correct?

A. Yes. Yes.

Q. Okay. Because I don't think either of us wants to repeat that mouthful.

A. Good. That's --

Q. So you would review appraisals that were provided to you and make sure that they were compliant with USPAP. What would that entail generally speaking, to make sure that they comply with USPAP?

A. The standards set out in USPAP that are required to do an appraisal and to report an appraisal.

Q. I understand that appraisals may be different, but are there certain standards that every single appraisal must meet?

A. Yes.

Q. And can you do -- can you highlight what those standards are for me without reading back all of the standards verbatim or give me high points?

A. Yes.

Q. Please do.

A. They have to identify the client, the intended user, the intended use. Contain a definition of market value. You have to address the scope of the assignment, address the highest and best use of the

Page 15

property.

Q. I'm sorry. Address the --

A. Highest and best use of the property. Has to address zoning, the legal use of the property. Has to define the date of the report, the effective date of the appraisal, any extraordinary assumptions (inaudible) conditions, any hypothetical conditions, and perform the most appropriate valuation approaches necessary. Do you want details on --

Q. No, the appropriate valuation as necessary? Is that what you said?

A. Appropriate valuation.

Q. So the appropriate valuation would probably be on a case-by-case basis depending on the property that is being appraised? Is that fair to say?

A. Yes.

Q. So the valuation would differ between a residential property and a commercial property, depending on the market?

A. I'm not sure I understand your question. The valuation to me means something different.

Q. What does the valuation mean to you?

A. It means the market value of the property and how to do it.

Q. Right. So you would value maybe a

Page 16

residential property in a downtown area different from a commercial property in a suburban area --

A. Yes.

Q. -- depending on the neighborhood and the market value; correct?

A. Yes.

Q. Generally speaking, with a lot of other factors that go into it?

A. Yes.

Q. In other words, there's no one type of valuation process?

A. Can you rephrase that?

Q. Sure. If you looked at a residential property, a commercial property, and then a blank -- vacant piece of land, you would not value all of the land the same if they were in different areas?

Let me say that again. If you had a residential property in an urban neighborhood, a commercial property in a suburban neighborhood, and a vacant piece of land in a rural area, you would not use the same valuation approach necessarily for every single property.

A. Most would have the sales comparison approach.

Q. Pardon me?



Page 17

A.   Most of those would have the sales comparison approach.

Q.   Okay.  And what would that entail?

A.   Gathering and analyzing comparable sales, comparing them to the subject property.

Q.   And you say most.  What would an exception be?

A.   Typically residential appraisals done on forms would not contain an income approach unless the dwelling was rented.

Q.   So based on that, you would agree that there's not one single approach to valuing properties?

A.   Yes.

Q.   So in the 2004 to 2009 period with -- when you were with National City, you had a host of responsibilities with respect to appraisals; correct?

A.   Appraisal and appraisal review, yes.

Q.   And you also mentioned that you would do market research work and perform your own appraisals; correct?

A.   Yes.

Q.   And can you tell me what kind -- how many appraisals you were required to do on an annual basis, if it was a requirement?

A.   We had to -- a certain dollar amount per

Page 18

year.  It would depend on the dollar value of the appraisal.

Q.   Do you recall what that dollar amount was?

A.   Not exactly.

Q.   Could you approximate how many appraisals you would do on an annual basis for National City?

A.   15, approximately.

Q.   And that would ebb and flow depending on the year, probably?

A.   Depending on the value assigned to the appraisal.

Q.   And would that mean the commercial properties, or would it be a mix of residential and commercial?

A.   Primarily commercial properties.

Q.   When you would order the scope of appraisals -- or set the scope of appraisals and order appraisals, would you be the one to review those appraisals that came in?

A.   Yes.

Q.   So you were in the chain of command from beginning to end with respect to a certain appraisal in those instances?

A.   Yes.

Q.   Is that correct?

Page 19

A.   Yes.

Q.   Would you have any intermediary to assist you in that outsourcing of an appraiser or turning it over to the bank, or was it just you?

A.   We had an administrative assistant that might send out a letter.

Q.   Did you have a supervisor in your position?

A.   Yes.

Q.   And who was that?

A.   Tom Silnes.

Q.   S-I-L-N-E-S?

A.   Yes.

Q.   And would he review your work?

A.   I think he looked at one appraisal report.  He did not review my work.

Q.   So if you -- if -- when you finished your work, would you be the one to certify that you had reviewed it and it conformed with USPAP standards and all of those certification procedures after you had finished reviewing it?

A.   Yes.

Q.   And then what would you do with the report?

A.   We would give it to the loan officers so

Page 20

they could proceed with their loan.

Q.   And when you say we, would you personally do it or would the administrative assistant do it?

A.   I would do my own and we uploaded -- for a while we uploaded to their database.

Q.   You -- National City had a database that you would upload the reports to?

A.   Yes.

Q.   And would the loan officer pull it down from the database or would you e-mail it to the loan officer?

A.   Probably both.

Q.   So it sounds like you had a significant amount of autonomy in your position at National City.  Is that fair?

A.   Yes.

Q.   You mentioned that National City was acquired by PNC in approximately 2009.  How did you learn about the acquisition?

A.   I don't recall exactly.  Just we were told we were being bought out.

Q.   I could have phrased that better.  Did you understand that your job would be transitioning over to PNC and that you would still stay employed as part of the acquisition?



Page 21

A.   Not immediately.

Q.   How did you learn that that would happen?

A.   I don't recall exactly.

Q.   Did your job transition over to PNC?

A.   Yes.

Q.   And did you maintain the same position as a real estate appraisal reviewer?

A.   For the short-term.

Q.   And when you say that, what does that mean?

A.   Can we back up a second?  You said reviewer?

Q.   Correct.

A.   Sometimes you interchange that with appraiser, I think.  But can I explain?

Q.   Please.

A.   When PNC first took over I still ordered and reviewed appraisals and later transitioned to just being a reviewer only.

Q.   What was your title when you transitioned over to PNC?

A.   It changed.  They changed it.

Q.   But initially your duties were essentially the same as what you had at National City when you first transitioned over to PNC?

Page 22

A.   For the first few months or so, yes.

Q.   And then something changed?

A.   Yes.

Q.   And what changed?

A.   I no longer ordered appraisals or scoped them or bid them out.

Q.   Did you perform any of your own appraisals?

A.   No.

Q.   And why was that?

A.   PNC policy did not want us or expect us to do appraisal work.

Q.   When you transitioned over to PNC, was Tom Silnes -- if I'm saying that --

A.   Silnes.

Q.   Silnes.  Was he still your supervisor?

A.   Initially he might have been.

Q.   Who did you report to then when you were at PNC in 2009?

A.   Jeff Rettstatt, Steve Mustain.

Q.   Steve?

A.   Mustain.

Q.   Do you recall what their titles were?

A.   No, now it's changed.

Q.   But they were directly above you and you

Page 23

would report to both of them?

A.   Steve was directly above me.  Jeff officially was above him, I believe, at that time.

Q.   So if you had an issue or a question with a particular appraisal, is it fair to say you would have gone to Steve Mustain first before going to Jeff Rettstatt?

A.   It depended on the issue.

Q.   Okay.  Can you give me an example of when you would go to Jeff Rettstatt over Steve Mustain?

A.   If Jeff called me to talk about something I would go to him.

Q.   Such as?

A.   We had a property, apartment complex.  I couldn't get the appraisal revised because the appraiser had died in an auto accident, so I couldn't get corrections made since the guy is no longer alive, so I worked with Mustain and Jeff to figure out what to do with that property.

Q.   For a general proposition, though -- I understand there are exceptions -- if you had an issue with a particular property or any particular appraisal, rather, would you go to Steve first before going to Jeff?

A.   Yes.

Page 24

Q.   From 2009 to 2012, did your title change at all at PNC?

A.   I was an assistant vice-president, and I was told not to include that on my e-mails.

Q.   When were you assistant vice-president?

A.   At National City.

Q.   I'm talking about at PNC.

A.   And at PNC.

Q.   So let's back up.  When you were assistant -- when did you become assistant vice-president at National City?

A.   I was hired as assistant vice-president.

Q.   That was the position you were hired in in 2004?

A.   That was my title, yes.

Q.   Assistant vice-president of a particular division or of the entire bank?  What was your --

A.   Of the real estate group.

Q.   And then who was the vice-president and president of that group?  If you remember.

A.   No, I think -- no, do not remember.

Q.   You don't remember?

A.   No.

Q.   Is that a no?  Sorry.

A.   That's a no.



Page 25

Q.   Were there any other assistant vice-presidents of the group?

A.   Yes.

Q.   Who were they?

A.   Joseph Rose.

Q.   Anybody else?

A.   I believe Tom Silnes was an assistant vice-president.

Q.   Anybody else?

A.   Not that I'm certain of.

Q.   So that was prior to 2009 --

A.   Yes.

Q.    -- when PNC acquired National City; correct?

A.   Yes.

Q.   And when PNC acquired National City I understand that you went over to PNC.  Did Tom Silnes go over to PNC?

A.   Yes.

Q.   And did Joseph Rose go over to PNC?

A.   Yes.

Q.   Who else from your group at National City went over to PNC?

A.   List all the names?

Q.   Well, could you -- how many people do you

Page 26

think?

A.   Everyone, except one person did not go.

Q.   How large -- let me back up.  How large was your group at National City, approximately?

A.   12 to 15, 18 people.

Q.   And you said all but one went over to PNC?

A.   He went to another bank, yes.

Q.   And who was that, if you remember?

A.   No, I don't remember his name.

Q.   So then in 2009 there is the transition over to PNC, and you said your position changed; is that right?

A.   My duties?

Q.   Well, your duties changed but you said you were no longer assistant vice-president.  Is that right?

A.   I was told I could not use that title in my e-mail.

Q.   Who told you that?

A.   Jeff Mazur.

Q.   When did he tell you that?

A.   Early on.  2010, 2011.

Q.   So in 2009 through 2010 and 2011, you were using assistant vice-president in your e-mails?

A.   Yes.

Page 27

Q.   Did he put it in writing?

A.   I don't believe -- I don't recall.

Q.   And why did he tell you you couldn't do that?

A.   Can I rephrase that answer?  It may have been my supervisor told me we couldn't do that.

Q.   And who was your supervisor?

A.   At that time, Steve Mustain.

Q.   And why did he tell you you couldn't do that?

A.   It's my understanding PNC did not have an assistant vice-president position.

Q.   So aside from the title and the change in duties and responsibilities when you moved over to PNC such that you weren't ordering appraisals, scoping appraisals, or performing your own appraisals, it sounds like you were primarily reviewing appraisals.  Is that fair?

A.   Yes.

Q.   Aside from reviewing appraisals at PNC, would you do anything else as part of your duties and responsibilities?

A.   We in the group were asked to participate in some training classes for administrative people.

Q.   Such that you would provide training to

Page 28

the administrative people?

A.   No, we'd put on a program describing, say, what the income approach was about in a group conference call.

Q.   And do you know what the purpose of those training sessions were?

A.   To train administrators to understand what they were -- what was involved in appraisals -- appraisal reviewer.

Q.   And what would the administrative staff do for you at PNC?

A.   I didn't have administrative staff.

Q.   So who was the administrative staff that you were training?

A.   They were part of the supervisory appraiser group.

Q.   And what part of the group were you -- what -- sorry.  What group were you in at PNC?

A.   The appraisal review group -- technical appraisal review group.

Q.   And was there a master umbrella over the supervisory appraisal group and the technical appraisal review group?

A.   Could you rephrase that?

Q.   Sure.  Were both of those groups -- the



Page 29

supervisory appraisal group and the technical appraisal group -- part of the real estate valuation services group?

A.    Yes.

Q.    Was that the master group?

A.    Yes.

Q.    Thank you.  It's often abbreviated as REVS -- R-E-V-S?

A.    Yes.

Q.    Were there any other subgroups within the real estate valuation services group?

A.    There was a supervisory appraiser group and a reviewer group.

Q.    And so those were the two main groups with -- underneath the real estate valuation services umbrella?

A.    Yes.  Some of the people did some things I wasn't familiar with, like the residential -- they'd order residential appraisals or something.  I don't know --

Q.    Where they fit?

A.    Where they fit, yes.

Q.    What was the job or the duties of the supervisory appraisal group?  I know you weren't in that group, but if you know.

Page 30

A.    They scoped appraisals, bid appraisals, and ordered appraisals.

Q.    And then the technical appraisal group which you were in reviewed appraisals?

A.    Yes.

Q.    Is that fair?

A.    Yes.

Q.    So based on that bifurcation of work, it sounds like the supervisory group did all of the duties that you were no longer doing that you had previously done at National City.  Is that fair?

A.    They did part of the duties, yes.

Q.    Well, of course you still reviewed?

A.    But they reviewed also.

Q.    They did review?  Okay.  So they scoped, they bid, they ordered, and they reviewed?

A.    I believe they did.

Q.    Would they review on top of what the technical appraisal group had reviewed, or would they review separate appraisals?

A.    I believe they had to do both, but I didn't work for that group.

Q.    So you don't know for sure?

A.    No.

Q.    Was that a no?

Page 31

A.    No.

Q.    How many people were in the technical appraisal group where you worked in 2009?

A.    12 to 18.

Q.    Was it essentially the same people that you had worked with at National City?

A.    Yes.

Q.    Do you remember all of their names?

A.    No.

Q.    Were all of the 12 to 18 people in the same position as you such that they would appraise -- pardon me -- they would review appraisals?

A.    Yes.

Q.    And I apologize if I already asked you this, but who was your superior or your supervisor, rather, in 2009 at PNC?  Oh, I'm sorry.  Was that Steve Mustain and Jeff Mettstatt -- Rettstatt?

A.    No, that wasn't until 2010, probably.  2009 would be Tom Silnes --

Q.    It was still --

A.    -- or perhaps Charles Buttle.

Q.    I'm sorry.  Charles --

A.    Buttle.

Q.    Can you spell that, please?  B-U-T-T-L-E?

A.    Yes.

Page 32

Q.    So in 2010 it transitioned that Steve Mustain and Jeff Rettstatt would have been your superiors -- or excuse me -- your supervisors?

A.    Yes.

Q.    And how long were they your supervisors?

A.    I believe Mustain left in 2011, 2012.  And Jeff Rettstatt left not too long after that.

Q.    They left PNC?

A.    Yes.

Q.    So in 2012 who became your supervisor?

A.    Tom Silnes.

Q.    And he was your direct supervisor?

A.    My direct supervisor, yes.

Q.    Do you know what his title was in 2012?

A.    Team leader or -- it changed, I believe.

Q.    Who was the manager or the president or whatever word you want to use of the entire real estate valuation services group?

A.    Adam Barone was in charge of the group.  Who did he report to is your question, or --

Q.    No, I want to know who was in charge of the entire group, and I think you answered that it's Adam Barone.

A.    Adam Barone.

Q.    And then would who -- Tom Silnes be



Page 33

directly below Adam Barone, or were there people between Tom Silnes and Adam Barone?

A. Greg Camburn took over for Jeff Rettstatt.

Q. Greg --

A. Greg Camburn. C-A-M-B-U-R-N.

Q. And was he above Tom Silnes?

A. Yes.

Q. Any other people between Greg Camburn and Adam Barone?

A. Jeff Mazur was in there, but I never -- Jeff Mazur was important, but I don't know how to describe his position.

Q. So you don't know where he fell in the ranks between Adam Barone and Tom Silnes but you know he lives up -- somewhere in there?

A. Involved, yes.

Q. Anybody else in the upper level management, if you will, besides Jeff Mazur, Greg Camburn, and Adam Barone?

A. At that time, no.

Q. And this is specifically 2010 to 2012 we're talking about? Is that fair?

A. Yes. Yes.

Q. So in 2012 it sounds like things changed. Mustain had left, Rettstatt had left. Did new people

Page 34

come -- other new people come in that affected upper level management?

A. No. Greg Camburn was the one -- the new person.

Q. He was the only new --

A. Yes.

Q. When you were at National City through 2009 -- 2004 to 2009 -- would you receive performance reviews?

A. Yes.

Q. And who would do those performance reviews with you?

A. Tom Silnes.

Q. And how were they performed? Were they handwritten? Was there a form? Or was it a formal process? How would that go?

A. There was a formal process where -- kind of see it, identify strengths, abilities, goals.

Q. And you mentioned that there was a certain financial number or target that you had when you were at National City, correct, with respect to appraisals?

A. Yes.

Q. And did you have any other benchmarks that you had to achieve when you were at National City?

A. I don't recall.

Page 35

Q. When you transitioned over to PNC --

A. Yes.

Q. -- starting 2009, 2010, were you given a set amount of benchmarks of what your annual goals were as a appraisal reviewer?

A. Yes.

Q. And what were those benchmarks?

A. Initially, seven-and-a-half reviews per week.

Q. And when you say initially, would this be 2009?

A. 2010.

Q. I'm sorry. Could you please repeat that? Seven reviews per week?

A. 7.5 reviews per week.

Q. Anything else? Any other benchmarks?

A. No.

Q. And I apologize. You may have said this. Was this a mix of residential and commercial review -- appraisal reviews that you were doing in 2009, 2010?

A. No. Commercial.

Q. And by this time you were solely doing reviews? You were not scoping, ordering, commissioning, or performing your own appraisals; correct?

Page 36

A. Correct.

Q. So your sole property would be to do seven-and-a-half appraisal reviews per week?

A. Initially.

Q. Initially? When did that change?

A. Somewhere around 2011.

Q. And what were the new benchmarks or the new goals?

A. We had to perform $120,000 worth of reviews per year.

Q. And how was that valued? How would you meet that? Was it the value of the property? Was it the value of the appraiser fees? How did you know to calculate $120,000?

A. The reviews were ascribed a dollar amount.

Q. By whom?

A. The supervisory appraisers ascribed it.

Q. So hypothetically speaking --

A. Yes.

Q. -- you could have one review that was valued as $100,000, which would be great because -- for your annual goal, and then another one -- another two each valued at $10,000, and that would be your goal for the year; correct? I know that didn't happen, but that could happen?



Case: 4:17-cv-02876-PLC   Doc. #: 64-1   Filed: 03/20/19   Page: 11 of 64 PageID #: 725

JOSEPH MEEHAN
MEEHAN vs PNC FINANCIAL

December 06, 2018
37–40

Page 37

A. No, those are too extreme.

Q. Well, I'm just saying they would be assigned a value?

A. Yes.

Q. And you would get to $120,000 for a year? That was your goal?

A. I'm not sure I understand --

Q. For simplicity's sake, I'm just trying to give three examples.

A. Okay.

Q. You could have one valued at $100,000, which I understand you didn't.

A. Uh-huh.

Q. That would mean you did three appraisals in a year.

A. Right.

Q. When I'm guessing did not happen.

A. Right.

Q. One at $100,000, one at $10,000, and another at $10,000, and then you would have met your goal for the year?

A. Hypothetically, yes.

Q. Hypothetically, yes. And you never set the value of the appraisals; correct? That came from the supervisory group?

Page 38

A. The appraisal reviews, yes.

Q. So was the value set before you ever received the appraisal to review?

A. Yes.

Q. How would you -- how was work distributed in your group? How would you get an appraisal to review?

A. I get an assignment -- an e-mail assignment saying you need to review this report.

Q. Who would the e-mail come from?

A. The LINKS system.

Q. L-N -- L-I-N-K-S?

A. L-I-N-K-S. The LINKS system.

Q. So it was an automated e-mail?

A. Yes.

Q. Not from a particular person?

A. No.

Q. So if there were 12 real estate appraisal reviewers in your group --

A. Yep.

Q. -- would everyone receive an e-mail from the LINKS system saying a new appraisal needed to be approved and then whoever was available would take it, or was there an order that people would receive appraisals and then it would repeat?

Page 39

A. No to both.

Q. Okay. Tell me how it would work that work was allocated?

A. Someone would assign a review to a reviewer.

Q. Who is someone?

A. Generally Greg Camburn.

Q. You said generally. Would somebody else do it?

A. Other people might have had the opportunity.

Q. Like who?

MR. CARTER: And for clarification, are we talking about 2012, or just in general?

MS. MARSH: Well, I think we're talking 2011 forward.

MR. CARTER: Okay.

MS. MARSH: When he had his $120,000 annual goal.

Q. (By Ms. Marsh) Is that correct?

A. I don't believe Greg Camburn was there at that time. It kind of blended together.

Q. So when would you start receiving assignments through the LINKS system? Would it have been in 2010?

Page 40

A. Yes.

Q. Would work be assigned based on the availability of the reviewer and making sure that there wasn't a bottleneck at some point to make sure the appraisal got done in a certain amount of time based on everybody's availability? Is that fair?

A. I didn't do that. I didn't assign them. So I'm not sure what they really did.

Q. Well, if you had five appraisals sitting in your queue and somebody next to you had no appraisals, is it fair to say the person with no appraisals would probably get the next available appraisal to review as opposed to you?

A. I don't believe that's how it officially worked.

Q. How do you believe it worked?

A. I believe if someone reviewed something previously it would go back to them again, so whether they had five on their queue or not, or if it was a St. Louis job it might come to a St. Louis reviewer versus another place. Or some people seemed to specialize in reviews. It might go to them.

Q. Did you see any -- so it was -- sorry. Let me start over. So it seemed to be on a case-by-case basis how work was -- how appraisals were



800.211.DEPO (3376)
EsquireSolutions.com

Page 41

allocated based on what the actual appraisal was; is that fair?

A.   I don't know.

Q.   Well, you weren't involved in it but you mentioned that it would depend if it was a St. Louis property for a St. Louis reviewer, special expertise, there were a lot of factors that probably went into it. Is that fair?

A.   I asked my supervisor one time how it was done, and he said he didn't know.  He couldn't tell me.

Q.   You asked what supervisor when?

A.   Tom Silnes how reviews were assigned.

Q.   When was that?

A.   When was that?

Q.   Uh-huh.

A.   He was there -- before he left -- 2012, probably.

Q.   And did you ask him in writing?

A.   No.

Q.   And he said he didn't know?

A.   Yes.

Q.   Was he responsible for allocating the assignments?

A.   Sometimes, I believe.  When somebody was on vacation he might have done it.

Page 42

Q.   Whose responsibility was it to distribute the appraisals?

A.   Greg Camburn did it most of the time.  Jim Dawson did it for some people or his group or region.

Q.   Who's his group?

A.   He was primarily out of Texas.

Q.   Was he part of your group, the technical review group?

A.   He had the same duties of Camburn for his area of the group.

Q.   My question was was he part of the technical review group?

A.   He had a different title probably.

Q.   My question was was he part of the technical review group?

A.   And not the supervisory group, yes.

Q.   So you don't really know how appraisals were assigned to reviewers?

A.   Correct.

Q.   So from 2009 to 2012, your responsibilities at PNC were to review commercial appraisals; correct?

A.   I'm struggling with this, because 2009 we still worked for National City.  We still did National City duties --

Page 43

Q.   That's fair.

A.   -- until PNC said you no longer should do those duties; do this.

Q.   So would you say officially in 2010 is when you were with PNC and primarily doing reviews of commercial properties only -- review of appraisals of commercial properties only?

A.   Middle of 2010 and on, probably.

Q.   Middle of 2010?

A.   Yes.

Q.   June-ish 2010?

A.   I just remember still cleaning up stuff from National City in the transition period.

Q.   Between 2012 and 2015 --

A.   Yes.

Q.   -- did your position cha -- your duties and responsibilities change at all at PNC?

A.   No.

Q.   And so to be clear, you were still reviewing commercial property appraisals?

A.   Yes.

Q.   Were you doing any residential properties?

A.   No.

Q.   From 2012 through 2015, who was your direct supervisor?

Page 44

A.   Doug Schoenberg.

Q.   S-C-H-O-E-N-B-E-R-G?

A.   Could be U-R-G.  I'm not sure.  I don't recall.

Q.   We'll see on the documents.  And what was his title, if you know?

A.   Team leader, team supervisor.

Q.   So aside from you, who else was on the team that he managed or led or supervised in his position?

A.   Joe Rose, Andy Donaldson, Darlene Trimble. I believe Oscar Hill, and another guy, Bill, might have been officially under him.

Q.   I'm sorry.  I didn't hear what you --

A.   Bill.  Bill.  I can't think of his last name.  Bill Eckert, perhaps.

Q.   I missed a name you said in there.  It was Joe Rose, you, Mr. Meehan, Darlene Trimble, Oscar Hill, Bill maybe Hecker and --

A.   Eckert.  Bill Eckert.

Q.   Oh, Eckert.  I'm sorry.  And you mentioned another name and I missed it.

A.   Andy Donaldson.

Q.   And each of these individuals that you just named held essentially the same position as you



Page 45

where they would review appraisals?

A. Yeah. Mike Reini. I'm sorry -- on here too -- yes.

Q. And all of you reported to Doug Schoenberg?

A. Yes.

Q. Who did Doug Schoenberg report to?

A. Greg Camburn.

Q. And was Jeff Mazur still part of the real estate valuation services group?

A. Yes.

Q. And was Adam Barone still a part of the group?

A. Yes.

Q. And they were above Doug Schoenberg?

A. Jeff Mazur took over a different sector of the group, so I don't know if he was still officially over Doug or not.

Q. Were there any -- was there anybody else in upper-level management aside from above or relative to Doug Schoenberg that you could have spoken to besides Greg Camburn, Jeff Mazur, or Adam Barone if you had an issue with your work?

A. Not in my group, no.

Q. Did the real estate valuation services

Page 46

group -- was it -- strike that. Do you know if there was somebody outside of the real estate valuation services group that you could have gone to if you had an issue?

A. Not personally, but ethics department.

Q. And where was the ethics department?

A. Pittsburgh.

Q. Was it a hotline? Was it a person? Was it a bunch of people?

A. Don't know.

Q. And how did you know about the ethics department?

A. Through corporate training programs.

Q. Would you receive corporate training on a monthly basis, annual basis?

A. We had to take the corporate conduct and ethics class annually.

Q. Was that for -- you said we. Was that everybody in the real estate valuation services group?

A. Yes.

Q. Between 2012 and 2015, did you always report to Doug Schoenberg?

A. After Silnes left, yes.

Q. And Silnes left in -- approximately sometime in 2012?

Page 47

A. Yes.

Q. Are you okay? Do you need a break at all?

A. I'm ready for a break.

Q. You are ready for a break?

A. Yes.

Q. Okay. Why don't we take five minutes?

[A brief recess was taken.]

Q. Okay. Back on the record. Mr. Meehan, when we talked about the transition from National City over to PNC, 2009 to 2010 time frame, there was obviously a change in your responsibilities as a real estate appraisal reviewer?

A. Yes.

Q. And you -- how did you learn about the changes in what your position or your duties and responsibilities would be for PNC?

A. We had meetings between our group, National City people, and from my direct supervisor.

Q. Who at the time was Tom Silnes?

A. Silnes, Buttle, yes.

Q. And when you say the group, meetings with the group -- who would that be? You mean PNC, the real estate valuation services group?

A. More the National City group.

Q. Meaning the group that you were affiliated

Page 48

with before you transitioned over to PNC?

A. As we were transitioning, yes.

Q. And did you undergo any specific training when you officially transitioned over to PNC for what the scope of your position would be?

A. We had a conference in Pittsburgh where we were told by Adam Barone, Jeff Mazur, Jeff Rettstatt, what our duties would be, what was expected of us, how we should do our job.

Q. Was that in 2009? When was that?

A. 2010, 2011.

Q. I'm sorry. Did you say it was run by Jeff Mazur and Jeff Rettstatt?

A. They all presented. Adam, Jeff, and Jeff.

Q. Adam as well? Adam Barone?

A. Yes.

Q. And at that conference, was it specific to the real estate valuation services group, so they were presenting to approximate -- the 12 to 18 of you that had transitioned over from National City?

A. Yes.

Q. Anybody else that was present for that conference?

A. Some of the people from Pittsburgh were there who worked under Adam and Jeff.



Page 49

Q.   Who were they?

A.   I remember Luke Laverka.  Couple other people -- I don't recall their names at the time.

Q.   But they worked under Adam and Jeff Mazur?

A.   They worked in Pittsburgh.

Q.   I understand you don't necessarily know the hierarchy of command --

A.   They were --

Q.   But was it your understanding that they worked with Adam Barone and Jeff Mazur?

A.   They worked for their group.

Q.   The real estate valuation services group?

A.   Yes.  I believe they ordered appraisals and --

Q.   How long was the conference?

A.   I believe it was two days.

Q.   When you came out of the conference, what was your understanding of what your duties and responsibilities would be as a real estate appraisal reviewer on behalf of PNC?

A.   I believe we would review appraisals.

Q.   Pardon me?

A.   We would review appraisals.  They wanted compliant appraisals.  They wanted us to check the math.  And they wanted the right value.  Then wanted us

Page 50

to trust the appraiser, trust the appraiser's opinions.  That's basically what I recall from that.

Q.   And did those duties and responsibilities comport with basically what you were doing in your position as a real estate appraisal reviewer at National City?

A.   Yes.

[Exhibit 1 marked for identification.]

Q.   Mr. Meehan, I'm handing you what's been marked as Exhibit 1, Bates Number MEEHAN003706 through 3744.  What is this document?

A.   The PNC real estate valuation services procedures.

Q.   And I understand this was effective November 1, 2014, and this was part of your production.  Are those your handwritten notes on the front?

A.   Yes.

Q.   If you go to the second page, Bates Number MEEHAN3707, it lists primary changes from the prior version to that current version.  Do you see that?

A.   What page was that?

Q.   The second page.  These should be double-sided.

A.   Okay.

Q.   Do you see that, where it lists the

Page 51

primary changes?

A.   Yes.

Q.   Were these updated on an annual basis?  Do you recall?

A.   I don't believe they were done annually.

Q.   Pardon me?

A.   I don't think changes were done annually --

Q.   How often do you think they were done?

A.   I don't recall.

Q.   When you received notice of the changes, were the changes anything substantial such that you would have to change how you performed your duties and responsibilities?

A.   I don't recall any particular changes at this time.  I don't think it would have.

Q.   From 2012 to 2015 and after you had attended this conference in Pittsburgh, did any of the procedures or policies of PNC change with respect to how you performed your function as a real estate appraisal reviewer?

A.   No.

Q.   So I'd like to go to the first page, the preface.  It's Page 5 of 39, and it says MEEHAN Bates Number 3710 in the bottom right-hand corner.  Do you

Page 52

see that?

A.   Say that again, please.

Q.   It's Page 5 of 39, Bates Number MEEHAN003710.

A.   Okay.  Yes.

Q.   That's the preface.  At the top it reads for the summary, PNC has established a policy which conforms to the appraisal policies and standards of the federal regulatory bodies.  This policy and related procedures set forth the minimum standards for obtaining valuation products, parentheses, appraisal and non-appraisal, close parentheses, applicable to all commercial loans secured with real property.  Did I read that correctly?

A.   Yes.

Q.   It reads under purpose, the purpose of this, the PNC commercial real estate appraisal procedures manual, hereinafter the procedures manual, is to set forth the procedures to be implemented by PNC for all commercial loans which are secured with real property which require the service of an appraiser consistent with the goals established by the appraisal policy.

Specific procedures have been outlined with the intent to maximum the quality of the appraisal



JOSEPH MEEHAN
MEEHAN vs PNC FINANCIAL

Page 53

report, the timeliness of its completion and acceptance, and the overall operating efficiency of the appraisal process. Did I read that correctly?

A. Yes.

Q. And then there are several chapters and it outlines -- for example, in Chapter 1, the organizational structure -- excuse me -- the organizational structure of the real estate valuation services department; correct?

A. Yes.

Q. And if you look at Section 1.1.8 on Page 7, it says reviewer. And that's performing nontechnical reviews of real estate valuation reports. Would that be you?

A. No.

Q. Where would you fall in the organizational structure, then?

A. 1.1.7.

Q. As the appraiser?

A. Yes.

Q. So it says -- it lists out three bullet points. Number 1 is reviews appraisal reports for compliance with federal regulatory policies, PNC appraisal policy and procedures, and generally accepted standards as evidenced by the uniform standards of

Page 54

professional appraisal practice, which we already did our handy-dandy acronym of USPAP.

A. Yes.

Q. Number 2, recommends changes to an appraiser's approval status, and Number 3, in bold, all appraisers are state-certified appraiser and are required to attend continuing education classes. Appraisers also attend periodic in-house training sessions. Did I read that correctly?

A. Yes.

Q. And does that generally conform with what you understood your role to be at PNC?

A. Yes.

Q. And if you look at the table of contents, it goes through several chapters. So there's the organizational structure, which we went through. Then Chapter 2 defines the minimum appraisal standards. Is that correct?

A. Yes.

Q. And then Chapter 3 has an approved appraiser list; correct?

A. Yes.

Q. And again, you were never in charge of hiring or retaining an outside appraiser; is that correct?

Page 55

A. In National City I was.

Q. I'm talking about at PNC.

A. In the -- after the transition period, yes. Wait a minute. Or no. I was not -- could you rephrase that again quickly?

Q. Sure. When you were at PNC officially --

A. Officially. Okay.

Q. -- you were not charged with outsourcing or choosing an appraiser to conduct an appraisal of a certain property; is that correct?

A. Correct.

Q. Who was in charge of doing that?

A. The supervisory appraisers group.

Q. And so -- but you understood that there was an approved appraiser list that PNC had?

A. Yes.

Q. And Chapter 4 deals with when to order an appraisal; correct?

A. Yes.

Q. And then Chapter 5 deals with appraisal evaluation ordering process; correct?

A. Yes.

Q. And then Chapter 6 deals with appraisal evaluation review process. Do you see that?

A. Yes. Yes.

Page 56

Q. And that would primarily apply to you, would it not, in your position at PNC?

A. Not the evaluation portion.

Q. Okay. Well, let's go to Page 31 for Chapter 6.

A. Okay.

Q. Are you there?

A. Yes.

Q. Under the summary it reads all valuation products, parentheses, appraisal/evaluation, close parentheses, required by PNC real estate appraisal policy must be reviewed and accepted prior to final credit decision. Did I read that correctly?

A. Yes.

Q. And then under responsibility it reads PNC REVS, which we know stands for the real estate valuation services group, has the responsibility for reviewing all appraisal and evaluation products of real estate taken as collateral for all commercial loan exposures. Did I read that correctly?

A. Yes.

Q. And then it lists out what the objective is and then has several subheadings for the process with respect to the review. Is that fair?

A. Yes.



Page 57

Q. Under appraisal review responsibility, Number 6.2, it says the responsibility for the review and acceptance of an appraisal report is determined by loan purpose and transaction value. PNC REVS is responsible for managing all appraisal reviews using a risk-based approach. The review process is directed by the type of loan, amount of loan, and the relative risk of the transaction based on a customer PD rating. Based on these factors, either a compliance, administrative, or technical review is performed. What is customer PD rating?

A. I don't recall what PD stands for.

Q. But it says the last sentence, based on these factors, either a compliance, administrative, or technical review is performed. So it says that -- it seems to implicate that there is a decision-making process by the reviewer depending on what type of appraisal they were reviewing and how they would conduct their review. Is that correct?

A. No.

Q. Why is that not correct?

A. Because someone else decided whether it should be a compliance review or an administrative review.

Q. Who decides that?

Page 58

A. I assume the supervisory group.

Q. So when you would receive an appraisal to review you were told whether or not it was a technical review, a compliance review, or an administrative review?

A. No. I received technical reviews.

Q. My under --

A. I didn't get compliance or evaluation --

Q. But you would be told what you were given was a technical review?

A. Yes.

Q. And then below that it says appraisal processing, Section 6.3.1, and it says once the appraisal is received into the LINKS document library it can be accessed by all members of the deal team. Well, we've already talked about the LINKS database, and then who is the deal team?

A. The deal team would include the loan officer and the supervisory appraiser and the reviewer.

Q. Going to 6.4.4, it talks about addressing concerns with the appraiser. Do you see that?

A. Yes.

Q. On Page 32?

A. Yes.

Q. And it reads if the appraisal reviewer has

Page 59

identified manageable concerns with the appraisal report, any significant issues must be communicated to the appraiser. Although verbal transmission of the concerns may be appropriate, written correspondence is recommended and should be retained in the appraisal file. The appraiser's response should also be in written form and might include clarification and additional support, corrected pages, and/or a revised report. Did I read that correctly?

A. Yes.

Q. Going down to Subpart Number 3 -- sorry -- Subpart Number 1, it reads if an appraisal report is being revised by the appraiser, a copy of the original report should be maintained until the review is completed. Correct?

A. I'm sorry.

Q. Under Subpart Number 1 on Page 32, 6.4.4.

A. Okay.

Q. Did I read that correctly? Do you want me to read it again?

A. Yes please.

Q. If an appraisal report is being revised by the appraiser, a copy of the original report should be maintained until the review is completed. Did I read that correctly?

Page 60

A. Yes.

Q. And then Section 2. In the event that the appraiser's revisions have no impact on the original value conclusion, the appraiser may address the reviewer's concerns in a letter or e-mail. Did I read that correctly?

A. Yes.

Q. Section 3. In the event that the report complies with federal regulars but there exists an unresolved issue which impacts the conclusion of value and the appraiser will not or cannot participate in the revision process, the reviewer may recommend a field review be completed.

All view -- pardon me. All value changes require a field review performed by a state-certified appraiser or a new appraisal evaluation. Internal value changes are prohibited. Did I read that correctly.

A. Yes.

Q. Can you tell me what a field review would be? Does that mean another appraisal would go to the actual property? What does that mean?

A. Field review in this instance means you would hire a third-party reviewer to review the appraisal, and he may just give his opinion of the



Page 61

review or he may be asked to come up with his own opinion of value based on information in the appraisal report or his further review of the market.

Q. And then if you would turn to Page 33, please.

A. Yes.

Q. Section 6.4.5, rejection of the report. Do you see that?

A. Yes.

Q. It says when a reasonable attempt to bring an appraisal into compliance or to correct problems within the report does not result in an acceptable report according to regulations, USPAP, and/or PNC real estate appraisal policy and procedures, then the recommendation to reject the report must be documented and one of the following actions should be taken. Did I read that correctly?

A. Yes.

Q. Number 1, another appraiser should be engaged, or Number 2, a senior appraiser may authorize a field review which complies with USPAP, specifically Standard 3. Number 3, a senior appraiser must approve the rejection of an appraisal report, and Number 4, in bold, if it is deemed appropriate to file a complaint against an appraiser or evaluator for a fraudulent

Page 62

appraisal or evaluation, the detection and resolution unit, DRU, fraud investigation support, FIS, creating and processing suspicious activity reports, SARs, policy, will be utilized. And then it provides a reference number DRU-4-0558. Did I read that correctly?

A. Yes.

Q. Were these generally -- I know this again is from 2014, but did you understand these generally to be the policies and procedures for the real estate valuation services group when you were a real estate appraisal reviewer for PNC?

A. Yes.

[Exhibit 2 marked for identification.]

Q. Mr. Meehan, you've been handed what's been marked as Exhibit 2.

A. Yes.

Q. Bates-numbered MEEHAN005015. Do you recognize this document?

A. Yes.

Q. What is this document?

A. Document -- sent from Jeff Mazur, expectations of what was expected from our group.

Q. And when you say our group, do you mean the real estate valuation services group?

Page 63

A. Yes.

Q. And to be clear, this was sent from Jeffrey Mazur on January 2, 2009; correct?

A. Yes.

Q. And it's a memorandum to PNC real estate review appraisers; correct?

A. Yes.

Q. And the subject line is expectations?

A. Yes.

Q. And so you were a recipient of this memorandum?

A. Yes.

Q. And this was during the transition from National City to PNC; correct?

A. Yes.

Q. And he writes thank you for your interest in becoming a review real estate appraiser for PNC Bank. The purpose of this memo is to highlight a few of the expectations PNC has of you as one of our real estate review appraisers. Is that correct?

A. Yes.

Q. So then he has several subitems in here, the items to be checked during review, miscellaneous items, lender review memorandum, and a document library. Did you -- is this your handwritings in --

Page 64

about a third of the way down on the page?

A. Yes.

Q. And you produced this document, so you're obviously familiar with it. Is that correct?

A. Yes.

Q. I just want to go through the first topic -- pardon me -- the first portion of the memorandum where it says items to be checked during review. And it says review PNC engagement letter to confirm the appraisal conforms to our request; correct?

A. Yes.

Q. Math calculations; correct?

A. Yes.

Q. Methodology, definition of market value, property rights appraised, narrative property description, and the appraiser engaged must sign the final appraisal report. Is that correct?

A. Yes.

Q. So does this comport with what you understood your responsibilities also as they were described to you at the conference in Pittsburgh?

A. Yes.

Q. And does this generally comport with what was expected of you based on the real estate valuation services appraisal procedures that we just went through



JOSEPH MEEHAN
MEEHAN vs PNC FINANCIAL

December 06, 2018
65–68

Page 65

in Exhibit 1?

A.  Yes.

[Exhibit 3 marked for identification.]

Q.  Mr. Meehan, you've just been handed Exhibit 3 or what has been marked as Exhibit 3 Bates-numbered MEEHAN005017.  Do you recognize this document?

A.  Yes.

Q.  And what is this document?

A.  It's a document from Darlene Trimble to Paul Higgins and me regarding reviews at PNC.

Q.  And it was in -- if you look at the bottom of the page it looks to be originated from you to Paul Higgins starting on June 26th, 2009; correct?

A.  Yes.

Q.  And then it went up the chain that day and then Darlene Trimble was added; correct?

A.  Yes.

Q.  And there is a question that you have about in your original e-mail you say Paul, to Paul Higgins, I have been asked to complete my review of the Sawgrass (ph) property in Florida.  Do you have any guidance for me?  Around this time had you officially transitioned from National City to PNC?

A.  No.

Page 66

Q.  When had you officially transitioned?

A.  Halfway through 2010.

Q.  Oh, okay.  I'm sorry.  I thought you said 2009 earlier.  We haven't talked about Paul Higgins yet.  Who's Paul Higgins?

A.  Paul worked in Cleveland for the appraisal group there.

Q.  Was he also an appraisal reviewer?  What was his position compared to you?

A.  He was an appraisal reviewer but he might have been a little higher than me.

Q.  And was he affiliated with PNC already when you had transitioned -- when you were transitioning over from National City?

A.  Could you repeat that, please?

Q.  Well, I'm trying to understand why you were seeking guidance from Paul Higgins.  Was he already affiliated with PNC, or was he with National City?

A.  I believe he was in meetings that I wasn't privy to, and I believe he had done a review for PNC and had some guidance on how to write a review that they wanted to see.

Q.  What kind of meetings are you talking about?  Meetings with respect to this appraisal or

Page 67

meetings in general?

A.  Meetings in the transition period, what we should be doing until we're officially taken over.

Q.  But by this time in June 2009 you had already received the memorandum from Jeff Mazur that we just went through in Exhibit 2; correct?

A.  I don't believe so.  I think this came later.

Q.  Well, it's dated January 2, 2009.

A.  Yes, but I don't know if it was given to me on that date or if it came -- here's what Jeff Mazur wants from us.  Here's the memo that he wrote in 2009.

Q.  When do you believe you would have received the Jeff Mazur memorandum?

A.  During the transition period.

Q.  So it could have been in January 2009?

A.  Yes.

Q.  You don't know when you actually received it?

A.  No.

Q.  And in June 26th, 2009, you had not yet gone to the conference in Pittsburgh; is that correct?

A.  Correct.

Q.  That was in 2010?

A.  Yes.

Page 68

Q.  So you were seeking guidance from Paul Higgins on how to complete a review that met what PNC was looking for with respect to an appraisal review; is that correct?

A.  Yes.

Q.  And then Mr. Higgins writes back to you on that same day and CCs Diane -- pardon me -- Darlene Trimble.  And you mentioned she's also a real estate appraisal reviewer; correct?

A.  Yes.

Q.  Do you know why she was CCed on this correspondence?

A.  Because she had done a few reviews in the procedure style that PNC wanted to see.

[Discussion off the record.]

Q.  So going back to Exhibit 3, I think you said -- I hope I didn't cut you off, but I think you said Darlene Trimble had also done reviews in the past for PNC and had an idea of what they were expecting in terms of format?

A.  Yes.

Q.  So Mr. Higgins writes to you with a CC to Darlene Trimble, keep the first page through fourth pages all based on facts from the appraisal, identify any risks and offset to those risks in the



Page 69

reconciliation section.

Jeff Mazur will review your review and he'll have a chance to comment on style and what they are looking for, so don't be too concerned that you have to nail it perfectly when you submit.

Darlene has done five reviews, as have I. "Ris" or "Reiss" -- R-I-S -- has done several, as has Diana. I would start with Darlene if you need some advice. She talked to Jeff directly on the ones that she did and may have some suggestions for you. Thanks, Paul. Did I read that correctly?

A. Yes.

Q. And that basically comports with what you just fronted for us that she had done reviews and other people had done reviews that you could seek advice from?

A. Yes.

Q. Above, Darlene weighs in later on in the afternoon and responds to you and Paul and says rely heavily on the canned comments PNC provided. If you don't have them I can resend. They like as much conformity as possible among all assignments. Obviously you may modify the canned comments to reflect your property.

Don't inject your opinion or interpret

Page 70

what the appraiser has done or said. If there is an issue, ask the appraiser to restate. They want the entire process to be on the appraiser, not the reviewer. Did I read that correctly?

A. Yes.

Q. It says don't -- a few sentences away it says they sent several sample reviews to reference. I have those too if you need them. Compare the request with what the appraiser provided. Don't hesitate to talk with the appraiser. Did I read that correctly?

A. Yes.

Q. If the narrative description differs significantly from the property appraised, make corrections -- i.e., request -- states the property has entitlements and the appraiser discovered they have expired.

Make sure all dates correlate. Verify math. If a mathematical error has been made the appraiser must correct and you must upload the e-mail correspondence regarding the value revision. If there is no change in value but you corresponded regarding concern, you do not need to upload the e-mail message.

All of the questions at the rear of the review should be yes answers and if there is a no, there is a problem. Don't worry about verifying the

Page 71

appraiser license. The coordinator will do so.

Always print the LRM. This is where the relationship manager will make comments regarding the valuation if there are any. Did I read that correctly?

A. Yes.

Q. And that generally seems to comport with the policies and procedures for the REVS department in Exhibit 1 that we talked about and very high level what's in Mr. Mazur's memo; is that correct?

A. Yes.

[Exhibit 4 marked for identification.]

Q. Mr. Meehan, you've just been handed what's been marked as Exhibit 4 Bates-numbered MEEHAN005436 through 5438. What is this document?

A. This is a code of professional ethics that members of the Appraisal Institute are required to abide by.

Q. And does this valuer's code of professional ethics dated July 31, 2015, apply to you in your position at PNC in 2015?

A. Yes.

Q. Are these code of professional ethics updated on an annual basis, if you know?

A. I don't know.

Q. Were you not subject to a code of ethics

Page 72

as an appraiser in 2015?

A. Yes.

Q. Were you subject to a code of ethics in 2014?

A. Yes.

Q. How about 2013?

A. Yes.

Q. How about 2012?

A. Yes.

Q. Who set those code of ethics for you to abide by?

A. The Appraisal Institute sets these codes. USPAP sets codes also.

Q. So if you ever had an ethical issue, what would you refer to for guidance?

A. If I had an ethical issue with myself -- could you rephrase that?

Q. As an appraiser. If in 2015 --

A. Yes.

Q. -- when you were working for PNC --

A. Uh-huh.

Q. If you as an appraisal reviewer had an ethical issue that you needed to address, what board or document or body would you look to for guidance?

A. I would go to my supervisor first.



Page 73

Q.    And -- okay.  And in 2015, who would that have been?

A.    Doug Schoenberg.

Q.    And you previously just said that you had to abide by a code of ethics; correct?

A.    Yes.

Q.    And what code of ethics was that?  Was it you abided by the code of ethics set by the Appraisal Institute; correct?

A.    Yes.

Q.    You --

A.    And USPAP.

Q.    And USPAP.  Any other code of ethics?

A.    PNC's code of ethics.

Q.    Anything else?

A.    No, can't think of anything.

Q.    And if you look on Page 2, it lists out definitions of things that -- with respect to an appraisal; is that fair?

A.    Yes.

Q.    I want to focus on the word credible.  Do you see that?

A.    Yes.

Q.    And it says worthy of belief, supported by analysis or relevant information.  Credibility is

Page 74

always measured in the context of intended use.  Did I read that correctly?

A.    Yes.

Q.    And then it says intended use is defined as the valuer's intent as to how the report will be used.  Did I read that correctly?

A.    Yes.

Q.    And then under justified, it says reasonably supported?

A.    Yes.

Q.    Correct?  At the bot -- the very list definition is valuer.  It says one who is expected to provide services in an unbiased and competent matter.  Is the valuer synonymous there with an appraiser?

A.    Yes.

Q.    And you understood these definitions to apply to the code of ethics generally when you were an appraisal reviewer with PNC?

A.    Yes.

[Exhibit 5 marked for identification.]

Q.    This one didn't print with Bates numbers for some reason.  I apologize.

MS. MARSH:  Are you fine if I proceed?

MR. CARTER:  Yes.

MS. MARSH:  Okay.  Thank you.

Page 75

Q.    (By Ms. Marsh)  This has been marked as Exhibit 5.  Do you recognize this document, Mr. Meehan?

A.    Yes.

Q.    And what is this document?

A.    Appraisal Institute's definition of standards of valuation practice.

Q.    And is this something that you would also have to abide by as a real estate appraisal reviewer in your term with -- in your position at PNC?

A.    Because I'm in MAI.

Q.    And what does MAI stand for?

A.    It means you're a designated member of the Appraisal Institute, but it doesn't stand for member of the Appraisal Institute.  Yeah.

Q.    And so you would abide by these standards of valuation practice; correct?

A.    Because I am a member of this group.  Not all reviewers are members of this group, so --

Q.    I'm talking about you particularly.

A.    Yes.

Q.    And this is -- this document is effective January 1, 2015.

A.    Yes.

Q.    Do you see that?

A.    Yes.

Page 76

Q.    And again, here are definitions that they put in, and then there's three standards on the table of contents page.  It says an appraisal must be credible, Standard B, the review must be credible, and Standard C, a report must be clear and not misleading.  Do you see that?  I'm looking at the table of contents.

A.    Oh.

Q.    It's just on the second page.

A.    Yes.

Q.    And so we have the definitions again.  And if you go to Page 5, it talks about Standard A, an appraisal must be credible.  Do you see that?

A.    Okay.

Q.    SR A-1?

A.    Yes.

Q.    SR A-1 competency.  In developing an appraisal, a valuer must, A, be aware of and understand methods and techniques that are necessary to produce credible assignment results.

A.    Yes.

Q.    B, not commit a substantial error of omission or commission that significantly affects the assignment results, and C, not make a series of records that considered individual may not significantly affect the assignment results but which when considered in the



Page 77

aggregate establish that the appraisal is being rendered in a careless or negligent manner. Did I read that correctly?

A.   Yes.

Q.   And then the next page is Standard A4, application of methodology. Do you see that?

A.   Yes.

Q.   And it says the valuer must, A, research and verify data necessary to develop a credible appraisal, and B, correctly employ methods and techniques necessarily to produce a credible appraisal.

A.   Yes.

Q.   Correct?

A.   Yes.

Q.   And then there's Standard B and Standard C, so there appears to be three separate standards, credible being the common word across all three?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And so that seems to be the guiding light, so to speak, with respect to an appraisal. Is that fair?

A.   Important, yes.

Q.   It's important?

Page 78

A.   Yeah.

Q.   And there are three acceptable standards for a review that are set forth by the Appraisal Institute effective January 1, 2015; is that correct?

A.   Could you repeat that question?

Q.   Based on this document there are three acceptable standards of valuation practice of how an appraisal would be deemed credible set by the Appraisal Institute?

A.   You said appraisal. You talking about appraisal review?

Q.   Well, it says an appraisal must be -- there's three standards in here. It says an appraisal must be credible, a review must be credible, and a report must be clear and not misleading.

A.   Yes. Okay.

Q.   So there's three standards that are set forth defining the scope of credibility with respect to an appraisal; correct?

A.   Based on this document.

Q.   Correct.

A.   Yes.

Q.   And as an MAI, this document applied to you; correct?

A.   Yes.

Page 79

Q.   So can we go to Standard B, please? A review must be credible? It's on Page 7.

A.   Okay.

Q.   Okay. SR B-1 competency. In developing a review, a reviewer must, A, be aware of and understand methods and techniques that are necessary to produce credible assignment results, B, not commit a substantial error of omission or commission that significantly affects the review, and C, not make a series of errors that considered individually may not significantly affect the review but which when considered in the aggregate establish that the review is being rendered in a careless or negligent manner. Did I read that correctly?

A.   Yes.

Q.   So similar to the actual appraisal, credibility again is important for the reviewer?

A.   Yes.

Q.   And then finally Standard C talks about the actual report being clear and misleading; correct? It's on Page 9.

A.   Yes.

Q.   And it says a report must clearly and accurately set forth the appraisal or review opinions and conclusions in a manner that will not be misleading

Page 80

in the context of the intended use. Correct?

A.   Yes. Yes.

Q.   And then below that is sufficient report content, and it lists 16 sub-items of what a written appraisal report must include; correct?

A.   Yes.

Q.   And a lot of these are what you testified to earlier in your deposition such as the date of the report, the intended use of the report, the property involved in the appraisal, the effective date of the appraisal; is that correct?

A.   Yes.

Q.   And these are all must-have items; correct?

A.   Yes.

Q.   And so these -- if you ever had a question about something that was absent from an appraisal report, you could look to -- if you didn't know already based on your years of experience, you could look to the Appraisal Institute standards of valuation practice as a guide; correct?

A.   I wouldn't.

Q.   What would you do?

A.   I would look for a USPAP.

Q.   You would have a resource to look to if



Page 81

you had a question about what was contained in a appraisal report?

A.    Yes.

Q.    But you could also look to the Appraisal Institute standards; correct?  Could?

A.    No.

Q.    Why not?

A.    Because not every appraiser has to abide by these.

Q.    I'm talking about you, sir.  Mr. Meehan.

A.    I would look for the USPAP.

Q.    My question was you could also look to the Appraisal Institute standards of valuation practice if you had a question; is that correct?

A.    This may not answer my question.  I would go to USPAP.

Q.    My question, to you, sir --

A.    Yes.

Q.    -- is could you as a member of the Appraisal Institute look to the standards of valuation practice for guidance on what an appraisal report is supposed to contain?

A.    It could be beneficial but wouldn't be what I would look for.

Q.    How does this standard val -- standards of

Page 82

valuation practice from the Appraisal Institute differ in any way from what is set forth by USPAP?

A.    I don't know if it does.

Q.    So again --

A.    Without comparing it.

Q.    -- you could look to the standards of valuation practice set forth by the Appraisal Institute for guidance if you needed to as a real estate appraisal reviewer?

A.    It could be beneficial.

Q.    When you were at PNC in 2012, you mentioned that your supervisor was Doug Schoenberg; correct?

A.    Yes.

Q.    And if you ever had a question about a particular appraisal that you were reviewing, could you have gone to him for guidance?

A.    Yes.

Q.    Who else could you have gone to if you had a question or concern about an appraisal that you were working on?

A.    Any colleagues, I think, might have information or help.

Q.    If you were unsure about a particular methodology and wanted to bounce an idea off of

Page 83

somebody --

A.    Uh-huh.

Q.    -- could you again have gone to Doug Schoenberg or one of your colleagues?

A.    Yes.

Q.    And would that include Darlene Trimble?

A.    Yes.

Q.    And Joe Rose, you mentioned?

A.    Yes.

Q.    Anybody else that you would have gone to?

A.    Paul Higgins.

Q.    And I think you said it.  He was in Cleveland; is that correct?

A.    Yes.

Q.    And you were based in St. Louis.  Who else was in St. Louis with you?

A.    Joe Rose.

Q.    Anybody else?

A.    No.

Q.    And could you have gone to people in Pittsburgh, such as Jeff Mazur?

A.    I don't believe so.

Q.    Why do you say that?

A.    We had to go through our supervisors before we contacted Jeff Mazur and Adam Barone.

Page 84

Q.    If you -- originally I think it was Exhibit 2 in the e-mail with Darlene Trimble and Paul Higgins, Jeff Mazur was offered up as somebody that you could go to that was going to check your work, and I realize that was early on.

A.    Yes.

Q.    If you didn't like an answer or the guidance you were receiving from your supervisor, Doug Schoenberg, could you have gone to Jeff Mazur or Adam Barone?

A.    Adam Barone told us we had to go through our supervisors to contact him.

Q.    When did Adam Barone tell you that?

A.    During the conference meeting in 2010 in Pittsburgh.

Q.    And did he provide you anything in writing that said that?

A.    No.

Q.    So if -- but my question is a little different.  If you didn't like what your supervisor said, if you had gone to the first level and asked a question and you didn't agree with the answer --

A.    Uh-huh.

Q.    -- could you have gone to the next level up, Jeff Mazur or Adam Barone?



JOSEPH MEEHAN
MEEHAN vs PNC FINANCIAL

December 06, 2018
85–88

Page 85

A. But I didn't feel like I was supposed to bother them.

Q. My answer -- my question was could you have gone to them and contacted them if you had a problem and didn't agree with what your supervisor had told you on any particular topic?

A. Yes.

Q. You knew how to contact them?

A. Yes.

Q. In -- at PNC, did you also have annual evaluations in your position?

A. Yes.

Q. And would you perform self-evaluations and then also have your supervisor, Doug Schoenberg, evaluate you?

A. Could you rephrase that or clarify that?

Q. Well, why don't you tell me what you remember the review process to be when you were at PNC in 2012.

A. I remember we were having a conference with my supervisor and talking about review, and he would send a review, and we would go through it, and then it would be published.

Q. It would be published?

A. It would be written up as my annual

Page 86

review, and then it would be in my record, and I would sign for it that I received it.

Q. And was this done on an annual basis?

A. Yes. There was some -- a few times there was a mid-annual review.

Q. Was the review process the same for all of the people within your department, the technical review group?

A. I believe.

Q. So some others also had mid-annual or midyear reviews as well?

A. Yes.

Q. And did other people in your group -- I think you already said this. They also reported to Doug Schoenberg as well; correct?

A. Yes.

Q. Was there anybody else at Doug Schoenberg's level that reviewers reported to, or was he in charge of all of the reviewers?

A. The reviewers in Texas reported to whoever they reported to.

Q. But the reviewers in St. Louis reported to Doug Schoenberg?

A. Yes.

Q. So depending on the location, there was a

Page 87

different supervisor on site that you would go to?

A. Not on site.

Q. Or in the state, presumably?

A. Doug was in Michigan.

Q. Pardon me?

A. Doug was in Michigan. Okay.

Q. Oh, okay. So depending on where -- there was more than one supervisor in the group?

A. Yes.

Q. Do you know who another supervisor would be besides Doug Schoenberg?

A. No.

Q. So you had a chance to -- what you just -- I believe you just said you had a chance to meet with your supervisor to talk about your review and then you would sign it after you had talked about it and then it would go in your file?

A. File. Yes.

Q. And that was the process from 2012 to 2015?

A. Yes.

Q. Was it any different from 2009, 2010, when you had transitioned over to PNC, up until 2012?

A. Basically no.

Q. And how was this relative to your review

Page 88

process when you were at National City, comparatively?

A. Very similar.

Q. You would have a supervisor look at it and perform an annual review and it would go in your file?

A. Yes.

Q. So you weren't a stranger to evaluations when you moved over to PNC?

A. Right.

Q. I'm going to mark this as the next exhibit, please.

[Exhibit 6 marked for identification.]

Q. Mr. Meehan, I'm handing you what's been marked as Exhibit 6, Bates number PNCMEEHAN000199 through 203. Do you recognize this document?

A. Yes.

Q. And what is this document?

A. It's annual performance summary self-evaluation.

Q. So you did perform self-evaluations in your position at PNC; is that correct?

A. I had to state what I did, not evaluate myself. But it's called that -- okay.

Q. So yes?

A. Yes.

Q. And this was due January 15, 2013, and it



Page 89

says it's your annual performance summary from January 1, 2012, through December 31, 2012; correct?

A. Yes. Yes.

Q. And then there's -- it's broken into sections. The first section is business and functional results with goals, and you can annotate as necessary in here, and then it goes through several goals, then demonstrated behaviors on the second-to-last page, risk management, and then employee year-round. So there's different sections for you to fill out?

A. Yes.

Q. Is that fair?

A. Yes.

Q. And the first goal you write under comments, I have performed my job duties in a timely manner. My performance has been consistent with bank policies and USPAP requirements. Correct?

A. Yes.

Q. Under Goal Two it talks about production, and it says it is expected that the number of reviews completed will be consistent with the allocation of 75 percent of your job duties being dedicated to performing technical reviews. The remaining job duties will focus on approved appraisal monitoring responsibilities. And the rating that you gave was

Page 90

meets all expectations; correct?

A. Yes.

Q. And you write in the comments my duties have been allocated to performing technical reviews and appraiser monitoring responsibilities. However, it is my opinion that more than 75 percent of my time is spent on technical reviews. My total production would have been higher if appraisal requests had not slowed down in August, September, and November. For example, I was assigned 24 reviews in July but only 10 in September, 13 in November, and 16 in August. Did I read that correctly?

A. Yes.

Q. Was it your experience in 2012 then that there was a slowdown period for certain months in the fall with respect to appraisals that were coming in for your review?

A. Could you repeat that?

MS. MARSH: Can you read it back? It was long.

[The pending question was read by the reporter.]

A. Yes.

Q. (By Ms. Marsh) If you go to the second page Bates Number PNCMEEHAN200. Are you there?

Page 91

A. Yes.

Q. At the top box it says -- it's following over from the previous page, but in the comments you write, I have maintained a working knowledge of the strength and weakness -- pardon me. I have maintained a working knowledge of the strength and weaknesses of appraisers in my areas and have recommended appraisers to supervisory appraisers when consulted.

I have worked with the advisory team and have graded appraisers on their performance. I also have downgraded appraisers who have not complied with USPAP or the bank's requirements. Finally, I've updated appraiser certification dates in links in my respective states. Did I read that correctly?

A. Yes.

Q. So based on that, if you had a problem with an appraiser and didn't think that they met with the requirements, you could downgrade whether or not you felt they were appropriate for the PNC to keep using?

A. Yes.

Q. And how would you do that -- through LINKS or something else?

A. We had a contact. I believe it was Fred Petrie.

Page 92

Q. And he was at PNC?

A. Yes.

Q. Was he a coordinator?

A. No.

Q. What was he?

A. He was manager of the Cleveland supervisory group.

Q. And you would --

A. Supervisory appraiser group.

Q. And you would tell him that you thought a certain appraiser should be downgraded and he would input something, or would you input something and CC him? How would that work?

A. Sorry -- call or send an e-mail explaining the reasons for -- something like that.

Q. If you go to the next box, Goal 4.

A. Uh-huh.

Q. It says my reviews have been completed in a timely manner. If appraisal review -- pardon me. If appraisal revisions are necessary I have notified the supervisory appraiser and the coordinator. Most times I discuss the appraisal issues and potential delays with the RM prior to contacting the appraiser. I have briefed my backup contact/manage on reviews/issues prior to absences. Did I read that correctly?



Page 93

A.   Yes.

Q.   So based on that, if you ever had an issue with an appraisal, you would speak to the coordinator, the supervisory appraiser, and even the RM, the relationship manager; is that correct?

A.   Speak or carbon (ph) them in an e-mail.

Q.   And document whatever issue it is that you have?

A.   Document.  Yes.  Yep.

Q.   And so -- and then it says prior to contacting the appraiser.  Were there instances where you would actually contact the appraiser?

A.   Yes.

Q.   If you could go to the next page.  Goal 7. Do you see that?

A.   Goal -- which one?  Goal 7?

Q.   Goal 7.

A.   Okay.  Yes.

Q.   It says I completed the USPAP 2012 update class in February 2012.  In addition, I completed two continuing education classes in 2012; thus I continue to enhance my appraisal knowledge, understanding of appraisal theory, banking regulations, and appraisal policy.  Did I read that correctly?

A.   Yes.

Page 94

Q.   So you were complying with your continuing education as we talked about and your certification that you had to maintain as a real estate appraisal reviewer; correct?

A.   Yes.  Yes.

Q.   And then under demonstrated behaviors, Goal 1, you write I continue to ask questions regarding appraisal policy in order to manage risk and to streamline the appraisal procurement and review process.  Did I read that correctly?

A.   Yes.

Q.   And so you knew to ask questions or seek out guidance when needed?

A.   Yes.

Q.   And then if you go to the second-to-last page under risk management, it says I have completed the code of business and conduct training and performed my duties in a manner that is consistent with the bank's code of business conduct.  Did I read that correctly?

A.   Yes.

Q.   And so I think you mentioned earlier that you did annual training with respect to PNC's code of business conduct.  Is that correct?

A.   Yes.

Page 95

Q.   And you would have to put that in your review?  You would have to state that in your review that you had complied with that?  Is that fair?

A.   This --

Q.   Yes.

A.   -- self-evaluation?

Q.   Yes.

A.   Yes.

MS. MARSH:  Off the record for a second.

[Discussion off the record.]

[Exhibit 7 marked for identification.]

Q.   Mr. Meehan, you've just been handed Exhibit Number 7, Bates Number PNCMEEHAN000193 to 198. Do you recognize this document?

A.   Yes.

Q.   And what is this document?

A.   This is my manager evaluation for the year 2012 signed by Doug Schoenberg.

Q.   And we already discussed that he was your immediate supervisor in 2012; correct?

A.   Yes.

Q.   And so was it expected that he would be the one to review you as your manager?

A.   Yes.

Q.   And his due date appears to be a month

Page 96

after yours.  It says February 15, 2013.  Do you see that at the top?

A.   Yes.

Q.   And it seems that he has similar benchmarks and boxes with goals that he has to fill out much like you did?

A.   Yes.

Q.   Is that fair?

A.   Yep.

Q.   Can we go to the second box, Goal 2, on the first page under business functional results.  Do you see that?

A.   Yes.

Q.   And the description is production. Comments are Joe's production goal was $108,000 for 2012 and his production was $96,710, or 90 percent. Joe completed 289 reviews, which was as many as several of his cohorts who did reach the goal, but his average fee per review was only $335.  We will work in the coming year to bring this number up.  However, Joe needs to seek out more work when times are slow.  Did I read that correctly?

A.   Yes.

Q.   So previously you said your production goal was $120,000?



Page 97

A.   Yes.

Q.   But this says $108,000?

A.   Yes.

Q.   Do you want to change your testimony, or was there a different standard that we've not seen yet?

A.   There's a different standard.  Was reduced from $120,000 to $108,000.

Q.   What year?

A.   2011, I believe.

Q.   So originally in 2010, 2011, your goal was $120,000?

A.   Yes.

Q.   And then it was reduced to $108,000?

A.   Yes.

Q.   And it looks like in 2012 you did not meet that production goal; correct?

A.   Correct.

Q.   And Doug Schoenberg writes you were at 90 percent but it was based on the fees for the reviews that you were doing; correct?

A.   Correct.

Q.   When he says you need to seek out more work when times are slow -- if you needed more work, how would you do that?  Would you go to Doug Schoenberg?

Page 98

A.   Go to Greg Camburn.  Say Greg, I'm slow.  Send me something if you got it.

Q.   And that would be distributed to you presumably through the LINKS system that we talked about?

A.   Be distributed through LINKS.

Q.   Yes.

A.   Send him an e-mail saying I need more work and if I got work, yes.

Q.   I understand that.

A.   Yes.

Q.   The actual work would be distributed to you through the LINKS system?

A.   Yes.

Q.   If you go to the second page on 194, Goal 3, it says Joe knows the appraisers and their strengths and weaknesses in his primary states.  He has recommended additional appraisers for the approved appraiser list and has made continual recommendations regarding appraiser downgrades.  He has also maintained the appraiser registrations for those states that are his responsibility.  Did I read that correctly?

A.   Yes.

Q.   And that comports with your self-evaluation where you talked about downgrading and

Page 99

dealing with certain appraisers?

A.   Yes.

Q.   It says states that you were responsible for and I don't think we talked about that.  What states were you responsible for in 2012?

A.   For this instance?  For certification?

Q.   Yes.

A.   Someone would have signed so many states for us to do, like Joe, you do Tennessee, Alaska, and Georgia.

Q.   And would they change on an annual basis?

A.   I don't know.  I don't remember.  You would go into the system and look up, see if somebody is certified in the federal regulations website and say yes, they're still certified.  So --

Q.   So your states for which you were responsible could have changed on an annual basis?  You just don't remember?

A.   Yes, I do not remember.

Q.   The goal -- below that, Goal 4 --

A.   Uh-huh.

Q.   -- it reads Joe completes reviews in a timely manner and communicates with all parties involved.  He has been willing to work through difficult review issues with RMs, even when these

Page 100

issues consume considerable time.  Did I read that correctly?

A.   Yes.

Q.   And RM, I believe, stands for relationship manager; correct?

A.   Yes.

Q.   And what is the relationship manager -- sorry.  What relationship is the relationship manager managing?

A.   He's the loan officer.

Q.   Between the loan officer and you as the reviewer, or --

A.   No, he is the relationship manager with the borrower or the clients.

Q.   And so when the difficult issues with RMs, even when these issues consume considerable time -- what is that referring to?  What type of issues would there be with relationship managers?

A.   The issues would be with the appraisal report, would be late, are the values likely to go up or down, to let him know that it's in process, something may not be the same as what he's seeing.

Q.   And that would be you communicating that to the relationship manager?

A.   Yes.



JOSEPH MEEHAN
MEEHAN vs PNC FINANCIAL

Page 101

Q.    And how would that be communicated -- through LINKS or e-mail?

A.    E-mail or phone call.

Q.    If you could go to demonstrated behaviors, Goal 1, on the third page.  Do you see that box?

A.    Yes.

Q.    And then Mr. Schoenberg writes Joe continually asks questions regarding appraisal and PNC policies in order to better manage risk and provide our service partners with what they need without compromising the bank's position; correct?

A.    Yes.

Q.    And then if you go to the second-to-last page, the standard of corporate risk management.  Do you see that?

A.    Yes.

Q.    It says Joe is very diligent in making sure the appraisals we use and his own reviews are compliant with USPAP and banking regulations.  He communicates effectively with both the supervisory appraiser and his supervisor.  Did I read that correctly?

A.    Yes.

Q.    And you got a rating of meets all expectations there; correct?

Page 102

A.    Yes.

Q.    Finally, year end -- that last box on that page, Mr. Schoenberg writes Joe is a good review appraiser with a good skill set and work ethic.  He did not meet his monetary production goal in 2012.  However, he did do enough reviews to meet the goal if these were higher.  He needs to concentrate on more critical issues.  Further, when times are slow, he needs to seek out more work.  Did I read that correctly?

A.    Yes.

Q.    And then would you have reviewed this with Mr. Schoenberg and signed off on it for your file?

A.    Yes.

Q.    And does that comport with your memory about meeting with Mr. Schoenberg in 2012 with respect to your annual review?

A.    Yes.

        MS. MARSH:  Okay.  Why don't we take a break?

        [A recess was taken.]

Q.    (By Ms. Marsh) All right.  Back on the record.  I'm just going to go ahead and mark a new exhibit.

        [Exhibit 8 marked for identification.]

Page 103

Q.    Mr. Meehan, you have been handed what's been marked as Exhibit 8, Bates Number PNCMEEHAN000189 through 192.  Do you recognize this document?

A.    Yes.

Q.    And what is this document?

A.    Self-evaluation annual performance for 2013.

Q.    And was this self-evaluation filled out by you?

A.    Yes.

Q.    So similar to what we did for 2012, I'd like to go through it with you.  In the first section, business functional results, you write I'm ahead of my production goals and should exceed the annual production goal by year end.  Did I read that correctly?

A.    Yes.

Q.    In the next box you write I provide prompt and reliable service.  I would like to believe I maintain a positive rapport with RMs, vendors, and REVS staff by communicating effectively and in a timely manner.  Any significant issues are discussed with my supervisor prior to taking action.  Did I read that correctly?

A.    Yes.

Page 104

Q.    And your supervisor that you're speaking about in that paragraph would be Doug Schoenberg; is that correct?

A.    Yes.

Q.    In the risk management section you write I perform my job duties in a manner that is consistent with PNC's code of business conduct and ethics.  I continually review appraisals -- pardon me -- I continually review appraisal policy and maintain a level of understanding that enables me to better advise my service partners.  Did I read that correctly?

A.    Yes.

Q.    In the last box on that page it's PNC standard corporate risk management.  Do you see that?

A.    Yes.

Q.    In the comments you write -- first of all as the rating you write exceeds expectations; is that correct?

A.    Yes.

Q.    And then you write -- I'm not sure if it's cut off, but it starts with seem to be exceptionally demanding during the review process.  I look for competency and expertise when reviewing an appraiser's report.

        I have difficulty accepting an appraiser's



Page 105

opinion of value if there are mathematical errors, improper methodologies, or inconsistencies in our report. An appraiser's opinion of value lacks credibility when there are mistakes in a report.

I do not hesitate to have an appraiser readdress issues I encounter during my review. I also offer guidance to appraisers. Some of my peers seem to be more lenient when similar appraisal issues are encountered.

Below that you write I attempt to describe the pertinent relevant risks in my reviews. These would relate to the functional utility and market appeal of the subject property, the neighborhood characteristics that would impact the property, and the submarket characteristics that affects the demand for the subject property. Did I read that correctly?

A. Yes.

Q. So again in 2013, you're commenting that you are aware -- you will speak to an appraiser or raise to your supervisor if there's an issue that you notice with an appraisal?

A. Yes.

Q. On the next page in the risk management compliance section, Goal 2 -- do you see that?

A. Yes.

Page 106

Q. You write I am in constant contact with my supervisor, apprising him of appraisal issues and potential delays due to errors in reports. I complete my reviews in a regulatory compliant manner and raise any concerns relating to the risk to the supervisory appraiser. I often engage my supervisor during the process. Did I read that correctly?

A. Yes.

Q. And again, that comports with what we just discussed, that you raise any issues with your supervisor and/or the appraiser?

A. Yes.

Q. And then at the end you write as mentioned I'm ahead of my production goal and should exceed my annual goal by year end. Correct?

A. Yes.

Q. And I think based on all of these reviews your year -- you're the calendar year, January 1 through December 31? That's your production year; is that correct?

A. Yes.

[Exhibit 9 marked for identification.]

Q. Mr. Meehan, you've been handed what's been marked as Exhibit 9, PNCMEEHAN000184 through 188. Do you recognize this document?

Page 107

A. Yes.

Q. And what is this document?

A. Manager evaluation for the year 2013.

Q. And this is similar to what was done in 2012 and Doug Schoenberg reviewed you as your manager; is that correct?

A. Yes. Yes.

Q. In the first box it reads Joe's total production for 2013 was $109,416 or 102 percent of the goal of $108,000. So similar to 2012, your production goal was $108,000; correct?

A. Yes.

Q. And you exceeded the goal in 2013?

A. Yes.

Q. Schoenberg writes this falls within the meets expectations grouping. Joe is a good technical review appraiser and comprehensive in his analysis of sometimes complex assignments. In addition to his review work, Joe has maintained the licensing certification updates for the states he is responsible for. Did I read that correctly?

A. Yes.

Q. On the second page in attitude/teamwork. Do you see that box?

A. Yes.

Page 108

Q. Douglas writes feedback from some of the procurement staff indicate that Joe can sometimes be stubborn in his approach to certain appraisal-related issues. However, others give Joe good marks for his direct approach.

I believe Joe meets expectations here. He is willing to take on complex assignments which sometimes lead to conflicts with the procurement staff due to quality of work, USPAP issues. Joe has further been involved in group activities as he was a judge for the REVS academy jeopardy game. Did I read that correctly?

A. Yes.

Q. So in 2013 it was again noted that there had sometimes been issues with the appraisals with respect to what you perceive to be errors or mistakes in a particular appraisal and you would speak about it with your supervisor or the appraiser?

A. Yes.

Q. And what is the procurement department?

A. That's the supervisory appraiser group.

Q. So there's --

A. They procure the appraisals.

Q. So sometimes they're referred to as the procurement department?



Page 109

A. Yes.

Q. And then the box below that reads Joe meets expectations in this area. That's the risk management box. He has completed all business conduct and ethics training and is versed in PNC appraisal policy and USPAP. His review work further exemplifies his commitment to risk management. Did I read that correctly?

A. Yes.

Q. And the next page at the top of the box, Doug writes Joe indicates in his self assessment that he is exceptionally demanding in the review process. My perception is that this is correct. His analysis of appraisal technique and methodology is very strong. However, he needs to concentrate on critical issues, especially in more known complex assignments. For example, errors in the sales comparison approach might be overlooked if the income approach is done correctly and given the most weight in the value conclusion. Did I read that correctly?

A. Yes.

Q. And then the bottom box, it reads Joe is good at communicating potential problems with me and keeping me updated on review issues. He is not afraid to ask questions regarding policy, procedure, or USPAP

Page 110

issues. Correct?

A. Yes.

Q. The last box, the manager's overall summary on the second-to-last page. Are you there?

A. Yes.

Q. Mr. Schoenberg writes Joe is good technical reviewer and he did meet his production goals for 2013. As he has indicated he can be quote, exceptionally demanding, close quote, during the review process, and this is both a strength and at times a weakness.

Joe is good at communicating with the procurement staff and myself regarding pending problems or issues. There are times when his communications with vendors seems very direct; however, he is generally correct in the analysis of appraisal evaluation issues. I enjoy having Joe on my staff, as I often learn to see things from a different perspective when I work with him on assignments. Did I read that correctly?

A. Yes.

Q. And did you similar to 2012 meet with Mr. Schoenberg to go over this review with him?

A. Yes.

Q. And would you have signed this?

Page 111

A. Yes.

Q. And it would have gone in your file?

A. Yes.

Q. And if you took issue with any of the things that were in your review, what would you have done?

A. Discussed them with Doug Schoenberg.

Q. And did you take issue with anything in your review?

A. Yes.

Q. What did you take issue with?

A. Asked him what he meant by stubborn, and --

Q. You asked him what he meant by stubborn?

A. Yeah, I asked him what that meant -- that I could be stubborn sometimes.

Q. Well, he didn't say stubborn. He said the procurement staff said you were stubborn.

A. Yes, but he wrote this paragraph.

Q. Right, but he's quoting what they said.

A. Yes, and I asked him what was going on with that.

Q. And what was his answer?

A. He said Fred Petrie wanted that in there.

Q. And did you write that down anywhere?

Page 112

A. I don't recall.

Q. Did you tell anybody that you disagreed with it, aside from Doug Schoenberg?

A. I don't recall, no.

Q. And did he say why Frank Petrie said that?

A. I asked if that was because of the Applied Medical Technology appraisal. He said I believe so.

Q. And what is the Applied Medical Technology appraisal?

A. I beg your pardon? Could you rephrase that?

Q. What are you talking about with respect to --

A. It's an appraisal review I completed. Fred and I disagreed on how it should be handled.

Q. In 2013?

A. I believe -- it, yeah, was like in November 2013, I believe.

Q. And what was the issue?

A. The issue was the comparable sales used by the appraiser in the report.

Q. I'm sorry?

A. The comparable sales utilized by the appraiser in the report.

Q. And what was the outcome of that



Page 113

disagreement that you had with Frank Petrie?

A. Apparently he thought I was stubborn, and we disagreed on it and I completed my review and had the appraiser make the revisions.

Q. And --

A. And the value declined.

Q. Of what? The property?

A. Yes.

Q. And did Frank Petrie review you separately?

MR. CARTER: I'm going to object. Misstate. It's Fred Petrie.

MS. MARSH: What did I say?

MR. CARTER: Frank.

MS. MARSH: Oh, sorry.

Q. (By Ms. Marsh) Did Fred Petrie review you?

A. Can you clarify review?

Q. Did he submit a performance evaluation of you similar to Doug Schoenberg?

A. No.

Q. And did you ever get in writing with respect to your conversation with Doug Schoenberg about your conversation with him where Fred Petrie told him to put this in the report?

Page 114

A. No.

Q. Did it affect your ability to continue working for PNC the following year?

A. I don't know.

Q. Did you continue to stay employed by PNC?

A. Yes.

Q. Did you continue to work for PNC in 2014?

A. Yes.

Q. Did you receive the same compensation for your work?

A. Yes.

Q. Did you receive increased compensation for your work in 2014?

A. Don't recall.

Q. Did you receive a bonus for your work in 2013?

A. I received one bonus.

Q. And when did you receive that?

A. I don't recall.

Q. Did you ever discuss the alleged comment that Fred Petrie made with Fred Petrie?

A. No.

Q. Did you ever discuss it with anybody else?

A. I believe I just discussed it with Joe Rose.

Page 115

Q. And when did you discuss it with Joe Rose?

A. About the time it happened -- my review.

Q. The time the review happened?

A. About that time.

Q. And what did you discuss with Joe Rose?

A. Just saying that Fred thought I was stubborn because of the Applied Medical Technology report. They put it in my review.

Q. And what did you say exactly?

A. I don't recall.

Q. And what did Joe say in response?

A. Don't recall.

Q. What was the purpose of telling Joe Rose?

A. Because I thought it was kind of unusual to see that in a review.

Q. Unusual to see what?

A. Someone thought he was stubborn because we disagreed on something.

Q. But you had -- in 2012 had received a review and you yourself had commented that you were often quick to notify people if you noticed a problem in a review; correct?

A. An appraisal review, yes.

Q. Yes.

A. Yes.

Page 116

[Exhibit 10 marked for identification.]

[Exhibit 11 marked for identification.]

Q. Mr. Meehan, you've been handed Exhibits 10 and 11. I'd like to start with Number 11 first, please.

A. Okay.

Q. Exhibit 11 for the record is Bates-numbered PNCMEEHAN000179 through 183. Do you recognize this document?

A. Yes.

Q. And what is this document?

A. Self-evaluation for 2014.

Q. And again, this is something that you would have completed?

A. Yes.

Q. And this is -- appears to be a similar format with goals as what you had done for 2012 and 2013; correct?

A. Yes.

Q. In the first section it's business functional results. Do you see that section?

A. Yes.

Q. And the measurement says each reviewer is expected to generate total allocated fees in the amount of $108,000 annually or an average of $9,000 monthly.



Page 117

Correct?

A. Yes.

Q. And so those are similar benchmark goals as you had in 2012 and 2013; correct?

A. Yes.

Q. And the rating you give yourself is meets all expectations; correct?

A. Yes.

Q. You write my duties have been allocated to performing technical reviews and appraiser monitoring responsibilities. However, it is my opinion that more than 90 percent of my time is spent on technical reviews. My total production would have been higher if appraisal requests had not slowed down during June, July, August, and November. For example, I completed 25 reviews in February but only 14 in November. My fee production during busy months ranged from $10,000 to $12,000. Slow month production ranged from $4,500 to $4,700. I request additional work as assignments are completed. Did I read that correctly?

A. Yes.

Q. In the next paragraph you write that I've maintained a working knowledge of the strength and weaknesses of appraisers in my areas and I've recommended appraisers to supervisory appraisers when

Page 118

consulted. I have worked with the advisory team and have graded appraisers on their performance. I've also downgraded appraisers who have not complied with USPAP or the bank requirements.

I've been willing to assist with special projects when requested. I have monitored appraiser certification for appraisers in seven states via asc.gov and have updated appraiser certification in LINKS. Did I read that correctly?

A. Yes.

Q. So this is similar to the previous years where you comment that you upgrade or downgrade appraisers based on their compliance with USPAP and you -- and that's part of your monitoring portion of your job responsibilities; correct?

A. Yes.

Q. And then you also mention that your production goals would have been higher but there were four slow months in 2014 -- June, July, August, and November; correct?

A. Yes.

Q. And the next page under customer service, in comments you write meets all expectation -- well, that's your rating. Meets all expectations. In comments you write my reviews have been completed in a

Page 119

timely manner. If appraisal revisions are necessary I have notified the supervisory appraiser and the coordinator.

Most times I have discussed the appraisal issues and potential delays with the RM prior to contacting the appraiser. I have briefed my backup contact, manage on reviews, issues prior to absences. I have demonstrated a high level of initiative on assignments by consulting with RMs and appraisers to verify that the appraisal addresses the needs of the RM and bank. Did I read that correctly?

A. Yes.

Q. On the second-to-last page you write under PNC standard corporate risk management, I believe I am honest and conduct business with the highest ethical standards. I understand the needs of my customers and to address those needs I provide professional and prompt service. Did I read that correctly?

A. Yes.

Q. And then I'm not going to read the entire box below it, but you write -- well, I'll just read it. It's not that long.

Under PNC standard corporate risk management you write I have performed my duties in a timely manner. My performance has been consistent with

Page 120

bank policies and USPAP requirements. However, I appear to spend more time on potential valuation concerns and questions than my colleagues. For example, I often hear appraisers saying they did it that way last year and it was approved when questioned about something that is theoretically incorrect or in error. Did I read that correctly?

A. Yes.

Q. What do you mean when you write something that is theoretically incorrect or in error?

A. Could you rephrase that?

Q. Do you understand the question?

A. I don't believe so.

Q. Well, you wrote this. What did you mean when you wrote something that is theoretically incorrect or in error? I want to understand what you mean.

A. For an example that I gave earlier, the Applied Medical Technology property. The appraiser used comparable sales which were not an arm's length transaction. In theory, that's a mistake.

Q. What do you mean by that? Why in theory is that a mistake?

A. Because they're not arm's length transactions. They don't give you a true indication of



Page 121

market value.

Q.    And how did you not know they were -- sorry.  How did you know they were not arm's length transactions?

A.    They said in the appraisal report these were built to suit properties.

Q.    And when you made a challenge to that appraisal, do you recall how much the value changed?

A.    No, do not.

Q.    So the comparables, whether or not they were an arm's length transaction --

A.    Uh-huh.

Q.    -- are an appropriate measuring stick; you just didn't agree with the fact that they weren't arm's length transactions; is that correct?

A.    That was a long question.  The value of the sales comparison approach did change.

Q.    That's not what I asked.  My question is you took issue -- let me start over.  Is it appropriate to use comparable sales when doing a property appraisal?

A.    Yes.

Q.    And the appraiser in that particular instance did use comparable sales as a point of valuation with respect to that particular property;

Page 122

correct?

A.    Non-arm's length sales are not comparable.

Q.    What are they then?

A.    They are custom built buildings.

Q.    Did they get sold?

A.    No.

Q.    They weren't sold?

A.    No.

Q.    Did they have a value?

A.    To the person that built the building.

Q.    So when you were -- I believe you originally testified that the comparable sales he -- or the comparable figures he used were a non-arm's length transaction; correct?

A.    The data he presented as comparable sales were not arm's length transactions since they don't meet the test of being a comparable sale.

Q.    And who sets that test as what a comparable sale is?

A.    For residential properties, Fannie Mae sets that.  For commercial properties, it's understood that there's no willing seller, no willing buyer to indicate that there's a value -- a market value or sale price -- official sale price for that transaction.

Q.    It's understood by whom?

Page 123

A.    Professionals in an industry.

Q.    So there's no industry standard in USPAP -- sorry -- USPAP or the Appraisal Institute that says you have to have arm's length transaction for it to be a comparable sale?

A.    I don't think it says that explicitly.

Q.    Is the only issue that you took with this particular building -- I'm forgetting the name of it -- the medical --

A.    Applied Medical Technology.

Q.    Applied Medical Technology building.  Is the only issue you took with the appraisal being the fact that the sales data used was not an arm's length transaction?

A.    No, there are other issues I don't recall.

Q.    Is it fair to say that was your primary issue?

A.    I don't recall.

Q.    And when you write in your self-evaluation your question about something that is theoretically incorrect or in error, you use the word theoretically, so I want to understand what you were meaning by saying the word theoretically.

A.    Appraisal theory is to use comparable sales that are similar to the subject property that

Page 124

have the same highest and best use that are arm's length transactions.

Q.    So in theory the original appraisal, even though they were not, in your words, arm's length transactions, were acceptable, but in theory you would have preferred to seeing arm's length transactions as a comparable sale?  Is that correct?

A.    I don't think -- I don't agree with the first part of your question.

Q.    What don't you agree with?

A.    Can you repeat the question?

MS. MARSH:  Yes, go ahead.

[The pending question was read by the reporter.]

A.    My concern is are acceptable --

Q.    (By Ms. Marsh)  I'm sorry?

A.    They weren't acceptable to me.

Q.    They weren't acceptable to you?

A.    Right.

Q.    But under USPAP standards and the appraisal institute, there is nothing that says it has to be an arm's length transaction to be a comparable sale; correct?

A.    I don't know if there's anything ever written specifically for that other than an article



Page 125

written in the appraisal journal.

Q. But your -- as we've talked about throughout this deposition, what you refer to if you ever have an issue is USPAP; correct?

A. Yes.

Q. And nothing in the USPAP says anything about having to have an arm's length transaction to be a comparable sale?

A. It says appraisals shouldn't be misleading. To use a non-arm's-length transaction would be misleading.

Q. My question to you is nothing in the USPAP says that an arm's length transaction has to be used in terms of a comparable sale measuring point. Is that correct?

A. Again, it says it should be comparable sales and arm's length tran -- non-arm's length transactions are not sales. They don't meet the test.

Q. My -- listen to my question very closely.

A. Okay.

Q. My question is the USPAP does not say anything about a comparable sale having to be something from an arm's length transaction; is that correct?

A. I think the definition of comparable sale takes care of that without having to state that.

Page 126

Q. Does the USPAP say anything in any place that you can point to that says a comparable sale has to be an arm's length transaction?

A. No.

Q. So your belief is that it has to be an arm's length transaction but it is not in the USPAP; correct?

A. It's implied by saying a comparable sale.

Q. It's implied by who?

A. By USPAP.

Q. But it doesn't say it exactly and that's how you read it to mean; correct?

A. Yes.

Q. So in theory, when you write theoretically it was appropriate --

A. Uh-huh.

Q. Or it was -- sorry, it was correct for him to use comparable sales from a non-arm's length transaction, but it was theoretically incorrect because you wanted it to be from an arm's length transaction; correct?

A. No.

Q. Why not?

A. There were other theoretical reasons I'm talking about besides just that one.

Page 127

Q. And what were those reasons?

A. In general other things that have happened in appraisals?

Q. No, I'm talking about -- well, you just said that particular appraisal. Was it -- were there other --

A. As an example on that particular appraisal.

Q. Okay. So could you give me another example of something that is theoretically incorrect?

A. Yes.

Q. Please give me that example?

A. An appraiser appraised an RV park. He showed the income in the RV park and he said there would be no expenses associated with the RV park. Theoretically, RV parks have expenses, and he should have included expenses in his analysis of income approach.

Q. And what year was this?

A. This was when I was at National City bank.

Q. And if he included expenses, how would that change the value of the property?

A. Excluding expenses. Excluded expenses.

Q. Well, I understand he originally excluded expenses.

Page 128

A. Yes.

Q. And I said if he included expenses, how would that change the value of his overall appraisal?

A. That would reduce the net income of the property.

Q. And would you know for certain what the amount of those expenses would be?

A. No.

Q. Would you have to estimate what those expenses would be?

A. Would I?

Q. Would a appraiser?

A. Yes.

Q. And how would an appraiser estimate what expenses would be for an RV park?

A. USPAP requires them to analyze the actual historical expenses of the property and comparable properties to determine if the actual expenses are in reason.

Q. And so it's an estimate; correct?

A. Yes.

Q. So it's not an exact number -- an appraisal can never be an exact number; correct?

A. Correct.

Q. It's more of an art than a science, so to



Page 129

speak? Is that fair?

A. There's science to it.

Q. Well, it's not always -- if you had -- you're never going to get the same number every time? Is that correct?

A. Possibly.

Q. Going to the last page of your 2014 review, you write -- you give yourself a rating meets all expectations. Let's see what that box is called. Employee's overall summary. I have been told that I should not be so astute and should not look for errors in appraisal reports.

I do not understand why errors seem to jump out at me. One former supervisor told me I find errors he would never find. Another former supervisor said we are production-oriented and indicated we should be less concerned about quality. I would like to believe I can do both while balan -- pardon me -- while still balancing time constraints with bank risk. Did I read that correctly?

A. Yes.

Q. I want to talk about the first sentence. You write I have been told I should not be so astute and should not look for errors in appraisal reports.

A. Yes.

Page 130

Q. Who said that to you?

A. Jeff Rettstatt.

Q. And why did you not write Jeff Rettstatt's name in here?

A. Don't recall.

Q. Did Jeff Rettstatt say that to you in writing or in a conversation you had with him?

A. Telephone conversation.

Q. And did you ever tell anybody he said that?

A. Yes.

Q. Who?

A. I probably mentioned it to Joe Rose, other people. Friends or something.

Q. And did you ever tell Doug Schoenberg?

A. That it was Jeff?

Q. Yes.

A. I don't recall.

Q. Did you take issue with that statement?

A. I thought it was funny.

Q. What do you mean?

A. I just couldn't believe he said it. I don't know what be as astute as an average reviewer means. I don't know what that means.

Q. Did you ask him to explain it?

Page 131

A. No.

Q. Did you take it as a criticism?

A. No.

Q. Then you write I do not understand why errors seem to jump out at me. What did you mean by that?

A. I mean sometimes I can read an appraisal and I think that just didn't make sense. Why didn't other people find that? What do I do?

Q. Why did you include that in your review?

A. I don't recall reason for that at this time.

Q. You write one former supervisor told me I find errors he never would have found. Who were you talking about there?

A. Jeff Rettstatt.

Q. And you didn't write his name there either, did you?

A. No.

Q. And when was that conversation that he said that to you?

A. He wasn't there very long. 2010, 2011.

Q. So you're bringing up something that happened from 2010 or 2011 in your 2014 review?

A. Yeah. Yes.

Page 132

Q. So you had not necessarily been told that in 2014?

A. No.

Q. Or you hadn't been told I should not be so astute and not look for errors for appraisal reports in 2014?

A. No.

Q. Then you write another former supervisor said we are production-oriented and indicated we should be less concerned about quality. Who said that?

A. Tom Silnes.

Q. And Tom Silnes was not your supervisor in 2014, was he?

A. No.

Q. He was no longer with the bank in 2014, was he?

A. Yes.

Q. Or he wasn't your -- I'm sorry. He was not your supervisor in 2014; correct?

A. No.

Q. Did he say this to you in 2014?

A. No.

Q. Why are you putting in comments from years past in your 2014 self-evaluation?

A. I don't recall.



Page 133

Q. Let's go to Exhibit 10. This is -- what is this document? Well, I'll mark it for the record first. I'm sorry. Exhibit 10 is PNCMEEHAN000174 to 178. Do you recognize this document?

A. Yes.

Q. And what is this document?

A. My manager evaluation for 2014 written by Doug Schoenberg.

Q. And this is -- he also reviewed you similar to as he had in 2013 and 2012; correct?

A. Yes. Yes.

Q. And again, in the first box it has what the goals are, so you have a total benchmark of $108,000, similar to 2013 and 2012; correct?

A. Yes.

Q. And he writes rating, meets all expectations. Comments. Joe was at 94 percent of the goal through November. This is not for lack of effort on his part, but there were several slow months when overall volumes were down. He has shown that he is willing and capable of meeting the goal when work volumes are adequate.

Joe is a good reviewer with strong technical skills. He's capable of handling complex assignments. Further, he has made several

Page 134

recommendations for appraiser downgrades throughout the year. Did I read that correctly?

A. Yes.

Q. So did you not meet your production goal in 2014?

A. I don't know.

Q. On this next page at the top box, you write -- or excuse me -- Doug Schoenberg writes reviews are completed in a thorough and timely manner. Joe communicates with RMs, associates, and appraisal vendors regarding possible delays and appraisal issues. Joe is very good about alerting me when he will be out and/or working from home. Did I read that correctly?

A. Yes.

Q. In the box below that you write Joe maintains a positive attitude, although justifiably so he's sometimes frustrated with the quality of work we see from outside vendors. He's good about coming to me with questions and comments regarding appraisal issues. Did I read that correctly?

A. Yes.

Q. So again, this is commenting that they noticed that you are aware of technical issues in appraisals and you are quick to bring them up to supervisors and the people that need to know about it;

Page 135

correct?

A. Yes.

Q. And that was consistent with your reviews in 2012 and 2014; correct?

A. Yes.

Q. On the next page, Mr. Schoenberg writes under risk management compliance, Joe is a good reviewer and understands the regulations very well. He's not afraid to query me regarding valuation or regulatory questions. He has a very clear understanding of the difference between extraordinary assumptions and hypothetical conditions. Did I read that correctly?

A. Yes.

Q. What does that mean to you -- the difference between extraordinary assumptions and hypothetical conditions?

A. I know the difference. I don't know why he says I have a clear understanding of them.

Q. What is the difference?

A. What is the difference?

Q. Yes. I'm assuming this is with respect to the appraisal review process?

A. More for the appraisal itself. Okay? Extraordinary assumption would be something similar to

Page 136

if you could get the zoning changed in a piece of property and the city said you could do that, that would be an extraordinary assumption that you could develop a property based on the new zoning change.

Q. Based on?

A. A new zoning change, approved zoning change. Hypothetical condition would be something like if you had a vacant piece of property and you appraise as if there was a building on there, that would be a hypothetical valuation because there was no building on there. So hypothetical condition would be if it were built today, that's what it would be worth.

Q. And so these are things that an appraiser would use in valuing the property that they are appraising?

A. Yes.

Q. And sometimes you may need to challenge an extraordinary assumption or a hypothetical condition if it doesn't meet USPAP standards or is not something that would necessarily be credible, to use the words of USPAP?

A. Yes.

Q. So that's not something that you as the reviewer would ever create? That's something that the appraiser does in their overall report; is that

Page 137

correct?

A. Yes.

Q. And does it happen in every appraisal, or it just depends on the property?

A. Depends on the property.

Q. If you could go to the next page, please. PNC standard corporate risk management. That box. Mr. Schoenberg writes Joe is very concerned about the quality of appraisal work that comes across his desk. He is very well-versed in USPAP and market parameters and is not afraid to challenge appraisers regarding their assumptions. Did I read that correctly?

A. Yes.

Q. And again, that's in line with the other things we've talked about in 2012 and 2013 where you are quick to challenge -- or not afraid to challenge an appraiser if you don't agree with their methodology or their overall value of a property?

A. Yes.

Q. And it looks like this year you would have had an midyear review under Section 5; correct?

A. Yes.

Q. And it says Joe and I discussed this midyear review on August 11, 2014. I am in agreement with Joe's self-evaluation assessment. Is that

Page 138

correct?

A. Yes.

Q. And then the bottom, manager's overall summary, Mr. Schoenberg writes your rating is that you meet all expectations. Joe will not likely meet the production goal for the year. However, this is not for lack of effort on his part. He's a very thorough and technical reviewer. He's not afraid to challenge appraisers regarding regulatory, USPAP, or valuation issues. I would recommend that Joe take the AI or AL general appraisal review course during 2015 if it's available locally. Did I read that correctly?

A. Yes.

Q. And then would you have reviewed this again with Mr. Schoenberg as you had in 2012 and 2013?

A. Yes.

Q. And if you had any issues in here, would you have addressed them with Mr. Schoenberg?

A. Yes.

Q. Did you have any issues with what was in here?

A. Not that I recall.

Q. And it went in your file?

A. Yes.

Q. By the way, I think you may have said it

Page 139

and I missed it. When was the Applied Medical Technology review? Was that 2012 or 2013?

A. I think it was around November 13th. October, November.

[Exhibit 12 marked for identification.]

Q. Mr. Meehan, you've been handed what's been marked as Exhibit 12, Bates-numbered PNCMEEHAN000160 to 166. You did not complete a performance evaluation for 2015; correct?

A. I don't believe so.

Q. And that's because your position was eliminated in 2015; correct?

A. Yes.

Q. And I just want to go through this because it says 2015 yearend performance summary for Joseph Meehan. I understand you didn't fill it out and it appears to be in a different format than the other ones, but if you look down to the bottom third of the page it doesn't have the box on it, but it says business functional results and then it says in progress. Do you see that?

A. Yes.

Q. And it says each reviewer is expected to generate allocated fees in the amount of $108,000 annually or an average of $9,000 monthly. Did I read

Page 140

that correctly?

A. Yes.

Q. So in 2015, your production goals and the standards that you were going to be held to were the same as they had been in 2014, 2013, and 2012?

A. Yes.

Q. And all of these say in progress because you did not fill these out; correct?

A. Correct.

Q. So each year, 2012, 2013, and 2014, you were reviewed. We have gone through every review and it talks about how you are more than capable of challenging an appraiser if you don't agree with their calculation or position; correct?

A. Yes.

Q. And were you ever reprimanded for making those challenges?

A. Not in writing.

Q. Who reprimanded you?

A. I felt like Fred Petrie reprimanded me.

Q. You felt like Fred Petrie --

A. Uh-huh.

Q. -- reprimanded you? When did Fred Petrie reprimand you?

A. When I reviewed the appraisal medical

Case: 4:17-cv-02876-PLC  Doc. #: 64-1  Filed: 03/20/19  Page: 37 of 64 PageID #: 751

Page 141

technology report.

Q. And how did he reprimand you?

A. His attitude was just let it go, let it go through. Your boss's bosses are okay with it.

Q. And how was that a reprimand?

A. It just seemed like he was challenging me.

Q. And did that negatively affect your continued employment with PNC?

A. I don't know.

Q. Well, did you continue to work for PNC in 2014?

A. Yes.

Q. And in 2015?

A. Not the total year.

Q. Did you continue to work in 2015 for PNC?

A. Partial year.

Q. Did you continue to work for PNC in 2015?

A. Yes.

Q. And you even had low productivity in 2012 and 2014 where you didn't meet your production goals in either of those years; correct?

A. Yes.

Q. And even though you didn't meet your production goals, you still got a rating of meets all expectations; correct?

Page 142

A. Yes.

Q. And you still continued to work the following year even though you hadn't met your production goals; correct?

A. Yes.

Q. And you weren't eliminated from your position in 2012; correct?

A. No.

Q. And you weren't eliminated from your position in 2013; correct?

A. No.

Q. And you weren't eliminated from your position in 2014; correct?

A. No.

Q. Correct?

A. Correct.

Q. Did you -- I'm sorry if I already asked this. Did you already discuss with Fred Petrie whether or not he said you were stubborn, or was that only a discussion that you had with Mr. Schoenberg?

A. Schoenberg. I did not discuss it with Fred Petrie.

Q. So you don't know for a fact if he ever said it?

A. No.

Page 143

Q. He never said it to your face?

A. No.

Q. And the Applied Medical Technology building --

A. Yes.

Q. That was the one that you took issue with the comparable sales; correct? One of the issues?

A. Yes.

[Exhibit 13 marked for identification.]

Q. Mr. Meehan, you've been handed what's been marked as Exhibit 13. Do you know what this document is?

A. This is our case with PNC provided by my attorney.

Q. I'm sorry. I didn't hear you.

A. That's all right. This is the petition for my case as provided by my attorney, I believe.

Q. Did you assist your attorney in giving facts relative to this document?

A. Yes.

Q. And I would like you to go to Page 5, Paragraph 14.

A. Okay.

Q. You -- or excuse me. The document reads one example occurred shortly before he, being Mr.

Page 144

Meehan, was notified of his termination?

A. Yes.

Q. Mr. Meehan was assigned to review the appraisals of two New Jersey child care properties in late September 2015. One property was appraised for $2.1 million, the second for $5.8 million. Each appraisal was deficient because the appraiser did not address or identify the licensed capacity of the facility as regulated and authorized by the State of New Jersey nor did he apply the most appropriate and recognized methodology for analyzing the market value, price per licensed child. The appraiser wasn't even aware of the need to research the property's associated licenses or the industry methodology for finding a child care facility's value. Did I read that correctly?

A. Yes.

Q. And in the preceding paragraph, you write -- or excuse me. The document reads PNC supervisors would routinely require him, being Mr. Meehan, to ignore standards -- I'm sorry. I'm just going to read the whole paragraph so it's clear.

A. Okay.

Q. Number 13 reads as a senior review appraiser at PNC, Mr. Meehan was required to follow



Page 145

state, federal, and professional licensing standards when reviewing and approving all appraisals he was assigned. However, PNC's supervisors would routinely require him to ignore such standards when reviewing appraisals, and Mr. Meehan's refusal to do so contributed to his termination. Did I read that correctly?

A.   Yes.

Q.   And then it goes -- I read them out of order but the next example that is given is with respect to the New Jersey child care facility?

A.   Yes.

Q.   Is that correct?  If you could go to the next page. It reads Mr. Meehan -- Paragraph 15. Mr. Meehan continued to work with the appraiser, sending him copious citations that explain how to appraise child care properties. New appraisals were generated the first week of October. These revised appraisals lowered each of the property's valuations to $1.9 million for the first property and $5.4 million for the second.

Paragraph 16. However, PNC's supervisors refused to accept the new devaluation of the properties stating via e-mail on October 15, 2015, that the bank should ignore Mr. Meehan's findings and just go back to

Page 146

the original analysis which is what was completed last year. Mr. Meehan continued to push back, arguing that the loan officer, parentheses, RM, did not object to the lower value and that the law required some -- in italics -- consideration of issued licenses and price per licensed child. Did I read that correctly?

A.   Yes.

Q.   Number 17, despite Mr. Meehan's strong objections, both reviews were taken from him on October 16, 2015, and no further explanation was provided. The revisions made by the appraiser as well as many of Mr. Meehan's review comments were deleted. The original appraisals of $2.1 million and $5.8 million were reinstated and signed by a PNC group supervisor.

Number 18. Mr. Meehan was notified on October 20, 2015, that he would be terminated.

Based on this, Mr. Meehan, do you believe you were terminated based on the review of the daycare center property in New Jersey?

A.   Not specifically, no.

Q.   What do you believe the reasons were for the elimination of your position?

A.   I think I was not given equal share of appraisals to review and equal dollar value, and therefore my production was low because those

Page 147

assignments were late because I wouldn't approve them, and I wasn't production-oriented as the way PNC would like me to have been.

Q.   So do you not believe the New Jersey daycare situation has any contributing factor in your termination?

A.   I think it shows that if I wouldn't accept it, they could take it away, which they did before. And the atmosphere there was to let things go through, and I wouldn't do that, and they saw a way to get rid of me.

Q.   Who's they?

A.   The bank. The people that determined why I should be the one to go.

Q.   And who was that?

A.   I'm not sure who that was.

Q.   You don't know who determined that you should -- your position should be eliminated?

A.   Not officially.

Q.   What do you mean, officially?

A.   I just told I was being severed.

Q.   Who told you that?

A.   HR department.

Q.   Who from HR?

A.   I don't recall her name.

Page 148

Q.   And you weren't given any reason?

A.   I think they said the business was slowing down, they needed to downsize.

Q.   Well, let's talk about the New Jersey daycare center.

A.   Okay.

[Exhibit 14 marked for identification.]

Q.   Okay. Mr. Meehan, you've been handed what's been marked as Exhibit 14, Bates-numbered MEEHAN002213 to 2230. Does this look to you like the review of the New Jersey daycare facility at 900 Hamilton Street?

A.   Yes, Emily Weismantle did the review.

Q.   I'm sorry?

A.   Emily Weismantle did this review.

Q.   How do you know that?

A.   Page 1, reviewer, Emily Weismantle.

Q.   Ah, there it is. Yes, correct. Okay. And is this the document -- or excuse me. Is this the appraisal review that's referenced in the petition that we just read?

A.   No.

Q.   Well, the petition talks about one being valued at $2.1 million and one being valued at $5.8 million.



Page 149

A.   Yes.

Q.   Is this one not the $2.1 million property?

A.   It's the property.  This is not my review.

Q.   How do you know this is not your review? At the back it has your signature.

A.   Ah.  My review starts on Page 3.  And Ms. Weismantle's starts on Page 1.

Q.   My question, to you, sir --

A.   Okay.

Q.   -- is this the property that we were talking about in the petition -- the New Jersey daycare facility?

A.   This is the property, yes -- 900 Hamilton.

Q.   Thank you.  So going to the third page, it says PNC technical appraisal review; correct?

A.   Yes.  Yes.

Q.   And it's transmitted on October 9, 2015?

A.   Yes.

Q.   And then it looks to be there's handwritten notes on the far upper right-hand corner?

A.   Yes.

Q.   Are those -- is that your handwriting?

A.   Yes.

Q.   And in here this is where you would fill in your comments and issues with the appraisal;

Page 150

correct?

A.   Sometimes, yes.

Q.   What do you mean by sometimes?

A.   You wouldn't report your issues here. Unless there was a risk with the property.  So when you say issues I don't know if you're referring to issues with the appraisal report or issues with the -- say the neighborhood.

Q.   Oh, okay.  So if you had an issue with the actual appraisal you wouldn't necessarily print them here; you would communicate them to the appraiser directly, but if there's a risk -- you would put it in here?

A.   Yes.

Q.   I understand.  Thank you for that clarification.  You have handwritten notes and questions in here and then I believe your analysis or review goes up through the end where then it has the minimum appraisal -- minimum regulatory appraisal standards before that checklist.  Correct?

A.   Yes.

Q.   And in your petition you write that you had an issue with the valuation of the property because the appraiser did not address or identify the licensed capacity of the facility as regulated or authorized by

Page 151

the State of New Jersey, nor did he apply the most appropriate and recognized methodology for analyzing the market value, price per licensed child.  Did I read that correctly?

A.   Yes.

Q.   What was the analysis that the appraiser used instead?

A.   In the original appraisal report?

Q.   Yes.

A.   Price per square foot of building area.

Q.   Price per square foot?

A.   Of building area.

Q.   And you thought it was more appropriate to use price per licensed child; correct?

A.   Yes.

[Exhibit 15 marked for identification.]

Q.   Mr. Meehan, I'm handing you what has been marked Exhibit 15, Bates number MEEHAN002231 to 2233. At some point in time did you bring up your concern about the valuation method used by the appraiser with a supervisor?

A.   Yes.

Q.   And who did you bring that up to?

A.   Diane Pockar.

Q.   And was she your supervisor or was she

Page 152

the -- what was --

A.   Supervising appraiser.

Q.   With respect to this particular property?

A.   Yes.

Q.   And she writes to you on October 15, 2015, at 1:26 PM.  Do you see that?

A.   Yes.

Q.   Subject, 900 Hamilton.

A.   Yes.

Q.   And she says hi, Joe.  I was thinking more about this report over the last day and actually called the vendors based on our conversation last evening that properties in this market do not sell on a per child licensed basis.  I'm concerned that the valuation is not significantly supported as the analysis appears to not be supported.

My suggestion is to revert back to the original analysis and accept the basis for which the appraisers originally concluded.  This is a strong market and I am afraid that if the appraisers have not seen analysis like this ever it's just not credible.

I am not able to get my arms around it entirely but was just thinking what if the number of licenses change, either for the property or the comparables?  The value is a moving target.  Do the

Page 153

licenses get issued to the business or do they run with the real estate? One of the comps, Page 50, states that the property is licensed for 457 children but rent is based on actual enrollment which we know can change at any time.

Please let me know if we have your approval to just go back to the original analysis, which is what was completed last year. Sorry to be longwinded. I thought it best to spell out my own mind by writing it in an e-mail. Thank you, Joe. Diane. Did I read that correctly?

A. Yes.

Q. Going back to Exhibit 13, your complaint, Paragraph 16.

A. What page are you on?

Q. It's Page 6, Paragraph 16.

A. Okay.

Q. It reads in an e-mail on October 15th the bank -- sorry. I'll just start -- however, PNC supervisors refuse to accept the new devaluation of the property stating via e-mail on October 15, 2015, that the bank should ignore Mr. Meehan's findings and quote, just go back to the original analysis, which is what was completed last year, close quote.

Mr. Meehan continued to push back, arguing

Page 154

that the loan officer RM did not object to the lower value and that the law required some, in italics, consideration of issued licenses and price per licensed child. So that's not actually a full representation of what the e-mail said; correct?

A. Correct.

Q. She actually suggested to you that you revert back to the original analysis and asked if they had your approval to go back to the original analysis.

A. Yes.

Q. You were never ordered to go back to the original analysis, were you?

A. No.

Q. If you go to the first page, you wrote back, and you said the RM is okay with the lower value. Our building is significantly larger than the comps and yet we are not licensed for significantly more students. Thus we have a super adequate building size and I am not convinced the market would pay top dollar for unneeded space. The sale comps reflect building area per license ranging from 56 square foot to 70 square foot. Our building has 195 square foot per license. Did I read that correctly?

A. Yes.

Q. So in your response you don't really

Page 155

address Ms. Pockar's concern about the value being a moving target with respect to numbers of licenses changing; correct?

A. Correct.

Q. And she says that it could be a moving target which overall affects credibility; correct?

A. No, she's talking about the appraisers and the analysis not being credible.

Q. Well, actually, she writes this is a strong market and I am afraid that if the appraisers have not seen analysis like this ever, it is just not credible. So it's your analysis that she takes issue with?

A. No, their analysis based on price per license, which is what she's referring to.

Q. But they did the analysis on price per square foot; correct?

A. Originally. They revised it and changed it.

Q. At your recommendation?

A. Yes.

Q. And she's saying she doesn't agree with the price per license; correct?

A. Yes.

Q. Because she says it's just not credible;

Page 156

correct?

A. Their analysis is not credible.

Q. And that's because credibility is one of the Number 1 things that you USPAP requires; correct?

A. Yes.

Q. And she outlines what her concerns are that it could be subject to change any year and might not be as credible as a square foot analysis; correct?

A. That might be her opinion.

Q. That's what I'm talking about. That's what her e-mail is saying to you; correct?

A. That's what she believes.

Q. And back to your words in your self-evaluation, theoretically it would be correct to do a valuation on price per square foot, but you thought it was better to do it on price per licensed child; correct?

MR. CARTER: I'm going to object. Mischaracterizes the previous testimony. He was talking about theoretical but he wasn't talking about this specific instance.

Q. (By Ms. Marsh) You can answer.

A. Repeat the question now?

MS. MARSH: Can you read it back, please?

[The pending question was read by the



Page 157

reporter.]

A.  That is confusing, but theoretical -- could you restate the question?

Q.  (By Ms. Marsh)  What is confusing about that question?  Well, I'll break it down. Theoretically, is it appropriate to value a commercial building on price per square foot?

A.  Is it appropriate?  Is that what you said? Sorry.

MS. MARSH:  Did I say appropriate?  Now I don't even know what I said.

THE REPORTER:  Yes.

A.  Yes.

Q.  (By Ms. Marsh)  So there was nothing wrong with the New Jersey daycare center original analysis valuing the property at price per square foot.  You just thought it was more appropriate to do it on price per licensed child?

A.  Yes.

Q.  And nobody said you had to revert to the original analysis; correct?

A.  Let me rephrase that.

Q.  Rephrase what?

A.  The answer.

Q.  Oh.  To what?

Page 158

A.  Repeat her question.

[The requested portion of the transcript was read by the reporter.]

A.  I think there is something wrong with that.

Q.  What is wrong with that?

A.  It should be based on price per licensed child.

Q.  What is wrong with that?  Who says it has to be based on price per licensed child?

A.  Recognized methodology and techniques would dictate that it should be looked at in that analysis made in that capacity.

Q.  What recognized methodology and techniques?  Who promulgates those?

A.  The Appraisal Institute classes.

Q.  Where is it written that you have to do a appraisal of a daycare center on price per licensed child and can never do it on price per square foot?

A.  It would be misleading to ignore it.

Q.  Did anybody ignore it?

A.  The original appraisal ignored it.  He didn't even mention the license capacity, which is a USPAP violation to omit information that's relevant to the valuation of a property.

Page 159

Q.  But then you were able to address that with the appraiser, were you not?

A.  Yes.

Q.  And then there was second analysis; correct?

A.  You submitted a revised report.  Correct.

Q.  And then you had a conversation via e-mail with Diane Pockar and we just went over that; correct?

A.  Yes.

Q.  And she didn't say it was wrong, did she?

A.  She said we should revert back to the original report.

Q.  Is that -- were those her words?

A.  Uh-huh.  That's what it says.  My suggestion is revert back to the original analysis, accept the basis for the appraisal which is included.

Q.  And then on the last page she writes please let me know if we have approval to go back to the original analysis which was done last year; correct?

A.  Yes.

Q.  So she's asking for your approval?

A.  To ignore the revised appraisal and go back to the original appraisal.

Q.  Where does she say that -- ignore it?

Page 160

A.  Do we have your permission -- if we have your approval just go back to the original analysis.

Q.  Does it say the word ignore in there?

A.  No.

Q.  Does it say you have to do this?

A.  No.

Q.  And she says it's her suggestion; right?

A.  Yes.

Q.  Not you have to?

A.  No.

Q.  Not you do this or else?

A.  No.

Q.  Did you ever see the final report, Mr. Meehan?

A.  The final report?  There was an original report, revised report, and then another report?

Q.  A final report that was turned in that completed the review of the property.

A.  Yes.

Q.  You did see it?

A.  (Nodding "yes.")

[Exhibit 16 marked for identification.]

MS. MARSH:  Just for the record, this was -- this is the wrong copy of it.  It's designated confidential, and it's missing that designation on



Page 161

here.

MR. CARTER: Okay.

MS. MARSH: But just for the record. PNCMEEHAN00266 to 280 is Exhibit 16.

Q. (By Ms. Marsh) Do you recognize this document, Mr. Meehan?

A. No.

Q. This report you said in your petition was taken away from you; correct?

A. Yes.

Q. Do you know who it was given to?

A. Paul Higgins.

Q. If you go to the back of the document. Is he the signatory to this?

A. Yes.

Q. And what is the date of it?

A. October 21st, 2015.

Q. I would like you to go to PNCMEEHAN00276. It's Page 11 of 15.

A. Okay.

Q. And do you see where it says additional review comments?

A. Yes.

Q. It says the property was previously appraised by the same appraiser in May 2014 and the

Page 162

value conclusion did not change. An additional sales comparable analysis based on price per licensed child in addition to sales price per square foot of GBA was initially requested during the review process.

However, this analysis was later determined not necessary to fill the evaluation requirement of this request. In addition, the sale price per licensed child did not consider the mix of infant, toddler, or preschool daycare, nor did it have a credible impact on the value conclusion. The appraisal as currently presented adequately supports the value conclusion. Did I read that correctly?

A. Yes.

Q. So this report actually takes into account your suggestion at some point that there be a consideration on price per licensed child; correct?

A. Yes.

Q. And nobody ignored that; correct?

A. Nobody ignored the consideration. Correct.

Q. And it's actually mentioned in the report that you suggested that there be another type of valuation; correct?

A. It suggested that I do this in the report?

Q. No, no. It suggested that another

Page 163

analysis -- sorry. It is written that another analysis was suggested to take licen -- the value of sale price per licensed child as opposed to sale -- sorry -- per square foot?

A. It says analysis was requested, yes.

Q. And it says however, this analysis was later determined not necessary to fill the evaluation requirement of this request. In addition, the sale price per licensed child did not consider the mix of infant, toddler, or preschool daycare, nor did it have a credible impact on the value conclusion. Is that correct?

A. That's what this says.

Q. So it's addressing the fact that you had suggested a different type of analysis; correct?

A. It didn't mention my name in here.

Q. Why would your name be in here?

A. I don't know.

Q. Do you need to have your name in here?

A. No.

Q. Were you -- did somebody else suggest the price per licensed child?

A. Not that I'm aware of.

Q. So nobody really ignored what your comments were; correct?

Page 164

A. No, I disagree.

Q. Who ignored your comments?

A. Whoever reassigned this to Paul Higgins, and Paul Higgins, who accepted the appraisal report.

Q. And why are they ignoring your comments, or how are they ignoring your comments, I should say.

A. They did not identify the subject, saying that it was state-licensed, how many licenses it was approved for, which impacts the value of the value property.

Q. Does it impact the value of the property when they're doing it on a price per square foot?

A. Yes.

Q. Why?

A. It's relevant to the value of the property.

Q. So in your opinion, that appraisal does not meet USPAP standards?

A. Yes.

Q. And that is because it does not mention what?

A. It's a commis -- Standard 1 says you must not omit relevant information, and that is very relevant, and that's how buyers look at these businesses. It's based on the number of licensed child



Page 165

you can generate revenue from, not price per square foot.

Q.   And who says that?

A.   It's an accepted standard for nursing homes, skilled nursing facilities, child care centers that are licensed by the state -- as I quote it in this home and underwriting guide -- this is how buyers look at it.

Q.   Is this a non-credible valuation?

A.   Non-credible valuation?

Q.   Appraisal.  The final one.

A.   The final one that Paul accepted?

Q.   Yes.

A.   In my opinion it's not credible.

Q.   What is not credible about it?

A.   He omits the information about license capacity of the subject and the comparable sales.

Q.   How do you know that?

A.   I saw the appraisal report that he approved.

Q.   So you do know then that he wrote those comments in here about you suggesting a different analysis?

A.   I know what he wrote here and I know the report that he approved.

Page 166

Q.   What is the difference between the report that he approved and what he wrote here?

A.   The report he approved neglected to mention the license capacity of the subject property.

Q.   Mr. Meehan, this is the final report.

A.   This is the final review, not the final appraisal report.

Q.   So you are saying to me that the final report does not --

A.   Appraisal report.

Q.    -- does not say what?

A.   Does not address the license capacity -- state license capacity authorized by the State of New Jersey, I think, maybe.

[Discussion off the record.]

Q.   Can you tell me where in the USPAP, though, it says that you have to do that?

A.   Standard 1-1B, I believe.

Q.   And what does Standard 1-1B say?

A.   It says appraiser shall not omit information that's relevant to the value of the property.

Q.   How do you determine what's relevant?  Who says what's relevant?

A.   The market determines what's relevant.

Page 167

Q.   So it's subject to change?

A.   Everything's subject to change.

Q.   And it's a subjective decision by an appraiser as to what is relevant; correct?

A.   No.  Everything doesn't have to be relevant in the appraisal report.

Q.   Like what?

A.   The legal description of the property, the size of the building.

Q.   Well, that's required; right?  That has to be in the report?

A.   Yes.

Q.   But isn't that under the standards of what has to be in the report before you sign off on it?

A.   It doesn't specifically say that the size of the property has to be mentioned, but yes, generally accepted that -- describe the property -- state licensing is part of the description of the property.

Q.   The term relevance.  That is something that is left to a appraiser to determine what should be put in the report; correct?

A.   No.

Q.   Is there a definition for relevance in USPAP?

A.   Not that I recall.

Page 168

Q.   So how do you determine what's relevant?

A.   It's what your appraisal peers would put in an appraisal report.

Q.   Pardon me?

A.   It's what your appraisal peers would put into an appraisal report.

Q.   So it's subjective?

A.   No, it's considered what the experts would do.

Q.   So it's subjective?

A.   It becomes the norm.

Q.   So what I'm getting at is there's no standard?  There's no set standard or definition as to what's relevant; correct?

A.   I'd say no, I disagree.

Q.   Why?

A.   Because the industry has presented what they believe what they do to be relevant in a description of the property.

Q.   Who is they?

A.   The professionals in the business.

Q.   Who?

A.   Appraisers, reviewers.

Q.   If you lined up five appraisers --

A.   Uh-huh.



Page 169

Q. -- to appraise the New Jersey daycare facility --

A. Uh-huh.

Q. -- do you believe that they would all come up with the exact same number and value for that property?

A. No.

Q. And why is that?

A. I don't believe they would do it, but I believe they'd all describe the building, the size and the land area.

Q. My question is, would they come up with the same value if five appraisers appraised the exact same property?

A. I do not know.

Q. Well, you previously said no. You don't know?

A. I said no to that?

Q. Yes, you did.

A. Can we go back to that? Can we not?

[Discussion off the record.]

A. Will they all come back to the same value? Unlikely.

Q. And why is that?

A. They might use different sales, different

Page 170

comparables, different way of making adjustments, what they think is important or relevant.

Q. And which one of those appraisers is wrong?

A. If everything was done correctly, I don't know if they need to be wrong.

Q. So an appraisal report can have different values depending on what that appraiser deems to be relevant or appropriate in accordance with USPAP standards; correct?

A. Yes.

Q. And some people such as you might not agree with the valuation but it doesn't mean that it's wrong; correct?

A. If there's errors in the appraisal, then it could be wrong.

Q. If there's what?

A. Errors or omission of information.

Q. I'm talking high-level. If -- there could be five different appraisals for one property.

A. Uh-huh.

Q. And they could be based on different comparables, they could be based on sales per square foot, sales per how many windows. Who knows what is appropriate? They could all be different but they

Page 171

could all be right. Isn't that true?

A. Yes.

Q. And nobody's necessarily wrong because it depends on what the appraisal -- excuse me -- what the appraiser deems to be appropriate and relevant based on his or her valuation; correct?

A. High level, if he follows appraisal theory and methodology, yes.

Q. So it is subjective; correct?

A. Yes, parts of it.

MS. MARSH: Okay. We can take a break.

[A brief recess was taken.]

Q. (By Ms. Marsh) I know you have a lot of documents over there. Perhaps you're better at keeping them in order than I am. Do you have Exhibit 5 handy?

A. Yes.

Q. And that's the standards of valuation practice?

A. Yes.

Q. If you could go to Standard A, please.

A. Standard what?

Q. A.

A. Okay.

Q. It's on Page 5.

A. Okay.

Page 172

Q. It says an appraisal must be credible. Correct?

A. Yes.

Q. And it says SR A-1 competency. In developing an appraisal, a valuer must be aware and understand methods and techniques that are necessary to produce credible assignment results, not commit a substantial error of omission or commission that significantly affects the assignment results, and does not make a series of errors that considered individually may not significantly affect the assignment results but which when considered in the aggregate establish the appraisal is being rendered in a careless or negligent manner. Did I read that correctly?

A. Yes.

Q. And then if you go to Standard B. I understand that these are different words, but it also says a review must be credible; correct?

A. Yes.

Q. And credible being the same operative word in both of them; right?

A. Yes.

Q. And it says in developing a review a reviewer must -- under Subpart A -- understand the



Page 173

methods and techniques; correct?

A. Yes.

Q. B, not commit a substantial error of omission or commission that significantly affects the review; correct?

A. Yes.

Q. And not make a series of errors that considered individually may not affect the review but considered in the aggregate establish that the review is careless or negligent; correct?

A. Yes.

Q. I summarized that I understand. So again, neither of these standards require that an appraisal be perfect; correct?

A. Correct.

Q. And neither of them say you have to include every single piece of information that could be relevant or might be relevant in an appraisal; correct?

A. This is not USPAP. USPAP does say that.

Q. Where does it say that?

A. The uniform standards appraisal practice.

Q. It says every piece of information that could be relevant in the world has to be in there?

A. It says it must adequately describe the subject property.

Page 174

Q. What does adequately mean? How does USPAP define that?

A. I think Standard 1A says if it affects the value of the property then it's adequate -- description should include that.

Q. And does the USPAP say that appraisals need to be perfect?

A. No, it says that certain standards have to be met.

Q. When you had an issue with -- had you -- prior to this New Jersey daycare center issue in 2015, had you ever worked or reviewed an appraisal that you did not agree with and it was not changed?

A. I don't recall.

Q. You --

A. I don't believe so, unless the appraiser proved to me that he was correct.

Q. And how would he prove to you if it was correct?

A. If I asked him a question and he said the sign out front says one month free rent and I asked him if there was concessions to this property and he said no, that was an old sign or something, then I would believe him, but if he said, oh, yeah, there is concessions, then we'd get it fixed.

Page 175

Q. So I want to understand how -- did you ever go to New Jersey to look at this property?

A. No. No.

Q. You were here in St. Louis; right?

A. Yes.

Q. And you would probably review appraisals from other states as well; correct?

A. Yes. Yes.

Q. And would you ever go and visit those properties?

A. Not at PNC, no.

Q. And your job as the reviewer then would be to rely on what was given to you by the appraiser; correct?

A. Yes.

Q. Because they had firsthand knowledge?

A. Yes.

Q. And they were at the actual land, property, what have you, to conduct their analysis?

A. Yes.

Q. And PNC has several steps because we've gone through their procedures about making sure that a appraiser is certified; correct?

A. Yes.

Q. And making sure that USPAP standards are

Page 176

met; correct?

A. By the appraisal review department, yes.

Q. Pardon me?

A. By the appraisal review department.

Q. And as part of the PNC policies and procedures; correct?

A. Yes.

Q. And there were set tasks or things that you could do if you didn't agree with a particular appraisal; correct?

A. Yes.

Q. And if you challenge it you could bring it to a supervisor; correct?

A. Yes.

Q. And if you didn't -- still didn't like it you could have challenged it and asked for a new review of the property; correct?

A. Yes.

Q. And you probably could have gone higher up to the ethics department based on what you learned in your annual training; correct?

A. Yes.

Q. Did you ever do that?

A. No.

Q. Why not?



Page 177

A. I never violated ethics.

Q. Did you have to be the person violating the ethics to go to the ethics department?

A. I felt like I did.

Q. Why?

A. Because if somebody asked me to do something, let something go, and I didn't do it, I didn't violate ethics.

Q. That's not my question.

A. Yes.

Q. My question was if you thought there was a violation in ethics --

A. Uh-huh.

Q. -- in any sort of appraisal review, could you not have reported it to the ethics department? Wasn't that taught to you in Pittsburgh?

A. No.

Q. I thought you said in Pittsburgh in every year you learned that you could go to an ethics department that was based out of Pittsburgh --

A. Yes.

Q. -- and if there was an issue you could report it to them?

A. Not an appraisal review issue.

Q. What would you report?

Page 178

A. Violation of ethics by people in the department.

Q. Well, if there's a violation of ethics in an appraisal review, does that not qualify?

A. No.

Q. Why not?

A. Because that would be a USPAP compliance issue, not the ethics department of PNC Bank.

Q. And who says that? Where is that written?

A. Not written anywhere.

Q. That's your interpretation?

A. Yes.

Q. Did you ever call USPAP or any other authority -- federal authority -- as to a potential violation?

A. No.

Q. And why is that?

A. Because my reviews I had them corrected and I no longer thought they were noncompliant.

Q. Well, you just sat here and criticized the New Jersey daycare center as non-USPAP compliant. Did you report that?

A. When he revised it it was compliant.

Q. When who revised it?

A. The appraiser revised it. It was

Page 179

compliant on my desk.

Q. You just said the final report is not compliant.

A. The final report that Paul Higgins accepted is not compliant.

Q. Did you report that?

A. To USPAP?

Q. Yes.

A. No.

Q. Any authority?

A. No.

Q. Why not?

A. Didn't think it was my duty to report it to everyone.

Q. Why was it not your duty?

A. PNC had a culture of not turning in bad appraisals to the state.

Q. PNC had a culture of what?

A. Not submitting bad appraisals to the state.

Q. So it would submit good appraisals, is what you're saying?

A. No. It would not submit bad appraisals to the state to reprimand the appraiser.

Q. I don't -- I'm sorry. I don't under --

Page 180

I'm not following what you're saying. PNC --

A. PNC would not turn in a report that was bad to the state.

Q. And that report is bad to the state? I'm sorry. I'm --

A. State.

Q. What state? Whose state?

A. Appraisers are certified by the state. If an appraisal is not compliant with USPAP, you turn it in to the state regulation department and they determine if it's compliant or not and either reprimand somebody or suspend their license or put them on discipline.

Q. Who told you at PNC that you couldn't report an appraiser?

A. The culture was PNC didn't send anything in.

Q. My question to you is who told you you could not report an appraiser?

A. I don't recall who said PNC doesn't turn these things into the state.

Q. Did somebody say that to you?

A. I'm pretty sure.

Q. Who?

A. It was knowledge. I don't remember.



Page 181

Q. It was knowledge?

A. Knowledge they didn't turn things in.

Q. Knowledge of who? Who -- was it a written policy? Was it in the kitchen? Was it in your user manual?

A. No.

Q. Your employee manual?

A. It was people talking, saying why don't we turn these people in to state? PNC doesn't do that.

Q. Well, you were allowed to downgrade appraisers, because that was in your review every year; right?

A. That was downgrade them on PNC's list of appraisers.

Q. And you were allowed to do that; right?

A. We could recommend that we not use somebody, yes. They wanted us to do that.

Q. And you could upgrade or promote an appraiser if you thought they were good, right, and add them to the approved list?

A. I didn't have that authority to do that.

Q. I thought your review said you would downgrade and recommend certain appraisers. Is that not true?

A. I did not put them on the approved list.

Page 182

Q. I'm sorry. You would recommend appraisers?

A. I don't know if I did, but yeah, you could say this guy does good work. Keep using him. Something like that.

Q. And you were allowed to downgrade?

A. We could say quit using this appraiser.

Q. Because you did it every year on 10-year performance reviews; right?

A. Yes, say this guy needs to be taken off our list.

Q. But nowhere is it written and you don't know if anybody told you that you were not allowed to report an ethical violation to USPAP? Is that correct?

A. It was not written.

Q. And nobody told you?

A. No.

Q. Is it -- are you violating USPAP by not reporting somebody that you believe to be violating?

A. No.

Q. And why is that?

A. You're not required to turn someone in to the state.

Q. You're not required to --

A. As an appraiser.

Page 183

Q. -- notify anybody of an ethical violation?

A. Not to the state.

Q. Who would you notify, then?

A. My supervisor. If I got it fixed it would no longer be an ethical violation.

Q. We're not talking about that. You have criticized this final report that went into the New Jersey -- on the New Jersey daycare center.

A. Yes.

Q. Why didn't you report it to somebody, anybody, that you believed it to be an ethical violation of USPAP?

A. It wasn't my responsibility -- requirement. No one ever said Joe, if there's a problem, turn it in to the state or turn it in to us.

Q. Did you have to be told to do that?

A. The culture from all my supervisors was just let things go.

Q. And you believe that that excuses you from reporting what you perceive to be an ethical violation?

A. It was not my responsibility to monitor Paul's work ethic.

Q. Well, it wasn't Paul becomes Paul wasn't the appraiser; right?

Page 184

A. Paul was the reviewer.

Q. Right. But who signs off to meet USPAP standards?

A. The appraiser and the reviewer.

Q. And in the 2009 e-mail that you had with Darlene --

A. Yes.

Q. -- she mentions that they want it to be with the appraiser, not the reviewer; correct? They want it to be coming from the appraiser, not the reviewer rewriting the report; correct?

A. Yes.

Q. And instead you inserted your own valuation analysis to bring it down to $1.9 million; correct?

A. No. No.

Q. You didn't tell the appraiser to do that?

A. No.

Q. I thought you e-mailed Diane Pockar saying that that was the appropriate valuation.

A. I asked the appraiser to also look at the property based on price per licensed.

Q. And he redid the analysis; correct?

A. And based on that he realized he was too high and lowered it.



Page 185

Q. He realized he was too high?

A. He changed his value so he must have realized that he did something differently.

Q. Do you see any credibility in Diane Pockar's e-mail to you about the fact that a price per child could be something that is a moving target and affect the overall value of the property?

A. No, I disagree with her.

Q. Why?

A. Because we did an as is value based on the date of valuation, it was licensed for so many children. Could you put an addition on a building and get more children? Yes. Then it's a moving target. But on that date there was only so many licensed children allowed.

Q. What if they were allowed 100 children and only 50 children were in the daycare?

A. Then it would be based on price per licensed child.

Q. Well, if they had licenses?

A. They had licenses.

Q. It's not wrong to value a building by price per square foot; correct?

A. Some buildings. Apartment buildings, you would do it on price per apartment.

Page 186

Q. A commercial building that's not an apartment building. It's not wrong to value on price per square foot; right?

A. An auto body, an auto repair facility, you base on overhead bays.

Q. There are many different ways to value a commercial property, aren't there?

A. Yes.

Q. Previously you testified, Mr. Meehan -- I wrote it down -- that you believe your position was eliminated because you did not receive an equal share of appraisals and you would have assignments that could be turned in late and so you didn't meet your goals. Correct?

A. Yes.

Q. I'm paraphrasing, obviously. I'm not quoting you.

A. Yes.

Q. In 2012 you didn't meet your goals; correct?

A. Correct.

Q. And it was commented that you were a technical reviewer and down in the details; correct?

A. Yes.

Q. And you were not -- your position wasn't

Page 187

eliminated in 2012, were you?

A. No.

Q. And you continued to work through 2013; correct?

A. Yes.

Q. And you did meet your production goals that year; correct?

A. Yes.

Q. And you still continued to be critical of appraisers that you did not agree with; correct?

A. Yes.

Q. And you continued to work in 2014; correct?

A. Yes.

Q. And you did not meet your production goals in 2014?

A. I don't have information -- I was close, but I didn't -- I don't think I did.

Q. Right, because we went over your review --

A. Said 94 percent as of November.

MR. CARTER: Right. I'm going to object. That mischaracterizes his previous testimony.

Q. (By Ms. Marsh) Well, let's go to your review, Mr. Meehan. Exhibit 10. As of November you were at 94 percent of the goal; correct?

Page 188

A. Yes. Yes.

Q. And then on the last page it says Joe will not likely meet his production for the goal for the year. However, this is not for lack of effort on his part. Correct?

A. Yes.

Q. Did you meet your goal in 2014?

A. I don't know.

Q. You don't remember?

A. I don't know.

Q. There were several slow months in 2014; correct?

A. Yes. This was through November. I don't know if I got the other six percent in December or not.

Q. Well, Doug Schoenberg modified it in January 14 of 2015, if you look at the first page.

A. Yes.

Q. Had the numbers not come in through December yet?

A. No, or he would have updated it, I'm sure.

Q. You previously mentioned that somebody from HR advised you that your position had been eliminated?

A. Yes.

Q. And you don't remember that person's name?



Page 189

A. No.

Q. And your complaint says October 20, 2015; correct?

A. Yes.

Q. And how were you notified? In person, in e-mail? Call? How did that happen?

A. Telephone call and a pamphlet, envelope in the mail.

Q. A telephone call from the HR person or somebody else?

A. HR person and Doug Schoenberg.

Q. He was on the call as well?

A. Yes.

Q. And what did Doug Schoenberg say on the call?

A. They were severing me. Production was low. They were letting me go.

Q. Anything else?

A. Not that I recall.

Q. And what did the HR person say?

A. Pretty much the same. I'm here for you. You will be at this place at such-and-such a date. You have to sign these papers. You'll work through the end of October and then be gone -- they might need you to be gone December 18th or something like that.

Page 190

Q. Anything else?

A. You can look on PNC's website for other jobs -- something like that.

Q. Did anybody say anything to you about your low productivity levels or your criticisms of how reviews were performed?

A. No.

Q. I'm going to mark this as the next exhibit, please.

[Exhibit 17 marked for identification.]

Q. Mr. Meehan, you've been handed what's been marked as Exhibit 17, Bates-numbered PNCMEEHAN000255 through 265. Have you ever seen this document before?

A. Not all of it.

Q. When did you see some of it?

A. This was sent to us, but we could -- I couldn't read it.

Q. I'm sorry?

A. I couldn't read all of it.

Q. When did you see it?

A. I looked at it Tuesday -- last Tuesday.

Q. Had you seen it before that date?

A. It was e-mailed to me by my attorney but I couldn't read it.

Q. Had you seen it before that date?

Page 191

A. I couldn't read it. But yes, I received it.

Q. Mr. Meehan, had you ever seen this document before Tuesday, when your attorney sent it to you?

A. Before he sent it to me? No.

Q. Yes, that is my question.

MR. CARTER: I'm sorry. What exhibit number?

MS. MARSH: 17.

MR. CARTER: 17.

Q. (By Ms. Marsh) The title of this document is work restructuring plan summary document.

A. Yes.

Q. And it says anticipated notification dates, October 13, 2015, to October 26, 2015; correct?

A. Yes.

Q. And it says date submitted to legal; correct?

A. Yes.

Q. And under the section it says number of anticipated displacements, three.

A. Yes.

Q. Do you see that?

A. Yes.

Page 192

Q. And then it says reasons why the WRP is being proposed. Do you see that?

A. Yes.

Q. And it reads PNC Bank supports a continuous improvement philosophy within our processes, services, and organizational structures to increase efficiencies and reduce expenses. The real estate valuations group has decreased a decrease in volume of appraisal reviews over the past year, and it is currently anticipated there will be no near-term increases in volume.

The primary job duties of a real estate valuation -- of the real estate valuations group is to perform technical reviews of real estate appraisals. In an effort to provide sufficient review work for our appraisal review staff, a reduction of real estate valuation specialist senior positions is necessary. Did I read that correctly?

A. Yes.

Q. And does that generally comport with what you were told on the phone by Doug Schoenberg and the HR person?

A. Yes.

Q. And on the second page of that it's signed by Joanna Robinson, HR project manager. Was



Page 193

that the person with whom you spoke on the phone?

A. I don't recall.

Q. That name doesn't sound familiar?

A. No.

Q. What about Lilly Salvo?

A. No.

Q. No? Okay. So do you have any idea how or when the real estate valuations department decided that it needed to eliminate some positions to account for the decrease in volume of appraisals?

A. Do I know --

Q. When the real estate valuations group decided that it needed to eliminate some positions to account for the decrease in volume of appraisal reviews?

A. Not until I was severed, no.

Q. So it could have been well before September 23, 2015, which is the date of this work restructuring plan document; correct?

A. Yeah.

Q. You have no idea?

A. No idea. Wait, when I knew about it?

Q. Do you know when the real estate valuations department started to make plans for a reduction in force to accommodate the decrease in

Page 194

volume of appraisal reviews?

A. No.

Q. It very well could have been before September 23, 2015, correct, based on the date of this document?

A. I don't know the policies -- when they started. I have no idea. Could have been 2010.

Q. You have no idea?

A. No idea.

Q. And do you know what metrics or weights or calculations were used to determine what positions should be eliminated?

A. Only by what I could decipher on the last page.

Q. And do you know who did those weights and calculations?

A. No.

Q. And do you know when those weights and calculations were performed?

A. No.

Q. And if you look at the last page, there are criteria, it looks like, for several people in the real estate valuations group; correct?

A. Two people.

Q. Well, the other ones are redacted for

Page 195

privacy. But those are names. Okay?

A. Okay.

Q. And the bottom two names are Matthew Green and Joseph Meehan, you; correct?

A. Correct.

Q. And on the right-hand side of that graph it says competency assessment, and there's one for managing risk, productivity, customer orientation, teamwork, and leading change. Correct?

A. Correct.

Q. And those are similar to the metrics that you measure yourself against in your self-evaluation and the evaluation by your manager on an annual basis; correct?

A. Well, I don't know what leading change is.

Q. I didn't say identical. Similar to.

A. Okay. Yes.

Q. And it looks like there are numbers assigned -- that he assigned -- it says weakness below average, average, above average, or strength. And on a scale of one to five. Do you see that? It's right here, Mr. Meehan. (Indicating document.) It's somewhat hard to read.

A. Managing risk?

Q. Right above that, it gives the scale of

Page 196

indicia, one through five, that can be assigned?

A. Weakness, below average. Okay.

Q. Do you see that?

A. Yes.

Q. And then that's how numbers seem to be assigned within that metric below it?

A. Yes.

Q. Correct?

A. Okay.

Q. And if you look on the far side, there's a total column after all of the numbers have been assigned; correct?

A. Yes.

Q. And the person at the top appears to have a number of -- it's hard to read, but I think 500. Do you see that? It could be 300. I'm unsure.

A. I see something that looks like numbers.

Q. And at the bottom is you and you come out at 205; right?

A. I can't read that, but I'm at the bottom.

Q. And then above that is Matthew Green and he's at 220 or 229. Do you see that?

A. Yes.

Q. It must be 220.

MR. CARTER: I'm just going to go ahead



Page 197

and just kind of make an objection. We -- you're stating he can't read it; it's hard for me to understand, so I don't think you're intentionally misrepresenting numbers, but for example, the first one is 500. I can't -- I've tried to even enlarge it and I can't tell.

MS. MARSH: Okay. Well, we can get a better copy.

A. Okay.

Q. (By Ms. Marsh) But are you at the bottom of the metric?

A. My name's at the bottom corner.

Q. And you have the least number out of all of them at the top, out of all of them in that chart; correct?

A. According to this chart, yes.

Q. And then the person above you, Matthew Green, has the second-to-least number out of everybody on the chart; correct?

A. Correct.

Q. And is it your understanding that Matthew Green was also -- his position was also eliminated?

A. Yes.

Q. And it doesn't say on here anything about Mr. Meehan complaining about a valuation report for a

Page 198

New Jersey daycare center, does it?

A. I didn't see it on there, no.

Q. And were you ever given any sort of piece of paper or formal review that said Mr. Meehan complains too much and needs to let it go?

A. Let's see here. Doug Schoenberg wrote for example, errors in the sales comparison approach might be overlooked if the income approach is done correctly and given the most weight in the value conclusion.

Q. I'm sorry. Where does that say let it go?

A. Errors might be overlooked.

Q. Does it say errors should be overlooked?

A. No, it says they might be --

Q. Does it say errors should be ignored?

A. It says might be overlooked.

Q. And what does the rest of that sentence say? If?

A. If the income approach is done correctly and given the most weight in a value conclusion.

Q. And so what we talked about before was there's more than one way to value a property; correct?

A. Yes.

Q. And so an income approach could be appropriate if the methodology analysis is accurate and the overall value of the property is credible in

Page 199

accordance with USPAP standards; correct?

A. Could you repeat that again?

MS. MARSH: Not if I tried.

[The pending question was read by the reporter.]

A. The income approach could be appropriate but the sales comparison approach has to be accurate and not with errors.

Q. (By Ms. Marsh) Can you answer my question now, please?

MS. MARSH: Can you read that again?

[The pending question was read by the reporter.]

A. Correct.

Q. (By Ms. Marsh) And that criticism that you just read -- which exhibit are you in, Mr. Meehan? Is that 10?

A. Exhibit 8. No, I'm sorry. Exhibit 9.

Q. Let me just get there. He writes for example, errors in the sales comparison approach might be overlooked if the income approach is done correctly and given the most weight in the value conclusion.

So Doug Schoenberg is actually giving a pretty specific example of how it would be okay to overlook a criticism if the actual outcome is done

Page 200

correctly and is credible; correct?

A. That's his opinion.

Q. My question, sir --

A. Yeah.

Q. -- is Doug Schoenberg is actually giving a specific example to you of how it could be a situation where you could overlook a criticism if a particular appraisal is done correctly and given the most weight in a value conclusion -- in other words, credible.

A. According to him. Yes.

Q. So he didn't say in here let it go; right?

A. Not in there.

Q. And he didn't say ignore USPAP standards, did he?

A. Not in that sentence.

Q. Has he ever told you ignore USPAP standards?

A. Told me to let things go. If a property's valued under $3 or $4 million let it go, which means ignore USPAP standards.

Q. When did he tell you that?

A. During one of my reviews.

Q. And did you get that in writing?

A. No.



Page 201

Q.   Did you ever report that to anybody?

A.   No.

Q.   Did you think it worthy of writing down or telling anybody?

A.   Everybody seemed to know.

Q.   Who's everybody?

A.   My cohorts, all my supervisors, Joe Rose.

Q.   But you don't have anything saying that? You don't have any documents saying that?

A.   No.

Q.   And you don't know when he told you that?

A.   Yes.  During my performance review.

Q.   Which performance review?

A.   My notes are in the documents we sent to you.

Q.   And when were those notes done?

A.   The day I was on the phone with him.

Q.   And are they dated?

A.   I think there's a date at the bottom when it was printed off of the computer.  I don't recall without seeing it.

Q.   Did you sign them under oath?

A.   No.

Q.   Did anybody witness it?

A.   No.

Page 202

Q.   In Paragraph 19 of your complaint, which is marked as Exhibit 13 -- I'll wait for you to get there.  It's on Page 7.  Are you there?

A.   Yes.

Q.   Paragraph 19 reads -- it's continuing from the previous page where it says you were notified that you would be terminated on October 20, 2015.  It says before this, Mr. Meehan had previously discussed the overall deficiency of many appraisers' work with others at PNC throughout 2015 and earlier.

Such deficiencies were acknowledged throughout the appraisal group including in recorded team meeting notes that were distributed throughout the group, yet PNC continued to pressure Meehan and other reviewers to defer to these reports while at the same time filing -- sorry -- failing to properly monitor the quality of other PNC reviewers' work.  This occurred frequently.

A few examples include -- first bullet point -- Mr. Meehan was often asked if he could just let it go when an appraisal was in error and in violation of USPAP.  It says often asked.  Who did that?  Who often asked you to let it go?

A.   Doug Schoenberg.

Q.   Well, you just said he told you that in

Page 203

your review.  When did he tell you to do it when an appraisal was in error and in violation of USPAP?

A.   Other times when we discussed -- issues with the appraisals.

Q.   Well, before I asked you if you had ever asked that a report be changed, and it wasn't changed, and you had a problem -- if you had a problem with it, and you said no, that every appraiser always changed when you had an issue.

A.   Yes.

Q.   So was there ever any report that was turned in in violation of USPAP under your review?

A.   Not in my opinion.

Q.   And who -- you write P -- or the document states PNC continued to pressure Mr. Meehan.  Who pressured you?

A.   Tom Silnes.

Q.   Well, Tom Silnes wasn't your supervisor in 2012 through 2015; correct?

A.   Yes.

Q.   Is that correct?

A.   Correct.

Q.   So when was he pressuring you?

A.   When he was my supervisor in 2011, 2012.

Q.   And who did you report that to?

Page 204

A.   No one.

Q.   Why not?

A.   I didn't know if that was coming from him or coming from Adam Barone.  I didn't know where that direction was coming from.

Q.   So why didn't you report it?

A.   Who would I report it to?  Adam Barone?

Q.   HR?  Ethics department?  USPAP?

A.   Well, I did not do that.

Q.   Why not?

A.   I decided I would just go ahead and do it the way I thought it should be done, USPAP compliant.  They didn't like it.

Q.   Is it your belief that your position was eliminated because you complained or is it your belief that your position was eliminated because of productivity, as you previously testified?

A.   It was because I complained.  Because I complained I didn't get the production, I didn't get the high review fee jobs, therefore I did more work than some and my production was lower -- my production number was lower.

Q.   Well, your production number was low in 2012; right?

A.   Yes.



Page 205

Q. And your position wasn't eliminated then; was it?

A. No.

Q. And your production number was low in 2014 and your position wasn't eliminated then, was it?

A. No.

Q. So why weren't you eliminated in those years if your production numbers were low?

A. I can't speculate to that.

Q. What happened in 2015 that is different from 2014, 2013, or 2012?

A. I don't know.

Q. You were asked to sign a separation agreement.

A. Yes.

Q. On October 20, 2015; correct?

A. Yes.

Q. And did you sign it?

A. No.

[Exhibit 18 marked for identification.]

Q. Mr. Meehan, is this the separation agreement that you were handed?

A. Yes.

Q. On October 20, 2015? Sorry. I didn't mention that. For the record, Exhibit 18 is

Page 206

Bates-numbered MEEHAN0003400 through 3408. Why did you not sign this document, Mr. Meehan?

A. Because of the statement on page -- says fully release him --

Q. Sorry. Can you slow down for the court reporter?

A. Because the first paragraph on Page 8.

Q. Subparagraph A?

A. Yes.

Q. The release?

A. Yes.

Q. And why did you take issue with that?

A. Because I felt like I had been terminated for not rubber-stamping appraisal reports.

Q. And did you say that when you were told that your position was being eliminated?

A. No.

Q. Why not?

A. Took me by surprise. I didn't expect to be called at home and severed.

Q. Well, when you were presented this report -- or pardon me when you were presented with this separation agreement and stated you did not want to sign it, did you say it then?

A. No.

Page 207

Q. Why not?

A. I didn't think I had to explain myself to the HR department or Doug Schoenberg.

Q. Going back to Exhibit 13. This is your petition. You -- you were notified on October 20, 2015, that your position was being eliminated; correct?

A. Yes.

Q. And per the separation agreement, it said we currently anticipate your last regularly scheduled workday will be December 18, 2015?

A. Yes.

Q. Did you work through December 18, 2015?

A. No.

Q. When did you stop working with PNC?

A. I think it was October 31st -- my last day in the office.

Q. And then your complaint in this action wasn't filed until October 18, 2017, two years later.

A. Yes.

Q. Why did you wait so long?

A. I didn't know I had to be in a hurry.

Q. Well, you thought that you -- you just testified that you thought you had been terminated for -- I'm going to misquote you. You thought you had been terminated for a reason other than the reason that

Page 208

was provided to you; correct?

A. That's not what I said, but --

Q. What did you -- tell me why you thought you were terminated.

A. I said I wouldn't rubber-stamp appraisal reports, let them go, and violate USPAP.

Q. And that was not what was told to you on October 20th; correct?

A. Correct.

Q. You were advised that there was a reduction in force; correct?

A. Yes.

Q. And you were not the only one whose position was eliminated; correct?

A. Correct.

Q. Who else was eliminated?

A. At that time I don't believe I knew -- Matthew Green and an administrative assistant.

Q. And do you know if PNC has hired anybody to replace you or Matthew Green since your positions were eliminated?

A. No, I do not.

Q. And do you know if there has been an uptick in appraisal -- volume of appraisals coming in since October 2015?



Page 209

A. No, I do not.

Q. And did you ever tell anybody at PNC that you believed you were -- your position was being eliminated because you thought you wouldn't, as you say, rubber-stamp appraisals that you thought were in your violation of USPAP?

A. No.

Q. You never told anybody?

A. At PNC?

Q. At PNC.

A. Not that I recall.

Q. Did you ever tell anybody outside PNC aside from an attorney?

A. Yes.

Q. Who?

A. My girlfriend.

Q. Did you tell any regulatory authority?

A. No.

Q. Did you tell anybody else that could do something about it?

A. No. Other than an attorney.

Q. Other than an attorney. When did you start looking for new employment, Mr. Meehan?

A. December 2015.

Q. And what did you do to look for new

Page 210

employment?

A. Called every appraiser in St. Louis that I knew of or worked with or heard of. Every bank in St. Louis. One in Kansas City. To see if they had a position open for a reviewer. Sent résumés to many companies through Monster.

Q. Are you still looking for employment?

A. I still look through Monster.

Q. Have you interviewed for any jobs?

A. I talked to one bank about possibly working for them.

Q. And what bank was that?

A. Midland States Bank.

Q. And when did you talk with them about potential employment?

A. July of 2018.

Q. And were you offered a position?

A. No formal letter.

Q. Were you offered a position?

A. They asked if I was interested. And I said it would be too far to drive.

Q. And what was the drive? What was the commute?

A. About an hour-and-a-half.

Q. Each way?

Page 211

A. Yes.

Q. And did they tell you what the salary would be?

A. Told me a range in salary.

Q. And what was that?

A. Around $87,000.

Q. That was the range, or that was the approximate --

A. They told me a range and I said I was making $87,000 before and said we could probably do that.

Q. And so did they provide you a range of what you could make?

A. They told me I couldn't make $120,000 because that's what somebody else wanted, but they had an idea in their -- a range of what they wanted, and I said this is what I'm making before and they said we could do that, so I don't think they did give me an actual range.

Q. So you potentially could have had employment with this bank?

A. Yes.

Q. But you declined because of the commute; correct?

A. I chose not to pursue the interview

Page 212

because of the commute and because I was going to accept the fact that I had to retire or something.

Q. Have you been offered any other positions other than the one that we just discussed?

A. A gentleman called me and asked me if I wanted to come to work for him or talk to him about coming to work for him.

Q. When was that?

A. January 2016.

Q. And who was this gentleman?

A. An appraiser by the name of Bill Haden.

Q. Bill Hagan?

A. Haden.

Q. Oh, H-A-D-E-N? A-N?

A. Yes. H-A-D-E-N.

Q. And how do you know Bill Haden?

A. He's a real estate appraiser who's been around St. Louis for about as long as me.

Q. And he asked you if you wanted to work for him?

A. He asked me I was interested in coming to work for him.

Q. And what did you say in response?

A. I believe I said I was going to keep looking for a reviewer position because that's what



Page 213

I've been doing for 11 years.

Q. What was the position that you would have done for him?

A. Fee appraiser.

Q. And did he give you a salary of any sort or --

A. No, it would have been fee work.

Q. Oh, I see.

A. Fee split.

Q. And you turned it down because you wanted to do appraisal review work?

A. Also I didn't think our personalities would mesh.

Q. Any other interviews that you went on between October 20, 2015, and present day?

A. No.

Q. Any other job -- potential jobs that have come to you that you have turned down?

A. Not that I've turned down.

Q. Not that you have turned down?

A. Yes.

Q. Have other potential jobs come to you that you have taken?

A. No. I'm sorry.

Q. Are there any other potential jobs that we

Page 214

have not discussed?

A. A chief appraiser said if one of his men left he would be interested in hiring me, but the guy never left.

Q. When was that call?

A. Must have been in the summer of 2016.

Q. I'm sorry. I don't know if I asked you this. Are you still actively seeking employment?

A. I still look at Monster ads and ads on the Appraisal Institute, but I haven't sent out a résumé in a while.

Q. When was the last time you sent out a résumé?

A. Probably July.

Q. Of this year?

A. Yeah.

Q. And when -- is that -- when you sent out a résumé is that also the last time you applied for a job?

A. Yes.

Q. Are you using those synonymously?

A. Yes. Yes.

Q. Mr. Meehan, did you take notes during the call that you received on October 20, 2015, advising you that your position was being eliminated?

Page 215

A. I don't recall.

[Exhibit 19 marked for identification.]

Q. Mr. Meehan, you've been handed a document marked as Exhibit 19, Bates-numbered MEEHAN003457 to 3459. Is that your handwriting?

A. Yes.

Q. Are these your notes related to the phone call you had on October 20, 2015?

A. No.

Q. What are these notes from?

A. These are notes -- when I called Paul Higgins back in August.

Q. August of what?

A. 2018. 2017. I think. 2017, I believe.

Q. Does Paul Higgins still work at PNC?

A. No, he had left about a year before I talked to him.

Q. So he would have left in 2016?

A. I believe. Yes.

Q. It doesn't appear to me that your notes are dated. Correct?

A. Correct. Yeah. Huh-uh.

Q. And what was the purpose of you calling Mr. Higgins?

A. I wanted to talk about what he knew about

Page 216

me being severed from PNC Bank.

Q. And this is -- I'm sorry. You said this is approximately August 2017?

A. I believe so. I don't recall exactly.

Q. So this is before you filed your complaint; correct?

A. Yes.

Q. So when you talked to Mr. Higgins, it looks like you write down and jotted notes what is being said to you?

A. Yes.

Q. It's not verbatim?

A. Yes.

Q. So you wrote Paul Higgins one year ago; correct?

A. Yes.

Q. And does that match up with what you had just said -- he had left PNC a year prior?

A. Yes.

Q. And do you know what the circumstances were for him leaving PNC?

A. He said he took a job at Chase Bank.

Q. Mr. Higgins did?

A. Yes.

Q. And he writes Schoenberg may -- or excuse



Page 217

me. You write Schoenberg may have retired?

A. Yes.

Q. And then you write Petrie?

A. Yes.

Q. What is -- what are you writing there? What is -- do you remember?

A. He's still at the bank.

Q. At PNC?

A. Was then, yes.

Q. And then you write volume, least productive people?

A. Yes.

Q. And what is that in reference to?

A. Paul thought the reason I let go -- they let the least productive people go.

Q. And then you write Bill Eckert retired last year and we had talked about his name earlier; correct?

A. Yes.

Q. And then you write too thorough, slowed down my production?

A. Yes.

Q. Right?

A. Yes.

Q. And then you write Paul not in meeting.

Page 218

Does that say submit?

A. Yeah, I believe -- yes.

Q. Submit last 12 months, ranked people by --

A. Production.

Q. -- production. What does that mean?

A. He said he was asked to submit a report of my production over the last 12 months, I think.

Q. But not in -- did I read that right? Not in meeting? Paul not in meeting?

A. I think it says no meeting.

Q. Oh, okay. And then the next page, Page 2 at the top, it says production request submitted to HR?

A. Yes.

Q. And then it says Matt Green rally production; correct?

A. Yes.

Q. All production-based, very cold process. What does that mean?

A. He said it was all based on production, very cold, not care about the individuals, just the numbers.

Q. And then below that it says pure number. What does that mean?

A. Pure numbers. Based on production numbers.

Page 219

Q. And then it says HR told them to cut so many people?

A. Yes.

Q. And then it says cut lowest-producing folks?

A. Yes.

Q. And then it says Dawson. Who's Dawson?

A. He was Greg Camburn's counterpart in Texas.

Q. So a higher level individual, not necessarily a reviewer; correct?

A. Correct.

Q. And then below that it says Scott Valore?

A. Yes.

Q. 3-16 left, and then it's a range of $95,000 to $110,000 at PNC, JPMorgan $110,000 for $15,000 more. What does that mean?

A. Scott Valore was making $95,000 at PNC and he took a job for $110,000.

Q. At JPMorgan?

A. At JPMorgan for $15,000 increase.

Q. And then the next page, MEEHAN003459 says no conspiracy. What does that mean?

A. Well, there was no conspiracy to let me go.

Page 220

Q. And then it says loan officer, back office people, capital CREA, assistants. What does that mean it?

A. It means other people were let go around the same time.

Q. And then it says didn't communicate. What does that mean?

A. I don't remember what I was talking about at that time.

Q. And then Dawson at Allegiant Bank, chief appraiser.

A. Yes.

Q. So we know Dawson left?

A. Yes.

Q. Not held in high enough esteem; is that right?

A. Yes.

Q. Who is not held in high enough esteem?

A. Real estate reviewers at PNC.

Q. In general?

A. Yes.

Q. Asking him for stuff. What's that mean?

A. I don't remember.

Q. And then really sudden?

A. That meant they asked for production and



Page 221

suddenly we were gone -- Matt and I were gone.

Q. Who asked for production?

A. The HR department.

Q. Asked you for production?

A. No, asked Paul for his production report he was alluding to on the first page.

Q. But you don't know when -- we previously talked about you don't know when the real estate department decided they needed to have a reduction in force?

A. No, I wasn't privy to that.

Q. And then you write JPMorgan Chase career.

A. Yes.

Q. And why did you write that?

A. Paul said I should look on JPMorgan website for a job.

Q. And did you?

A. Yes.

Q. And did you apply to any jobs there?

A. There was no openings when I looked.

Q. Are you looking just in the St. Louis area?

A. I quit looking across the country. I was sending résumés to Washington, California. I decided I didn't want to move.

Page 222

Q. Could you work remotely in your position, similar to what you did in St. Louis?

A. It would depend on the bank and their --

Q. It's a possibility, though, right, where you could review --

A. It wasn't at Midland States Bank. I mean, I couldn't work at home at Midland States Bank. They wanted me in their office at Midland States. Is a possibility. I only know of one, maybe two banks to do remote review people.

Q. Right. I guess I just meant that as a reviewer -- obviously it would depend on the job, but as a reviewer you could work remotely because you're not actually out in the field reviewing the property? You could probably review it as long as you're at a computer; right?

A. Possibly. I'm certified in Missouri, so I don't know if I could work for a California company without being certified in California.

Q. Right. But you reviewed remotely in Missouri for PNC Bank?

A. Yes.

[Exhibit 20 marked for identification.]

Q. Mr. Meehan, you've been handed what's been marked as Exhibit 20. Do you recognize this document?

Page 223

A. Yes.

Q. And what is this document?

A. This is a set of interrogatory questions I wrote and submitted to the defendant.

Q. So you -- did you assist counsel in preparing this narrative in this document?

A. Assist as in I wrote this?

Q. Oh, did you write it?

A. Yes.

MR. CARTER: I'm going to -- and so just to clarify -- we did both assist.

A. Okay.

MR. CARTER: And so you can talk to her generally about the fact that we both participated in it.

A. Okay. Yes.

MR. CARTER: That's -- you're not -- that's fine.

MS. MARSH: I'm assuming you did the objections.

MR. CARTER: Objections and --

MS. MARSH: Right.

MR. CARTER: We worked on the whole thing.

MS. MARSH: Right.

MR. CARTER: But yeah.

Page 224

Q. (By Ms. Marsh) Can we go, please, to Page 13, Mr. Meehan?

A. Yes.

Q. And I just want to go through your answer to Number 16. Okay?

A. Okay.

Q. The question is if you contend that defendant, meaning PNC, treated you differently than any similarly-situated employees, please identify all such employees and describe in complete detail all facts supporting your contention. Okay?

A. Uh-huh.

Q. And then there is the answer, and so you -- it goes on to Page 14. And do you -- and at the very back of this is a verification where you sign this under oath?

A. Yes.

Q. Correct?

A. Yes.

Q. Do you remember being asked this interrogatory?

A. Yes.

Q. And your answer is PNC terminated my employment while not terminating individual with less experience, education, qualifications, and many



Page 225

received higher salaries. I believe I was more thorough in my appraisal reviews than similarly-situated employees, which led to my termination, yet other co-workers were rewarded with continuing employment and receiving additional work assignments even after making mistakes or failing to follow the law and public policy regarding appraisal reviews. Did I read that correctly?

A. Yes.

Q. And then you do a list of people that you believe who were not severed but that you believe based on the answer were similarly situated and treated differently than you; correct?

A. Yes. Yes.

Q. Starting with Paul Higgins; right?

A. Yes.

Q. Did Mr. Higgins hold the same position as you?

A. No, he was a supervisory appraiser.

Q. Why do you believe he was treated differently than you?

A. Because he wasn't severed.

Q. But he wasn't in the same position as you; correct?

A. Correct.

Page 226

Q. Fred Petrie.

A. Supervisory appraiser manager.

Q. So he did not hold the same position as you; correct?

A. No. Correct.

Q. And why was he treated differently?

A. He wasn't severed. He had less education and qualifications than I did.

Q. And Jim Dawson? What was his position?

A. Team leader supervisor.

Q. So not a reviewer either; right?

A. Yes, it was -- they did reviews also. Team leaders did reviews. Schoenberg, Dawson, Camburn -- they all did reviews also.

Q. My que -- he didn't have the same title as you?

A. No.

Q. Ris Gilad, if I'm saying that right.

A. Yes.

Q. What about him? What was his position? His or her? Sorry.

A. I think he did reviews and supervisory work.

Q. So not the same title as you; correct?

A. Correct.

Page 227

Q. Scott Valore?

A. Supervisory appraiser reviewer.

Q. Laura Laurent?

A. Pretty sure she was a reviewer.

Q. Was she based in St. Louis?

A. No.

Q. Do you know where she was based?

A. Raleigh, North Carolina.

Q. Diane Pockar?

A. Supervisory appraiser.

Q. Luke Laverka?

A. I think he was a supervisory appraiser.

Q. Mike Reini?

A. Technical appraiser turned supervisory appraiser.

Q. I'm sorry. What was the next part? Technical appraiser and then?

A. Converted to supervisory appraiser.

Q. So in 2015 he was a supervisory appraiser?

A. I don't remember when he switched over. It was probably --

Q. 2015?

A. Probably.

Q. Patrick Bender?

A. I'm not sure exactly what he did. He was

Page 228

in Philadelphia. Pittsburgh, I mean.

Q. Douglas Gilbert?

A. I think he was a technical reviewer.

Q. Clancy Kelly?

A. Technical reviewer.

Q. Pat O'Connell?

A. Technical reviewer.

Q. Veronica Weiland?

A. Supervisory appraiser, I believe.

Q. Melanie Perryman?

A. Technical.

Q. Doug Schoenberg, we know. Supervisor. Bill Eckert?

A. Technical reviewer.

Q. Oscar Hill?

A. Technical reviewer.

Q. Darlene Trimble?

A. Technical reviewer.

Q. Andy Donaldson?

A. Technical reviewer.

Q. Ron Sacco?

A. I think he was a supervisory. I'm not sure.

Q. Susan Sharp?

A. She was in Raleigh. I'm not sure.



Page 229

Q. Pat Bender. Is that mentioned twice? Did I make that --

A. No --

Q. Sorry. Go ahead.

A. I'm not sure if he was -- technical, I believe.

Q. You believe he was a technical reviewer?

A. I'm not sure. I don't have a chart in front of me.

Q. Janet Matney?

A. She was an administrative reviewer.

Q. And Beth Harvey?

A. Don't remember her.

Q. In the work restructuring plan that we marked as Exhibit 17, on the last page, I know some of the names are redacted, but the only people who were being considered were real estate valuation specialists -- senior real estate valuation specialists. Do you see that?

A. Does it say that on here somewhere?

Q. Yes. It's name and then job title is the second column.

A. Okay.

Q. So is it your contention that supervisors and administrative reviewers and everybody else in the

Page 230

real estate valuations department should have been part of this as well?

A. Part of what?

Q. The decision for the work restructuring plan?

A. Yes.

Q. Why?

A. Because they also did technical review work, and I could have done their jobs. I could have been promoted, moved, relocated to any of their positions.

Q. Did you tell anybody that?

A. No, I had already been severed, and I didn't see this until this week.

Q. Well, did you ask anybody if there was another position within PNC that you could take?

A. No, it was understood there was none.

Q. But you still thought you should have done one of their jobs instead?

A. I could have been, yeah, trained to do their job or relocated.

Q. But if people were being eliminated because there was too many people in the department --

A. Yes.

Q. -- why would -- why were you more

Page 231

deserving of staying on than somebody else?

A. Well, as my supervisor said, I had more qualifications, experience, and made less money than some people that they kept.

Q. Who said that?

A. Doug Schoenberg.

Q. When did Doug Schoenberg say that?

A. In the summer of 2015. He said things are getting slow. They could let somebody go, but I don't think it would be you if they're trying to save money because you have more experience and qualifications and make less money than some other people. If they want to save money they would let them go.

Q. So in the summer of 2015 you were on notice that they were considering a reduction in force?

A. No.

Q. According to Doug Schoenberg?

A. No. He just said slow. It's possible. It could happen.

Q. And --

A. He didn't say I was on notice. He didn't say it was happening or was in the works.

Q. Well, he hinted at it right?

A. He just said if things are slow they probably wouldn't let you go.

Page 232

Q. So he brought it up; you did not ask?

A. Yes.

Q. And so in the summer of 2015 you had an idea -- you knew that things were slow?

A. Yes.

Q. And you knew that there was a possibility that there would be a reduction in force?

A. According to him, yes.

Q. And then when you spoke to Paul Higgins in 2017 -- around August 2017 -- Paul Higgins said to you that it was all about numbers; right?

A. Yes.

Q. And he said HR told them to cut so many people; correct?

A. Is that what he said?

Q. It's Exhibit 19.

A. I think he was referring to HR told the group, not him. But yeah, okay.

Q. Well, it says them.

A. Okay. Yeah.

Q. So whoever.

A. Yeah.

Q. HR told them to cut so many people; right?

A. Yes.

Q. Pure number. All production based. Very



Page 233

cold process.

A. Yes.

Q. Right? Cut lowest-producing folks. Right?

A. Yes.

Q. So nowhere in here did Paul Higgins tell you that it had anything to do with USPAP or rubber-stamping appraisal you didn't agree with; right?

A. No.

Q. And this was in August 2017; right?

A. Yes.

Q. And in August or the summer of 2015 Doug Schoenberg told you you were on notice that things were slow and there could be a reduction in force; right?

A. No, he did not say I was on notice.

Q. Listen to my question.

A. Okay.

Q. I'm not saying he told you you were on notice.

A. Okay.

Q. I am saying in August of 2015 Doug Schoenberg came to you and told you that things were slow and there was a possibility of a reduction in force; correct?

A. Yes.

Page 234

Q. And still, despite all of this, you filed a complaint two months later after talking to Paul Higgins in October of 2017 claiming that PNC terminated you because you wouldn't agree with appraisals that didn't satisfy USPAP standards?

A. Yes.

Q. What do you have to support that?

A. There were appraisals taken from me because I wouldn't approve them.

Q. What appraisals?

A. May I refer to the interrogatory?

Q. Sure.

A. Job Number 528070.

Q. What page are you on?

A. First page, Page 1.

Q. Okay. Okay. And when was that job done? 2011?

A. 2011.

Q. Were you eliminated in 2011?

A. No.

Q. Were you eliminated in 2012?

A. No.

Q. Were you eliminated in 2013?

A. No.

Q. Were you eliminated in 2014?

Page 235

A. No.

Q. So it took almost five years for them to eliminate you because they took a job away from you in 2011?

A. Then they took one away right after that.

Q. So then they took another one away?

A. Yes.

Q. When was that?

A. 2011.

Q. What page are you on?

A. Page 1.

Q. The same one? Are you talking about something else?

A. No, the one Adam Barone took away from me.

Q. And why was that taken away from you?

A. Because it wouldn't meet USPAP requirements and we couldn't get it revised and Adam Barone didn't want to spend $1,500 to get it done, so it got reassigned to Steve Mustain.

Q. And again, were you terminated in 2011?

A. No.

Q. How about 2012?

A. No.

Q. 2013?

A. No.

Page 236

Q. 2014?

A. No.

Q. What else?

A. And then I had two daycare properties taken from me.

Q. The one in 2015; correct?

A. Yes.

Q. And we've talked about that at length, haven't we?

A. Yes.

Q. And that didn't happen until 2015; right?

A. Yes.

Q. And we already talked that it can be appropriate to value a property in more than one way; right?

A. Yes.

Q. And aside from having jobs taken away from you as you say in your interrogatories --

A. Uh-huh.

Q. -- what evidence do you have that your position was eliminated in 2015 because you would not, as you say, rubber-stamp appraisals that you believe did not comport with USPAP requirements?

A. That e-mail correspondence that says -- that indicates it's okay to let things go.



Page 237

Q.   From whom?

A.   From Fred Petrie, Paul Higgins.

Q.   And when was that correspondence documented or dated?

A.   December 2013 was the Applied Medical Technology.

Q.   We've talked about that; right?

A.   Yes.  Built to suit properties not being arm's length transactions.

Q.   My question to you is what evidence do you have that your elimination of your position was based on the fact that you would not rubber-stamp appraisals based on them not conforming with what you perceived to be USPAP requirements?

A.   Well, I thought your question was what information I have that proves that people were saying let it go.

Q.   No.

A.   Okay.  2013.  Paul Higgins.  I wouldn't accept that appraisal without revisions because it didn't apply with USPAP.  Paul Higgins says we've approved that methodology before and he didn't say there was -- that we really needed to have -- it was a church property -- we didn't really need to have church comps in the appraisal.  It wouldn't be meaningful.

Page 238

Q.   So if I'm understanding you -- what page are you on?

A.   Page 5.

Q.   If I'm understanding you from -- it's Borland Church in June 2013?

A.   Yes.

Q.   If I'm understanding you, you're saying that because you didn't agree with the appraisal in June 2013 --

A.   Uh-huh.

Q.   -- and you spoke to Paul Higgins about that --

A.   Uh-huh.

Q.   -- they waited over a year-and-a-half to terminate you, and somebody else in your department that had the same position as you and an administrative assistant, and then almost two years later you spoke to Paul Higgins and he told you that it was purely based on numbers and their volume was low and it was a cold process and had nothing to do with anything but numbers, but it's your contention that a June 2013 disagreement you had is the reason for your elimination?

A.   I think those examples caused me to get less production and lower value per reports to review,

Page 239

which didn't allow me to meet production.

Q.   But your reviews and your productivity --

A.   Yes.

Q.   -- was something in your control, wasn't it?

A.   No.

Q.   Well, in all of your reviews it said that you should speak up if times were slow and you needed work; right?

A.   Yes.

Q.   And so if you are battling with a appraiser about something that you're being told is not a USPAP issue --

A.   Uh-huh.

Q.   -- that's taking time away from your productivity; right?

A.   Yes.

Q.   And instead of taking the steps that you could have taken that were outlined in PNC procedures --

A.   Uh-huh.

Q.   -- such as asking for a third-party review, going above your supervisor, reporting it to the ethics hotline -- you didn't do any of those things, did you?

Page 240

A.   I took it to my supervisor.

Q.   Did you ever ask or demand for a third-party reviewer?

A.   Yes.

Q.   When?

A.   I asked for it 2011.  Adam Barone denied it.  I asked for another one, which was approved.  I don't remember when that was.

Q.   So none of your self-evaluation mention any of these instances in 2013 -- we didn't look at your 2011 evaluation, so I won't make you agree to that.  But they don't mention any of these things, and your productivity was low in 2013 and it was low in -- your productivity was low in 2012 and your productivity was low in 2014?

A.   Yes.

Q.   And you were not eliminated either of those years, were you?

A.   No.

MR. CARTER:  I'm going to object again.  Mischaracterizes his prior testimony.

Q.   (By Ms. Marsh)  You can answer.

A.   No.

Q.   So is it your belief that they just waited, even though you had a history of years that you



Page 241

were not productive, and decided to eliminate you in 2015 just because?

A.   Yes.

Q.   And what evidence do you have to support that?

A.   I have all this documentation in this interrogatory that shows a trend that I was told to let things go, that the bank really didn't care about USPAP, the reports are taken away from me that I wouldn't approve that other people rubber-stamped, and that my production was low, I wasn't getting the volume that other people were getting.  I wasn't getting the value of review other people were doing, and therefore I was pushed aside, and then when they had the opportunity, I was the first one to get out.

Q.   And what evidence do you have to support that?  I understand what you think you were told.  I want to know what documents you have to support that?

MR. CARTER:  Okay.  I'm going to object.  That calls for a legal conclusion.  I mean, you're saying evidence and you're saying documents.  He's cited to the interrogatory.  He's talked about -- if that's insufficient then okay, fine, but you keep asking the same question.

Q.   (By Ms. Marsh)  Because I'd like an

Page 242

answer.  What documents do you have to support that the reason for your elimination in 2015 -- October 2015 was based on you not rubber-stamping appraisal reviews because you believed they didn't comport with USPAP evaluations?

MR. CARTER:  Objection.  Asked and answered.

Q.   (By Ms. Marsh)  You can answer.

A.   Do I have to answer?

Q.   Yes, you do, actually, sir.

A.   Okay.

MR. CARTER:  You can go ahead and answer.

A.   I sent you thousands of pages of documents of appraisals that had errors in them that were taken from me and approved by somebody else.  And I have e-mails that say look the other way, we've approved this before.  We asked for, didn't get, production reports from these other people to see what they've done.

Q.   Their numbers are in there, sir.

A.   No, they're just ranking numbers.  There's no total production.

Q.   And you have no idea what the process was in terms of determining how to do a reduction in force, do you?

Page 243

A.   Only what I saw here.

Q.   Yeah.  You don't know the weights or criteria that were used, do you?

A.   No, and I don't know the production --

Q.   And you don't know when they decided to start determining that they needed to have a reduction in force, do you?

A.   No.

Q.   And you weren't the only person that was eliminated from your position, were you?

A.   No.

Q.   And you have no idea if they've taken any strides to replace your position or fill somebody else in your position, do you?

A.   No.

Q.   And you've had offers for other employment and you've turned it down, haven't you?

A.   One sort of offer.

Q.   Two, I believe.

A.   I couldn't have worked for him.

Q.   Was it an offer of employment, sir?

A.   No.

Q.   You previously testified that it was a fee-based situation where you could do appraisal reviews for fee; correct?

Page 244

A.   Yes.

Q.   That was an offer, was it not?

A.   No.

Q.   What was it?

A.   He said come in -- talk on the phone.  Said come in and talk about it.

Q.   And did you?

A.   No.

Q.   You turned it down; right?

A.   Yes.

MS. MARSH:  Okay.  I'm going to go through my notes.  Your attorney might have questions for you, but I'm just going to go through my notes quickly, and I'll hand him the floor.  Are you going to ask questions?

MR. CARTER:  Yeah.

MS. MARSH:  Go ahead.

MR. CARTER:  Oh, I'm sorry.  I thought you were waiting to see if you had a final.

MS. MARSH:  No, no.  Go ahead.

MR. CARTER:  Okay.

QUESTIONS BY MR. CARTER:

Q.   This is Jase Carter, attorney for the plaintiff, Mr. Meehan.  Mr. Meehan, I only have really one subject, and that was talking about the offer



Page 245

conversation with someone in January 2016 about possible employment. So who is that person that you spoke with?

A. Bill Haden.

Q. Bill Haden. And you indicated that -- earlier that there's a personality conflict with Mr. Haden; is that right?

A. Yes. Yes.

Q. What was the personality conflict?

A. I didn't think we had the same work ethics.

Q. Why did you think you didn't have the same work ethics?

A. Mr. Haden was not on our approved list.

Q. When you say he wasn't on your -- on our approved list --

A. On the bank's approved list.

Q. Whose approved list?

A. PNC's approved list, National City's approved list.

Q. And do you know why he wasn't on the approved list?

A. His work product was not up to our standards.

Q. And is that why you turned down the

Page 246

opportunity to work with him?

THE WITNESS: Yes.

MR. CARTER: That's it.

MS. MARSH: Okay. Are you reserving?

MR. CARTER: Yes.

[SIGNATURE RESERVED.]

Page 247

C E R T I F I C A T E

I, JOHN ARNDT, a Certified Shorthand Reporter and Certified Court Reporter, do hereby certify that prior to the commencement of the examination, JOSEPH MEEHAN was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

_____

JOHN ARNDT, CSR, CCR, RDR, CRR

CSR No. 084-004605

CCR No. 1186

Page 248

DEPOSITION ERRATA SHEET
Our Assignment No. J3304121
Case Caption:  MEEHAN v. FINANCIAL SERVICES GROUP, INC.

DECLARATION UNDER PENALTY OF PERJURY
I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.
Signed on the _____ day of _____, 20___.

_____
Joseph Meehan


ESQUIRE
DEPOSITION SOLUTIONS

Page 249

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____

SIGNATURE:_____DATE:_____
            Joseph Meehan

Page 250

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____
Page No._____Line No._____Change to:_____

_____
Reason for change:_____

SIGNATURE:_____DATE:_____
            Joseph Meehan

