# EXHIBIT B

Adam Barone

1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

* * *

JOSEPH MEEHAN,                    )

        Plaintiff,                )   CASE NO.

   VS.                            )   4:17-CV-02876-PLC

PNC FINANCIAL SERVICES            )

GROUP, INC.,                      )

        Defendant.                )

* * *

DEPOSITION OF DEFENDANT PNC FINANCIAL SERVICES GROUP, INC. RULE 30(b)(6) WITNESS (ADAM BARONE), taken in accordance with Pennsylvania Rules of Civil Procedure No. 4007.1, by and before Dutcheen O. Cameron, Registered Merit Reporter-Certified Realtime Reporter and Notary Public in and for the Commonwealth of Pennsylvania, taken via videoconference at the offices of Constance Lee & Company Court Reporters, One PPG Place, 31st Floor, Conference Room B, Pittsburgh, Pennsylvania, 15222, on Tuesday, December 11, 2018, at 10:00 a.m.

Adam Barone

2

A-P-P-E-A-R-A-N-C-E-S

On behalf of the Plaintiff: (Via Videoconference)

Carter Law Firm, LLC

BY: Jase Carter, Esquire

3407 S. Jefferson Ave, #109

St. Louis, MO  63118

314-675-1882

jase@carterfirm.law

On behalf of the Defendant:

Seyfarth Shaw, LLP

BY:  Robyn E. Marsh, Esquire

233 South Wacker Drive

Suite 8000

Chicago, IL 60606

312-460-5000

marsh@seyfarth.com

Also Present:  Joseph Meehan (Via Videoconference)

Adam Barone

4

E X H I B I T S

Exhibit 1      7
Exhibit 4      24
Exhibit 9      28
Exhibit 5      42
Exhibit 12     79
Exhibit 11     84
Exhibit 10     99
Exhibit 15     102
Exhibit 7      129
Exhibit 8      131

Adam Barone

3

I N D E X

EXAMINATIONS                          PAGE

ADAM BARONE                           5

EXAMINATION                           5

BY MR. CARTER

EXAMINATION                           157

BY MS. MARSH

FURTHER EXAMINATION                   169

BY MR. CARTER

Adam Barone - by Mr. Carter

5

COMMENCING -- 10:00 A.M.

ADAM BARONE,

having been first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. CARTER:

Q.   Thank you, Mr. Barone.  My name is Jase Carter, and I am the attorney for plaintiff Joseph Meehan in his current litigation against PNC Bank.

First of all, can you hear me okay?

A.   Yes.

Q.   So I'm going to go through some preliminary matters regarding depositions, but because we're doing it videoconference, it's especially important that you understand, you know, everything that I ask you.  So if you have a question or if there's something that's not clear, do you agree to indicate that to me?

A.   Yes.

Q.   And likewise, if there's something that I don't understand from you, I might ask you to repeat it or I might ask you to say it a little more loudly.  Right now I can hear you fine, but if anything at any point changes, would you please let me know?

Adam Barone - by Mr. Carter

6

A. Yes. Sure.

Q. So, Mr. Barone, go ahead and state your name.

A. Okay. Adam Barone.

Q. And Mr. Barone, as we talked about briefly before we got on the record, I have with me, next to me, he's off camera, but it's Joseph Meehan, the plaintiff is with me. And I understand your attorney is with you here today?

A. That's correct.

Q. Have you ever had your deposition taken before?

A. Yes, I have.

Q. Is there anything that will prevent you from giving your full attention this morning?

A. No, I don't believe so.

Q. Any medication you're taking or suffering from, any illness that would prevent you from answering fully?

A. No.

Q. If you need to take a break, that's fine, let me know. I'd only ask that you finish the question that I ask. So we did that for a deposition that we had in this case last week. I don't -- there's never going to be an issue, I

Adam Barone - by Mr. Carter

7

think, with you ever taking a break that I would say no to; I would just ask that you finish whatever question I ask. Okay?

A. That's fair.

Q. You're doing a good job of it now, but make sure, so that the record's clear, we're not saying uh-huh, huh-uh, right; we have clear answers, yes or no. Do you understand that?

A. Yes.

Q. Let's go ahead -- and I'm sorry -- Dutch, is D-U-T-C-H?

COURT REPORTER: Yes. D-U-T-C-H.

MR. CARTER: Dutch, let's go ahead and hand Mr. Barone Exhibit No. 1.

* * *

(Barone Deposition Exhibit 1 was marked for identification.)

* * *

THE WITNESS: I have it. I have the exhibit.

MR. CARTER: Robyn, do you also have a copy of it?

MS. MARSH: I do.

MR. CARTER: Did they go ahead and give you all the copies that I sent them?

Adam Barone - by Mr. Carter

8

MS. MARSH: It looks like, yes.

MR. CARTER: Could you hand them back to Dutch and -- because some of them we may or may not use.

MS. MARSH: Okay. I'm not looking through them, so...

MR. CARTER: Okay. Could you still give them back to Dutch?

MS. MARSH: I already did that.

Q. So Mr. Barone, do you recognize this document?

A. Yes, I do.

Q. And what is it?

A. You tell me. It's basically a legal -- a legal document that indicates there's matters to be discussed with myself, I guess. I don't know what you're getting at.

Q. Yeah, no, I say the same things for my clients. Sometimes I hand them something and we as lawyers just assume that everyone knows what every legal document is. But so this is -- in the middle of the first page you see it's the Amended Rule 30(b)(6) Notice of Deposition?

MS. MARSH: The title.

A. Yeah, got it.

Adam Barone - by Mr. Carter

9

Q. Okay. And so do you understand that here today you are representing the entity, which is PNC Bank?

A. Yes, I do.

Q. And do you understand that what you say today is the same as if PNC Bank was in physical form as a person giving the deposition?

MS. MARSH: Object to form.

A. Yes.

MS. MARSH: But go ahead, you can answer. Just give me time to object before you answer.

THE WITNESS: Okay.

MS. MARSH: Thanks.

Q. All right. Let's look at the third page. Okay? It says Schedule A on the top.

A. Okay. Schedule A.

Q. So at the top it says Schedule A, and then matters for which designation of deponent is requested and there's -- starting on this page and then going forward several other pages there's 12 different paragraphs. Do you see that?

A. Yes.

Q. And what is your understanding about the different topics that are listed here for paragraph 1 to 12?

Adam Barone - by Mr. Carter

10

MS. MARSH: Objection; form.

You can answer.

THE WITNESS: What does that mean?

MS. MARSH: You can still answer, just I'm putting my objection on the record.

A. Okay. So what are you asking me again there, Jase?

Q. Yeah. No problem. And I'll go ahead and say this, too. There will be times that your attorney will object and I am not going to say you go ahead and answer the question. Every time she objects, unless she explicitly tells you not to answer, I am going to assume that you're going to still answer. Okay. However, just like in this case, if you need me to repeat myself, that's fine.

So what is your understanding about the paragraphs No. 1 through 12 that are listed here?

MS. MARSH: Same objection; form.

A. These are a list of questions that you would like -- well, actually they're statements and questions that you'd like to discuss in the matter that we're here to discuss today.

Q. Okay. So what -- I'm going to go individually 1 through 12, and I'm not going to read it but I'm going to let you look at it. And I want

Adam Barone - by Mr. Carter

11

to make sure that you are able to testify about these matters. Okay? And if you aren't able to testify about these matters, that's fine, you'll just let me know that and I'll ask a follow-up question. Okay?

A. Okay.

Q. So No. 1, I'll let you read No. 1.

A. (Witness reviewing.)

MS. MARSH: Do you want him to read it out loud in the record?

MR. CARTER: No, just to himself, please.

A. (Witness reviewing.) I could identify the supervisor --

MS. MARSH: Did you read No. 1?

THE WITNESS: Yes.

MS. MARSH: You have to wait until a question is pending.

A. Yes, I did read it.

Q. All right. Thank you.

Are you able to testify about this subject this morning?

A. Can you repeat that?

Q. Are you able to testify regarding paragraph No. 1 this morning?

A. Yes.

Adam Barone - by Mr. Carter

12

Q. Okay. Thank you. Let's do the same thing for No. 2. Please read that to yourself; let me know when you're done reading it.

A. (Witness reviewing.) Yes.

Q. Are you able to testify to paragraph 2 this morning?

A. Yes.

Q. So Mr. Barone, what I'm going to do is I'm going to allow you to continue reading, so paragraphs No. 3 through 12, and when you're done I would like you to let me know. Okay?

A. (Witness reviewing.)

MS. MARSH: Are you finished reading?

THE WITNESS: Yeah, I'm finished.

MS. MARSH: Subject to the objections that we already sent to you, Jase, with respect to No. 11 and 12, he can speak high level with respect to personnel files as identified in subject No. 11, but again, he's not the custodian of those. And No. 12, I believe you stipulated that you would not address any of the questions with respect to disability or the need for an accommodation because that's outside of the scope of this lawsuit.

MR. CARTER: Yeah, I think that's an accurate description of the e-mails we've had back

Adam Barone - by Mr. Carter

13

and forth.

Q. So Mr. Barone, regarding what you just read, is there anything that you do not have knowledge to testify about this morning?

A. Well, with the exception that my attorney Robyn stated, no, I'm good.

Q. Okay. Thank you. Mr. Barone, tell me everything you did to get ready for this deposition. And I'm not looking for the contents of your conversations with your attorney.

A. Read the -- this document, okay. I read this document and I did look over USPAP.

Q. So you looked over the Notice of Deposition that we just went over and you said that you went -- looked over USPAP?

A. That's correct.

Q. Okay. Let's go ahead and get this out of the way. What does USPAP stand for?

A. It stands for the Uniform Standard for Professional Appraisal Practice.

Q. So if I use the word USPAP, you understand it to have the meaning you just testified to?

A. That's correct.

Q. So you looked at USPAP, Notice of

Adam Barone - by Mr. Carter

14

Deposition; any other documents?

A.   I did look at that exhibit relative to our workflow over the last few years that demonstrates the number -- our work volume. I looked at that.

Q.   Okay. So I received from your attorney yesterday, it was a -- it was a list and then a bar graph of -- we're going to get into it later, but I think the amount of -- I don't have it in front of me, but the -- I guess you described it as the workload of your group. Is that what you're referring to?

A.   Yes, it's actually the work volume. It's the completed requests for each of those years.

Q.   Okay. So we have USPAP, Notice of Deposition, the work volume graph; anything else?

MS. MARSH:   I'm just going to go ahead and object; it invades the attorney-client privilege, but you can answer.

THE WITNESS:   With the exception of the things that we discussed?

MS. MARSH:   Uh-huh.

THE WITNESS:   Anything outside of that? I'm trying to understand what the question is.

MS. MARSH:   Yes. You have to ask him,

Adam Barone - by Mr. Carter

15

not me.

A.   Okay. So anything other than what I discussed with my attorney prior to this, that's what we're trying to understand, right?

Q.   Yeah. But I mean, there might have been documents that you discussed with your attorney, and I don't want to know the contents of your discussions, I don't want to know, you know, what you said to her and what she said to you, but I would like to know what those documents were.

MS. MARSH:   I'm going to object because it invades the attorney-client privilege for what we did to prepare for this deposition. But I will go ahead and say for the record that he reviewed documents produced in discovery, if we can just short-circuit this and get to the meat.

Q.   I think I -- it's pretty clear I get to know what specific documents. I mean, if there's something that is a document with attorney-client privilege, I don't need to know that, so I'm not asking for that, but we can -- Mr. Barone, but to the best of your knowledge you have the Notice of Deposition, that workflow volume; are those all the documents you remember reading?

A.   Yes.

Adam Barone - by Mr. Carter

16

Q.   And then likewise, conversations -- you said you had a conversation with your attorney for this. I don't want to know when that took place or how long, what the content was, but did you have any other conversations with anyone regarding your preparation for this deposition?

A.   No.

Q.   Have you ever been deposed before?

A.   Yes.

Q.   And how many times have you been deposed before?

A.   I think twice.

Q.   And talk to me about the circumstances of those depositions.

A.   Well, one was related to when I was on borough council related to a situation there. I don't quite recall the details, but it dealt with a contractor. And the other was with the bank, and I don't actually recall what the nature of that was, but they were in the '90s.

Q.   How long ago was that?

A.   In the '90s.

Q.   Mr. Barone, let's talk about your position at PNC Bank. What is your current position?

Adam Barone - by Mr. Carter

17

A.   I'm senior vice president. I manage the real estate valuations group.

Q.   How long have you been a senior vice president?

A.   I don't recall. It's probably greater than ten years, though.

Q.   How long have you worked at PNC Bank?

A.   Since 1991.

Q.   And you mentioned the real estate valuations group. Is that the abbreviation of REVS?

A.   It's real estate evaluation services.

Q.   And is the abbreviation REVS?

A.   That is correct.

Q.   Is the abbreviation REVS something that's commonly used to refer to -- so if I refer to REVS in the deposition, is that normal for someone to refer to it as that, or what's the shorthand for referring to the group that you work in?

A.   REVS.

Q.   Okay. So you are a senior vice president in REVS. Is there anyone in REVS that you report to that is above you in the hierarchy?

A.   No. I report to a credit executive.

Q.   I'm sorry. Who did you say you report to?

Adam Barone - by Mr. Carter

18

A. A credit executive.

Q. So is the REVS group part of a larger group within PNC Bank?

A. Yes. It's part of credit risk.

Q. And who's the individual -- what is their name -- that you report to that's the credit executive?

A. Kim McNeil.

Q. K-I-M?

A. McNeil.

Q. McNeil. Let's talk a little bit about your background as an appraiser. Are you a certified appraiser?

A. That is correct.

Q. And talk to me about your certifications. What certifications do you have?

A. Well, I have the appraisal certification. I'm also a real estate broker.

Q. When you say an appraisal certification, I'm not -- there's going to be a lot of questions where I might seem like I'm playing dumb, but I'm just not knowledgeable about the appraisal world. So when you say appraisal certification, what does that entail?

A. I have a state certification.

Adam Barone - by Mr. Carter

19

Q. What state?

A. Pennsylvania, the state I reside.

Q. And when did you become certified in Pennsylvania?

A. Well, when you -- it was the first year you could be certified, so I believe it was around 1991. My number's actually 221, so I'm the 221st person in Pennsylvania to be certified as a general appraiser.

Q. And you maintain that certification up until the present?

A. That's correct.

Q. Are you familiar with the MAI designation?

A. It's not -- no. MAI?

Q. MAI.

A. Yeah, I do have that designation, MAI.

Q. So explain to what me MAI stands for and what the designation is.

A. Well, there's an organization known as the Appraisal Institute, and the way they distinguish their different levels of designation, they provide names. So I am an MAI designated member of the Appraisal Institute.

Q. And when did you get that designation?

Adam Barone - by Mr. Carter

20

A. I believe it was around 1995.

Q. Why did you choose to get that designation?

A. Professional development.

Q. So are there benefits to having that designation?

A. The benefits include educational resources, classes, and it's also -- it's credentialing in terms of an appraiser. It's something else to have as an appraiser.

Q. Are there continuing obligations to be an MAI designated appraiser?

A. Yes, there are. And the same holds true with state certification. They both require you to have continuing education to maintain both your certification and your appraisal designation.

Q. Are there any requirements -- strike that. I'm going to think of a way to phrase this. Are there any duties that you have as an MAI designated appraiser that an individual that is not an MAI designated appraiser but has their state certification would have?

A. No. Our requirement at the bank is to have a state certification. There's no requirement to have the MAI.

Adam Barone - by Mr. Carter

21

Q. So to work at PNC Bank an individual is not required to have an MAI?

A. No, they're not. It's looked at as a preferred thing, but it's not required.

Q. If an individual appraiser has an MAI designation, do they have any obligations apart from, you know, the employment requirements that PNC holds, do they have any additional obligations that a state certified appraiser may or may not have?

MS. MARSH: Objection; form.

You can answer.

A. Well, if you're asking me do you have to -- you have to take courses that they provide, right, so you have to keep your continuing education for the Appraisal Institute. That's one item. There's also a standards of professional appraisal practice that they have that's similar to USPAP, but has some nuances relative to the Appraisal Institute.

Q. Mr. Barone, have you ever worked as an appraiser?

A. Yes, I have.

Q. When did you work as an appraiser?

A. I worked as an appraiser from 1983 to before I came to the bank in 1991.

Adam Barone - by Mr. Carter

22

Q.   Okay.  And then in 1991, you seem to indicate that you stopped appraising properties; so what did you begin doing in 1991?

A.   No, that's not the case.  So in 1990, I took a job with Mellon Bank as an appraiser.  Okay?  And their format was to do appraisal work.  When I came to PNC, I came to PNC as a review appraiser.

Q.   And how long did you work as a review appraiser at PNC?

A.   Well, I was a staff appraiser for the first few years.  I don't know exactly how many years.  Then I was promoted to a manager position.

Q.   And what was the manager position?

A.   I managed the workgroup that was responsible for Western Pennsylvania.

Q.   And how long did you hold that position?

A.   I don't know exactly when I was promoted, but at some point we consolidated the roles and I had responsibility for a greater region, but I don't have the dates off the top of my head.

Q.   Okay.  And how long have you been senior vice president?

A.   I'm not certain, but I believe it's in excess of ten years.

Q.   As a manager did you still perform

Adam Barone - by Mr. Carter

23

appraisal reviews?

A.   Yes.  Early on, yes.

Q.   When's the last time that you had done an appraisal review?

A.   I can't tell exactly but it's been -- it's been several years.

Q.   Several years meaning more than five years?

A.   It's probably been around five years.

Q.   What was the last review that you did?  Do you recall that?

A.   No, I don't recall.

Q.   And I forgot to ask you before when you did appraisals, were they residential or commercial appraisals?

A.   Okay.  The first year I did residential appraisals, and then for the remaining time frame I worked in -- and I'll just give you a description -- I worked in a regional appraisal firm that was led by four MAIs.  Okay?  And I worked for those four MAIs for the balance of those years working on almost every kind of commercial property you can imagine.  So we did anything from residential subdivisions to retail properties to apartments, the gamut.

Adam Barone - by Mr. Carter

24

MR. CARTER:  Dutch, let's go ahead and pass out No. 4.

* * *

(Barone Deposition Exhibit 4 was marked for identification.)

* * *

MR. CARTER:  It's titled PNC real estate evaluation Services, Commercial Real Estate Appraisal Procedures.

Q.   Mr. Barone, do you recognize this document?

A.   Yes, I do.

Q.   And I'm going to go ahead and give you a chance because it looks like there's 39 pages, so I'm going to give you a chance to -- we'll go through this in detail, but just to kind of flip through it.

A.   (Witness reviewing.)  Okay.

Q.   Mr. Barone, what document is this?

A.   This is our procedures manual.

Q.   And I want to talk about the content of the manual, but first let's talk about how the manual is developed.  So tell me what goes into writing a document like this?

MS. MARSH:  Objection; form, foundation.

Adam Barone - by Mr. Carter

25

You can answer.

A.   Okay.  Well, you look at the previous version of what was being used, you take the current regulations and things that would influence this procedure, you would then compile that information, update any portions of the document that needed to be updated because of changes in regulations, make the necessary changes, then review it with senior staff and legal and then publish for use.

Q.   You mentioned looking at current regulations and things that would influence the procedure.  What, in addition to current regulations, would influence the procedure?

A.   Banking regulations change, interpretations change, so the original FIRREA was enacted in 1989.  Since then there have been numerous clarifications provided to the original document that gave clearer understanding of what was being looked for.  Those are the type of things that were updated and amended.

Q.   So even if a law or regulation may not have been changed, there may have been an interpretation or some sort of report that -- in which the interpretation of those laws may have been changed; is that right?

Adam Barone - by Mr. Carter

26

A.   Well, the interpretations would be that of the current examination teams.  So the regulations stayed the same, they didn't amend the regulation, they provided clarifications that were how the examiners wanted you to view versus, I think, what they saw people were actually doing.

Q.   Would you look to -- strike that.

What sources would you look to regarding interpretation of laws or regulations?

A.   Well, there's guidances put out by the OCC.  The most relevant is the Interagency Appraisal and Evaluation Guidelines that came out in 2010.

Q.   Okay.  Mr. Barone, I'm going to go by the page numbers that are listed in the bottom, not the Bates numbers, the long complicated, I'm going to go by page, you know.  For example, the first one I want to look at is page 5 of 39.  And I'm going to read the very first sentence of the procedures.  "PNC has established a policy which conforms to the appraisal policies and standards of the federal regulatory bodies."

Did I read that correctly?

A.   Yes.

Q.   So a moment ago you were talking about, you know, regulations.  What federal regulatory body

Adam Barone - by Mr. Carter

27

is the procedure describing here?

A.   Well, our primary regulator is the OCC, but we're also regulated by other agencies like the Federal Reserve.  It's called the interagency appraisal guidance, meaning it's all the agencies combined.

Q.   The next sentence says, "This policy and related procedures set forth the minimum standards for obtaining valuation products (appraisal and nonappraisal) applicable to all commercial loans secured with real property."

Did I read that correctly?

A.   Yes.

Q.   So what does it mean by the "minimum standards"?

A.   Okay.  Well, there are standards that are set forth by the regulations.  So the minimum standards are actually outlined in this document.

Q.   Are you referring to Chapter 2, minimum appraisal standards?

A.   That's correct.

Q.   And it says -- I'm going back to page 5, the second sentence that I read earlier.  It says, "For obtaining valuation products (appraisal and nonappraisal)."

Adam Barone - by Mr. Carter

28

Give me an example of a nonappraisal product that's covered by these procedures.

A.   Okay.  There's instances where the bank is not required to get an appraisal performed by an appraiser -- or get an evaluation.  They're not required to get an appraisal, they're required to get an evaluation.  Okay.  And that evaluation can be done outside of the appraisal regulations as long as it's in conformance with the evaluation requirements set forth by the regulations.

Q.   And if we continue in that second sentence, it says.  "Applicable to all commercial loans secured with real property."

This might sound very obvious, but residential loans aren't covered by this procedure; correct?

A.   There's a separate procedure for that.

MR. CARTER:  Okay.  Dutch, let's go ahead and give Mr. Barone -- so I seem to have marked two exhibits here as No. 9.  So this is the PNC work restructuring plan.

* * *

(Barone Deposition Exhibit 9 was marked for identification.)

* * *

Adam Barone - by Mr. Carter

29

Q.   Mr. Barone, do you recognize this document?

A.   (Witness reviewing.)  Yes.

Q.   Do you recognize this document?

A.   Yes.

Q.   And what is this document?

A.   It's the documentation relative to our restructure plan back in 2015.

Q.   And you say our restructure plan; are you referring to REVS?

A.   Correct.

Q.   So I would like to talk about the organizational structure of REVS.  So it's my understanding that you are in charge of REVS; is that correct?

A.   I'm the group manager, correct.

Q.   And I'm going to be asking these questions to you regarding today, which is, you know, December of 2018.  There may be times where I might ask questions about what it was like in 2015, but right now let's just talk about how it is today.  Okay?

A.   We're going to talk about the structure in the group as it exists today, correct?

Q.   Yes.

Deposition of Adam Barone

Adam Barone - by Mr. Carter

30

A. Okay.

Q. So if I'm thinking of this as an organizational chart, you're in the top. What's the level below you?

A. Pardon me?

Q. If you're at the top of the organizational chart in REVS, describe to me the individual or individuals that are directly below you in the organizational chart.

A. Okay. Our -- the managers include Jeff Mazur, Laura Lorent, and Fred Petrie. And I also have a part-time administrative assistant, Christine Coyle. Those are my direct reports.

Q. And you said Jeff, Laura and Fred, their title were managers, correct?

A. Correct, managers.

Q. What responsibilities does Jeff Mazur manage?

A. Jeff Mazur's responsibilities include the overall operations of the unit, but he specifically has the review team report up through him currently. So we're divided into two teams.

Q. Did you say the review team?

A. So we're divided into two teams, Jase. So we have a procurement group and we have a review

31

group. And Fred and Laura have the procurement teams reporting up through them. Jeff has the review team reporting up through him. The review team consists of the folks that are responsible for reviewing our appraisals that we order. The procurement team's responsible for managing the process from beginning to end, utilizing the review team at a certain point of the process.

Q. In 2015 what was the structure of REVS? And I'm sorry, let me back up.

In October 1st of 2015, and this is before Mr. Meehan was severed, what was the structure of the group? And I don't need you to list every single person, just similar to what you did before with the overall organization.

A. I'm not -- I can't recall specifically, but there would have been a similar structure with people in place. I'm not sure who had what role because things have changed.

Q. Okay. Mr. Barone, I'd like you to flip in the document you have in front of you, it's a Work Restructuring Plan Summary Document. It's the fourth page.

A. Okay.

Q. It looks to be an organizational chart.

32

At the top it says real estate evaluation Services Current. Are you able to read any of the names on the chart?

A. Not -- not really. I can tell you I'm at the top. It looks like Fred Petrie is the first box on the left. And I can't read the name of that second box.

MS. MARSH: It's Mazur.

A. It's Mazur? Okay. That seems right. And the last box is Paul Higgins.

So at that point in time, Paul Higgins had the review team reporting to him.

Q. Okay. And if you would flip to the next page, which is No. 0259, another organizational chart, is this one easier to read?

A. Yeah, I can make out the names of people that report to me. Yeah, I can make out most of the names.

Q. So I see you, Adam Barone, and underneath, similarly to the page before, it states Fred Petrie, Jeffrey Mazur, and Paul Higgins, and those are the managers?

A. At that time, correct. They're senior managers, by the way. There's other managers that would fall in underneath those groups, but they were

33

the senior managers.

Q. And underneath Paul Higgins, it seems like there's another row. Are those the managers you were just referring to?

A. No. So we're looking under what one? The current or the future?

Q. Future.

A. Okay. Under the future, the first five -- well, let's see -- the first three are single contributors. Scott Valore, don't know if -- I -- if he had someone reporting to him, but at one point he was a manager. Veronica was a single participant. And the last name, Doug Schoenberg, was a manager who had single contributors reporting to him.

Q. And underneath Douglas Schoenberg, there seems to be four individuals?

A. That's correct.

Q. And are these reviewers?

A. Correct. They were appraisal -- they were review appraisers. Review appraisers.

Q. Okay. Review appraisers. Because there's a difference between review appraisers and reviewers, correct?

A. Well, a reviewer wouldn't necessarily be

Adam Barone - by Mr. Carter

34

a certified appraiser. It's a lower level position.

Q. So, Mr. Barone, let's go back to -- I said we were going to be spending a lot of time on this. I wasn't lying. Let's go back to the procedures which I -- I have as Exhibit 4.

MR. CARTER: Dutch, we still -- are you numbering them in the order that I give them or are you sticking with the numbers that I gave?

COURT REPORTER: I'm doing the numbers that you have them numbered.

* * *

(Whereupon, an off-the-record discussion was held.)

* * *

BY MR. CARTER:

Q. Mr. Barone, if you could pull out Exhibit 4 again.

A. I got it.

Q. Okay. And then go to page 6 of 39.

A. Okay.

Q. At the very top it says, "PNC has established roles within the organization that are designed to conform to the appraisal policies and standards of the federal regulatory bodies."

Did I read that correctly?

A. Yes.

Adam Barone - by Mr. Carter

35

Q. It seems like it's a priority for PNC to conform to appraisal policies and standards of federal regulatory bodies; is that correct?

MS. MARSH: Objection; form.

Go ahead.

A. Will you restate that, please.

Q. It seems important to PNC to conform to the appraisal policies and standards of the federal regulatory bodies.

A. That is a correct statement.

Q. And I say that because, as we look at the procedures, it's stated and restated over and over again. Chapter 1 says Organizational Structure, is at the top of this page, correct?

A. Page 6, correct.

Q. Yeah. So I would like to go through the different responsibilities of individuals in the REVS group. So the 1.1.1, if you see that, says the relationship manager. So in 2015, October 1, 2015, if you want, who was the relationship manager for REVS?

A. Okay. That would be someone outside of our group. Those are the individuals from the lending side that request appraisals. So they're the relationship managers that manage the bank's

Adam Barone - by Mr. Carter

36

relations with clients. So they're outside our group.

Q. Is the definition of a relationship manager in these procedures because at some point you refer to relationship managers --

A. So they're our primary --

MS. MARSH: You have to let him finish the question.

A. I'm sorry.

Q. Go ahead.

A. They're our primary clients within the bank. That's who we service, the relationship managers.

Q. 1.1.2 says Manager, PNC real estate evaluation Services. Who would that be in 2015?

A. That would be me.

Q. 1.1.3 says Assistant Chief Real Estate Appraiser; who's that?

A. That would be Jeff Mazur.

Q. 1.1.4, it's on the next page, page 7 of 39, Valuation Coordinator?

A. There are multiple valuation coordinators within REVS. They basically coordinate the workflow as it says here under the direction of our senior appraisers, supervising appraisers.

Adam Barone - by Mr. Carter

37

Q. And who was the senior manager that supervised valuation coordinators in 2015?

A. Well, based on -- I'm not certain, but the procurement groups had managers, and within the procurement group there are positions. And it's 16 -- 1.1.6. They're individuals known as supervising appraisers. Okay. That's who the coordinators work directly with to do their workflow. They may or may not have been managers, but they work with a certified appraiser, supervising appraiser to manage the workflow.

Q. At 1.1.5 it says Review Team Lead/Appraisal Manager/Senior Appraiser. Who was that in 2015?

A. I believe it was Paul Higgins.

Q. 1.1.6, Procurement Team Lead/Appraisal Manager/Supervising Appraiser, and you mentioned this earlier, but who was the individuals or individual that this is referring to?

A. There's multiple individuals. I am -- without a list I would be challenged to give you an accurate accounting of that. But I would -- two of those individuals would be, I believe, Jeff Mazur, Fred Petrie.

Q. Now, you testified that the -- on page 6

Deposition of Adam Barone

Adam Barone - by Mr. Carter

38

that 1.1.3, Assistant Chief Real Estate Appraisal was Jeff Mazur. Did Mr. Mazur have multiple responsibilities?

A. That's correct.

Q. And then 1.1.7, Appraiser, does this refer to one of the positions that Joseph Meehan had?

A. That would be our single contributor appraisers, yes.

Q. And a little bit ago you talked about the difference between being a reviewer and being a review appraiser. And are the -- some of the differences shown here in 1.1.7 and 1.1.8?

A. Yes.

Q. Okay. Thanks, Mr. Barone. We're going to keep going on this document. And you had spoken about it before, Chapter 2, Minimum Appraisal Standards, page 12 of 39.

A. 12 of 39, Chapter 2.

Q. Okay. You had previously mentioned various regulatory bodies. The second sentence of the first paragraph reads, "This chapter outlines those minimum requirements." The third sentence says, "Please refer to Section 2330 of the PNC Real Estate Finance Commercial Loan Policy Manual for a

Adam Barone - by Mr. Carter

39

copy of the PNC Real Estate Appraisal Policy, Title XI of FIRREA, Regulatory Agencies' appraisal regulations, Interagency Appraisal and Evaluation Guidelines, and USPAP."

Did I read that correctly?

A. Yes.

Q. I want to talk about the third sentence in this paragraph. It says, "Please refer to Section 2330 of the PNC Real Estate Finance Commercial Loan Policy Manual." What is that referring to?

A. Well, at the bank you have policies. Okay. And the policies are the top document that -- other procedures basically give you the how to, to comply. So the Real Estate Finance Commercial Loan Policy Manual is a manual that would be used by the lending teams to manage their workflow. Within that, we have a reference to our policy, which is the real estate appraisal policy.

Q. And my question is, you know, what is that appraisal policy?

MS. MARSH: Objection; form.

You can answer.

A. Okay. The appraisal policy is what this procedure document enables us to comply with. So it

Adam Barone - by Mr. Carter

40

sets out the broad -- the broad rules relative to or -- yeah, the broad rules and requirements for appraisals.

Q. Okay. So when it says PNC Real Estate Appraisal Policy, is policy talking about the overall policies of PNC and it doesn't refer to a particular and only one document; is that right?

MS. MARSH: Objection; form.

You can answer.

A. No. The real estate appraisal policy is a document that pertains to the appraisal requirements for a bank. So it basically tells you when you have to get an appraisal or when you have to get an evaluation or you have the option to get neither. So it's a high-level policy that basically is used for the bank to manage their loans in a way that they get appraisals when they need to; and when they don't, they don't.

Q. So when was the appraisal policy developed?

A. Well, the appraisal policy's been in place, itself, for as long as I can remember. Each year it's reviewed and approved by the Board of Directors of the bank.

Q. You said each June it is approved?

Adam Barone - by Mr. Carter

41

A. Well, each year. I don't know specifically the date, but annually. It's approved annually.

Q. Do you have access to this policy?

A. Yes. Anyone at the bank would.

Q. Would the general public have access to the policy?

A. No.

Q. Did you distribute this policy to REVS employees?

A. We would distribute policy and procedure, any changes, to the group when they occurred. That was our practice. They're also available to any employee using the bank's intranet.

Q. How many pages is the appraisal policy?

MS. MARSH: Objection; form, foundation.

A. I don't recall. It's several.

Q. Is it more detailed or less detailed than the procedures that we're looking through right now, Exhibit 4?

MS. MARSH: Objection; form, foundation.

Go ahead.

A. It's less detailed. It's high level. As indicated previously, the procedure is the roadmap for complying with the policy.

Q.    In the third sentence of the first paragraph on page 12 it talks about Interagency Appraisal and Evaluation Guidelines; is this what you were talking about earlier regarding guidelines that were used to make changes or help with drafting of the procedures that we're talking about now?

A.    Yes.

MR. CARTER:  Dutch, let's go ahead and distribute No. 5.

* * *

(Barone Deposition Exhibit 5 was marked for identification.)

* * *

Q.    Mr. Barone, earlier you testified to interagency guidelines, and you even stated the year, which was 2010; is that right?

A.    Yes.

Q.    Are these the guidelines that you were talking about earlier in your testimony?

A.    Yes, they are, but the copy that's provided is cut off, so you don't have the whole page.  But I think it was intended to be that document.

Q.    So the copies you have the entire page is not provided?

A.    For each -- yes, that's correct.  The way it was copied, it was copied -- so it's print out in landscape but it should have been a page, so it's long ways.  So the bottom of the pages are all missing.

Q.    Okay.  So I want to -- because there could be a chance that it's just shrunk but, for example, on the second page, which is the Interagency Appraisal and Evaluation Guidelines -- I'm sorry -- it's a table of contents?

A.    I got the table of contents, correct.

Q.    So what is the last entry -- or what is the last words that you have on that page?

A.    Depth of review.  It's cut off.

Q.    Okay.  All right.

MR. CARTER:  I'm going to need to get you a copy that has everything.  So we'll -- when we take our first break, Dutch, I'm going to resend the PDF, and I might be able to make sure that it's printed horizontally so Mr. Barone can be able to see all of it.  Okay.

Q.    Mr. Barone, let's go back to the procedures that we were walking through.  So on page 12, Chapter 2, Minimum Appraisal Standards, there begins to be listed various federal regulatory

bodies.  And as we talked about before, this sets up the minimum appraisal standards for REVS, correct?

A.    Well, it sets up the new regulatory standards for a regulated institution, which PNC is.

Q.    So does -- the standards that list here, are they equally applied to other similarly situated financial institutions?

MS. MARSH:  Objection; form, foundation.

You can answer.

A.    Okay.  The standards provided here are taken from the regulation.  So I don't want to say in theory, but in -- the concepts would be the same for other institutions and the requirements.

Q.    Could you turn to page 14 of 39.  2.7 says Evaluation Content.  It says, "An evaluation will contain an adequate level of information, analysis and detail to support the concluded market value estimate."

What is the evaluation it's referring to here?

MS. MARSH:  Objection; form.

You can answer.

A.    Okay.  In situations where the requirements do not require us to get an appraisal performed by a certified appraiser, we have the

opportunity to get what's known as an evaluation that can be performed by someone other than an appraiser.  And the standards relative to the format and content are less than an appraisal.

Q.    Earlier you talked about appraisal and nonappraisal products.  So is an evaluation an example of a nonappraisal product?

A.    An evaluation would be a non- -- yes.

Q.    2.5, Appraisers/Evaluator Independence, I will go ahead and read it.  "Federal regulations require that appraisals and evaluations be prepared by appraisers/evaluators independent of the loan production and collection process and have no direct, indirect or prospective interest, financial or otherwise, in the property or transaction."

Did I read that correctly?

A.    Yes.

Q.    Talk to me about how REVS ensured that it complied with the appraiser/evaluator independence.

A.    Okay.  First of all, real estate evaluation services is an independent group within the bank, so it's not connected with loan production or the origination of loans.  So from that perspective, real estate evaluations was responsible for ordering appraisals independent from any

Adam Barone - by Mr. Carter

46

influence from the loan, the loan officer, or the borrower. And we do that through a process of -- we manage the selection of appraisers.

Q. So you said that the group is independent from other sections of the bank. The selection of appraisers is monitored; is that correct?

MS. MARSH: Objection; form.

A. No, the selection of the appraiser is our responsibility.

Q. Okay.

A. And in doing so, we're required to ensure that the selection of that appraiser wasn't influenced by loan production or the borrower.

Q. So for appraiser/evaluator independence, the responsibility of selecting appraisers, of ordering loans independently, anything else that REVS did to ensure appraiser/evaluator independence?

A. Well, the whole process is to ensure appraiser independence, okay, so from the beginning to end. So we ordered the appraisal independent of influence from the borrower or the loan officer. And then through our process, the review process, we manage that process independent of any direct influence from the relationship manager or the borrower on the appraiser. But that doesn't mean

47

that our review appraisers who are responsible for maintaining independence don't interact with our loan officers for information that may be germane to an appraisal. But their responsibility is to act as an insulation between any potential undue influence by our loan production team on the result of the appraisal. So to your question is we manage it from beginning to end.

Q. So there are safeguards to ensure independence relating to loan production and review of appraisals, correct?

A. So safeguards for independence for the appraisal function from loan production and the borrower.

Q. And as you said, there may be some interaction between loan production and the review appraiser, but the priority or the requirement is that those interactions should not influence the appraiser, the appraiser's review, correct?

MS. MARSH: Objection; form.

You can answer.

A. Okay. It shouldn't impact the -- what the reviewer's doing nor what the appraiser ultimately concluded in their appraisal. Now, there are instances, the interaction where the loan team

Adam Barone - by Mr. Carter

48

who have firsthand knowledge of a property will identify something that's amiss. For instance, the appraiser missed a tenant. We wouldn't know that from where we are at. So the loan officers have the obligation to provide any kind of reconnaissance relative to potential inaccuracies with the property, and they're to report it to the review appraiser who, in turn, as appropriate, would raise the issue with the appraiser that performed the appraisal.

Q. You've been talking about independence between the appraisal reviewer and loan procurement, correct?

A. No. Well, if you talk -- yeah, loan procurement. So let's not mix terms. So we have a procurement group within the real estate evaluation group that's responsible for managing the workflow. Then you have the lenders who are -- their purpose is to book loans. And that's a separate process. So there's this process to procure loans, which is not to be confused with what I'm describing, I guess.

Q. And I'm, you know -- I want to use precise language, and so it seems like what you were describing is that the very first sentence involves

49

the REVS group is independent of other groups and that probably includes the loan procurement, correct?

A. Loan production, correct.

Q. Loan production. Okay. And then within REVS there's still loan -- did you say managers; is that the term you used?

A. No. They're process managers. They're request process managers.

Q. Okay.

A. The whole group is independent from loan production. It's not bifurcated at all. Everyone within REVS would be considered as an independent individual from loan production.

Q. Is it helpful to think of different groups within REVS as being, you know, process managers and appraisal reviewers?

MS. MARSH: Objection; form.

You can answer.

A. Well, I don't know. Can you kind of rephrase that so -- I'm trying to understand what you're driving at.

Q. Yeah. There was an appraisal review group, correct?

A. Well, it's really a subset within the

Adam Barone - by Mr. Carter

50

team. There's folks that at any given time their responsibility is to be reviewers.

Q. So there was an appraisal review team?

A. Okay. Yes.

Q. And was there a process managers team?

MS. MARSH: Objection; form.

A. Well, there was the team that was responsible for managing the workflow. So that means scoping the appraisal and then ultimately accepting the appraisal at the end.

Q. And regarding 2.5 with Appraiser/Evaluator Independence, part of the independence was making sure appraisal review team members and their appraisal reviews were not influenced by process managers' thoughts or personal feelings about an appraisal, correct?

A. No.

MS. MARSH: Objection, form, misstates the document and misstates testimony.

Go ahead, you can answer.

A. No, it's not the case. They're on -- they're both -- their objective is to get to the same thing, and that is an independent appraisal. So independence in 2.5 really references the appraiser themselves, the person that actually did

Adam Barone - by Mr. Carter

51

the appraisal. That's what 2.5 references.

Q. Okay. So the appraiser in 2.5 is the appraiser of the -- of a particular loan?

A. Of the real estate. And it would be a third-party real estate appraiser, because at PNC that's the only individuals we use to -- for appraisals. So it would be a third-party appraiser.

Q. So in 2.5 it's referring to nonPNC employees if it refers to appraisers?

A. That's correct.

Q. Who's it referring to regarding the evaluator?

A. So if it's something that's other than an appraiser, performed by someone who's not an appraiser, their generic name would be evaluator.

Q. So an evaluator is referring to nonPNC employees?

A. That is correct.

Q. So what is the purpose of having 2.5 in the procedures if appraiser and evaluator are referring to nonPNC employees?

MS. MARSH: Objection; form.

You can answer.

A. It's the requirement by regulation. That's why it's stated, because it's the minimum

Adam Barone - by Mr. Carter

52

standards. The minimum standards refer to what we're required to do. And it is the case that our appraisers and evaluators, third parties, are independent of any of this negative influence.

Q. Well, I understand that. But there's probably a ton of regulations that deal with nonPNC employees that are placed in PNC, you know, manuals or procedures. So my questions is why is this important for PNC employees to know?

MS. MARSH: Objection; form, asked and answered.

Go ahead.

A. Okay. Because when it relates to the appraisal function at a bank, in the regulation itself, it has two primary themes, one -- and this was to kind of correct the problems of the past, but when FIRREA came into play, it was really to address appraiser independence and also the competency of an appraiser.

So the independence part is that a bank's not allowed to use an appraisal that was provided to them from a borrower. In the past, prior to the regulation, that was common practice for an appraiser to be hired by a developer, bring an appraisal to a bank and the bank would use it. And

Adam Barone - by Mr. Carter

53

the regulation was put in play, that was no longer available.

So appraiser independence is a regulatory function that from the regulation itself is an important element. So you have the independence and then you have the competency, which is what the certification's supposed to address.

Q. I know that you answered this version of this question earlier, but now that we've discussed 2.5 I'm going to ask it again because I don't think I was fully understanding you earlier. So -- talk about the ways that PNC Bank helped ensure that appraiser/evaluator independence occurred.

MS. MARSH: Objection; form, asked and answered.

You can answer again.

A. Can you restate what you just said because I'm trying to understand what we're -- what you're really asking me.

Q. Yeah. Sure. So I mean, what I'm really asking is that, you know, 2.5, the appraiser/evaluator does not apply to nonPNC employees and then we already talked about that. So, please tell me the ways in which the REVS group helped make sure that these nonPNC employees

Deposition of Adam Barone

Adam Barone - by Mr. Carter

54

remained independent.

MS. MARSH: Objection; form, asked and answered.

Go ahead.

A. Okay. When we order an appraisal, it's real estate evaluation services choosing the appraiser based on their competency and relative to the assignment and location. So we control the process. We're not using appraisals that are provided to us by borrowers. We're not using appraisals that are provided by our internal loan production team.

Q. Thanks. I appreciate that. There was just some confusion on my part because I didn't know that 2.5 was referring to nonPNC employees. So that's why there was some kind of hiccup there at the beginning.

So Chapter 3, if you turn the page, page 15, and this is the Approved Appraiser List procedures; is that correct?

A. Correct.

Q. Is following the approved appraiser list one of the ways that PNC helped ensure that there was appraiser/evaluator independence?

A. Yes.

Adam Barone - by Mr. Carter

55

Q. Mr. Barone, let's switch gears a little bit.

MS. MARSH: Sorry, can I interrupt you, Jase? Before you switch gears, would it be okay if we took, like, a five-minute break so I could use the ladies' room?

MR. CARTER: Yeah. And then we'll go ahead. And I was probably planning on taking lunch at, like, 12:30 you guys' time. I don't think I have -- no predictions for time, but I still think a lunch break is going to be needed.

MS. MARSH: Okay. Well, I don't mean to cut you off, but if you're switching gears I think now would be an appropriate time to take a break.

MR. CARTER: Let's take ten minutes. So it will be 11:45 your guys' time.

MS. MARSH: Okay.

* * *

(Whereupon, a brief recess was taken.)

* * *

MR. CARTER: Let's go back on the record.

BY MR. CARTER:

Q. Mr. Barone, we were talking about 2.5 from the real estate appraisal procedures and appraiser/evaluator independence. My question is,

Adam Barone - by Mr. Carter

56

what, if any, independence do review appraisers have to have?

MS. MARSH: Objection; form.

You can answer.

A. Well, anyone related to the process in itself needs to be independent from those same influences. So anyone in my group, anyone we hire, has to be insulated from undue influence.

Q. Specifically regarding review appraisers; are they required to be independent?

MS. MARSH: Objection; form.

You can answer.

A. Yes, along with the coordinators, along with supervising appraisers, along with the reviewers, along with myself. Again, anyone in our group.

Q. And so for review appraisers, in what ways do they need to be independent?

MS. MARSH: Objection; form.

A. Well, they can't allow themselves to be influenced by outside forces like the loan production team. Folks who have a vested interest in the conclusion. Or as my team has a vested interest in complying with the regulations in getting an appropriate, credible valuation.

Adam Barone - by Mr. Carter

57

Q. You mentioned outside forces. What kind of outside forces are you referring to?

A. Okay. You have a loan officer whose motivation is to close a loan. They need a certain value on an appraisal. They're motivated for that interest. We can't let that interest influence our critique, review or procurement of the appraisal.

Q. Any other outside forces?

A. Borrower -- a borrower who has the motivation to close the loan and a vested interest in the answer.

Q. You mentioned loan officer, borrower; anyone else?

A. Well, anyone on the loan production side who's motivated by being compensated by the closure of a loan.

Q. Anyone else you can think of?

A. That seems to be a pretty good list.

Q. But is it a complete list? You mentioned loan officer, borrowers, loan production, individuals that might have some sort of compensation; is there anyone else that would be considered outside forces?

MS. MARSH: Objection; form.

A. No, because the whole premise is someone

Adam Barone - by Mr. Carter

58

who has a vested interest in the outcome.

MS. MARSH: Can you just hold on one second, Jase?

* * *

(Whereupon, an off-the-record discussion was held.)

* * *

BY MR. CARTER:

Q. As Robyn knows, I also work in a co-working space, so I understand.

Mr. Barone, you talked about outside forces. Were there any inside forces that could influence an appraisal reviewer?

MS. MARSH: Objection; form.

Go ahead.

A. Okay. So let me give you a little drop on why our process is the way it is. One of the things that we do is we set up a process where not one individual could manage the appraisal process to its conclusion. So along with that, it requires multiple individuals within my team to be in agreement to the answer. That allows the bank to feel comfortable that we don't have potentially -- and again, it's -- you always look at the worst case scenario, that you don't have a rogue employee who basically could manage the appraisal process from

Adam Barone - by Mr. Carter

59

beginning to end with maybe less than appropriate motivations. So our process is actually built in with checks and balances to protect the bank from potential individuals who could, on their own accord, manage a process and put the bank in a position that they're relying on something that they shouldn't. So in our process you have a supervising appraiser, a coordinator, a review appraiser, and ultimately the appraiser that we ask to do the original appraisal. So at the end of the day, since PNC does not allow for any internal changes to value, the value is always going to be representative of somebody independent of the bank. And that's not without challenge, but at the end of the day our -- we safeguard the opinion of the appraiser by putting these various things in place.

Q. And when you refer to appraiser, you're talking about the nonPNC employee?

A. Correct. That's the only individual that can render an opinion of value that the bank would rely on would be the third-party.

Q. So in talking about review appraisers which are PNC employees, do they have a duty to be independent?

MS. MARSH: Objection; form.

Adam Barone - by Mr. Carter

60

A. As I stated, along with the coordinator, along with the supervising appraiser and the review appraiser, they need to be independent; that's correct.

Q. Just to make sure, you are testifying that the review appraiser is required to be independent, correct?

MS. MARSH: Objection; form, misstates his testimony with respect to the document, asked and answered.

Go ahead.

A. Okay. If you think about this process, you have a supervising appraiser who is a certified appraiser who is, you know, accountable, all the same requirements as the review appraiser, has similar qualifications. They're all mandated to maintain independence. If they weren't, then our process would not be acceptable to the regulators, which it obviously is.

Q. You said they're mandated to maintain independence. Where are review appraisers mandated to maintain independence?

MS. MARSH: Objection; form.

A. Well, the overreaching thing -- so let's go back to the regulation. The regulation basically

Adam Barone - by Mr. Carter

61

says that you have to have an independent process to procure your appraisals. So anybody under that umbrella -- that includes the original appraisal -- original appraiser, anybody within our staff, that includes reviewers, supervising appraisers, coordinators; they all maintain an independence from the undue influences.

Q. And the undue influences you're talking about, those are the same outside forces you were describing earlier?

A. Generally, yes.

Q. In addition to the outside forces you mentioned earlier, what additional influences could negatively affect the independence of a review appraiser?

MS. MARSH: Objection; asked and answered.

Go ahead. For the fortieth time, you can answer.

A. I don't know what I can say other than what I already said, Jase.

Q. Okay. Well, you said that there were undue influences that could negatively affect the independence of review appraisers; is that correct?

A. There's outside forces, correct, which

Adam Barone - by Mr. Carter

62

would be the loan production -- actually, the regulation reads loan production, borrower. It's kind of that specific. It's anyone motivated -- and I use the general terms -- anyone who has a vested interest in the loan closing. Someone who would monetarily benefit from that.

Q.    Are there any internal pressures that could prohibit a review appraiser from being independent?

MS. MARSH:  Objection; form, asked and answered.

Go ahead, you can answer again.

A.    That would be based on the personality of the individual, if they allow someone to influence what they're doing. But our system's set up to kind of provide controls so that if someone -- one person was influenced, that there's a group of consensus that needs to occur and ultimately the appraiser's word stands, and that's the appraisal we accepted.

Q.    Describe the consensus that needs to occur.

A.    Okay. At the end of the day, obviously the review appraiser has to recommend acceptance of that appraisal. And then the supervising appraiser needs to review -- needs to look at that document

Adam Barone - by Mr. Carter

63

and feel comfortable that we've satisfied everything we need to.

Q.    And what happens if a supervising manager finds a deficiency in her review appraisal?

A.    Well, there would be a discussion with the review appraiser. Because the line of work is that once a review appraiser does their work, it's locked down and they're the only ones that control that document. So once a review appraiser says they accept an appraisal, they're the only ones that can unlock it. So there's an opportunity for discussion back and forth, but it's individually everyone standing up for their own integrity.

Q.    You said that the appraisal is locked; what does that mean?

A.    It means once I complete a review, no one can change it. Other than myself. Same as an appraisal. Once an appraisal's commissioned and provided, we're unable to change it. We have to use it as is, where is. Same is true with how our review documentation is set up.

Q.    So what happens if a review appraisal is done and then another member of the REVS team disagrees with the review appraisal?

MS. MARSH:  Objection; form, incomplete

Adam Barone - by Mr. Carter

64

hypothetical.

Go ahead.

A.    There would be discussions between those two individuals, and being you have two folks that are -- have a vested interest in getting the correct answer, hopefully, there's a collaborative approach to a solution.

Q.    And what if there is disagreement between the supervisor and the reviewer?

A.    As a matter of practice, those occur on a regular basis to a different level, that there's a difference of opinion. There's a discussion. So if you think about USPAP and appraisal in general, it's basically a consensus of your peers, right? So what's right and wrong. Not one appraiser has all the answers to every appraisal problem that exists. So it's helpful, and actually productive, to have a collaborative approach where you have more than one individual critiquing a report. Now, if you step back and say okay, we pre-qualified the individual we had do the appraisal, okay, we pre-qualified him, so we selected somebody who we had a very good understanding that they would provide us a document that we would be able to use unrevised. So once that report, again performed by a qualified

Adam Barone - by Mr. Carter

65

individual, is performed, our team needs to go in and just look at that to make sure that what they produced is credible. Knowing that appraisals can take different formats, they can use different methodologies, but at the end of the day if what is expressed to you and documented in the report is a credible appraisal, then our group would get to a point where we would accept that particular appraisal and it would be utilized by the credit loan production teams.

Q.    What happens if there's a disagreement between the initial review appraiser and the supervisor? What happens?

MS. MARSH:  Objection; asked and answered.

Go ahead.

A.    They would work together for a resolution.

Q.    What does that look like, working together for a resolution?

MS. MARSH:  Objection; asked and answered, form.

Go ahead.

A.    Okay. I'm just trying to -- so in our process the review appraiser is put in a position

Adam Barone - by Mr. Carter

66

where they either can accept or reject the report. Okay. Typically they're accepted after, maybe, back and forth. And that's the typical process.

Q. And Mr. Barone, I'm probably not talking about the typical process because it seems like most of the time there is agreement. I'm talking about the circumstances where there isn't agreement. So in a scenario in which the review appraiser is going to either accept or reject an appraisal and the supervisor or another member of the REVS management disagrees with that decision, what does it mean for them to work to a resolution? What does that look like?

MS. MARSH: Objection; form, incomplete hypothetical, asked and answered, calls for speculation.

Go ahead and try this again.

A. Okay. So there's typical back and forth between the parties within the group. At the end of the day the -- things are resolved, Jase. I mean, they're resolved. And the review appraiser accepts the -- recommends acceptance of the appraisal and ultimately the supervising appraiser does what they need to do, and that means they have to accept it, the recommendation, and we move forward with using

67

the appraisal.

Q. In a case of disagreement will the appraisal be reassigned to a different review appraiser?

A. Well, it would depend on the nature of the discourse. But there's the potential to do that. Because you have to remember, the starting process here is we go with the assumption that the qualified individual we use up front, the appraiser, had the necessary qualifications to perform what we asked him to do. So we don't have the expectation that an appraisal comes in and it's going to be flawed. That's why we take great measures to ensure that we have an approved appraiser list that's well vetted, that we have an understanding of people's expertise so that when an appraisal comes in, we don't find ourselves in a situation where we have a review appraiser that can't get comfortable with what an appraiser has done. And ultimately, if there is an issue with the report that can't be resolved through back and forth with the appraiser and the other parties involved in my group, then we always have the ability to reject that report and go get a new one.

Q. If an appraisal is transferred between

68

one review appraiser and another because of a disagreement regarding the underlying appraisal, how is that communicated to the initial review appraiser?

A. That would depend on the parties involved. See, people are speaking with each other. These people work as a team, they're not -- they're not working in isolation. They're working together. So the rapport of the individuals involved would dictate how the communication, you know, transpired.

Q. Let's talk a little bit about the chain of command in the REVS group, and specifically regarding issues that employees in the REVS group may find through the course of their employment.

So the first example is, you know, a loan that may -- I'm sorry -- an appraisal that may come in and there might be some question or discrepancy. What's the reporting structure that that employee should follow?

MS. MARSH: Objection; form, incomplete hypothetical.

Go ahead.

A. So, we have a situation where you're telling me that the review appraiser doesn't agree with the appraisal?

69

Q. Sure. Or there's some other problem that the review appraiser has found in dealing with the appraiser. Who should that individual speak to at PNC in that situation?

MS. MARSH: Well, hold on. What question do you want him to answer; if there's a problem with the report or he has a problem with the appraiser?

Q. We'll start with the report. If there's a problem with the report, who should the individual report to at PNC, if anyone?

A. So if the review appraiser has a problem with the report, they should have a discussion with the supervising appraiser.

Q. And what if there's a problem with the third-party appraiser?

A. Well, there's one of two things. If we can't get resolution with that third-party appraiser, we are going to reject the report and get another third-party opinion.

Q. If there's disagreements regarding an underlying appraisal within the REVS team, is there a chain of command that that individual should report to or first consult? And when I say that individual, I'm talking about a review appraiser.

MS. MARSH: Objection; form, asked and

Deposition of Adam Barone

Adam Barone - by Mr. Carter

70

answered.

Go ahead.

A.   Okay.  So our process can't move forward without a consensus.  So if there was a situation where there was an issue, it would be raised to probably their supervisor to help, you know, resolve any outstanding issues.  But regardless of the situation, understand that before anything would make it through the entire path, two people need to agree to it.  And that's very important because if there is a situation where you would allow someone -- because it's not -- it's not the case that potentially that review appraiser is correct, it could be the original appraiser be correct.  We can't assume that the review appraiser is correct in their issues with the report.  So in our group it's more of a peer on peer consolidation or discussion that gets you through whether or not as a consensus of peers, certified appraisers, we're not agreeable to what the appraiser did.  See, our system is set up to safeguard against a lone individual being able to dictate the ultimate conclusion here; there's a checks and balance.  More than one person needs to agree to get us to the acceptance of the appraisal.

Q.   Does the review appraiser need to sign

Adam Barone - by Mr. Carter

71

anything regarding the underlying appraisal?

MS. MARSH:  Objection; form.

A.   Well, at the end of their process they're required to electronically sign the review that basically contains a certification that says they're in agreement with what -- and the report's compliant and they recommend acceptance.

Q.   At that point is that when you described it as the review being locked?

A.   Well, it's locked -- they're the only ones that can work on it.  So if you're a review appraiser, you're the only one that can -- it's like any electronic document that's designated to someone.  They have to log in, they're the only ones that have the ability to make any alterations to it and ultimately provide their acceptance or recommended -- it's actually recommended -- recommending acceptance.

Q.   And if after signing the recommending acceptance where is review sent?

A.   Well, it's contained within the Links System.  That's the system of -- that's our appraisal management system.  It's contained within Links.  So it's two steps, right, Jase?  So the -- again, as I told you, not one person can carry

Adam Barone - by Mr. Carter

72

things through from beginning to end because the bank needs to safeguard itself from the potential of a rogue individual who may have motivation to do something that's incorrect.  So once the review appraiser clicks off and accepts it, it requires a supervising appraiser then to provide an acceptance or transmittal letter that's contained within the system, which is the document needed by the loan production -- loan production team to utilize the appraisal.

Q.   Does the review appraiser supervisor look over the review once it's been signed by the review appraiser?

A.   No, because in our system it's a process.  Okay?  So you think about it, you have a supervising appraiser who works with a coordinator who's responsible for managing the process from beginning to end.  During the course of that process we're going to order an appraisal, it's going to be reviewed, it's going to be brought in and reviewed.  The review appraiser is part of the team.  They're the person that's asked to come in, review the report, and provide a recommendation of acceptance.  And along the way, there are issues sometimes that present themselves, which it's incumbent upon the

Adam Barone - by Mr. Carter

73

review appraiser to work through efficiently to get to an appropriate resolution.

Q.   I'm sorry.  I didn't hear the last thing you said.  You said get to a --

A.   An appropriate resolution.

Q.   An appropriate resolution.  If a third-party appraiser refuses to amend an appraisal, what happens?

A.   We're in a position that we don't -- we're not going to accept it?

Q.   Correct.

A.   Okay.  Then we're going to hire someone who's in the market, most likely, to review the report.  Because one of the challenges we have is that we're centralized groups and we have appraisals done throughout the country, right?  So the best opportunity when we're not in agreement with the first appraiser is to have a field review commissioned, and we'll have somebody with similar competency in that market provide us a field review to get their -- their input on the appraisal, because we're limited because we're sitting at a desk versus somebody going out, you know, hitting the pavement, looking at the comps, looking at the property and saying you know what, yeah, they got it

**Adam Barone - by Mr. Carter**

74

right, or no, I think it should be something different than what they conclude. And at that point, once the field review is completed, we review the field review to make sure that everything that happened prior to that all kind of fits relative to getting to a good, credible valuation that we can use to support our collateral valuations.

Q. I want to talk a little bit more about field reviews, but first to circle back.

How many instances do you know of in which a review appraiser refused to make a required change or suggested change and the appraisal was transferred to someone else within the group?

MS. MARSH: Objection. As to what time frame?

MR. CARTER: We can go back five years.

MS. MARSH: What does that mean? From -- 2013 to present?

MR. CARTER: To 2010, sure.

MS. MARSH: Sorry. What time frame are you saying?

MR. CARTER: From January 1, 2010, till today.

MS. MARSH: So eight years.

MR. CARTER: Eight years total, yes.

**Adam Barone - by Mr. Carter**

75

MS. MARSH: Okay. So do you understand the question?

THE WITNESS: No.

MS. MARSH: There were objections back and forth. Sorry.

THE WITNESS: Jase, what's your question again?

Q. How many times has an appraisal been transferred from one reviewer to another because of disagreements regarding the appraisal review?

MS. MARSH: Objection; form and subject to the time limitations we just discussed, you can answer.

A. It would be minimal. I don't have an answer. It's minimal.

Q. Do you remember any such instance?

MS. MARSH: Objection; form.

You can answer. Go ahead and answer.

A. Not specifically, Jase. I mean, you understand that there's a lot of pieces moving through the group, so...

Q. Is it rare for that to happen?

MS. MARSH: Objection; form.

You can answer.

A. Yes, it's rare because, remember the step

**Adam Barone - by Mr. Carter**

76

back, we ordered an appraisal from a qualified individual with the expectation that that individual provided us a report that we would not take issue with. So if you take that and the idea that we put ourselves in a position not to have discourse at the end because, quite honestly, if you ran a system where you anticipated having problems and having to rework appraisers' work, you wouldn't have a very successful loan production group because you wouldn't have the ability to get through the work product in a reasonable format so that they could ever have an end point.

Q. And I understand that. I mean, coming from a business side, it doesn't make any sense to deal with -- to correct all these problems on the back end which take up a ton of resources and take up, you know, the energies of your team, energies of PNC Bank when you can -- it's a much more efficient way to try and eliminate all those problems on the front end, which is talking about the quality of the appraisers and the appraisal quality themselves. So that makes complete sense. You know, I think what we're discussing now are those particular instances where, you know, even despite all of those efforts there's still some sort of disagreement, you know,

**Adam Barone - by Mr. Carter**

77

on the back end.

Let's talk about field reviews. So is there a policy that relates to requiring field reviews?

MS. MARSH: Objection; form.

A. Well, I think there's guidelines in the procedures that relate to the use of field reviews. Ultimately through the recommendation of the review appraiser and the supervising appraiser, we would take that direction.

Q. Let's talk about reporting ethical violations. What is the process of a member of the REVS group reporting an ethical violation regarding an appraisal or the review of that appraisal?

A. Through the communication of the review, not accepting it.

Q. Is there any other way to report an ethical violation regarding an appraisal or the review of the appraisal?

A. Reporting an ethical violation to whom, Jase?

Q. I don't know. Who should they report it to?

A. No, so -- there's two things going on here, right? So if you perceive the appraiser has

Deposition of Adam Barone

Adam Barone - by Mr. Carter

78

done something unethical, then you would not be able to accept your appraisal, right? You would not be able to accept their appraisal. By default, the review would be incomplete. If there was an issue that needed to be addressed, we would -- with an appraiser that dealt with that type of severity, we would contact the legal team and we would get advice on how to pursue it.

Q. Would the individual -- sorry, strike that.

If it was a review appraiser who thought that there was an ethical violation, would the review appraiser him or herself report that to legal?

MS. MARSH: Objection; form.

A. Well, they have the opportunity to report it up through the normal chain, like I just described, but if they --

Q. And the normal chain would be their supervisor?

A. Well, it would be addressing it with the supervising appraiser, then the supervising appraiser along with the reviewer in consult with management would, you know, come up with a way to address it. And depending on what the issue is.

Adam Barone - by Mr. Carter

79

All hypotheticals.

Q. Has there been any such ethical complaints while you've been in charge of REVS?

MS. MARSH: Objection; form, incomplete hypothetical, vague.

Subject to that, you can answer.

A. No.

Q. Have there been any ethical complaints that were escalated to you but REVS decided not to forward on to the legal?

A. No.

Q. Have any REVS employees in the last ten years been disciplined for ethical violations?

A. No.

MR. CARTER: Mr. Barone, so I said we'd break here for lunch. Let's go over the document that was sent to me yesterday, which is I believe No. 12, Dutch. So if you could pass that out. I sent it in color. I don't know if it was printed in color, but if that affects your testimony, we can talk about it.

* * *

(Barone Deposition Exhibit 12 was marked for identification.)

* * *

Adam Barone - by Mr. Carter

80

MS. MARSH: Just so you know, it was printed in color.

MR. CARTER: Okay. Great.

* * *

(Whereupon, an off-the-record discussion was held.)

* * *

BY MR. CARTER:

Q. Mr. Barone, do you recognize this document?

A. Yes.

Q. What is this document?

A. It's basically a document that summarizes our closed files over the years designated on the document.

Q. Did you review this document in preparation for your deposition today?

A. Yes, I looked at it.

Q. Who created this document?

A. I asked Jeff Mazur to do that.

Q. When did you ask Jeff to do this?

A. Yesterday.

Q. What did you specifically ask Jeff to do?

A. I asked him --

Q. With regard -- go ahead.

A. No, I asked --

Adam Barone - by Mr. Carter

81

MS. MARSH: That's all right. Go ahead.

A. I asked him to provide me our workflow on an annual basis.

Q. So at the top it says Real Estate Valuation Services, and underneath that, we have a number of closed valuation requests. Explain to me what closed valuation request are.

A. That's the number of requests we processed in a given year. So in 2013, we processed 14,000-plus appraisal assignments. In 2017, we completed 5,000-plus assignments.

Q. Earlier we were discussing the difference between appraisal and nonappraisal products. So just to be clear, are we talking about both appraisal and nonappraisal products here?

A. Correct. It's our -- it's the number of files we closed in a given year. So it would be akin to the number of requests for appraisal evaluation services in a given year that were completed.

Q. And in 2013 the total is 14,324; is that correct?

A. That's correct.

Q. What's the number of appraisal products -- and I say appraisal in the context of, you know,

Deposition of Adam Barone

Adam Barone - by Mr. Carter

82

page 5 of the procedures that we talked about before, the difference between appraisal and nonappraisal products.

A.    I can't tell you from that information that's here.

Q.    And then the number from 2018 year-to-date, 12/10, 4,069.  Likewise, can you not give me the number for the -- the number of appraisal products in that request number?

A.    No.

Q.    And sorry if I'm making you repeat yourself, but in my notes I don't have it as clear as I would like.  Could you please just give a brief description about the difference between appraisal and nonappraisal products through the REVS group.

MS. MARSH:  Objection; asked and answered at least two times.

Go ahead.

A.    Okay.  An appraisal is going to be performed by an appraiser, and it's going to come in the form of an appraisal.  A nonappraisal product is an evaluation in a nonappraisal format that, you know, basically follows the same process.

Q.    Do review appraisers -- do they review both appraisal and nonappraisal products?

Adam Barone - by Mr. Carter

83

A.    No.  A review appraiser is because they're appraisers are reviewing real estate appraisals only.

Q.    And this document here doesn't break down the difference between appraisal and nonappraisal requests, correct?

A.    No, it does not.

Q.    The years that are on here, is this calendar years?

A.    That's correct.

Q.    Is that how -- I'm sorry.  Is that how REVS is organized, per calendar year?

A.    Well, that's how we report our numbers, Jase, calendar years.

Q.    All right.  This chart starts in 2013.  Are you familiar with any numbers before 2013?

A.    I -- there's numbers in the system I could report.  I mean, there are system's numbers that I could go back and get.

MR. CARTER:  Okay.  Okay.  I think this is a good stopping point for lunch.  How much time do you guys want?

MS. MARSH:  Well, no longer than 45 minutes given the amount of time it's taken to get through the material we have already.

Adam Barone - by Mr. Carter

84

MR. CARTER:  45 minutes.  Would that be 1:20 for you all?

MS. MARSH:  Sure.

MR. CARTER:  Let's do 1:20.  All right.

* * *

(Whereupon, a lunch recess was taken.)

* * *

MR. CARTER:  Let's go back on the record.

BY MR. CARTER:

Q.    All right.  Mr. Barone, we're going to now talk about performance reviews and how the REVS group goes about evaluating its employees.  Okay?

A.    Okay.

MR. CARTER:  Dutch, go ahead and give Mr. Barone -- it would be No. 11.

* * *

(Barone Deposition Exhibit 11 was marked for identification.)

* * *

Q.    Mr. Barone, what is this document?

A.    It appears -- it's an annual performance review.

Q.    And who is it an annual performance review of?

A.    Of Joe Meehan.

Adam Barone - by Mr. Carter

85

Q.    And what year is this evaluation?

A.    2014.

Q.    And you use the word review, I think.  If I use the word evaluation, are those two words interchangeable regarding documents like this?

A.    Yes.

Q.    Okay.  So talk about in general in the REVS group how employees are evaluated.  And I mean on the very high level.  We don't need to talk about the, you know, particular metrics, but just in general how are REVS employees evaluated?

MS. MARSH:  Objection; form.

You can answer.

A.    Okay.  At the beginning of the year we develop goals for each role within the group.  And so we develop these goals consistent with what's portrayed here.  Okay.  So, for instance, everyone who's a similar role would have similar goals assigned to them, and those goals would be what they were held accountable for a given year.

Q.    Okay.  Let's speak specifically about Mr. Meehan's 2014 review.  So can you tell who was in charge of evaluating Joe that year?

A.    It indicates Doug Schoenberg.

Q.    And Mr. Schoenberg was Mr. Meehan's

Adam Barone - by Mr. Carter

86

direct supervisor at that time; is that right?

A.    That's correct.

Q.    Is that common for direct supervisors to be the one that composed the review of an employee?

A.    They're the ones that do the review, that's correct.

Q.    Are there ever occasions where a review would be done by someone other than the supervisor? Can you think of anything?

A.    No. Because the way the form's set up, it's set up to go to their supervisor.

Q.    Section 1 talks about business function results. It's a little difficult to read, but I believe it says productivity; is that correct?

A.    Yes, it does.

Q.    And there's a description and measurement in the subsection, correct?

A.    Yes.

Q.    The measurement says, "Each reviewer is expected to generate total (allocated) fees in the amount of $108,000 annually, or an average of $9,000 monthly"; is that correct?

A.    Correct.

Q.    Let's talk a little bit about how work was assigned to individuals in Mr. Meehan's

Adam Barone - by Mr. Carter

87

position. How was work assigned?

A.    There's an individual responsible for assigning the reviews for the staff. So when work came in and needed to be reviewed, they'd -- as a matter of practice, they would review the appraiser's workload -- review appraiser's workload and assign additional work accordingly.

Q.    In 2014 who was the individual that was in charge of assigning work?

A.    I believe that would have been Paul Higgins.

Q.    And what was Mr. Higgins' position in 2014?

A.    I believe he was the manager for the review team.

Q.    And how did Mr. Higgins assign the work?

A.    Well, based on availability, based on competency, based on the type of property it was, they would basically assign the work to an individual available to do the work.

Q.    You listed availability, competency, type of property. Was there any other factor or anything else that Mr. Higgins used to assign the work?

A.    I can't speak for him, but generally speaking, that would be the general criteria.

Adam Barone - by Mr. Carter

88

Basically keeping everybody's shelf full.

Q.    And how did Mr. Higgins determine an individual's availability to assign work?

A.    Well, my understanding would be that we have very good reporting systems to allow you to know what people have on their plate, but there's also constant communication between the reviewer and the person that assigns the work. So it's the expectation that, because the workflow doesn't always demonstrate what your availability is, that you raise your hand when you have availability to do work.

Q.    Talk a little bit more about the reporting system and how it would or wouldn't show someone was available to receive work.

A.    Well, it's not they're not available to do work but you have to understand the process isn't necessarily always requiring activity by a reviewer. For instance, I'm a reviewer, I've read a report, I have completed my part of what I need to do, I need someone else to provide additional information. So there's a gap in my schedule where I might have the opportunity to take more work. The expectation was that reviewers would raise their hands and say I have time in my schedule even though my -- I have

Adam Barone - by Mr. Carter

89

currently ten appraisals assigned to me, I can handle more work.

Q.    What about competency; how did Mr. Higgins determine competency regarding assignment of work?

MS. MARSH:  Objection; form, but you can answer. Go ahead.

A.    Okay. So in -- in the majority of 90 -- probably 90-plus percent of the time that didn't -- that wasn't relevant because we have certified appraisers that have the ability from a generalist perspective to review everything, but if we had a specialized property, it may be assigned to somebody who had a greater experience in that type of product.

Q.    And when you mentioned certified appraisers, are you referring to members of the REVS staff?

A.    Well, if we're talking about the review volume, I'm talking about the other review appraisers on REVS staff, correct.

Q.    And you also mentioned Mr. Higgins would use a type of property in determining work assignment?

A.    Again, on -- it's the exception, Jase,

Deposition of Adam Barone

Adam Barone - by Mr. Carter

90

understanding that our appraisal reviewers, certified appraisers, have a level of competency that they can handle most reviews. It's only in the minority of situations where we look to somebody who may have more experience with, say, apartments or retail and in a certain area, and we would -- they would get a particular assignment.

Q. Give me an example of a type of property that that would be used to --

MS. MARSH: Objection; asked and answered.

A. Okay. If we had an affordable housing project that had tax credits associated with it, there's some uniqueness to that where efficiency would be gained by someone who does them more frequently than a generalist.

Q. So using the example of an affordable housing project, there might be an appraisal comes in and perhaps everyone within the group could work on it; however, for reasons I'll let you explain, REVS group will assign that to particular appraisers that have an expertise in affordable housing, for example?

A. Can you kind of point me to what your real question is? You said a lot of stuff there.

Adam Barone - by Mr. Carter

91

Q. Sure. Using an example that you just gave about affordable housing projects, so what would happen is that there would be an appraisal that would come in for affordable housing projects and it would be, perhaps, depending on Paul Higgins' determining, be assigned to someone that specialized in affordable housing projects; correct?

A. Correct.

Q. And those affordable housing projects could have been reviewed by others without that speciality, but REVS decided that that's the best way to allocate those type of property; is that right?

MS. MARSH: Objection; form, misstates his testimony.

But go ahead, you can answer.

A. Yeah. So -- and again, these are the minority of the situations. The interesting thing about affordable housing type appraisal requests, they have a tendency to be our longest duration in request. So folks who do a lot of these types of -- and we don't get a lot of them, they take longer than a normal appraisal -- a normal appraisal review just because of all the different things that are involved. So -- but at the end of the day -- and we

Adam Barone - by Mr. Carter

92

didn't do a lot of these, it's a type of property you want to get somebody who has a good leg up on it so they can get through that process as quickly as possible.

Q. And just to make sure that we covered everything, you said that Paul Higgins would determine work based on availability, competency, the type property, and you can't think of any other reasons.

A. It could be location of the property -- I'm sorry. Location also. You didn't indicate that, the location of the property.

For example, if I have a property that's in Pittsburgh, Pennsylvania, and I have a reviewer that sits in Pittsburgh, Pennsylvania, and they have availability, it makes sense just from getting the best person on the job, you would utilize that person.

Q. Let's go back to the 2014 evaluation of Mr. Meehan. So section 2 talks about customer service. Do you see that?

A. Yes.

Q. So explain to me what customer service means in the context of this evaluation.

A. Well, I think the nuts and bolts of it

Adam Barone - by Mr. Carter

93

relates to being a reliable service partner within the bank so that you provide a -- you know, provide the service that you're providing in a way that the folks you interact with are comfortable that it's being handled the way it needs to be in a timely fashion.

Q. So under Measurement it says, "Demonstration of ability to meet and/or exceed customer" and then in parenthetical it says "(co-workers, relationship managers, vendors, et cetera) expectations."

Is that a good summary of customer service?

A. Well, that's a demonstration of exceptional customer service when you exceed someone's expectation. That would always be the goal.

Q. Okay.

A. So if you somebody needed it done in ten days and you're able to get it done in nine days, you exceeded the customer's expectation.

Q. And we're using the word customer here. Did -- sorry, strike that.

The customer here is not referring to individuals that procured the loan, correct?

Adam Barone - by Mr. Carter

94

MS. MARSH: Objection; form.

A. Well, actually, you see in the paren it says "co-worker," which would be those individuals. So it's anybody you basically --

Q. Oh, co-workers includes loan procurement individuals?

A. Wait a minute. That would be the relationship manager. Co-worker would be someone you work with. And the vendor would be your appraiser.

Q. So if an individual is evaluated based on this criteria, how are they able to remain independent --

MS. MARSH: Objection to form.

Q. -- regarding loan procurement?

A. Well, there's nothing that says that you can't provide service without being compliant. It's more or less of a way of interacting that's respectful, diligent; all the things you expect whether you're, you know, going to have a tooth pulled or something of that effect. It's something you may not like to have done, but you want it to be done in the best manner it can be accomplished.

Q. On the next page, the middle of the page, it says, Attitude/Teamwork.

Adam Barone - by Mr. Carter

95

Do you see that?

A. Yes, I do. Thanks.

Q. The description says, "Have a positive impact on REVS daily environment and also our employee engagement performance."

Did I read that correctly?

A. Yes.

Q. Does attitude/teamwork only relate to an individual's interaction within the REVS group?

A. No. Attitude's the presence you basically provide the people around you so that they have a willingness to engage in conversation with you. This is about being the type of person that you can perform your job because people don't have a hesitation to work with you because they feel that there's a mutual type of respect and understanding that works for a free flow in communication.

Q. Section 3 on that same page, it says Risk Management. What is risk management/compliance goal 1 -- I'm sorry, strike that. That's a bad question.

So, in general, would you please talk about what risk management means in the context of the evaluation?

A. Well, risk management is managing the risk in a given situation. So our responsibility is

Adam Barone - by Mr. Carter

96

to manage the risk relative to the appraisal process; to do what we do in a way that we're providing the bank with appraisals that are credible.

Q. In your role at PNC do you look at employee evaluations that other supervisors have written?

A. No, I do not.

Q. In 2014 after Douglas Schoenberg performed the evaluation, would any other supervisors have had to review what Mr. Schoenberg wrote?

A. No. Well, actually, I think there's a high level of approval in the HR system, but no one in our direct line.

Q. Okay. So you say in HR. What was the review that HR performed?

A. I don't know. What I'm saying is no one in our direct line, neither his manager nor myself, would have the ability -- would review this.

Q. But is it your understanding that someone from HR would have reviewed this after Mr. Schoenberg --

A. No, strike that.

MS. MARSH: Let him finish what he's

Adam Barone - by Mr. Carter

97

saying. Sorry. Just so we have a clear record.

COURT REPORTER: Finish your question, please.

Q. Is it your understanding that someone from HR would have reviewed this 2014 evaluation after Mr. Schoenberg submitted them?

A. No, it's not.

Q. And how do you know that?

A. I don't. Either way. That's why I'm saying; it would be a guess.

Q. So you don't know if someone from HR reviewed this or they didn't review it; you don't know either way?

A. I don't know either way to the extent of what happens to this after it goes to HR. That's correct.

Q. Has someone from HR ever spoken to you about a review that they read from one of your supervisors?

A. No. And I don't believe that actually occurs but I can't speak to it one way or the other, but I don't believe that it occurs. But based on what you're asking me, no, I have not.

Q. Once the evaluation is submitted by the supervisor, where is the evaluation placed?

Deposition of Adam Barone

Adam Barone - by Mr. Carter

98

A. Well, it's saved in the HR system. I don't know exactly what that amounts to.

Q. What system is it saved in?

A. I can't say for certain but we have a report that was generated by it.

Q. Did the supervisors in the REVS group have access to employees' evaluations?

A. I believe they only have access to their employees. So they have to report to you.

Q. So in 2014 who had access to Joe Meehan's evaluation?

A. My understanding, that would be Doug Schoenberg.

Q. And Doug Schoenberg's the only person that had access to Joe's evaluation?

MS. MARSH: Objection; form.

A. I can't answer that definitively.

Q. So you don't know who had access to Mr. Meehan's evaluation?

MS. MARSH: Objection; form, asked and answered.

A. No. It's my understanding that only the supervisor has the opportunity to do that.

Q. And I'm sorry, Mr. Barone, did you say only the supervisor had --

Adam Barone - by Mr. Carter

99

A. That's my answer --

MS. MARSH: Sorry. Finish your question.

Q. And did you state, Mr. Barone, that only the supervisor has access to an evaluation?

MS. MARSH: Objection; asked and answered, form. Go ahead.

A. I'll answer it this way. I'm not aware of anyone else that would have that access.

MR. CARTER: Dutch, next one up, so this is going to be No. 10.

* * *

(Barone Deposition Exhibit 10 was marked for identification.)

* * *

(Whereupon, an off-the-record discussion was held.)

* * *

BY MR. CARTER:

Q. Mr. Barone, do you recognize this document?

A. Yeah, it looks like a mid-year performance review printout.

Q. A mid-year performance review of who?

A. Joe Meehan.

Q. At the top it says Career Compass; what is that?

Adam Barone - by Mr. Carter

100

A. That's just the system by which the bank refers these items, Career Compass.

Q. Did that begin in 2017 -- I'm sorry, did that begin in 2015?

A. The name probably was new at that point, because I don't see it on the others.

Q. Now, this is the only version I have. This was provided by the bank. It's a little more difficult to follow than the 2014 evaluation that we spoke about. Are you able to see who authored this mid-year performance summary?

MS. MARSH: I'm just going to object because this isn't filled out in any way. This is a blank document.

Q. I'm not trying to trick you about this document. We can talk about individual pieces of it, but I'm just asking if you know who submitted this. And your attorney made an objection, so I think it might just be best for us to walk through it individually. So can you turn to the last page of it for me.

A. Yeah, I'm at the last page.

Q. And at the top it says, "Employee overall performance rating no rating selected."

Did I read that correctly?

Adam Barone - by Mr. Carter

101

A. Yes.

Q. About five lines down, do you see where it says "overall performance rating"?

A. Yes.

Q. And underneath that do you see where it states "Meets all expectations"?

A. Yes.

Q. Two lines down it says "Manager's comments." Do you see that?

A. Yes.

Q. And would you please read the two lines that follow manager's comments?

A. It says: Discussed mid-year performance rating with him on Monday, July 20th. Stressed his need for continual ask for work.

Q. Who wrote those comments?

A. If you look at the bottom of the page, it has a manager and a date, so it would suggest that his manager did.

Q. And who was his manager in August of 2015?

A. I believe it was Doug Schoenberg.

Q. In the middle of the page above manager's comments, two lines up, it says, "Meets all expectations."

Adam Barone - by Mr. Carter

102

Do you know who wrote that?

MS. MARSH:  Objection; form, asked and answered.

A.     Well, based on it's the same form and the person that would control the inputs to the form, it would have been his manager if -- and that would be Doug Schoenberg.

MR. CARTER:  Dutch, let's go ahead and give -- so it's the other No. 9.  So this would be the 2015 full-year evaluation.  And if we could just go ahead and make that Exhibit 15, that would be wonderful.

* * *

(Barone Deposition Exhibit 15 was marked for identification.)

* * *

Q.     Mr. Barone, what document is this?

A.     You're asking me?

Q.     Yes.

A.     It's the year-end performance summary for Joe Meehan, 2015.

Q.     Okay.  And who authored this evaluation?

A.     I don't see where it says.

Q.     On the very last page, similar to the exhibit we just looked at, there's a date and it

Adam Barone - by Mr. Carter

103

says, manager.  Do you see that?

A.     Yes, I do.

Q.     What name is there next to manager?

A.     Someone that I'm not associated with who appears to be the Career Compass administration person.

Q.     And the name is Diane E. Ferianc, F-E-R-I-A-N-C; is that correct?

A.     That's what -- yeah, that's what's printed.

Q.     And who is Diane?

MS. MARSH:  Objection; asked and answered.

A.     I don't know.  She appears to be connected with the Career Compass administration.

Q.     So Diane is not a member of the REVS group?

A.     Yeah, that's correct.

Q.     Has she ever been a member of the REVS group?

A.     No.

Q.     Is she a PNC employee?

MS. MARSH:  Objection; form, foundation.

A.     I can't speak to that.

Q.     You don't know if she's a PNC employee or

Adam Barone - by Mr. Carter

104

not?

A.     I don't.  It would be an assumption.

MS. MARSH:  Don't assume.

THE WITNESS:  I'm not.  Thank you.

Q.     It says "By Career Compass Administration"; what does that mean?

MS. MARSH:  Objection; form, foundation, asked and answered.  If you don't know, you don't know.

A.     I don't know.  We'd have to ask HR.

Q.     Who do you know that would have knowledge about who Career Compass administration is?

MS. MARSH:  Objection; form, foundation.

If you know, you can answer.

A.     I don't know.

Q.     You don't know of anyone that would know what Career Compass administration is?

MS. MARSH:  That's not the question you asked him.  Objection; form, foundation.

Go ahead, if you can answer his question.

A.     No, I don't.

Q.     Did Miss Ferianc create evaluations for all REVS employees in 2015?

MS. MARSH:  Objection; form, foundation.

Adam Barone - by Mr. Carter

105

He already said he doesn't know who she is.

Can you answer the question that he's asked you 35 times?

A.     No, I don't -- that name I do not know, and they're not associated nor in a typical course would they have any -- any part in a review of an employee.

Q.     Is there anyone else in the REVS team that you can think of that would have had any interaction with Miss Ferianc?

MS. MARSH:  Objection; form, foundation, asked and answered multiple times.  This is the last time.  Go ahead.

A.     No.  I --

Q.     After the completion of this 2015 year-end performance summary, where was the summary placed?

MS. MARSH:  Objection; form, foundation, asked and answered.  Go ahead.

A.     It's in Career Compass because that's what it indicates, which is an HR system.

Q.     I'm not a PNC employee.  When you say it's in Career Compass, what does that mean?

A.     That's an HR system.

Q.     Do you know how the Career Compass system

Adam Barone - by Mr. Carter

106

is monitored?

MS. MARSH: Objection; form, foundation, beyond the scope of the 30(b)(6), and beyond the scope of our objections that we previously launched and discussed at the beginning of this deposition.

Subject to that, you can answer.

A. What's the question?

MS. MARSH: Yeah, that's also a good question. Can you repeat it back, please?

* * *

(Whereupon, reporter read pending question.)

* * *

MS. MARSH: And subject to my same objections, you can answer.

A. No.

Q. Mr. Barone, are you surprised to see this evaluation of one of your former team members done by this Miss Ferianc?

MS. MARSH: Objection; form, foundation, objection to use of the word "surprised."

Subject to that, you can answer, if you know.

A. It looks more like something that was never completed that was printed out. That's what it appears to me.

Adam Barone - by Mr. Carter

107

Q. Okay. Mr. Barone, you can put that stuff aside. So what was the reason for PNC's dismissal of Joe Meehan in 2015?

MS. MARSH: Objection; form.

You can answer.

A. The group was -- needed to do a work restructure because of the fall-off in workflow.

Q. Let's go ahead and pull up the Work Restructuring Plan Summary Document. I believe that is Exhibit 9.

A. I got it.

Q. We talked about this document earlier, but it was in the context of one of the middle pages regarding the organizational structure. Let's talk about some of the other pages. So the first page at the top, it says Work Restructuring Plan Summary Document, correct?

A. Correct.

Q. At the top it says WRP No. 2015-234. Do you know the significance of those numbers?

A. No, I do not.

Q. The first line says Date Submitted to Legal: September 23, 2015. What does that mean, "date submitted to legal"?

MS. MARSH: Objection; form.

Adam Barone - by Mr. Carter

108

You can answer.

A. Well, my understanding would be that's the point that the plan was put together and provided to legal for review.

Q. You said put together; who put together the plan?

A. We worked with human resources.

Q. Who's we?

A. It would have been myself and Jeff Mazur. We work with --

Q. And who did you work with in human resources?

A. I believe it was Joanna Robinson but there are others involved also from HR.

Q. Did you initiate the conversation with HR regarding restructuring?

MS. MARSH: Objection. When? At what time frame?

If you understand the question, you can answer.

A. Why don't you restate the question for me, Jase.

Q. You said, correct, that you and Jeff Mazur worked with HR, who you identified was Joanna Robinson, regarding the work restructuring plan,

Adam Barone - by Mr. Carter

109

correct?

A. Correct.

Q. So describe to me the process that you and Jeff undertook regarding the restructuring plan.

A. Okay. Start off with a recognition of our workflow falling off with the expectation it would continue to do so. We then contacted -- I would have been the contact with HR, and we proceeded to discuss what options we had relative to our situation.

Q. So how was the decision made that three displacements were needed?

MS. MARSH: Objection; form.

You can answer.

A. Well, my recollection is we reviewed the work volume and looked at the staffing that we had and came away with an understanding that we no longer needed three positions.

Q. Okay. The next page, it has approval. Who's William Fallon?

A. He's a senior credit executive with PNC.

Q. And who's Michael Hannon?

A. He's the chief credit officer for PNC.

Q. Who's Lilly Salvo?

A. She's an HR individual.

Adam Barone - by Mr. Carter

110

Q. And Joanna Robinson is the individual that you spoke about just a moment ago, correct?

A. That's correct.

Q. Okay. Let's go ahead and turn to -- it's the sixth page in. It's PNCMEEHAN0260. Do you recognize this page?

A. I can't even really read it, to be honest with you.

Q. Yeah, I'm with you on this. I can't read it, so I actually enlarged it from what was sent to us. But I -- yeah, I don't think I can -- I can't really read it either. I was hoping that you were going to be able to tell me what it says.

But do you recognize this table at all?

A. I don't remember this table.

Q. Do you know if tables like this are normally placed in work restructuring plans?

MS. MARSH: Objection; form, foundation.

A. I don't know.

Q. Is there anything that you can read on this at all?

A. Unfortunately not.

Q. Okay. Yeah, me either.

So let's turn to the last -- I'm sorry -- let's just go page by page. So the next page, 261,

Adam Barone - by Mr. Carter

111

Impact Ratio Analysis-Selection Process. Were you involved in tabulating any of these numbers?

A. I don't believe so.

Q. Mr. Barone, I'm not going to be spending any time on it, I just didn't know if this was a document -- a page that you had created or not.

MS. MARSH: He answered you already.

MR. CARTER: I'm sorry. I didn't hear him.

Q. In general, the document you have, the Work Restructuring Plan Summary Document, did you receive this summary document back in 2015?

A. I don't recall what I saw back then. I do remember signing the page that I signed. But other than that, I don't have any recollection of the rest of this form.

Q. Okay. So in -- on page 262 it says, Displacement Analysis Report. So this says as of September 14, 2015; is that correct?

A. That's what it's dated, correct.

Q. So this report was run on or around that time?

MS. MARSH: Objection; form, foundation. If you know.

A. I don't know, other than the date on the

Adam Barone - by Mr. Carter

112

report.

Q. Are you able to read any of the names in the employee name column?

A. There's only two names that are barely legible. Is that what you're asking me?

Q. Yes. Can you read those names?

A. Yeah. Looks like Green, comma, Matthew, and Meehan, comma, Joseph M.

Q. And then on the far right there's a status. Can you read the status of each of those two individuals?

A. Yes. It says displaced.

Q. So according to this report, Matthew Green and Joe Meehan's status has been made displaced; is that correct?

MS. MARSH: Objection; form, foundation.

You can answer.

A. I don't know other than that's what the report date says. It's a report.

Q. Let's flip all the way to the last page. So you had mentioned earlier not sure of particular dates except for the date that you had signed. Are you referring to your signature on the top of this page?

MS. MARSH: Objection; form, misstates

Adam Barone - by Mr. Carter

113

his testimony, but you can answer.

A. No. You asked me if I knew whether I saw those other forms, and I said I did not. But I do recall the one I signed.

Q. So talk about this page, what this page is, please.

MS. MARSH: Objection; form.

You can answer.

A. It's a bas- -- it's basically a summary of the various employees and their -- the performance criteria that was used to rate them. And it has the actual ratings within it, which I can't read too well.

Q. Okay. At the top it says Assessment Form. Can you see that?

A. Yeah, I can.

Q. On the left about, you know, eight lines down, it says, Paul Higgins. Can you read his name?

A. No, I can't.

Oh, yeah. Yeah, wait a minute. Third line down, you said?

Q. Yes.

A. Oh, yeah. Yeah, I can see that.

Q. And I said eight lines, but it's the third, you know, line there.

Adam Barone - by Mr. Carter

114

A.   Got it.

Q.   Can you read -- are you able to read what's under Paul Higgins' name?

A.   It's -- I -- it looks like assessing manager.  That's what I -- is that what you read?

Q.   That's what I think it says, yeah.  And this is an assessment, so that's why I think it says assessing manager.  It's difficult for me to read, too.  And I also enlarged this from what PNC had sent, but it's difficult to read.

In the middle of the page, approving manager's signature, that's your signature, correct?

A.   That is correct.

Q.   And what's the date that you signed it?

A.   It looks like 10/13/15 based on what I can see.

Q.   The assessments -- let me back up -- strike that.

Was there an assessment done for the restructuring plan?

MS. MARSH:  Objection; form.

You can answer.

A.   Okay.  So there was criteria set up by myself and Jeff Mazur.  Criteria.  We set up the criteria.  Okay.  That was our responsibility.  And

Adam Barone - by Mr. Carter

115

then Paul Higgins took the criteria and performed the assessment.

Q.   When did you give the criteria to Paul?

A.   I don't recall.

Q.   And when did Paul provide you the criteria?  I'm sorry, strike that.

When did Paul provide you the assessments?

MS. MARSH:  Objection; form.

A.   I don't recall, other than there's the date that this is signed, Jase.

Q.   Is there any other documents or anything that could help you remember when Paul provided you the assessments?

A.   Not that I'm aware of.

Q.   What documents did Paul provide you regarding the assessments?

MS. MARSH:  Objection; form, foundation.

A.   Well, actually, I think Paul provided his response back, and if my recollection is correct, he provided his response back to HR and then they provided it back to myself.

Q.   And who in HR did Paul submit this to?

MS. MARSH:  Objection; foundation.

A.   I don't know, but Joanna Robinson was our

Adam Barone - by Mr. Carter

116

primary contact.

Q.   Joanna Robinson was your primary contact but you don't know if Paul submitted the assessments to her or somebody else?

A.   I can't say for certain.

Q.   You say you can't say for certain, but do you know who Paul submitted to?

MS. MARSH:  Objection; form, foundation, asked and answered.  Go ahead.

A.   No, Jase, I don't.  I'm only going on the dates.

Q.   And who from HR submitted the assessment to you?

A.   Again, I'm going from recollection.  I believe it would have been Joanna Robinson.

Q.   Did she provide you any comments regarding the assessment?

A.   I do not recall.

Q.   And what did you and Joanna talk about in the call?

A.   There was no --

MS. MARSH:  Objection; form, misstates his testimony.

Q.   I'm sorry.  I thought you said you remembered a call.

Adam Barone - by Mr. Carter

117

A.   I don't recall.  I do not recall.  Sorry about that.

Q.   Sorry.  But your recollection is that this assessment form was sent to you by Joanna Robinson?

A.   Yes, it was provided to me.  That was my recollection.

Q.   Do you remember if she e-mailed you the form?

A.   I can't recall.

Q.   How did Paul determine that Joseph Meehan did or did not meet the criteria that you and Jeff Mazur gave him?

MS. MARSH:  Objection; form, foundation.

To the extent you can answer.

A.   So say the question again.

Q.   Okay.  I'll just back up.  So you and Jeff Mazur gave the assessment criteria to Paul Higgins.

A.   Actually, I think it was --

MS. MARSH:  You have to let him finish the question.  Okay.  Go ahead.

Q.   And correct me if I'm wrong, I'm not trying to -- I'm not trying to misstate what you said, but my note here is that you and Jeff Mazur

Deposition of Adam Barone

Adam Barone - by Mr. Carter

118

came up with criteria to assess the real estate evaluation specialist senior position and then Paul was the individual that applied the criteria to the individual employees; is that correct?

A.   With the step being that we provide the information to HR, then HR worked with Paul Higgins separate and apart from us.

Q.   So you and Jeff worked with HR, and specifically Joanna Robinson --

A.   That's my recollection.

Q.   -- is that right?

A.   Yes, that's my recollection.

Q.   And that Joanna Robinson then communicated to Paul Higgins the criteria that was developed, correct?  Your answer?  I'm sorry.

A.   Well, I don't know -- I can't -- I can't attest to that.  I mean, that's -- that's something that I wasn't involved in.  I wasn't there.  I wasn't part of that exchange, so I can't tell you that was what occurred.  I can only tell you that my contact, from my recollection, is Joanna Robinson.  And typically she was the person who was the interface with these types -- this type -- this activity.

Q.   How did Paul Higgins apply the criteria

Adam Barone - by Mr. Carter

119

that was provided to him by HR?

MS. MARSH:  Objection; form, foundation.  If you know what Paul did.

A.   No, I don't.

Q.   Let's look at this document again.  It's difficult to read.  Underneath your signature there's a table, and can you -- are you able to read the title of the table?

MS. MARSH:  Do you see where he's talking about?

A.   No.  I just see assessment.  I can't make out the words before it.  It's like a reading test -- or an eye test.

Q.   Yeah.  So I can't read a couple of the letters, but it looks to be something competency assessment.

MS. MARSH:  Is that a question?

Q.   Mr. Barone, does it look like it says competency assessment there in the title, the table?

A.   If you fill in the missing letters --

Q.   Okay.

A.   -- it's assessment.  It's an assessment, we know that.

Q.   Yeah.  I think we can agree it's assessment.  When you were talking to HR -- and I'm

Adam Barone - by Mr. Carter

120

not -- this is going to be a recurring pattern, so I do know you do not remember, but I'm just trying to come up with, you know, who developed this table.

So when you were speaking to Joanna Robinson in HR, did you provide her an assessment table like the one here on this page?

MS. MARSH:  Objection; form.

You can answer.

A.   My recollection is we gave her the criteria.  I don't know who actually set up the table.

Q.   Okay.  So what is the -- or what are the criteria for the assessment?

A.   It's similar to what you found in the performance reviews.  It categorizes difficult elements of your -- of what you're supposed to do.  They include managing risk, productivity, customer orientation, it looks like, teamwork and leading change.

Q.   And each of the criteria has a different weight in the overall assessment; is that correct?

A.   Yes, that's correct.

Q.   Did you and Jeff also develop the weight of each of the criteria?

A.   I believe that's what we did.  We set the

Adam Barone - by Mr. Carter

121

criteria and the weight of the criteria.

Q.   How did you determine that managing risks -- well, let me back up.  We haven't established that yet.

So in the criteria that's underneath assessment, the first criteria, it says managing risk; is that correct?

A.   That's correct.

Q.   And directly under managing there's a column that says weight.  Do you see that?

A.   Yes.

Q.   And in that column, all of those numbers are the same, correct?

A.   Correct.

Q.   And that number is 30?

A.   Correct.

Q.   And the reason all of those numbers in weight are the same is because each person is being weighted in their overall score of 30 percent for managing risk; is that right?

MS. MARSH:  Objection; form.

A.   Yes.  It's weighted 30 percent.

Q.   Okay.  How did it become determined that managing risk would be 30 percent?

A.   Well, it's consistent with what we have

Deposition of Adam Barone

Adam Barone - by Mr. Carter

122

done over time relative to these different components of their jobs. So it's consistent with what we had done in the past relative to the criteria and how it was weighted in their performance on an annual perspective.

Q. So not just with managing risks, but all the other criteria, the weight was consistent in your mind with the previous evaluations that were done in the REVS group?

A. It's consistent with what we felt were the appropriate weighting of the various components of what they're required.

Q. So in the managing risks at the very bottom we have some numbers here. Okay. If we look at the bottom of the table and go all the way to the left, okay, there's a name there that's the last name. Are you able to read that name?

A. Yes, I am.

Q. And who is that?

A. Joe Meehan. Joseph Meehan.

Q. And there's a name directly above. Do you know, is that Matt Green? Is that correct?

A. That's correct.

Q. And Joe and Matt were the two individuals that were severed at this time, correct?

Adam Barone - by Mr. Carter

123

A. Yeah, their positions were eliminated.

Q. Okay. So if we look at managing risks, it seems like Joe received a four for that criteria; is that correct?

A. That's what it indicates.

Q. Okay. And do you know why Joe received a four for managing risks?

MS. MARSH: Objection; form, foundation.

A. Do not.

Q. For productivity it seemed like Joe received a one; is that correct?

A. That's what it states here, correct.

Q. Do you know why Joe received a one for productivity?

MS. MARSH: Objection; form, foundation.

A. No.

Q. For customer orientation, satisfaction, Joe received a one; is that correct?

A. That's what it shows, yes.

Q. And you do not know why Joe received a one on this assessment, correct?

MS. MARSH: Objection; form.

You can answer.

A. No.

Q. For teamwork -- now this one's a little

Adam Barone - by Mr. Carter

124

difficult, but I believe it's a two because the middle number is a five and the subtotal is a ten, so it looks like Joe received a two for teamwork. Do you see that?

A. Yes.

Q. And again, you don't know why Joe received a two on this assessment?

A. No.

Q. Okay. Last one. Leading change, Joe received a three. Do you see that?

A. Yes.

Q. And I acknowledge it's difficult to see but his subtotal was 15, correct, for leading change?

A. Correct.

Q. And it's a weight of five?

A. Yeah, looks like a five.

Q. Okay. And you're not sure why Joe received a three for leading change?

A. No.

Q. What happens after you sign this document?

MS. MARSH: Objection; form.

You can answer.

A. I believe we proceed with the restructure

Adam Barone - by Mr. Carter

125

plan.

Q. And what does that mean? What was -- what happened?

A. They move forward on the displacement of the individuals involved.

Q. Do you remember having any thoughts regarding Joe being one of the ones that was going to be terminated?

MS. MARSH: Objection; form, foundation, vague.

I mean, to the extent you can answer.

A. No.

Q. No, you didn't have any thoughts either way that Joe was one of the two that was selected?

MS. MARSH: Objection; form, foundation, outside the scope of 30(b)(6) notice, incomplete hypothetical, vague, but to the extent that you can answer, go ahead.

A. Other than Matt Green and Joe were the ones that were -- that were going to be displaced.

Q. Did you and Jeff Mazur have any discussion about the results of the assessment that was performed?

A. I don't recall.

Q. Let's talk a little bit about training in

Adam Barone - by Mr. Carter

126

the REVS group. So what yearly training -- and I'm talking about years 2015 and before, what yearly training would the REVS group participate in?

A. Okay. First, for all your certified appraisers, they're required to take continuing education, and that's usually handled through local classes and seminars in their area. The bank made the funds available for them to take the classes necessary to maintain their certifications. So they regularly are -- review appraisers would regularly attend classes and seminars to fulfill the continuing education or even take a class that they felt was interesting that would help them in their career progression.

In addition to that, USPAP is a required class for each real estate appraiser in any -- in any period -- hold on a second -- during their certification recycling or -- during the recertification cycle where in most states it's every two years you're required to take USPAP. It was our requirement at REVS that you take that requirement within the first quarter once the USPAP was updated and revised. That was our way to make sure and ensure that our folks and our team were where they needed to be relative to USPAP at any

Adam Barone - by Mr. Carter

127

given time. Unfortunately, we found appraisers sometimes didn't take that till the end of their cycle. So we always required that up front.

So in addition to what they're required to do to maintain that certification and maintain their designation, we provided the funds for that. We also provided training through monthly staff meetings, training programs through our REVS academy, which we held on twice a year where we basically took specialized situations and provided training to the entire group. So we had training focus for reviewers.

And then we also had training also intended for everyone within the staff so that whether you were a coordinator or one of our seasoned appraisers, you were getting information relative to what was going on with the regulations relative to banking regulations, appraisals, appraisal methodologies because we wanted our folks to kind of raise their standard along the way.

So again, through staff meetings, through our real estate academy, through different meetings and different training, we made an effort to keep our folks at a high level of training relative to real estate appraisal and banking regulations.

Adam Barone - by Mr. Carter

128

Q. Do individual or did individual REVS staff also take a vow of independence on training or education and classes, et cetera?

MS. MARSH: Objection; form.

A. I didn't understand that, Jase. What did you say?

Q. Yeah, you know, you were talking about things that the REVS group does as a whole. And I was wondering if individual employees would also take a vow through their own initiative to continue education or to, you know, improve their knowledge base regarding, you know, appraisals, et cetera?

MS. MARSH: Objection; form, foundation.

To the extent you know what individuals did, you can answer.

A. Okay. We did provide the resources and availability for them to take classes to do just that, to take appraisal classes that would promote, like I said before, the professional development and understanding.

Q. Did employees go to conferences?

A. Well, conferences aren't necessarily a continuing education, but they would go to seminars and classes, primarily those provided by the Appraisal Institute.

Adam Barone - by Mr. Carter

129

MR. CARTER: Dutch, let's look at Exhibit No. 7, please.

MS. MARSH: Do you mind if I just interrupt since we have been going an hour since lunch, just take a quick comfort break, five minutes.

MR. CARTER: Yeah. Sure.

* * *

(Whereupon, a brief recess was taken.)

* * *

(Barone Deposition Exhibit 7 was marked for identification.)

* * *

Q. So we now have Exhibit No. 7, and this is an All REVS Team Meeting Agenda; is that right?

A. Correct.

Q. It's two pages long. So I'm just talking about in general. I don't necessarily mean to talk about this individual team meeting agenda, though, we can if you like.

Who wrote up these meeting minutes in general for REVS?

MS. MARSH: I'm going to object. This is an agenda, not minutes.

A. That's correct.

Adam Barone - by Mr. Carter

130

MR. CARTER: Okay. That's fair.

Q.   Mr. Barone, this is a meeting agenda; is that correct?

A.   Correct.

Q.   Did a document like this -- was it created before the meeting or was it created afterwards?

A.   It was the agenda. It was created before.

Q.   Okay. Thank you for clarifying that. Is the title All REVS Team Meeting Agenda, does that mean that everyone that's part of the REVS group was required to attend?

A.   That's our entire group meeting, that's what we called it. That's what we dubbed it; All REVS.

Q.   You were all in different parts of the country, correct?

A.   That's correct.

Q.   So was this done via conference call?

A.   Yes, it was.

Q.   I'm going --

MR. CARTER: Dutch, let's go ahead and give him Exhibit 8.

* * *

Adam Barone - by Mr. Carter

131

(Barone Deposition Exhibit 8 was marked for identification.)

* * *

Q.   Mr. Barone, is this a REVS Team Meeting Agenda and Minutes from a June 5, 2013, team meeting?

A.   Looks like that, yes.

Q.   Now, this one at the top, it doesn't say all REVS. Do you know what group this meeting included?

A.   It would suggest the review staff.

Q.   And the facilitator that is listed here is Greg Camburn; is that correct?

A.   That's what's listed, correct.

Q.   And meeting minutes, Doug Schoenberg?

A.   That's what's listed.

Q.   So talk to me about when there would be minutes to meetings and when there weren't.

MS. MARSH: Objection; form, foundation. If you know.

A.   I don't know. It would be personal preference.

Q.   And the personal preference of the individual that's in charge of the meeting; is that right?

Adam Barone - by Mr. Carter

132

A.   Yes. There was not a requirement for minutes.

Q.   On the second page, the first line says Appraiser Review Panel Discussion, Joe Schoenberg; do you see that?

MS. MARSH: Says Doug, not Joe. Just so we're clear.

A.   Doug. Yes.

Q.   Doug. Thank you.

Says, "Doug Schoenberg reported on an appraisal review panel discussion for the Northern Ohio Chapter of the Appraisal Institute."

Now, Mr. Barone, we were talking earlier before the break about trainings that were done by REVS staff and, you know, even though you most likely can't speak to this particular meeting or panel that Doug attended, was it common for REVS staff to attend panels such as this for continuing education?

MS. MARSH: Objection; form, foundation.

You can answer, if you know.

A.   I don't believe it's common because they're not that frequent.

Q.   On these minutes it talks about the deficiency in appraisal reports, correct?

Adam Barone - by Mr. Carter

133

A.   It says that, yes.

Q.   You had mentioned earlier that -- I'm sorry, strike that. I don't need to restate your testimony. I'll just go ahead and ask you directly.

So is this an example of PNC's efforts to ensure appraiser competency?

MS. MARSH: Objection; form.

You can answer.

A.   What are you asking me?

Q.   I guess I see Doug going off from the panel, him learning something, and then coming back and sharing what he learned with the rest of the -- his review group.

MS. MARSH: So what's the question?

Q.   Is that accurate?

MS. MARSH: Objection; form, foundation.

To the extent you know, you can answer.

A.   I don't know that that's the case, but I mean, he's reporting back things that he became aware of.

Q.   It's common for REVS staff to -- after coming back from a panel or some other type of continuing education to discuss with other members of the REVS staff what they had learned?

Adam Barone - by Mr. Carter

134

MS. MARSH: Objection; form, foundation, asked and answered, and outside the scope of the Rule 30(b)(6) topics. Go ahead.

A. It's not -- people -- I mean, it's not a common practice, but someone could go somewhere and come back and report it to the group.

Q. Okay. I guess these types of discussions and conversations at team meetings, would you classify this as a type of training that was available to REVS staff?

MS. MARSH: Objection; form, foundation, incomplete hypothetical.

You can answer.

A. Team meetings were used for a mechanism for training.

Q. Okay. Thanks. Let's talk specifically about Joe Meehan's duties as a technical reviewer. What were Joe's duties as a technical reviewer?

A. Technical reviewers were asked to review real estate appraisals. In addition to that, they had a secondary function where they were asked to basically update our system for certification expiration dates for our appraisers and the -- each of the appraisers, our review appraisers were given a state or two to go back and just keep the system

135

updated with their certification because our system actually needed that information to be updated or appraisers would not be available for use because it's important that appraisers are certified.

Q. How often were they required to update the system and check for certifications of appraisers?

A. It depended on the expiration for the particular state they were required to monitor.

Q. You said two duties of a technical reviewer were to, one, review real estate appraisals and, two, update the NC system for appraiser certification status; is that correct?

A. There were two primary duties, but there are also opportunities for projects as needed, too.

Q. What additional projects could be added?

A. Training projects. So we had -- what I spoke to is our REVS academy. What we would do is have folks on staff work in a group to put a presentation together of which that would include reviewers.

Q. Any other additional projects?

A. There could be other projects, Jase, but nothing comes to mind.

Q. So for additional projects you said

Adam Barone - by Mr. Carter

136

training, REVS academy, there may be additional but there's nothing else that comes to mind?

A. Yes.

Q. Let's go back and unpack the duty to review real estate appraisals. So what is required for a technical reviewer for a review of a real estate appraisal?

A. Well, they're required to read the report and utilizing our review form, document their review of the appraisal. During that process, we give the opportunity for the deal team to provide insight into information that they have a firsthand knowledge of. So, for instance, it's the requirement of the relationship manager deal team to let us know if there's any material issues with the description of the property or leasing schedule different to what they know so that our review appraiser can raise any of those questions during the course of the review without having direct interaction from the loan production side and the appraiser. So the bottom line is they read the report, review it, critique it, work out any issues relative to the assignment and, if all goes well, recommend acceptance.

Q. So within the duty of reviewing real

137

estate appraisals you mention read the report utilizing the PNC review criteria or what would you -- would you just call that a criteria or a system?

A. They document the review using our review form. It's to provide for consistency in review.

Q. And then obviously depending on the -- a critique of the review, it would ultimately likely be recommended for acceptance?

MS. MARSH: Objection; form, misstates his testimony.

You can answer.

A. Will you restate that?

Q. Sure. I'm just trying to get the items within the review duties. So one you report, two, utilizes the review form, and then if all goes well or something along that effect, you would -- the reviewer would recommend acceptance of the appraisal.

A. Well, there's one other step. If there's items that need to be addressed, the review appraiser's responsible for getting those elements addressed.

Q. So that would be a critique function?

A. Well, yeah, a review critique.

Q. So what duties does a technical reviewer

Deposition of Adam Barone

Adam Barone - by Mr. Carter

138

have when they are critiquing a report?

MS. MARSH: Objection; form.

You can answer.

A. They're responsible for checking things such as methodology, math, and the description of the market that the appraisal is being performed. So they're looking at the appraisal for its content in terms of the credibility of the ultimate document and challenging the appraiser on anything that they don't quite understand so that we have a, you know, a situation we're comfortable with the report that they provided, you know, is adequate.

Q. You said one of the duties is looking at the credibility of the document; is that correct?

A. No. It's establishing it's credible because that's what --

Q. Would you --

THE COURT REPORTER: I'm sorry?

Q. I said one of the duties of the technical reviewer is to look at the credibility of the appraisal; is that correct?

A. I would state it a different way. You know, the requirement of an appraiser is to provide us a credible report, so they're measuring that.

Q. So the duty of the third-party appraiser

Adam Barone - by Mr. Carter

139

is to have a credible appraisal, but you're saying that the duty of the technical reviewer is to have a credible report of the appraisal; is that right?

A. No, I'm not. That's not what I'm saying. So ultimately, based on standards, an appraisal has to be credible. So that's what the appraiser provides us. We're asking them to provide us a credible appraisal on a piece of real estate. Our job is to review that report to make sure that in reading it we are comfortable that it addresses the things it needs to address and ultimately is credible.

Q. So a technical reviewer has the duty to make sure that the underlying appraisal is credible; is that correct?

MS. MARSH: Objection; form, misstates testimony that you've said many times.

You can answer again.

A. You want to restate the question again?

Q. Yeah. Sure. So a duty of a technical reviewer is to check and determine whether the appraisal is credible; is that correct?

A. Well, determine is a pretty strong word, because we're dealing with opinions of value here. But to the best of their understanding that they

Adam Barone - by Mr. Carter

140

provided an appraisal that reasonably supports the conclusion that the appraiser provided.

Q. Do appraisers have the duty to ensure that the appraisal is credible?

A. That's embedded in USPAP.

Q. And you're saying the same standard in USPAP regarding the credibility of appraisals for appraisers is not applicable to technical reviewers at PNC?

MS. MARSH: Objection; form, misstates his testimony. Go ahead.

A. I'm not understanding what you're asking me there, Jase.

Q. Okay. So USPAP requires appraisers to have credible reports -- I'm sorry, strike that. We'll start over.

USPAP requires appraisers to have credible appraisals, correct?

A. Yes.

Q. Does USPAP require appraisal reviewers to ensure that the appraisal that they are reviewing is credible?

MS. MARSH: Objection; form.

You can answer.

A. Well, the review is to ultimately

Adam Barone - by Mr. Carter

141

recommend that the appraiser provided an opinion of value that was well supported and credible.

Q. Is that a yes?

MS. MARSH: Objection; asked and answered.

A. Just give me the question again. I'm sorry. It's getting late in the day.

Q. Does USPAP require appraisal reviewers to ensure that an appraisal is credible?

MS. MARSH: Objection; form.

You can answer.

A. Yes.

Q. You've spoken about the duties of a technical reviewer to be -- or the primary duties to be review real estate appraisals and to update the system for appraisers' certifications in various states, correct?

A. Right. So that's a secondary function; the updates. The primary function is to perform the review of appraisals.

Q. And you also mentioned additional projects that might be in addition to these duties, and we talked about those briefly, right?

A. Correct.

Q. All right. So the second duty, kind of

Adam Barone - by Mr. Carter

142

the secondary duty to update system for appraisers' certifications, what exposure does the bank have if it uses appraisers that aren't certified?

MS. MARSH: Objection; form, foundation to the extent you're asking for a legal opinion.

Outside of that, you can answer.

A. Okay. Our system is set up so that if the certification of an appraiser is not updated, they're not available to use. It's a safeguard.

Q. Is it one of the ways that -- I don't need to ask it -- is it one of the ways that you help ensure the quality of the appraisals and I'm sure it is.

I have one additional small line of questions and that -- we didn't --

So regarding the technical reviewers and the evaluation of technical reviewers, so how did or how does -- we'll focus on 2015 -- how did REVS during the time that Joseph Meehan was employed there evaluate the quality of the reviews done by the technical reviewers?

MS. MARSH: Objection; form.

You can answer.

A. What are you implying by quality of review? Because ultimately --

Adam Barone - by Mr. Carter

143

MS. MARSH: Let him rephrase.

THE WITNESS: Okay.

Q. By quality, it means how well a particular technical reviewer reviewed real estate appraisals.

MS. MARSH: Objection; form.

A. So at the end of the day, they either accept or reject. So they're all headed to the same conclusion, to accept an appraisal. So the assumption -- implied in that is the quality would be similar based on the ability to get through our review form and document the compliance with all the various factors.

Q. How would you know that a technical reviewer was not adequately providing the critique of particular appraisals during the review process?

MS. MARSH: Objection; form.

A. Okay. As I said, part of the process is not one person takes the process from beginning to end. So each time a reviewer recommends a report for acceptance, it's then -- the review is then read by a supervising appraiser, another appraiser, so that they can get comfortable that all the pieces, all the things that were necessary to be addressed were addressed. So there's another person that

Adam Barone - by Mr. Carter

144

looks at that work as part of the process.

Q. So how often does a supervisor read the underlying appraisal and appraisal report that was submitted by a technical reviewer?

MS. MARSH: Objection; form, asked and answered. Go ahead.

A. Right. I can't comment to the amount of times that would occur.

Q. Can you provide an estimate or percentage?

MS. MARSH: Objection; form, asked and answered. Don't guess if you don't know.

A. I don't know.

Q. So you don't know how often supervisors read a subordinate's appraisal and appraisal report that happens to come in?

MS. MARSH: Objection; form, asked and answered. Go ahead for the third time.

A. I don't.

Q. How do you ensure the quality of the review process without a secondary review?

A. That is the secondary review, Jase. The appraisal -- it's reviewed by the technical reviewer and then the technical reviewer's work product, which is the review, is reviewed by the supervising

Adam Barone - by Mr. Carter

145

appraiser.

Q. Because how do you evaluate or ensure quality without supervisors reviewing the work of their subordinates?

MS. MARSH: Objection; asked and answered. Repeat it again.

A. Okay. So they're not -- the supervising appraiser is supervising the process. Okay. And so it's -- anyway, at the end of the day --

Q. (Inaudible.)

MS. MARSH: Can you let him finish his answer? Thank you.

MR. CARTER: Sure.

MS. MARSH: Go ahead.

A. So the review form is set up in a way that by reviewing the review form you can get a good snapshot of what was contained in the appraisal. We feel it does a very adequate job of making a good presentation. And if there is any awkwardness within the appraisal, it will show up in the review documentation giving the supervising appraiser a very good leg up in being able to get a good understanding that things are in a good place by looking at that review form.

Q. So the reliance on quality of work is

Deposition of Adam Barone

Adam Barone - by Mr. Carter

146

based upon the supervisor reading the review appraiser's report, correct?

MS. MARSH: Objection; form, asked and answered. Go ahead.

A. Say the question again because I'm trying to hear what you're trying to ask me.

Q. That's okay. The underlying appraisal, okay, is submitted. Is there any other appraisal that's -- I'm sorry -- is there any other report that's submitted with the appraisal to the REVS team, to the appraisal review team?

MS. MARSH: Objection; form.

You can answer.

A. We get the appraisal.

Q. Pardon?

A. You're saying -- we get a completed appraisal delivered by an appraiser. That's -- that's the action of the appraiser. Okay?

Q. Okay. Is there any other report that's submitted to you all -- I'm not talking about that's created by PNC -- but that's submitted by some other additional vendor or something?

A. I'm not understanding, like, how that ties in, Jase. I'm sorry.

Q. I'm trying to get at what documents a

Adam Barone - by Mr. Carter

147

supervisor actually reviews of their subordinates. Okay. So it's my understanding that supervisors, unless there's some other problem that's escalated to them, the only documents that they review of their subordinates are the reports that the technical reviewer submits to the supervisor; is that correct?

A. Well, let me qualify one thing. The supervising appraiser is not supervising the review appraiser. They're supervising the process. You called them subordinates; they're not subordinates. Okay? As I indicated previously, if you looked at our review form, the way it's set up, okay, it provides a very good summarized snapshot of what goes on in the appraisal and if it's documented appropriately by a reviewer, another appraiser could come in and get a very high comfort level that all the necessary points were covered and things were in a good place. See --

Q. But that presumes that the technical reviewer knew what they were doing, correct?

MS. MARSH: Objection; form, argumentative, foundation, misstates -- or mischaracterizes his testimony. Just try it one more time.

Adam Barone - by Mr. Carter

148

A. No, because if a review appraiser doesn't document well, the form will not read correctly. And it will not -- it will have unanswered questions that anybody who is also an appraiser -- so we have three appraisers involved here. We have the original appraiser that we contracted that we believe that they provided us a credible appraisal. We had the review appraiser who steps in, reads that report, provides any necessary challenges to get to a point that we feel that we have -- we're in a good place relative to that appraisal. Once that's completed, there's a review form that documents this, that the review form's written in such a way that another appraiser can look at it -- because I've done this -- and you can -- it provides a very nice snapshot to any irregularities that may occur or be reported by the review appraiser relative to the appraisal.

MR. CARTER: I don't think I have any more questions, but if we could just take a -- I'd like to talk with my -- with Joe just briefly, see if he has any thoughts. And so if we could, before 3:30 is fine. So be ready to go by 3:30, and I don't anticipate having anything else. Okay?

MS. MARSH: Okay.

Adam Barone - by Mr. Carter

149

MR. CARTER: All right.

* * *

(Whereupon, a brief recess was taken.)

* * *

MS. MARSH: Yep, we're back.

MR. CARTER: Let's go back on the record.

BY MR. CARTER:

Q. Okay. Mr. Barone, so part of, I think, the last little bit of discussion that was -- that there was miscommunication, is that -- there's a supervisory review that is part of the appraisal review process, correct?

A. You're saying there's a supervisor appraiser involved who manages the process, correct.

Q. And that individual is different than, you know, other management at -- in the REVS management group, correct?

MS. MARSH: Objection; form.

You can answer.

A. Yes. So your supervisor is not -- it's two different terms. Supervisor meaning your HR supervisor versus supervising a function. Everyone has an HR supervisor. In this case Doug Schoenberg was Joe's supervisor, right, in human resources. That's the person you report to. That's the person

Adam Barone - by Mr. Carter

150

that does your review. Then the appraisal process has a supervising appraiser who's responsible for that particular process. They supervise a process, not a person.

Q. Thank you. And that's something that I should know by now and I just had confused in my mind today. So I apologize for any confusion.

So I would like to talk about how the REVS management tested the quality of the technical reviewers. All right. So, you know, if we've talked about this before, I apologize, but I want to make sure that now we have this understanding that I'm not, you know, I'm giving you all an opportunity to explain.

So in what ways did the REVS management test the quality of the technical reviewers?

MS. MARSH: Objection; form. To the extent you -- whatever. Objection; form. Go ahead and answer.

Are you talking about REVS management now or are you talking about the supervisory appraisers?

MR. CARTER: REVS management.

MS. MARSH: Okay.

THE WITNESS: So now I'm lost. We're talking about --

Adam Barone - by Mr. Carter

151

MS. MARSH: I have no idea.

A. Your -- the -- I'm not still getting what you're getting at, you're driving at. You said something about the quality of review, so let's go from there.

Q. So let's specifically talk about Joseph Meehan. Doug Schoenberg in 2014 issued Joseph Meehan an evaluation, correct?

MS. MARSH: Objection; form.

You can answer.

A. Correct.

Q. In 2014 are you aware of any time that Doug Schoenberg looked at one of Mr. Meehan's assigned appraisals and read both the underlying appraisal and Mr. Meehan's review as a way of checking the quality of Joe's work?

MS. MARSH: Objection; form, foundation.

To the extent you know, you can answer.

A. I'm not aware that was done, but that may happen on a regular basis. There's nothing that restricts the supervising appraiser at any time because, basically, what folks are looking at, if something -- if they have a question of that review form, they're going to dig deeper. So I do think it

Adam Barone - by Mr. Carter

152

does occur when there's a question of how the review form's been filled out, that a supervising appraiser will go in for their own acknowledgment, look at the report. They are looking at the report from a high level at a minimum, but if they sense something from the way the review is, they will -- they will do a more in-depth review. So it's available for them to do.

Q. You said it's available for them to do. Have you instructed management staff to do that on a regular or occasional basis to test the quality of the review appraiser's work?

MS. MARSH: Objection; form, foundation, incomplete hypothetical.

To the extent you understand, you can answer.

A. Yeah, so part of the supervising appraiser's responsibility is to -- if they have any concerns, that they don't stop at the review itself, they go further into the report. That's part of what they're responsible to do. That is their responsibility.

Q. But that would only be when there's a concern that arises, correct?

MS. MARSH: Objection; misstates his

Adam Barone - by Mr. Carter

153

testimony. Go ahead.

A. Okay. So we have this review form that basically summarizes in a lot of detail the important aspects of the appraisal relative to factors that may, you know, be of issue. So when the report's filled out, it's presented in such a way that another appraiser could look at that form, be alerted to issues relative to things that aren't totally addressed in that review and dig deeper.

Q. But there's no policy that requires members of the REVS management team to on occasion look at individual appraisal reviewers' original appraisals and their reports?

MS. MARSH: Objection; form, misstates his testimony.

A. What I'm trying to explain is that through the course of their responsibility, a supervising appraiser would be made aware based on how the form is completed and how it was completed as to whether there may be an issue that needed to be addressed relative to a review or a reviewer's work.

Q. Do you agree that it would be beneficial to have a qualified reviewer conduct a risk-based secondary review of a sample of each reviewer's work

Adam Barone - by Mr. Carter

154

products in the REVS group?

MS. MARSH: Objection; form, foundation calls for an opinion, outside the scope of 30(b)(6), improper hypothetical. To the extent you know the answer, go ahead.

A. No, other than -- no.

Q. If a regulation guideline suggested that such a sample took place, don't you think that would be a good idea for PNC to follow?

MS. MARSH: Objection; form, foundation, incomplete hypothetical as to "regulation," mischaracterizes previous testimony, asked and answered. To the extent you can rephrase your previous answer so that Mr. Carter understands what you're saying, please feel free to do so.

A. So your indication is, our process by which we basically have an appraisal, we have somebody review that appraisal that's competent, okay, and is well trained and maintains a level of training that they should be able to perform their job duty. They perform their job duty. As part of their performance of their job duty, they have a form that they need to complete. This form is written and designed in such a way it will identify weaknesses in the reviewer's work product based on

Adam Barone - by Mr. Carter

155

how in its design. So from that perspective, the supervising appraiser is in a position to identify weaknesses or concerns in a review appraiser's work such that they will go back and do further due diligence.

Q. Is there any possibility that the technical reviewer fills out the form correctly and the supervisor isn't alerted to any problems, yet there's still credibility problems in the underlying appraisal?

MS. MARSH: Objection; form, foundation, incomplete hypothetical, calls for speculation.

To the extent you can answer, go ahead.

A. I don't want to speculate.

Q. Why is that speculation?

A. You're assuming that somebody did something wrong; that it wouldn't be identified by the mechanism we already have set up. We have a mechanism to monitor the output of a reviewer through the form that they're filling out.

Q. How do you know that the -- how do you know that a technical reviewer isn't lying when they fill out that form?

MS. MARSH: Objection; form, foundation,

Adam Barone - by Mr. Carter

156

calls for speculation, argumentative.

To the extent you can answer, go ahead.

A. Well, if someone's misleading, eventually it will -- well, I don't know how you guard against someone lying so -- or being dishonest. But your assumption is the original appraiser's not getting it right on a regular basis and it's -- it's not the case. For the most part, appraisals when they're delivered to the bank because appraisers risk losing their licenses when they perform inadequate work. When they provide us something, it's done to a USPAP and FIRREA compliance level, at least in their minds, with the idea that potentially there will be critique, but at the end of the day, when all issues are resolved, appraisers are delivering reports that will keep their livelihood in place because that's what they jeopardize when they don't deliver reports that are credible.

Q. How many -- in 2015 how many appraisal reports were submitted to PNC Bank?

MS. MARSH: Objection; form, foundation. If you know off the top of your head...

A. I don't know.

Q. And I'm only speaking about the REVS

Adam Barone - by Ms. Marsh

157

group. Do you have any idea, a number?

MS. MARSH: Objection; form, asked and answered.

A. No, I do not. But it would be contained within the number of that closed valuation request chart.

MR. CARTER: Hold on one second.

Okay. I am done. We are done. So Mr. Barone, thank you for answering my questions. Your attorney might have some -- what we call some redirect follow-up questions.

THE WITNESS: Okay. Thanks, Jase.

* * *

EXAMINATION

BY MS. MARSH:

Q. Mr. Barone, thank you for being here. I'm going to jump around a little bit.

We talked a little bit -- or you talked at great length, rather, about certain safeguards that are in place with respect to the REVS team in making sure that an appraisal is credible in accordance with USPAP. Do you recall this extensive questioning?

A. Yes.

Q. Okay. In addition to the livelihood that

Adam Barone - by Ms. Marsh

158

is important to the original appraiser that is submitting a report you mentioned, are the technical reviewers also required to abide by USPAP?

A. Correct.

Q. And what about the supervisory appraisers; are they required to adhere to USPAP?

A. Correct.

Q. And what about REVS management; are they required to adhere to USPAP?

A. In --

Q. To the extent they review any of these appraisals.

A. Yes. They would, yes.

Q. Pardon me. Thank you. And does anybody in the REVS team have any motivation to not abide by USPAP?

A. No.

Q. And when a technical reviewer signs off on a report of an appraisal that they have reviewed, do they have to submit certain certifications that are in accordance with USPAP standards?

A. That's part of the review form, yes.

Q. What else is part of the review form that the technical appraiser is signing off on?

I obviously do not expect you to repeat

Adam Barone - by Ms. Marsh

159

back the entire form, but can you explain other things that are critical in their form that would provide the roadmap to the supervisor appraiser that is reviewing it?

A. Right. So it outlines a description of the property and then it provides a summary of each analysis. So, for instance, in the sales comparison approach it requires the reviewer to outline the value ranges indicated in the conclusions provided enabling someone to get a snapshot about whether or not they seem reasonable from a high level because, basically, it takes what's in the appraisal, summarizes it in a fashion that you can quickly see whether or not there's reasonableness implied in the numbers that they used. So you go through the approaches to value including the --

COURT REPORTER: I'm sorry, you go through the approaches --

A. Of value, correct, and summarize at the high points that would give a person reading the document a good understanding of the completeness of the appraisal that was reviewed.

Q. And if the supervisory appraiser found that there was an issue in the reviewer's report and thought there was something that needed to be

Adam Barone - by Ms. Marsh

160

checked or an issue with credibility, would the supervisory appraiser then discuss that with the technical reviewer?

A. Absolutely.

Q. And if a technical reviewer does not agree with the supervisory appraiser or the actual appraisal report, does the technical reviewer have avenues of people or departments that that technical reviewer can speak to to voice his concerns about the report?

A. Yes.

Q. And what are those avenues?

A. Concerns about the report?

Q. Yes.

A. Okay. You're speaking the supervising appraiser?

Q. Sure.

A. Okay. Their manager.

Q. The supervisory appraiser's manager?

A. Right. The peer group, that basically they have availability to, their peers, other appraisers on staff.

Q. And what if they wanted to go outside the REVS group; do they have opportunities to do that?

A. If they are concerned that there's some

Adam Barone - by Ms. Marsh

161

sort of ethical violation?

Q. Sure.

A. Yeah. The bank -- PNC is very -- very big on the code of conduct, in holding a high level for its employees. And each and every year we are required to take code of conduct training, and in that training they basically give us the various anonymous or nonanonymous ways to identify issues related to anything that's incorrect or that needs to be addressed. So it's not that something happened, but it gives you avenues to express your concerns so it can be investigated. So you have the ombudsman, you have employee relations, you have your supervisor, you have legal, various opportunities that -- and again, on an annual basis they remind us it's our obligation if we are aware of something like this to bring it forward so it can be investigated so the bank stays in the right place.

Q. And does USPAP have any internal guidelines for an appraiser or somebody that is subject to USPAP about what they should do if they believe something does not comply with USPAP?

MR. CARTER: Objection; outside of the direct examination.

Deposition of Adam Barone

Adam Barone - by Ms. Marsh

162

MS. MARSH: Go ahead, you can answer.

THE WITNESS: What's that?

MS. MARSH: You can answer.

A.    Yeah. USPAP basically indicates that you shouldn't knowingly allow an employee or any other person to communicate, like, a noncredible or erroneous situation.

Q.    You've been with PNC, I believe you said, since 1991; is that correct?

A.    Correct.

Q.    Were you there when PNC acquired National City?

A.    That's correct.

Q.    And what year was that?

A.    I believe it was around 2009.

Q.    And when PNC acquired National City, did they acquire their real estate evaluation department, whatever its formal name was?

A.    Yes.

Q.    And is that where Mr. Meehan came from?

A.    That's correct.

Q.    Did it acquire all of the individuals from the National City real estate valuations department?

A.    We retained all the appraisers.

Adam Barone - by Ms. Marsh

163

Q.    And were you involved in training any of those National City employees with respect to how PNC's protocols and procedures were regarding reviews of appraisals?

A.    Yes. We put out information early on to be presented to the group to make sure there was consistency in understanding because they obviously had a different way of working their business.

Q.    So in 2015 we discussed the restructuring plan in the REVS group. Prior to the date, that Exhibit 9, the Work Restructuring Plan Summary Document, was submitted to legal on September 23, 2015, were there discussions prior to that date regarding the restructuring?

A.    Yeah, I believe we started the discussions mid-summer sometime.

Q.    And how did those discussions come about; do you recall?

A.    We evaluated our workflow and realized that we were having a considerable workflow fall-off and needed to consider our staffing model.

Q.    So in this summary document that reads, "The real estate valuations group has experienced a decrease in the volume of appraisal reviews over the past year and it is currently anticipated there will

Adam Barone - by Ms. Marsh

164

be no near-term increases in volume," did that prove to be true?

A.    Correct.

Q.    And this was submitted to legal in September of 2015. It says, "Anticipated notification date, October 13, 2015, through October 26, 2015."

Were you involved in the notification process?

A.    I was aware of the notification process, yes.

Q.    But were you involved in actually notifying any of the individuals that were being -- whose positions were being eliminated?

A.    They were handled through their managers.

Q.    Okay. And you previously talked about working with Jeff Mazur to provide the weights and criteria and that was given to HR; is that correct?

A.    Correct.

Q.    And then it sounds -- I believe you said that Paul Higgins was involved in assigning the values that ultimately were used in the weights across the REVS management -- or excuse me, the REVS appraiser reviewer group; is that correct?

A.    Correct.

Adam Barone - by Ms. Marsh

165

Q.    And did you have any discussions with Paul Higgins or become involved in the process and how he assigned those numbers?

A.    No. Because part of the process was HR was the intermediary, so we presented ourself to HR, HR then worked with Paul and presented back to Paul, and then ultimately the paper that I signed came back to me.

Q.    And prior to September 23, 2015, had anybody else left the REVS department?

A.    Well, just prior to that we had a manager leave out of our Houston office.

Q.    And what was his name?

A.    Jim Dawson.

Q.    And even after that person had left there still needed to be a restructuring?

A.    Yes.

Q.    And since Mr. Meehan and Mr. Green and the administrative assistant positions were eliminated pursuant to this work restructuring plan, have those positions been filled or replaced by REVS?

A.    No.

MR. CARTER: Objection; outside the scope of the direct.

Adam Barone - by Ms. Marsh

166

Q.   And has -- in fact, since that time have -- has the REVS department grown or changed in any way since September 2015?

MR. CARTER:  Objection; outside the scope of the direct.

MS. MARSH:  Well, it's also in your 30(b)(6) notice, so.  Anyway, go ahead.

A.   Okay.  The staff -- we've had a loss of staff through retirement and folks taking positions at other banks.  We've had -- in 2016 we had three of our review appraisers leave.  2017 we had another appraiser leave.  And then this year we had another appraiser leave.

Q.   So how many review appraisers, approximately, if you know, are in the REVS department now?

A.   I don't know.

MR. CARTER:  Objection; outside the scope of the direct.

Q.   And going back to Exhibit No. 12, the closed valuation requests, I understand you didn't know what the breakdown was between a nonappraisal versus an appraisal but can you describe what the trend has been in the REVS group with respect to valuation requests from 2013 to present?

Adam Barone - by Ms. Marsh

167

A.   Yeah.  It's been a significant fall off from that time frame.  And it has kind of plateaued at a level in or around 5,000 versus the 14,000 requests we had back in 2013.

Q.   In 2013 it appears the total valuation requests was 14,324; is that correct?

A.   That's correct.

Q.   And then they drop down in 2014 by approximately 4,000; is that correct?  So down to the 10,000 range?

A.   Just under 10,000 because that's a year-to-date number.

Q.   Okay.  And then in 2015 the number had dropped to 8,173?

A.   That's correct.  I misunderstood what you said.  Yes.

Q.   And then so between 2013 and 2015 there had been a loss of approximately 6,000 requests in valuations; is that fair?

A.   Yeah, our volume dropped.

Q.   In 2018 year-to-date, while we haven't completed the year, is somewhere around 4,000; is that correct?

A.   Correct.

Q.   And that's almost 10,000 down from 2013?

Adam Barone - by Ms. Marsh

168

A.   Approximately.

Q.   Okay.  Understanding that the year is not complete yet, right?

A.   Yeah.

Q.   Do you have an understanding of when Mr. Meehan left his employment with PNC?

A.   It was the end of 2015.

Q.   Do you know if he completed his year of -- like if he worked through the end of December of 2015?

A.   No, he did not.

Q.   Would he have been subject to a 2015 year-end performance then if he had not completed the year?

A.   I don't believe that would have been the case.

Q.   Would it even have been relevant if he was no longer an employee and his position had been eliminated?

A.   I don't believe so.

Q.   You were previously shown Exhibit No. 15, Career Compass, a 2015 year-end performance; do you have that handy?  It's Exhibit 15.

A.   Yes, I do.

Q.   Okay.  Could you just go to the last

Adam Barone - by Mr. Carter

169

page, please.

A.   Yes.

Q.   What is the date of that?

A.   March 5th of 2016.

Q.   And how many months would that have been after -- approximately, after Mr. Meehan's position was eliminated from the REVS department?

A.   Three months plus.

Q.   Okay.  And is this a filled-out performance summary for Mr. Meehan discussing his accomplishments in any way?

A.   No, it does not appear to be that.

MS. MARSH:  Okay.  I don't have any further questions.

*  *  *

FURTHER EXAMINATION

BY MR. CARTER:

Q.   Okay.  Mr. Barone, I have one question.  You spoke about the -- it's Exhibit 15.

A.   Okay.

Q.   I believe you just testified that the 2015 year-end performance summary for Joseph Meehan here is not relevant; is that correct?

MS. MARSH:  Misstates his testimony.

A.   No.  It appears not to be completed.

Adam Barone - by Mr. Carter

170

That's what I said.

Q.    Okay.  So does a 2015 performance summary for Joe Meehan, is that relevant --

MS. MARSH:  Objection; form, foundation, calls for a legal conclusion.  You don't have to answer that.

A.    I don't know.

Q.    You don't know.

You mentioned again that Paul Higgins was the individual that filled out the assessment as part of the Work Restructuring Plan Summary Document?

A.    Right.

MS. MARSH:  Objection; misstates his testimony.  Go ahead.

Q.    And you're not sure where Paul Higgins pulled any of the information used to fill out the assessment, correct?

MS. MARSH:  Objection; form, misstates and mischaracterizes testimony.  That question was never asked.  So if you know the answer to his question trying to put words in your mouth, go ahead.

A.    I don't.

MR. CARTER:  Okay.  Thank you.  That's

171

it.

MS. MARSH:  Okay.  We reserve.

THE WITNESS:  Thanks.

MR. CARTER:  Mr. Barone, thank you very much.  I could tell you were answering everything to the best of your ability, and I appreciate that.

THE WITNESS:  Thank you, Jase.  Try to have a good day.

MR. CARTER:  Thank you.

COURT REPORTER:  Do you want to give me your order on the record?

MR. CARTER:  Yeah.  I would like an E-tran, please.

COURT REPORTER:  Do you want the exhibits linked or not?

MR. CARTER:  No, you don't have to link them.  Thank you for asking.

I will just be in contact with Connie regarding invoice and following up with her.

* * *

(Signature Not Waived)

* * *

CONCLUDED -- 3:58 P.M.

172

CERTIFICATE

Dutcheen O. Cameron, RMR, CRR

COMMONWEALTH OF PENNSYLVANIA

NOTARIAL SEAL
DUTCHEEN O. CAMERON, Notary Public
Penn Township, Westmoreland County
My Commission Expires June 22, 2020

COMMONWEALTH OF PENNSYLVANIA )
                             ) SS.
COUNTY OF WESTMORELAND       )

I, Dutcheen O. Cameron, Registered Merit Reporter-Certified Realtime Reporter, Notary Public within and for the Commonwealth of Pennsylvania, do hereby certify that the witness, ADAM BARONE was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth, and that the foregoing deposition was recorded in stenotype by me and reduced to typewriting under my direction.

I further certify that the said deposition constitutes a true record of the testimony given by said witness; that the foregoing deposition was taken at the time and place stated herein.

I further certify that I am not a relative, employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel or financially interested directly or indirectly in this action.

I further certify that the inspection, reading and signing of said deposition were not waived by counsel for the respective parties and by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 18th day of December, 2018.

173

COMMONWEALTH OF PENNSYLVANIA  )
                              )    ERRATA SHEET
COUNTY OF WESTMORELAND        )

I hereby make the following changes in my deposition testimony:

PAGE NO.   LINE NO.   REASON FOR CHANGE:

CERTIFICATE OF READING

I, ADAM BARONE, hereby acknowledge that I have read the foregoing transcript of my testimony on this_____ day of _____, 20  .  Taken by Dutcheen O. Cameron, RMR, CRR.  I further certify that the answers are true and correct as transcribed unless otherwise as noted on the Errata Sheet.

ADAM BARONE

Subscribed and sworn to before me this _____ of _____, 20  .

_____
Notary Public

1

| # | | 7 |
|---|---|---|
| **#109** [1] - 2:5 | 102:14, 124:13, 168:21, 168:23, 169:19<br>**15222** [1] - 1:19<br>**157** [1] - 3:8<br>**16** [1] - 37:5<br>**169** [1] - 3:10<br>**18th** [1] - 172:17<br>**1983** [1] - 21:24<br>**1989** [1] - 25:16<br>**1990** [1] - 22:4<br>**1991** [6] - 17:8, 19:7, 21:25, 22:1, 22:3, 162:9<br>**1995** [1] - 20:1<br>**1:20** [2] - 84:2, 84:4<br>**1st** [1] - 31:11 | **7** [6] - 4:2, 4:10, 36:20, 129:2, 129:11, 129:14<br>**79** [1] - 4:6 |

**$**

**$108,000** [1] - 86:21
**$9,000** [1] - 86:21

**'**

**'90s** [2] - 16:20, 16:22

**0**

**0259** [1] - 32:14

**1**

**1** [15] - 4:2, 7:14, 7:16, 9:25, 10:17, 10:24, 11:7, 11:14, 11:24, 35:13, 35:19, 74:22, 86:12, 95:20
**1.1.1** [1] - 35:18
**1.1.2** [1] - 36:14
**1.1.3** [2] - 36:17, 38:1
**1.1.4** [1] - 36:20
**1.1.5** [1] - 37:12
**1.1.6** [2] - 37:6, 37:16
**1.1.7** [2] - 38:5, 38:13
**1.1.8** [1] - 38:13
**10** [3] - 4:8, 99:10, 99:12
**10,000** [3] - 167:10, 167:11, 167:25
**10/13/15** [1] - 114:15
**102** [1] - 4:9
**10:00** [2] - 1:19, 5:1
**11** [6] - 1:19, 4:7, 12:17, 12:18, 84:15, 84:17
**11:45** [1] - 55:16
**12** [15] - 4:6, 9:20, 9:25, 10:17, 10:24, 12:10, 12:17, 12:20, 38:18, 38:19, 42:2, 43:24, 79:18, 79:23, 166:20
**12/10** [1] - 82:7
**129** [1] - 4:10
**12:30** [1] - 55:9
**13** [1] - 164:6
**131** [1] - 4:11
**14** [2] - 44:14, 111:19
**14,000** [1] - 167:3
**14,000-plus** [1] - 81:10
**14,324** [2] - 81:21, 167:6
**15** [8] - 4:9, 54:19, 102:11,

**2**

**2** [7] - 12:2, 12:5, 27:19, 38:17, 38:19, 43:24, 92:20
**2.5** [11] - 45:9, 50:11, 50:24, 51:1, 51:2, 51:8, 51:19, 53:10, 53:21, 54:15, 55:23
**2.7** [1] - 44:14
**20** [2] - 173:18, 173:23
**2009** [1] - 162:15
**2010** [4] - 26:12, 42:16, 74:19, 74:22
**2013** [11] - 74:18, 81:9, 81:21, 83:15, 83:16, 131:5, 166:25, 167:4, 167:5, 167:17, 167:25
**2014** [12] - 85:2, 85:22, 87:8, 87:13, 92:19, 96:9, 97:5, 98:10, 100:9, 151:7, 151:12, 167:8
**2015** [37] - 29:8, 29:20, 31:9, 31:11, 35:19, 36:15, 37:2, 37:14, 100:4, 101:21, 102:10, 102:21, 104:24, 105:15, 107:3, 107:23, 111:12, 111:19, 126:2, 142:18, 156:20, 163:9, 163:13, 164:5, 164:6, 164:7, 165:9, 166:3, 167:13, 167:17, 168:7, 168:10, 168:12, 168:22, 169:22, 170:2
**2015-234** [1] - 107:19
**2016** [2] - 166:10, 169:4
**2017** [3] - 81:10, 100:3, 166:11
**2018** [5] - 1:19, 29:19, 82:6, 167:21, 172:18
**20th** [1] - 101:14
**221** [1] - 19:7
**221st** [1] - 19:7
**23** [3] - 107:23, 163:12, 165:9

**233** [1] - 2:13
**2330** [2] - 38:24, 39:9
**24** [1] - 4:3
**26** [1] - 164:7
**261** [1] - 110:25
**262** [1] - 111:17
**28** [1] - 4:4

**3**

**3** [3] - 12:10, 54:18, 95:18
**30** [4] - 121:15, 121:19, 121:22, 121:24
**30(b)(6** [7] - 1:15, 8:23, 106:3, 125:16, 134:3, 154:3, 166:7
**312-460-5000** [1] - 2:16
**314-675-1882** [1] - 2:7
**31st** [1] - 1:18
**3407** [1] - 2:5
**35** [1] - 105:3
**39** [7] - 24:14, 26:17, 34:18, 36:21, 38:18, 38:19, 44:14
**3:30** [2] - 148:23
**3:58** [1] - 171:23

**4**

**4** [6] - 4:3, 24:2, 24:4, 34:5, 34:16, 41:20
**4,000** [2] - 167:9, 167:22
**4,069** [1] - 82:7
**4007.1** [1] - 1:16
**42** [1] - 4:5
**45** [2] - 83:23, 84:1
**4:17-CV-02876-PLC** [1] - 1:7

**5**

**5** [9] - 3:5, 3:6, 4:5, 26:17, 27:22, 42:9, 42:11, 82:1, 131:5
**5,000** [1] - 167:3
**5,000-plus** [1] - 81:11
**5th** [1] - 169:4

**6**

**6** [3] - 34:18, 35:15, 37:25
**6,000** [1] - 167:18
**60606** [1] - 2:15
**63118** [1] - 2:6

**8**

**8** [3] - 4:11, 130:24, 131:1
**8,173** [1] - 167:14
**8000** [1] - 2:14
**84** [1] - 4:7

**9**

**9** [6] - 4:4, 28:20, 28:23, 102:9, 107:10, 163:11
**90** [1] - 89:8
**90-plus** [1] - 89:9
**99** [1] - 4:8

**A**

**a.m** [1] - 1:19
**A.M** [1] - 5:1
**abbreviation** [3] - 17:10, 17:12, 17:14
**abide** [2] - 158:3, 158:15
**ability** [8] - 67:23, 71:15, 76:10, 89:11, 93:8, 96:20, 143:11, 171:6
**able** [22] - 11:1, 11:2, 11:20, 11:23, 12:5, 32:2, 43:19, 43:20, 64:24, 70:21, 78:1, 78:3, 93:20, 94:12, 100:10, 110:13, 112:2, 114:2, 119:7, 122:17, 145:22, 154:20
**absolutely** [1] - 160:4
**academy** [4] - 127:9, 127:22, 135:18, 136:1
**accept** [10] - 63:10, 65:8, 66:1, 66:9, 66:24, 73:10, 78:2, 78:3, 143:8, 143:9
**acceptable** [1] - 60:18
**acceptance** [13] - 62:23, 66:22, 70:24, 71:7, 71:16, 71:18, 71:20, 72:6, 72:23, 136:24, 137:8, 137:17, 143:21
**accepted** [2] - 62:19, 66:2
**accepting** [2] - 50:10, 77:16
**accepts** [2] - 66:21, 72:5
**access** [9] - 41:4, 41:6, 98:7, 98:8, 98:10, 98:15, 98:18, 99:4, 99:8

**accommodation** [1] - 12:22
**accomplished** [1] - 94:23
**accomplishments** [1] - 169:11
**accord** [1] - 59:5
**accordance** [3] - 1:15, 157:22, 158:21
**according** [1] - 112:13
**accordingly** [1] - 87:7
**accountable** [2] - 60:14, 85:20
**accounting** [1] - 37:22
**accurate** [3] - 12:25, 37:22, 133:15
**acknowledge** [2] - 124:12, 173:17
**acknowledgment** [1] - 152:3
**acquire** [2] - 162:17, 162:22
**acquired** [2] - 162:11, 162:16
**act** [1] - 47:4
**action** [2] - 146:18, 172:13
**activity** [2] - 88:18, 118:24
**actual** [2] - 113:12, 160:6
**ADAM** [6] - 1:15, 3:5, 5:2, 172:5, 173:17, 173:21
**Adam** [2] - 6:4, 32:19
**added** [1] - 135:16
**addition** [7] - 25:12, 61:12, 126:15, 127:4, 134:20, 141:22, 157:25
**additional** [11] - 21:8, 61:13, 87:7, 88:21, 135:16, 135:22, 135:25, 136:1, 141:21, 142:14, 146:22
**address** [5] - 12:21, 52:17, 53:7, 78:25, 139:11
**addressed** [8] - 78:5, 137:20, 137:22, 143:24, 143:25, 153:9, 153:21, 161:10
**addresses** [1] - 139:10
**addressing** [1] - 78:21
**adequate** [3] - 44:16, 138:12, 145:18
**adequately** [1] - 143:15
**adhere** [2] - 158:6, 158:9
**administration** [4] - 103:5, 103:15, 104:12, 104:17
**Administration** [1] - 104:6
**administrative** [2] - 30:12, 165:19
**advice** [1] - 78:7
**affect** [2] - 61:14, 61:23
**affects** [1] - 79:20
**affixed** [1] - 172:17
**affordable** [8] - 90:12, 90:17, 90:22, 91:2, 91:4, 91:7, 91:9, 91:19
**afterwards** [1] - 130:7

**agencies** [2] - 27:3, 27:5
**Agencies'** [1] - 39:2
**Agenda** [3] - 129:15, 130:11, 131:5
**agenda** [4] - 129:19, 129:24, 130:2, 130:8
**ago** [4] - 16:21, 26:24, 38:10, 110:2
**agree** [7] - 5:18, 68:24, 70:10, 70:24, 119:24, 153:23, 160:6
**agreeable** [1] - 70:19
**agreement** [5] - 58:21, 66:6, 66:7, 71:6, 73:17
**ahead** [67] - 6:2, 7:10, 7:13, 7:24, 9:10, 10:8, 10:11, 13:17, 14:17, 15:14, 24:1, 24:13, 28:18, 35:5, 36:10, 41:22, 42:8, 45:10, 50:20, 52:12, 54:4, 55:8, 58:14, 60:11, 61:18, 62:12, 64:2, 65:16, 65:23, 66:17, 68:22, 70:2, 75:18, 80:24, 81:1, 82:18, 84:14, 89:7, 91:16, 99:6, 102:8, 102:11, 104:20, 105:13, 105:19, 107:8, 110:4, 116:9, 117:22, 125:18, 130:23, 133:4, 134:3, 140:11, 144:6, 144:18, 145:14, 146:4, 150:18, 153:1, 154:5, 155:14, 156:3, 162:1, 166:7, 170:15, 170:23
**akin** [1] - 81:18
**alerted** [2] - 153:8, 155:8
**allocate** [1] - 91:12
**allocated** [1] - 86:20
**allow** [7] - 12:9, 56:20, 59:11, 62:14, 70:11, 88:5, 162:5
**allowed** [1] - 52:21
**allows** [1] - 58:21
**almost** [2] - 23:22, 167:25
**alterations** [1] - 71:15
**amend** [2] - 26:3, 73:7
**Amended** [1] - 8:22
**amended** [1] - 25:20
**amiss** [1] - 48:2
**amount** [4] - 14:9, 83:24, 86:21, 144:7
**amounts** [1] - 98:2
**Analysis** [2] - 111:1, 111:18
**analysis** [2] - 44:17, 159:7
**Analysis-Selection** [1] - 111:1
**annual** [5] - 81:3, 84:21, 84:23, 122:5, 161:15
**annually** [3] - 41:2, 41:3, 86:21

**anonymous** [1] - 161:8
**answer** [87] - 9:10, 9:11, 10:2, 10:4, 10:11, 10:13, 10:14, 14:19, 21:11, 25:1, 39:23, 40:9, 44:9, 44:22, 47:21, 49:19, 50:20, 51:23, 53:16, 56:4, 56:12, 57:11, 58:21, 61:19, 62:12, 64:6, 69:6, 75:13, 75:15, 75:18, 75:24, 79:6, 85:13, 89:7, 91:16, 98:17, 99:1, 99:7, 104:14, 104:20, 105:2, 106:6, 106:14, 106:21, 107:5, 108:1, 108:20, 109:14, 112:17, 113:1, 113:8, 114:22, 117:15, 118:15, 120:8, 123:23, 124:24, 125:11, 125:18, 128:15, 132:21, 133:8, 133:18, 134:13, 137:11, 138:3, 139:18, 140:24, 141:11, 142:6, 142:23, 145:12, 146:13, 149:19, 150:19, 151:10, 151:19, 152:16, 154:5, 154:14, 155:13, 156:2, 162:1, 162:3, 170:6, 170:21
**answered** [31] - 52:11, 53:8, 53:15, 54:3, 60:10, 61:17, 62:11, 65:15, 65:22, 66:15, 70:1, 82:16, 90:11, 98:21, 99:6, 102:3, 103:13, 104:8, 105:12, 105:19, 111:7, 116:9, 134:2, 141:5, 144:6, 144:12, 144:18, 145:6, 146:4, 154:13, 157:3
**answering** [3] - 6:19, 157:9, 171:5
**answers** [3] - 7:7, 64:16, 173:19
**anticipate** [1] - 148:24
**anticipated** [2] - 76:7, 163:25
**Anticipated** [1] - 164:5
**anyway** [2] - 145:9, 166:7
**apart** [2] - 21:6, 118:7
**apartments** [2] - 23:24, 90:5
**apologize** [2] - 150:7, 150:11
**appear** [1] - 169:12
**APPEARANCES** [1] - 2:1
**applicable** [2] - 27:10, 140:8
**Applicable** [1] - 28:12
**applied** [2] - 44:6, 118:3
**apply** [2] - 53:22, 118:25
**Appraisal** [17] - 13:20, 19:21, 19:24, 21:15, 21:18, 24:9, 26:11, 38:1, 38:17, 39:1, 39:3, 40:5, 42:3, 43:9, 43:24, 128:25, 132:12
**appraisal** [184] - 18:17,

18:19, 18:22, 18:23, 20:16, 21:16, 22:6, 23:1, 23:4, 23:19, 26:20, 27:5, 27:9, 27:20, 27:24, 28:4, 28:6, 28:8, 33:20, 34:22, 35:2, 35:8, 39:2, 39:19, 39:21, 39:24, 40:10, 40:11, 40:13, 40:19, 40:21, 41:15, 44:2, 44:24, 45:4, 45:5, 46:20, 47:4, 47:7, 47:13, 47:24, 48:10, 48:12, 49:17, 49:23, 50:3, 50:9, 50:10, 50:13, 50:14, 50:16, 50:23, 51:1, 52:14, 52:21, 52:25, 54:5, 55:24, 57:5, 57:7, 58:12, 58:18, 58:25, 59:10, 61:3, 62:19, 62:24, 63:4, 63:10, 63:14, 63:18, 63:22, 63:24, 64:13, 64:16, 64:21, 65:7, 65:9, 66:9, 66:22, 67:1, 67:3, 67:12, 67:16, 67:25, 68:2, 68:16, 68:25, 69:21, 70:24, 71:1, 71:23, 72:10, 72:19, 73:7, 73:21, 74:12, 75:8, 75:10, 76:1, 76:21, 77:14, 77:18, 77:19, 78:2, 78:3, 81:10, 81:13, 81:15, 81:18, 81:24, 81:25, 82:2, 82:9, 82:14, 82:19, 82:21, 82:25, 83:5, 90:1, 90:18, 91:3, 91:19, 91:23, 96:1, 127:19, 127:25, 128:18, 132:11, 132:25, 136:7, 136:10, 137:18, 138:6, 138:7, 138:21, 139:1, 139:3, 139:5, 139:8, 139:14, 139:22, 140:1, 140:4, 140:20, 140:21, 141:8, 141:9, 143:9, 144:3, 144:15, 144:23, 145:17, 145:20, 146:7, 146:8, 146:10, 146:11, 146:14, 146:17, 147:15, 148:7, 148:11, 148:18, 149:11, 150:1, 151:15, 153:4, 153:12, 154:17, 154:18, 155:10, 156:20, 157:21, 158:19, 159:12, 159:22, 160:7, 163:24, 166:23
**appraisal's** [1] - 63:18
**appraisals** [37] - 23:14, 23:15, 23:17, 31:5, 35:24, 40:3, 40:17, 45:11, 45:25, 47:11, 51:7, 54:9, 54:11, 61:2, 65:3, 73:15, 83:3, 89:1, 96:3, 127:18, 128:12, 134:20, 135:11, 136:5, 137:1, 140:7, 140:18, 141:15, 141:20, 142:12,

143:5, 143:16, 151:14, 153:13, 156:9, 158:12, 163:4

**Appraiser** [6] - 36:18, 37:13, 37:17, 38:5, 54:19, 132:4

**appraiser** [163] - 18:12, 18:13, 19:9, 20:9, 20:10, 20:12, 20:20, 20:21, 21:5, 21:9, 21:21, 21:23, 21:24, 22:5, 22:7, 22:9, 22:10, 28:5, 34:1, 37:10, 38:12, 44:25, 45:3, 46:8, 46:12, 46:19, 46:25, 47:17, 47:19, 47:23, 48:3, 48:8, 48:9, 50:25, 51:2, 51:3, 51:5, 51:7, 51:14, 51:15, 51:20, 52:18, 52:19, 52:24, 53:3, 54:7, 54:22, 59:8, 59:9, 59:16, 59:17, 60:2, 60:3, 60:6, 60:13, 60:14, 60:15, 61:4, 61:15, 62:8, 62:23, 62:24, 63:6, 63:7, 63:9, 64:15, 65:12, 65:25, 66:8, 66:21, 66:23, 67:4, 67:9, 67:14, 67:18, 67:19, 67:21, 68:1, 68:4, 68:24, 69:2, 69:3, 69:7, 69:11, 69:13, 69:15, 69:18, 69:24, 70:13, 70:14, 70:15, 70:20, 70:25, 71:12, 72:5, 72:6, 72:11, 72:13, 72:16, 72:21, 73:1, 73:7, 73:18, 74:11, 77:9, 77:25, 78:6, 78:11, 78:13, 78:22, 78:23, 82:20, 83:1, 94:10, 126:16, 133:6, 135:12, 136:18, 136:21, 138:9, 138:23, 138:25, 139:6, 140:2, 141:1, 142:8, 143:22, 145:1, 145:8, 145:21, 146:17, 146:18, 147:9, 147:10, 147:16, 148:1, 148:4, 148:6, 148:8, 148:14, 148:17, 149:14, 150:2, 151:22, 152:2, 153:7, 153:18, 155:2, 158:1, 158:24, 159:3, 159:23, 160:2, 160:6, 160:16, 161:21, 164:24, 166:12, 166:13

**appraiser 's** [11] - 47:19, 62:18, 87:6, 137:21, 146:2, 152:12, 152:18, 155:3, 156:7, 160:19

**Appraiser /Evaluator** [1] - 50:12

**appraiser /evaluator** [7] - 45:19, 46:14, 46:17, 53:13, 53:22, 54:24, 55:25

**appraisers** [55] - 33:21,

33:22, 33:23, 36:25, 37:7, 38:9, 46:3, 46:6, 46:15, 47:1, 51:9, 52:3, 56:1, 56:9, 56:14, 56:17, 59:22, 60:21, 61:5, 61:24, 70:19, 76:21, 82:24, 83:2, 89:11, 89:17, 89:21, 90:2, 90:21, 126:5, 126:10, 127:1, 127:16, 134:23, 134:24, 135:3, 135:4, 135:7, 140:3, 140:8, 140:14, 140:17, 142:3, 148:5, 150:21, 156:10, 156:16, 158:6, 160:22, 162:25, 166:11, 166:14

**appraisers '** [3] - 76:8, 141:16, 142:1

**Appraisers /Evaluator** [1] - 45:9

**appraisers /evaluators** [1] - 45:12

**appraising** [1] - 22:2

**appreciate** [2] - 54:13, 171:6

**approach** [3] - 64:6, 64:18, 159:8

**approaches** [2] - 159:16, 159:18

**appropriate** [8] - 48:8, 55:14, 56:25, 59:1, 73:2, 73:5, 73:6, 122:11

**appropriately** [1] - 147:16

**approval** [2] - 96:14, 109:19

**approved** [5] - 40:23, 40:25, 41:2, 54:22, 67:14

**Approved** [1] - 54:19

**approving** [1] - 114:11

**area** [2] - 90:6, 126:7

**argumentative** [2] - 147:23, 156:1

**arises** [1] - 152:24

**aside** [1] - 107:2

**aspects** [1] - 153:4

**assess** [1] - 118:1

**assessing** [2] - 114:4, 114:8

**Assessment** [1] - 113:14

**assessment** [22] - 114:7, 114:19, 115:2, 116:12, 116:17, 117:4, 117:18, 119:11, 119:16, 119:19, 119:22, 119:25, 120:5, 120:13, 120:21, 121:6, 123:21, 124:7, 125:22, 170:10, 170:18

**assessments** [5] - 114:17, 115:8, 115:14, 115:17, 116:3

**assign** [6] - 87:7, 87:16, 87:19, 87:23, 88:3, 90:21

**assigned** [8] - 85:19, 86:25,

87:1, 89:1, 89:13, 91:6, 151:14, 165:3

**assiging** [3] - 87:3, 87:9, 164:21

**assignment** [5] - 54:8, 89:5, 89:24, 90:7, 136:23

**assignments** [2] - 81:10, 81:11

**assigns** [1] - 88:8

**assistant** [2] - 30:12, 165:19

**Assistant** [2] - 36:17, 38:1

**associated** [3] - 90:13, 103:4, 105:5

**assume** [4] - 8:20, 10:13, 70:15, 104:3

**assuming** [1] - 155:17

**assumption** [4] - 67:8, 104:2, 143:10, 156:7

**attend** [3] - 126:11, 130:13, 132:18

**attended** [1] - 132:17

**attention** [1] - 6:15

**attest** [1] - 118:17

**attitude 's** [1] - 95:10

**Attitude /Teamwork** [1] - 94:25

**attitude /teamwork** [1] - 95:8

**attorney** [16] - 5:8, 6:9, 10:10, 13:5, 13:10, 14:6, 14:18, 15:3, 15:6, 15:12, 15:19, 16:2, 100:18, 157:10, 172:11, 172:12

**attorney -client** [3] - 14:18, 15:12, 15:19

**August** [1] - 101:20

**authored** [2] - 100:10, 102:22

**availability** [9] - 87:17, 87:21, 88:3, 88:10, 88:11, 92:7, 92:16, 128:17, 160:21

**available** [11] - 41:13, 53:2, 87:20, 88:15, 88:16, 126:8, 134:10, 135:3, 142:9, 152:7, 152:9

**Ave** [1] - 2:5

**avenues** [3] - 160:8, 160:12, 161:11

**average** [1] - 86:21

**aware** [8] - 99:7, 115:15, 133:21, 151:12, 151:20, 153:18, 161:16, 164:10

**awkwardness** [1] - 145:19

**B**

**background** [1] - 18:12

**bad** [1] - 95:20

**balance** [2] - 23:21, 70:23

**balances** [1] - 59:3

**Bank** [11] - 5:9, 9:3, 9:6, 16:24, 17:7, 18:3, 21:1, 22:5, 53:12, 76:18, 156:21

**bank** [30] - 16:18, 20:23, 21:25, 28:3, 36:12, 39:12, 40:12, 40:16, 40:24, 41:5, 45:22, 46:5, 52:14, 52:25, 58:21, 59:3, 59:5, 59:13, 59:20, 72:2, 93:2, 96:3, 100:1, 100:8, 126:7, 142:2, 156:10, 161:3, 161:18

**bank's** [3] - 35:25, 41:14, 52:20

**banking** [3] - 25:14, 127:18, 127:25

**banks** [1] - 166:10

**bar** [1] - 14:7

**barely** [1] - 112:4

**BARONE** [6] - 1:15, 3:5, 5:2, 172:5, 173:17, 173:21

**Barone** [60] - 5:7, 6:2, 6:4, 6:5, 7:14, 7:16, 8:10, 12:8, 13:2, 13:7, 15:21, 16:23, 21:20, 24:4, 24:10, 24:19, 26:13, 28:19, 28:23, 29:1, 31:20, 32:19, 34:2, 34:15, 38:15, 42:11, 42:14, 43:20, 43:22, 55:1, 55:23, 58:10, 66:4, 79:15, 79:23, 80:8, 84:10, 84:15, 84:17, 84:20, 98:24, 99:3, 99:12, 99:18, 102:14, 102:17, 106:16, 107:1, 111:4, 119:18, 129:11, 130:2, 131:1, 131:4, 132:13, 149:8, 157:9, 157:16, 169:18, 171:4

**bas** [1] - 113:9

**base** [1] - 128:12

**based** [17] - 37:3, 54:7, 62:13, 87:17, 87:18, 92:7, 94:11, 97:22, 102:4, 114:15, 139:5, 143:11, 146:1, 153:18, 153:24, 154:25

**basis** [6] - 64:11, 81:3, 151:21, 152:11, 156:8, 161:15

**Bates** [1] - 26:15

**became** [1] - 133:20

**become** [3] - 19:3, 121:23, 165:2

**begin** [3] - 22:3, 100:3, 100:4

**beginning** [10] - 31:7, 46:19, 47:8, 54:17, 59:1, 72:1, 72:17, 85:14, 106:5, 143:19

**begins** [1] - 43:25
**behalf** [2] - 2:2, 2:10
**below** [2] - 30:4, 30:8
**beneficial** [1] - 153:23
**benefit** [1] - 62:6
**benefits** [2] - 20:5, 20:7
**best** [8] - 15:22, 73:16, 91:11, 92:17, 94:23, 100:19, 139:25, 171:6
**between** [17] - 33:23, 38:11, 47:5, 47:16, 48:12, 64:3, 64:8, 65:12, 66:19, 67:25, 81:13, 82:2, 82:14, 83:5, 88:7, 166:22, 167:17
**beyond** [2] - 106:3
**bifurcated** [1] - 49:12
**big** [1] - 161:4
**bit** [11] - 18:11, 38:10, 55:2, 68:11, 74:8, 86:24, 88:13, 125:25, 149:9, 157:17, 157:18
**blank** [1] - 100:14
**Board** [1] - 40:23
**bodies** [6] - 26:21, 34:23, 35:3, 35:9, 38:21, 44:1
**body** [1] - 26:25
**bolts** [1] - 92:25
**book** [1] - 48:19
**borough** [1] - 16:16
**borrower** [10] - 46:2, 46:13, 46:21, 46:25, 47:14, 52:22, 57:9, 57:12, 62:2
**borrowers** [2] - 54:10, 57:20
**bottom** [6] - 26:14, 43:4, 101:17, 122:14, 122:15, 136:21
**box** [3] - 32:5, 32:7, 32:10
**break** [10] - 6:21, 7:1, 43:18, 55:5, 55:11, 55:14, 79:16, 83:4, 129:5, 132:14
**breakdown** [1] - 166:22
**brief** [4] - 55:19, 82:13, 129:9, 149:3
**briefly** [3] - 6:6, 141:23, 148:21
**bring** [2] - 52:24, 161:17
**broad** [3] - 40:1, 40:2
**broker** [1] - 18:18
**brought** [1] - 72:20
**built** [1] - 59:2
**business** [3] - 76:14, 86:12, 163:8
**BY** [15] - 2:4, 2:12, 3:7, 3:9, 3:11, 5:6, 34:14, 55:22, 58:7, 80:7, 84:9, 99:17, 149:7, 157:15, 169:17

# C

**calendar** [3] - 83:9, 83:12, 83:14
**Camburn** [1] - 131:13
**camera** [1] - 6:7
**Cameron** [3] - 1:16, 172:4, 173:19
**career** [1] - 126:14
**Career** [11] - 99:24, 100:2, 103:5, 103:15, 104:5, 104:12, 104:17, 105:20, 105:23, 105:25, 168:22
**carry** [1] - 71:25
**Carter** [4] - 2:3, 2:4, 5:8, 154:14
**CARTER** [60] - 3:7, 3:11, 5:6, 7:13, 7:21, 7:24, 8:2, 8:7, 11:11, 12:24, 24:1, 24:7, 28:18, 34:6, 34:14, 42:8, 43:16, 55:7, 55:15, 55:21, 55:22, 58:7, 74:16, 74:19, 74:22, 74:25, 79:15, 80:3, 80:7, 83:20, 84:1, 84:4, 84:8, 84:9, 84:14, 99:9, 99:17, 102:8, 111:8, 129:1, 129:7, 130:1, 130:23, 145:13, 148:19, 149:1, 149:6, 149:7, 150:22, 157:7, 161:24, 165:24, 166:4, 166:18, 169:17, 170:25, 171:4, 171:9, 171:12, 171:16
**CASE** [1] - 1:6
**case** [12] - 6:24, 10:15, 22:4, 50:21, 52:2, 58:23, 67:2, 70:12, 133:19, 149:23, 156:9, 168:16
**categorizes** [1] - 120:15
**centralized** [1] - 73:15
**certain** [10] - 22:23, 31:8, 37:3, 57:4, 90:6, 98:4, 116:5, 116:6, 157:19, 158:20
**CERTIFICATE** [2] - 172:1, 173:17
**certification** [16] - 18:17, 18:19, 18:23, 18:25, 19:10, 20:14, 20:16, 20:22, 20:24, 71:5, 126:18, 127:5, 134:22, 135:1, 135:13, 142:8
**certification 's** [1] - 53:7
**certifications** [7] - 18:15, 18:16, 126:9, 135:6, 141:16, 142:2, 158:20
**Certified** [2] - 1:16, 172:4
**certified** [16] - 18:13, 19:3,

19:6, 19:8, 21:9, 34:1, 37:10, 44:25, 60:13, 70:19, 89:10, 89:16, 90:2, 126:4, 135:4, 142:3
**certify** [5] - 172:5, 172:8, 172:11, 172:14, 173:19
**cetera** [3] - 93:11, 128:3, 128:12
**chain** [4] - 68:11, 69:22, 78:17, 78:19
**challenge** [1] - 59:14
**challenged** [1] - 37:21
**challenges** [2] - 73:14, 148:9
**challenging** [1] - 138:9
**chance** [3] - 24:14, 24:15, 43:7
**CHANGE** [1] - 173:4
**change** [10] - 25:14, 25:15, 63:17, 63:19, 74:12, 120:19, 124:9, 124:14, 124:19
**changed** [4] - 25:22, 25:25, 31:19, 166:2
**changes** [7] - 5:24, 25:7, 25:8, 41:12, 42:5, 59:11, 173:3
**chapter** [1] - 38:22
**Chapter** [7] - 27:19, 35:13, 38:17, 38:19, 43:24, 54:18, 132:12
**charge** [5] - 29:14, 79:3, 85:23, 87:9, 131:24
**chart** [8] - 30:3, 30:7, 30:9, 31:25, 32:3, 32:15, 83:15, 157:6
**check** [2] - 135:6, 139:21
**checked** [1] - 160:1
**checking** [2] - 138:4, 151:16
**checks** [2] - 59:3, 70:23
**Chicago** [1] - 2:15
**chief** [1] - 109:23
**Chief** [2] - 36:17, 38:1
**choose** [1] - 20:2
**choosing** [1] - 54:6
**Christine** [1] - 30:12
**circle** [1] - 74:9
**circuit** [1] - 15:16
**circumstances** [2] - 16:13, 66:7
**City** [4] - 162:12, 162:16, 162:23, 163:2
**Civil** [1] - 1:15
**clarifications** [2] - 25:17, 26:4
**clarifying** [1] - 130:10
**class** [2] - 126:12, 126:16
**classes** [8] - 20:8, 126:7, 126:8, 126:11, 128:3,

128:17, 128:18, 128:24
**classify** [1] - 134:9
**clear** [8] - 5:17, 7:6, 7:7, 15:17, 81:14, 82:12, 97:1, 132:7
**clearer** [1] - 25:18
**clicks** [1] - 72:5
**client** [3] - 14:18, 15:12, 15:19
**clients** [3] - 8:19, 36:1, 36:11
**close** [2] - 57:4, 57:10
**closed** [6] - 80:13, 81:6, 81:7, 81:17, 157:5, 166:21
**closing** [1] - 62:5
**closure** [1] - 57:15
**co** [5] - 58:9, 93:10, 94:3, 94:5, 94:8
**co-worker** [2] - 94:3, 94:8
**co-workers** [2] - 93:10, 94:5
**co-working** [1] - 58:9
**code** [2] - 161:4, 161:6
**collaborative** [2] - 64:6, 64:18
**collateral** [1] - 74:7
**collection** [1] - 45:13
**color** [3] - 79:19, 79:20, 80:2
**column** [3] - 112:3, 121:10, 121:12
**combined** [1] - 27:6
**comfort** [2] - 129:5, 147:17
**comfortable** [7] - 58:22, 63:1, 67:18, 93:4, 138:11, 139:10, 143:23
**coming** [3] - 76:13, 133:11, 133:23
**comma** [2] - 112:7, 112:8
**command** [2] - 68:12, 69:22
**COMMENCING** [1] - 5:1
**comment** [1] - 144:7
**comments** [5] - 101:9, 101:12, 101:16, 101:24, 116:16
**commercial** [4] - 23:14, 23:22, 27:10, 28:12
**Commercial** [4] - 24:8, 38:25, 39:10, 39:15
**commissioned** [2] - 63:18, 73:19
**common** [6] - 52:23, 86:3, 132:17, 132:22, 133:22, 134:5
**commonly** [1] - 17:15
**COMMONWEALTH** [2] - 172:2, 173:1
**Commonwealth** [2] - 1:17, 172:5
**communicate** [1] - 162:6
**communicated** [2] - 68:3,

118:14
**communication** [4] - 68:10, 77:15, 88:7, 95:17
**Company** [1] - 1:18
**comparison** [1] - 159:7
**Compass** [11] - 99:24, 100:2, 103:5, 103:15, 104:5, 104:12, 104:17, 105:20, 105:23, 105:25, 168:22
**compensated** [1] - 57:15
**compensation** [1] - 57:22
**competency** [13] - 52:18, 53:6, 54:7, 73:20, 87:18, 87:21, 89:3, 89:4, 90:2, 92:7, 119:15, 119:19, 133:6
**competent** [1] - 154:18
**compile** [1] - 25:5
**complaints** [2] - 79:3, 79:8
**complete** [5] - 57:19, 63:16, 76:22, 154:23, 168:3
**completed** [14] - 14:14, 74:3, 81:11, 81:20, 88:20, 106:24, 146:16, 148:12, 153:19, 167:22, 168:8, 168:13, 169:25
**completeness** [1] - 159:21
**completion** [1] - 105:15
**compliance** [2] - 143:12, 156:13
**compliant** [2] - 71:6, 94:17
**complicated** [1] - 26:15
**complied** [1] - 45:19
**comply** [3] - 39:15, 39:25, 161:23
**complying** [2] - 41:25, 56:24
**components** [2] - 122:2, 122:11
**composed** [1] - 86:4
**comps** [1] - 73:24
**concepts** [1] - 44:12
**concern** [1] - 152:24
**concerned** [1] - 160:25
**concerns** [5] - 152:19, 155:3, 160:9, 160:13, 161:12
**conclude** [1] - 74:2
**concluded** [2] - 44:17, 47:24
**CONCLUDED** [1] - 171:23
**conclusion** [6] - 56:23, 58:19, 70:22, 140:2, 143:9, 170:5
**conclusions** [1] - 159:9
**conduct** [3] - 153:24, 161:4, 161:6
**Conference** [1] - 1:19
**conference** [1] - 130:20
**conferences** [2] - 128:21, 128:22

**conform** [3] - 34:22, 35:2, 35:7
**conformance** [1] - 28:9
**conforms** [1] - 26:19
**confused** [2] - 48:21, 150:6
**confusion** [2] - 54:14, 150:7
**connected** [2] - 45:22, 103:15
**Connie** [1] - 171:18
**consensus** [5] - 62:17, 62:20, 64:14, 70:4, 70:18
**consider** [1] - 163:21
**considerable** [1] - 163:20
**considered** [2] - 49:13, 57:23
**consistency** [2] - 137:5, 163:7
**consistent** [5] - 85:16, 121:25, 122:2, 122:7, 122:10
**consists** [1] - 31:4
**consolidated** [1] - 22:18
**consolidation** [1] - 70:17
**Constance** [1] - 1:18
**constant** [1] - 88:7
**constitutes** [1] - 172:9
**consult** [2] - 69:23, 78:23
**contact** [6] - 78:7, 109:8, 116:1, 116:2, 118:21, 171:18
**contacted** [1] - 109:7
**contain** [1] - 44:16
**contained** [5] - 71:21, 71:23, 72:7, 145:17, 157:4
**contains** [1] - 71:5
**Content** [1] - 44:15
**content** [4] - 16:4, 24:21, 45:4, 138:7
**contents** [4] - 13:9, 15:7, 43:10, 43:11
**context** [4] - 81:25, 92:24, 95:22, 107:13
**continual** [1] - 101:15
**continue** [4] - 12:9, 28:11, 109:7, 128:10
**continuing** [8] - 20:11, 20:15, 21:14, 126:5, 126:12, 128:23, 132:18, 133:24
**contracted** [1] - 148:6
**contractor** [1] - 16:18
**contributor** [1] - 38:8
**contributors** [2] - 33:10, 33:14
**control** [3] - 54:8, 63:8, 102:5
**controls** [1] - 62:16
**conversation** [3] - 16:2,

95:12, 108:15
**conversations** [4] - 13:10, 16:1, 16:5, 134:8
**coordinate** [1] - 36:23
**coordinator** [4] - 59:8, 60:1, 72:16, 127:15
**Coordinator** [1] - 36:21
**coordinators** [5] - 36:22, 37:2, 37:7, 56:13, 61:6
**copied** [2] - 43:2
**copies** [2] - 7:25, 42:24
**copy** [4] - 7:22, 39:1, 42:20, 43:17
**correct** [148] - 6:10, 13:16, 13:24, 17:13, 18:14, 19:12, 27:21, 28:16, 29:11, 29:15, 29:16, 29:24, 30:15, 30:16, 32:23, 33:18, 33:20, 33:24, 35:3, 35:10, 35:14, 35:15, 38:4, 43:1, 43:11, 44:2, 46:6, 47:11, 47:19, 48:13, 49:3, 49:4, 49:24, 50:16, 51:10, 51:18, 52:16, 54:20, 54:21, 59:19, 60:4, 60:7, 61:24, 61:25, 64:5, 70:13, 70:14, 70:15, 73:11, 76:15, 81:16, 81:22, 81:23, 83:6, 83:10, 86:2, 86:6, 86:14, 86:17, 86:22, 86:23, 89:21, 91:7, 91:8, 93:25, 97:16, 103:8, 103:18, 107:17, 107:18, 108:23, 109:1, 109:2, 110:2, 110:3, 111:19, 111:20, 112:15, 114:12, 114:13, 115:20, 117:23, 118:4, 118:15, 120:21, 120:22, 121:7, 121:8, 121:13, 121:14, 121:16, 122:22, 122:23, 122:25, 123:4, 123:11, 123:12, 123:18, 123:21, 124:13, 124:15, 129:16, 129:25, 130:3, 130:4, 130:18, 130:19, 131:13, 131:14, 132:25, 135:13, 138:14, 138:21, 139:15, 139:22, 140:18, 141:17, 141:24, 146:2, 147:7, 147:21, 149:12, 149:14, 149:17, 151:8, 151:11, 152:24, 158:4, 158:7, 159:19, 162:9, 162:10, 162:13, 162:21, 164:3, 164:18, 164:19, 164:24, 164:25, 167:6, 167:7, 167:9, 167:15, 167:23, 167:24, 169:23, 170:18, 173:19
**correctly** [9] - 26:22, 27:12,

34:24, 39:5, 45:16, 95:6, 100:25, 148:2, 155:7
**council** [1] - 16:16
**counsel** [3] - 172:11, 172:12, 172:15
**country** [2] - 73:16, 130:18
**COUNTY** [2] - 172:3, 173:2
**couple** [1] - 119:14
**course** [5] - 68:14, 72:18, 105:5, 136:19, 153:17
**courses** [1] - 21:13
**COURT** [8] - 1:1, 7:12, 34:9, 97:2, 138:18, 159:17, 171:10, 171:14
**Court** [1] - 1:18
**covered** [4] - 28:2, 28:15, 92:5, 147:18
**Coyle** [1] - 30:13
**create** [1] - 104:23
**created** [6] - 80:18, 111:6, 130:6, 130:8, 146:21
**credentialing** [1] - 20:9
**credibility** [6] - 138:8, 138:14, 138:20, 140:7, 155:9, 160:1
**credible** [23] - 56:25, 65:3, 65:7, 74:6, 96:4, 138:15, 138:24, 139:1, 139:3, 139:6, 139:8, 139:12, 139:14, 139:22, 140:4, 140:15, 140:18, 140:22, 141:2, 141:9, 148:7, 156:19, 157:21
**credit** [7] - 17:23, 18:1, 18:4, 18:6, 65:9, 109:21, 109:23
**credits** [1] - 90:13
**criteria** [29] - 87:25, 94:12, 113:11, 114:23, 114:24, 114:25, 115:1, 115:3, 115:6, 117:12, 117:18, 118:1, 118:3, 118:14, 118:25, 120:10, 120:13, 120:20, 120:24, 121:1, 121:5, 121:6, 122:4, 122:7, 123:3, 137:2, 137:3, 164:18
**critical** [1] - 159:2
**critique** [7] - 57:7, 136:22, 137:7, 137:23, 137:24, 143:15, 156:15
**critiquing** [2] - 64:19, 138:1
**CRR** [1] - 173:19
**current** [7] - 5:9, 16:24, 25:3, 25:10, 25:12, 26:2, 33:6
**Current** [1] - 32:2
**custodian** [1] - 12:19
**customer** [9] - 92:20, 92:23, 93:9, 93:12, 93:15, 93:22, 93:24, 120:17, 123:17

customer 's [1] - 93:21
cut [3] - 42:21, 43:14, 55:13
cycle [2] - 126:19, 127:3

**D**

D-U-T-C-H [1] - 7:12
daily [1] - 95:4
Date [1] - 107:22
date [16] - 41:2, 82:7, 101:18, 102:25, 107:24, 111:25, 112:19, 112:22, 114:14, 115:11, 163:10, 163:13, 164:6, 167:12, 167:21, 169:3
dated [1] - 111:20
dates [4] - 22:20, 112:22, 116:11, 134:23
Dawson [1] - 165:14
days [2] - 93:20
deal [4] - 52:6, 76:15, 136:11, 136:14
dealing [2] - 69:2, 139:24
dealt [2] - 16:17, 78:6
December [4] - 1:19, 29:19, 168:9, 172:18
decided [2] - 79:9, 91:11
decision [2] - 66:11, 109:11
decrease [1] - 163:24
deeper [2] - 151:25, 153:9
default [1] - 78:3
Defendant [2] - 1:10, 2:10
DEFENDANT [1] - 1:14
deficiency [2] - 63:4, 132:25
definition [1] - 36:3
definitively [1] - 98:17
deliver [1] - 156:18
delivered [2] - 146:17, 156:10
delivering [1] - 156:16
demonstrate [1] - 88:10
demonstrates [1] - 14:4
Demonstration [1] - 93:8
demonstration [1] - 93:14
department [6] - 162:18, 162:24, 165:10, 166:2, 166:16, 169:7
departments [1] - 160:8
depended [1] - 135:8
deponent [1] - 9:18
deposed [2] - 16:8, 16:10
Deposition [15] - 7:16, 8:23, 13:14, 14:1, 14:16, 15:23, 24:4, 28:23, 42:11, 79:23, 84:17, 99:12, 102:14, 129:11, 131:1
deposition [14] - 6:11, 6:24, 9:7, 13:8, 15:13, 16:6,

17:16, 80:16, 106:5, 172:7, 172:8, 172:9, 172:14, 173:3
DEPOSITION [1] - 1:14
depositions [2] - 5:13, 16:14
depth [2] - 43:14, 152:7
describe [4] - 30:7, 62:20, 109:3, 166:23
described [3] - 14:10, 71:8, 78:18
describing [4] - 27:1, 48:21, 48:25, 61:10
description [8] - 12:25, 23:18, 82:14, 86:16, 95:3, 136:16, 138:5, 159:5
design [1] - 155:1
designated [6] - 19:23, 20:12, 20:20, 20:21, 71:13, 80:13
designation [11] - 9:18, 19:14, 19:17, 19:19, 19:22, 19:25, 20:3, 20:6, 20:16, 21:6, 127:6
designed [2] - 34:22, 154:24
desk [1] - 73:23
despite [1] - 76:24
detail [3] - 24:16, 44:17, 153:3
detailed [3] - 41:18, 41:23
details [1] - 16:17
determine [7] - 88:2, 89:4, 92:7, 117:11, 121:2, 139:21, 139:23
determined [1] - 121:23
determining [2] - 89:23, 91:6
develop [3] - 85:15, 85:16, 120:23
developed [4] - 24:23, 40:20, 118:15, 120:3
developer [1] - 52:24
development [2] - 20:4, 128:19
Diane [3] - 103:7, 103:11, 103:16
dictate [2] - 68:10, 70:22
difference [7] - 33:23, 38:11, 64:12, 81:12, 82:2, 82:14, 83:5
differences [1] - 38:13
different [21] - 9:21, 9:24, 19:22, 35:17, 49:15, 64:11, 65:4, 67:3, 74:2, 91:24, 120:20, 122:1, 127:22, 127:23, 130:17, 136:17, 138:22, 149:15, 149:21, 163:8
difficult [8] - 86:13, 100:9, 114:8, 114:10, 119:6, 120:15, 124:1, 124:12

dig [2] - 151:25, 153:9
diligence [1] - 155:5
diligent [1] - 94:19
direct [12] - 30:13, 45:14, 46:23, 86:1, 86:3, 96:15, 96:19, 136:19, 161:25, 165:25, 166:5, 166:19
direction [3] - 36:24, 77:10, 172:7
directly [6] - 30:8, 37:8, 121:9, 122:21, 133:4, 172:12
Directors [1] - 40:24
disability [1] - 12:22
disagreement [5] - 64:8, 65:11, 67:2, 68:2, 76:25
disagreements [2] - 69:20, 75:10
disagrees [2] - 63:24, 66:11
disciplined [1] - 79:13
discourse [2] - 67:6, 76:5
discovery [1] - 15:15
discrepancy [1] - 68:17
discuss [5] - 10:21, 10:22, 109:9, 133:24, 160:2
discussed [8] - 8:16, 14:21, 15:3, 15:6, 53:9, 75:12, 106:5, 163:9
Discussed [1] - 101:13
discussing [3] - 76:23, 81:12, 169:10
discussion [12] - 34:12, 58:5, 63:5, 63:11, 64:12, 69:12, 70:17, 80:5, 99:15, 125:22, 132:11, 149:9
Discussion [1] - 132:4
discussions [7] - 15:8, 64:3, 134:7, 163:13, 163:16, 163:17, 165:1
dishonest [1] - 156:6
dismissal [1] - 107:2
displaced [3] - 112:12, 112:15, 125:20
displacement [1] - 125:4
Displacement [1] - 111:18
displacements [1] - 109:12
distinguish [1] - 19:22
distribute [3] - 41:9, 41:11, 42:9
DISTRICT [2] - 1:1, 1:1
divided [2] - 30:22, 30:24
DIVISION [1] - 1:2
Document [6] - 31:22, 107:9, 107:17, 111:11, 163:12, 170:12
document [57] - 8:11, 8:15, 8:21, 13:11, 13:12, 15:19, 24:11, 24:19, 24:24, 25:6,

25:18, 27:18, 29:2, 29:4, 29:6, 31:21, 38:16, 39:13, 39:25, 40:7, 40:11, 42:23, 50:19, 60:9, 62:25, 63:9, 64:23, 71:13, 72:8, 79:16, 80:9, 80:11, 80:12, 80:14, 80:15, 80:18, 83:4, 84:20, 99:19, 100:14, 100:16, 102:17, 107:12, 111:6, 111:10, 111:12, 119:5, 124:22, 130:5, 136:9, 137:4, 138:8, 138:14, 143:12, 148:2, 159:21, 163:22
documentation [3] - 29:7, 63:21, 145:21
documented [2] - 65:6, 147:15
documents [12] - 14:1, 15:6, 15:10, 15:15, 15:18, 15:24, 85:5, 115:12, 115:16, 146:25, 147:4, 148:12
done [26] - 12:3, 12:10, 23:3, 28:8, 63:23, 67:19, 73:16, 78:1, 86:8, 93:19, 93:20, 94:22, 94:23, 106:17, 114:19, 122:1, 122:3, 122:9, 130:20, 132:14, 142:20, 148:15, 151:20, 156:12, 157:8
Doug [16] - 33:13, 85:24, 98:12, 98:14, 101:22, 102:7, 131:15, 132:6, 132:8, 132:9, 132:10, 132:17, 133:10, 149:23, 151:7, 151:13
Douglas [2] - 33:16, 96:9
down [9] - 63:8, 83:4, 101:2, 101:8, 113:18, 113:21, 167:8, 167:9, 167:25
drafting [1] - 42:5
Drive [1] - 2:13
driving [2] - 49:22, 151:3
drop [2] - 58:15, 167:8
dropped [2] - 167:14, 167:20
dubbed [1] - 130:15
due [1] - 155:4
duly [2] - 5:3, 172:6
dumb [1] - 18:21
duration [1] - 91:20
during [7] - 72:18, 126:17, 126:18, 136:10, 136:18, 142:19, 143:16
Dutch [15] - 7:10, 7:13, 8:3, 8:8, 24:1, 28:18, 34:6, 42:8, 43:18, 79:18, 84:14, 99:9, 102:8, 129:1, 130:23
DUTCH [1] - 7:11
Dutcheen [3] - 1:16, 172:4,

173:19

**duties** [12] - 20:19, 134:17, 134:18, 135:10, 135:14, 137:14, 137:25, 138:13, 138:19, 141:13, 141:14, 141:22

**duty** [13] - 59:23, 136:4, 136:25, 138:25, 139:2, 139:13, 139:20, 140:3, 141:25, 142:1, 154:21, 154:22

## E

**e-mailed** [1] - 117:8
**e-mails** [1] - 12:25
**E-tran** [1] - 171:13
**early** [2] - 23:2, 163:5
**easier** [1] - 32:15
**EASTERN** [2] - 1:1, 1:2
**education** [9] - 20:15, 21:14, 126:6, 126:12, 128:3, 128:11, 128:23, 132:19, 133:24
**educational** [1] - 20:7
**effect** [2] - 94:21, 137:16
**efficiency** [1] - 90:14
**efficient** [1] - 76:18
**efficiently** [1] - 73:1
**effort** [1] - 127:23
**efforts** [2] - 76:24, 133:5
**eight** [4] - 74:24, 74:25, 113:17, 113:24
**either** [9] - 66:1, 66:9, 97:9, 97:13, 97:14, 110:12, 110:23, 125:13, 143:7
**electronic** [1] - 71:13
**electronically** [1] - 71:4
**element** [1] - 53:5
**elements** [2] - 120:16, 137:21
**eliminate** [1] - 76:19
**eliminated** [5] - 123:1, 164:14, 165:20, 168:19, 169:7
**embedded** [1] - 140:5
**employed** [1] - 142:19
**employee** [17] - 41:14, 58:24, 59:18, 68:18, 86:4, 95:5, 96:6, 103:22, 103:25, 105:7, 105:22, 112:3, 161:13, 162:5, 168:18, 172:11, 172:12
**Employee** [1] - 100:23
**employees** [23] - 41:10, 51:9, 51:17, 51:21, 52:7, 52:9, 53:23, 53:25, 54:15, 59:23, 68:13, 79:12, 84:12, 85:8,

85:11, 98:9, 104:24, 113:10, 118:4, 128:9, 128:21, 161:5, 163:2
**employees '** [1] - 98:7
**employment** [3] - 21:7, 68:14, 168:6
**enables** [1] - 39:25
**enabling** [1] - 159:10
**enacted** [1] - 25:16
**end** [31] - 31:7, 46:20, 47:8, 50:10, 59:1, 59:10, 59:14, 62:22, 65:5, 66:19, 71:3, 72:1, 72:18, 76:6, 76:12, 76:16, 76:20, 77:1, 91:25, 102:20, 105:16, 127:2, 143:7, 143:20, 145:9, 156:15, 168:7, 168:9, 168:13, 168:22, 169:22
**energies** [2] - 76:17
**engage** [1] - 95:12
**engagement** [1] - 95:5
**enlarged** [2] - 110:10, 114:9
**ensure** [15] - 46:11, 46:17, 46:18, 47:9, 53:12, 54:23, 67:13, 126:24, 133:6, 140:3, 140:21, 141:9, 142:12, 144:20, 145:2
**ensured** [1] - 45:18
**entail** [1] - 18:24
**entire** [5] - 42:24, 70:9, 127:11, 130:14, 159:1
**entity** [1] - 9:2
**entry** [1] - 43:12
**environment** [1] - 95:4
**equally** [1] - 44:6
**ERRATA** [1] - 173:1
**Errata** [1] - 173:20
**erroneous** [1] - 162:7
**escalated** [2] - 79:9, 147:3
**especially** [1] - 5:15
**Esquire** [2] - 2:4, 2:12
**established** [3] - 26:19, 34:21, 121:4
**establishing** [1] - 138:15
**Estate** [9] - 24:8, 36:17, 38:1, 38:25, 39:1, 39:9, 39:15, 40:4, 81:4
**estate** [32] - 17:2, 17:9, 17:11, 18:18, 24:7, 32:1, 36:14, 39:19, 40:10, 45:20, 45:24, 48:16, 51:4, 51:5, 54:6, 55:24, 83:2, 118:1, 126:16, 127:22, 127:25, 134:20, 135:11, 136:5, 136:7, 137:1, 139:8, 141:15, 143:4, 162:17, 162:23, 163:23
**estimate** [2] - 44:18, 144:9
**et** [3] - 93:10, 128:3, 128:12

**ethical** [9] - 77:11, 77:13, 77:18, 77:20, 78:12, 79:2, 79:8, 79:13, 161:1
**evaluate** [2] - 142:20, 145:2
**evaluated** [4] - 85:8, 85:11, 94:11, 163:19
**evaluating** [2] - 84:12, 85:23
**Evaluation** [5] - 26:12, 39:3, 42:3, 43:9, 44:15
**evaluation** [40] - 17:11, 24:8, 28:5, 28:7, 28:9, 32:1, 36:15, 40:14, 44:15, 44:19, 45:1, 45:6, 45:8, 45:21, 48:16, 54:6, 81:19, 82:22, 85:1, 85:4, 92:19, 92:24, 95:23, 96:10, 97:5, 97:24, 97:25, 98:11, 98:15, 98:19, 99:4, 100:9, 102:10, 102:22, 106:17, 118:2, 142:17, 151:8, 162:17
**evaluations** [6] - 45:11, 45:24, 96:6, 98:7, 104:23, 122:8
**evaluator** [4] - 51:12, 51:15, 51:16, 51:20
**evaluators** [1] - 52:3
**eventually** [1] - 156:4
**exactly** [4] - 22:11, 22:17, 23:5, 98:2
**examination** [2] - 26:2, 161:25
**EXAMINATION** [6] - 3:6, 3:8, 3:10, 5:5, 157:14, 169:16
**EXAMINATIONS** [1] - 3:4
**examined** [1] - 5:4
**examiners** [1] - 26:5
**example** [11] - 26:16, 28:1, 43:8, 45:7, 68:15, 90:8, 90:17, 90:23, 91:1, 92:13, 133:5
**exceed** [2] - 93:8, 93:15
**exceeded** [1] - 93:21
**except** [1] - 112:22
**exception** [3] - 13:5, 14:20, 89:25
**exceptional** [1] - 93:15
**excess** [1] - 22:24
**exchange** [1] - 118:19
**excuse** [1] - 164:23
**executive** [4] - 17:23, 18:1, 18:7, 109:21
**exhibit** [3] - 7:20, 14:2, 102:25
**Exhibit** [34] - 4:2, 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 7:14, 7:16, 24:4, 28:23, 34:5, 34:16, 41:20, 42:11, 79:23, 84:17, 99:12, 102:11, 102:14, 107:10,

129:1, 129:11, 129:14, 130:24, 131:1, 163:11, 166:20, 168:21, 168:23, 169:19
**exhibits** [2] - 28:20, 171:14
**exists** [2] - 29:24, 64:16
**expect** [2] - 94:19, 158:25
**expectation** [7] - 67:11, 76:2, 88:9, 88:23, 93:16, 93:21, 109:6
**expectations** [3] - 93:11, 101:6, 101:25
**expected** [1] - 86:20
**experience** [2] - 89:14, 90:5
**experienced** [1] - 163:23
**expertise** [2] - 67:16, 90:22
**expiration** [2] - 134:23, 135:8
**explain** [7] - 19:18, 81:6, 90:20, 92:23, 150:14, 153:16, 159:1
**explicitly** [1] - 10:12
**exposure** [1] - 142:2
**express** [1] - 161:11
**expressed** [1] - 65:6
**extensive** [1] - 157:22
**extent** [15] - 97:14, 117:15, 125:11, 125:17, 128:14, 133:17, 142:5, 150:18, 151:18, 152:15, 154:4, 154:13, 155:13, 156:2, 158:11
**eye** [1] - 119:13

## F

**facilitator** [1] - 131:12
**fact** [1] - 166:1
**factor** [1] - 87:22
**factors** [2] - 143:13, 153:5
**fair** [3] - 7:4, 130:1, 167:19
**fall** [4] - 32:25, 107:7, 163:20, 167:1
**fall-off** [2] - 107:7, 163:20
**falling** [1] - 109:6
**Fallon** [1] - 109:20
**familiar** [2] - 19:13, 83:16
**far** [1] - 112:9
**fashion** [2] - 93:6, 159:13
**federal** [6] - 26:20, 26:25, 34:23, 35:3, 35:8, 43:25
**Federal** [2] - 27:4, 45:10
**feelings** [1] - 50:16
**fees** [1] - 86:20
**felt** [2] - 122:10, 126:13
**Ferianc** [4] - 103:7, 104:23, 105:10, 106:18
**FERIANC** [1] - 103:8

few [2] - 14:3, 22:11
field [8] - 73:18, 73:20, 74:3, 74:4, 74:9, 77:2, 77:3, 77:7
files [3] - 12:18, 80:13, 81:17
fill [3] - 119:20, 155:24, 170:17
filled [6] - 100:13, 152:2, 153:6, 165:21, 169:9, 170:10
filled-out [1] - 169:9
filling [1] - 155:21
fills [1] - 155:7
Finance [3] - 38:25, 39:9, 39:15
financial [2] - 44:7, 45:14
FINANCIAL [2] - 1:8, 1:14
financially [1] - 172:12
fine [5] - 5:23, 6:21, 10:15, 11:3, 148:23
finish [8] - 6:22, 7:2, 36:7, 96:25, 97:2, 99:2, 117:21, 145:11
finished [2] - 12:13, 12:14
firm [1] - 23:19
Firm [1] - 2:3
FIRREA [4] - 25:15, 39:2, 52:17, 156:13
first [28] - 5:3, 5:10, 8:22, 19:5, 22:11, 23:16, 24:22, 26:16, 26:18, 32:5, 33:8, 33:9, 38:22, 42:1, 43:18, 45:20, 48:25, 68:15, 69:23, 73:18, 74:9, 107:15, 107:22, 121:6, 126:4, 126:22, 132:3, 172:6
firsthand [2] - 48:1, 136:12
fits [1] - 74:5
five [10] - 23:7, 23:9, 33:9, 55:5, 74:16, 101:2, 124:2, 124:16, 124:17, 129:5
five-minute [1] - 55:5
flawed [1] - 67:13
flip [4] - 24:16, 31:20, 32:13, 112:20
Floor [1] - 1:18
flow [1] - 95:17
focus [2] - 127:12, 142:18
folks [12] - 31:4, 50:1, 56:22, 64:4, 91:21, 93:4, 126:24, 127:19, 127:24, 135:19, 151:23, 166:9
follow [6] - 11:4, 68:19, 100:9, 101:12, 154:9, 157:11
follow-up [2] - 11:4, 157:11
following [3] - 54:22, 171:19, 173:3
follows [2] - 5:4, 82:23
FOR [2] - 1:1, 173:4

forces [10] - 56:21, 57:1, 57:2, 57:8, 57:23, 58:11, 61:9, 61:12, 61:25
foregoing [3] - 172:7, 172:9, 173:18
forgot [1] - 23:13
form [152] - 9:7, 9:8, 10:1, 10:18, 21:10, 24:25, 35:4, 39:22, 40:8, 41:16, 41:21, 44:8, 44:21, 46:7, 47:20, 49:18, 50:6, 50:18, 51:22, 52:10, 53:14, 54:2, 56:3, 56:11, 56:19, 57:24, 58:13, 59:25, 60:8, 60:23, 62:10, 63:25, 65:22, 66:14, 68:20, 69:25, 71:2, 75:11, 75:17, 75:23, 77:5, 78:15, 79:4, 82:21, 85:12, 89:6, 91:14, 94:1, 94:14, 98:16, 98:20, 99:6, 102:2, 102:4, 102:5, 103:23, 104:7, 104:13, 104:19, 104:25, 105:11, 105:18, 106:2, 106:19, 107:4, 107:25, 109:13, 110:18, 111:16, 111:23, 112:16, 112:25, 113:7, 114:21, 115:9, 115:18, 116:8, 116:22, 117:4, 117:9, 117:14, 119:2, 120:7, 121:21, 123:8, 123:15, 123:22, 124:23, 125:9, 125:15, 128:4, 128:13, 131:19, 132:20, 133:7, 133:16, 134:1, 134:11, 136:9, 137:5, 137:9, 137:15, 138:2, 139:16, 140:10, 140:23, 141:10, 142:4, 142:22, 143:6, 143:12, 143:17, 144:5, 144:11, 144:17, 145:15, 145:16, 145:24, 146:3, 146:12, 147:13, 147:22, 148:2, 148:12, 149:18, 150:17, 150:18, 151:9, 151:17, 151:25, 152:13, 153:2, 153:7, 153:14, 153:19, 154:2, 154:10, 154:23, 155:7, 155:11, 155:21, 155:24, 155:25, 156:22, 157:2, 158:22, 158:23, 159:1, 159:2, 170:4, 170:19
Form [1] - 113:15
form's [3] - 86:10, 148:13, 152:2
formal [1] - 162:18
format [4] - 22:6, 45:3, 76:11, 82:22
formats [1] - 65:4

former [1] - 106:17
forms [1] - 113:3
forth [9] - 13:1, 27:8, 27:17, 28:10, 63:12, 66:3, 66:18, 67:21, 75:5
fortieth [1] - 61:18
forward [6] - 9:20, 66:25, 70:3, 79:10, 125:4, 161:17
foundation [41] - 24:25, 41:16, 41:21, 44:8, 103:23, 104:7, 104:13, 104:19, 104:25, 105:11, 105:18, 106:2, 106:19, 110:18, 111:23, 112:16, 115:18, 115:24, 116:8, 117:14, 119:2, 123:8, 123:15, 125:9, 125:15, 128:13, 131:19, 132:20, 133:16, 134:1, 134:11, 142:4, 147:23, 151:17, 152:13, 154:2, 154:10, 155:11, 155:25, 156:22, 170:4
four [5] - 23:20, 33:17, 123:3, 123:7
fourth [1] - 31:23
frame [5] - 23:17, 74:15, 74:20, 108:18, 167:2
Fred [6] - 30:11, 30:14, 31:1, 32:5, 32:21, 37:24
free [2] - 95:17, 154:15
frequent [1] - 132:23
frequently [1] - 90:16
front [5] - 14:9, 31:21, 67:9, 76:20, 127:3
fulfill [1] - 126:11
full [3] - 6:15, 88:1, 102:10
full-year [1] - 102:10
fully [2] - 6:19, 53:11
function [9] - 47:13, 52:14, 53:4, 86:12, 134:21, 137:23, 141:18, 141:19, 149:22
funds [2] - 126:8, 127:6
FURTHER [2] - 3:10, 169:16
future [3] - 33:6, 33:7, 33:8

## G

gained [1] - 90:15
gamut [1] - 23:25
gap [1] - 88:22
gears [3] - 55:1, 55:4, 55:13
general [11] - 19:8, 41:6, 62:4, 64:13, 85:7, 85:11, 87:25, 95:21, 111:10, 129:18, 129:22
generalist [2] - 89:11, 90:16
generally [2] - 61:11, 87:24

generate [1] - 86:20
generated [1] - 98:5
generic [1] - 51:15
germane [1] - 47:3
given [11] - 50:1, 81:9, 81:17, 81:19, 83:24, 85:20, 95:25, 127:1, 134:24, 164:18, 172:9
goal [2] - 93:17, 95:19
goals [4] - 85:15, 85:16, 85:18, 85:19
graph [2] - 14:8, 14:16
great [3] - 67:13, 80:3, 157:19
greater [3] - 17:5, 22:19, 89:14
Green [4] - 112:7, 112:14, 122:22, 125:19
green [1] - 165:18
Greg [1] - 131:13
GROUP [2] - 1:9, 1:15
group [69] - 14:11, 17:2, 17:10, 17:18, 18:2, 18:3, 29:16, 29:24, 30:25, 31:1, 31:13, 35:18, 35:23, 36:2, 37:5, 41:12, 45:21, 46:4, 48:16, 48:17, 49:1, 49:11, 49:24, 53:24, 56:7, 56:16, 62:17, 65:7, 66:19, 67:22, 68:12, 68:13, 70:16, 74:13, 75:21, 76:9, 77:13, 82:15, 84:12, 85:8, 85:15, 90:19, 90:21, 95:9, 98:6, 103:17, 103:20, 107:6, 122:9, 126:1, 126:3, 127:11, 128:8, 130:12, 130:14, 131:9, 133:13, 134:6, 135:19, 149:17, 154:1, 157:1, 160:20, 160:24, 163:6, 163:10, 163:23, 164:24, 166:24
groups [5] - 32:25, 37:4, 49:1, 49:16, 73:15
grown [1] - 166:2
guard [1] - 156:5
guess [7] - 8:16, 14:10, 48:22, 97:10, 133:10, 134:7, 144:12
guidance [1] - 27:5
guidances [1] - 26:10
guideline [1] - 154:7
Guidelines [4] - 26:12, 39:4, 42:3, 43:9
guidelines [5] - 42:4, 42:15, 42:18, 77:6, 161:21
guys [1] - 83:22
guys' [2] - 55:9, 55:16

## H

**hand** [5] - 7:14, 8:2, 8:19, 88:11, 172:17
**handle** [2] - 89:2, 90:3
**handled** [3] - 93:5, 126:6, 164:15
**hands** [1] - 88:24
**handy** [1] - 168:23
**Hannon** [1] - 109:22
**head** [1] - 22:20
**head..** [1] - 156:23
**headed** [1] - 143:8
**hear** [5] - 5:10, 5:23, 73:3, 111:8, 146:6
**held** [6] - 34:12, 58:5, 80:5, 85:20, 99:15, 127:9
**help** [5] - 42:5, 70:6, 115:13, 126:13, 142:12
**helped** [3] - 53:12, 53:25, 54:23
**helpful** [2] - 49:15, 64:17
**hereby** [3] - 172:5, 173:3, 173:17
**herein** [1] - 172:10
**hereunto** [1] - 172:17
**herself** [1] - 78:13
**hesitation** [1] - 95:15
**hiccup** [1] - 54:16
**hierarchy** [1] - 17:22
**Higgins** [22] - 32:10, 32:11, 32:21, 33:2, 37:15, 87:11, 87:16, 87:23, 88:2, 89:4, 89:22, 92:6, 113:18, 115:1, 117:19, 118:6, 118:14, 118:25, 164:21, 165:2, 170:9, 170:16
**Higgins '** [3] - 87:12, 91:5, 114:3
**high** [11] - 12:17, 40:15, 41:23, 85:9, 96:14, 127:24, 147:17, 152:4, 159:11, 159:20, 161:4
**high-level** [1] - 40:15
**himself** [1] - 11:11
**hire** [2] - 56:7, 73:12
**hired** [1] - 52:24
**hitting** [1] - 73:23
**hold** [5] - 22:16, 58:2, 69:5, 126:17, 157:7
**holding** [1] - 161:4
**holds** [2] - 20:13, 21:8
**honest** [1] - 110:7
**honestly** [1] - 76:6
**hopefully** [1] - 64:6
**hoping** [1] - 110:12
**horizontally** [1] - 43:20
**hour** [1] - 129:4

**housing** [8] - 90:12, 90:18, 90:22, 91:2, 91:4, 91:7, 91:9, 91:19
**Houston** [1] - 165:12
**HR** [32] - 96:14, 96:16, 96:17, 96:22, 97:5, 97:11, 97:15, 97:17, 98:1, 104:10, 105:21, 105:24, 108:14, 108:15, 108:24, 109:8, 109:25, 115:21, 115:23, 116:12, 118:6, 118:8, 119:1, 119:25, 120:5, 149:21, 149:23, 164:18, 165:4, 165:5, 165:6
**human** [3] - 108:7, 108:11, 149:24
**hypothetical** [10] - 64:1, 66:15, 68:21, 79:5, 125:17, 134:12, 152:14, 154:4, 154:11, 155:12
**hypotheticals** [1] - 79:1

## I

**idea** [5] - 76:4, 151:1, 154:9, 156:14, 157:1
**identification** [10] - 7:17, 24:5, 28:24, 42:12, 79:24, 84:18, 99:13, 102:15, 129:12, 131:2
**identified** [3] - 12:18, 108:24, 155:18
**identify** [5] - 11:12, 48:2, 154:24, 155:2, 161:8
**IL** [1] - 2:15
**illness** [1] - 6:18
**imagine** [1] - 23:23
**Impact** [1] - 111:1
**impact** [2] - 47:22, 95:4
**implied** [2] - 143:10, 159:14
**implying** [1] - 142:24
**important** [8] - 5:15, 35:7, 52:9, 53:5, 70:10, 135:4, 153:4, 158:1
**improper** [1] - 154:4
**improve** [1] - 128:11
**IN** [2] - 1:1, 172:17
**in-depth** [1] - 152:7
**inaccuracies** [1] - 48:6
**inadequate** [1] - 156:11
**inaudible** [1] - 145:10
**INC** [2] - 1:9, 1:15
**include** [5] - 20:7, 30:10, 30:19, 120:17, 135:20
**included** [1] - 131:10
**includes** [4] - 49:2, 61:3, 61:5, 94:5
**including** [1] - 159:16

**incomplete** [10] - 63:25, 66:14, 68:20, 78:4, 79:4, 125:16, 134:12, 152:14, 154:11, 155:12
**incorrect** [2] - 72:4, 161:9
**increases** [1] - 164:1
**incumbent** [1] - 72:25
**Independence** [2] - 45:9, 50:12
**independence** [25] - 45:19, 46:14, 46:17, 46:19, 47:2, 47:10, 47:12, 48:11, 50:13, 50:24, 52:18, 52:20, 53:3, 53:5, 53:13, 54:24, 55:25, 56:1, 60:17, 60:21, 60:22, 61:6, 61:14, 61:24, 128:2
**independent** [22] - 45:12, 45:21, 45:25, 46:4, 46:20, 46:23, 49:1, 49:11, 49:13, 50:23, 52:4, 54:1, 56:6, 56:10, 56:18, 59:13, 59:24, 60:3, 60:7, 61:1, 62:9, 94:13
**independently** [1] - 46:16
**indicate** [3] - 5:18, 22:2, 92:11
**indicated** [3] - 41:24, 147:12, 159:9
**indicates** [5] - 8:15, 85:24, 105:21, 123:5, 162:4
**indication** [1] - 154:16
**indirect** [1] - 45:14
**indirectly** [1] - 172:13
**individual** [40] - 18:5, 20:20, 21:1, 21:5, 30:8, 37:19, 49:14, 58:18, 59:19, 62:14, 64:19, 64:20, 65:1, 67:9, 69:3, 69:9, 69:22, 69:24, 70:21, 72:3, 76:2, 78:9, 87:2, 87:8, 87:20, 94:11, 100:16, 109:25, 110:1, 118:3, 118:4, 128:1, 128:9, 129:19, 131:24, 149:15, 153:12, 170:10
**individual 's** [2] - 88:3, 95:9
**individually** [3] - 10:24, 63:12, 100:20
**individuals** [24] - 30:8, 33:17, 35:17, 35:23, 37:6, 37:18, 37:20, 37:23, 51:6, 57:21, 58:20, 59:4, 64:4, 68:9, 86:25, 93:25, 94:3, 94:6, 112:11, 122:24, 125:5, 128:15, 162:22, 164:13
**influence** [13] - 25:4, 25:11, 25:13, 46:1, 46:21, 46:24, 47:5, 47:18, 52:4, 56:8, 57:6, 58:12, 62:14

**influenced** [4] - 46:13, 50:15, 56:21, 62:17
**influences** [5] - 56:7, 61:7, 61:8, 61:13, 61:23
**information** [11] - 25:5, 44:16, 47:3, 82:4, 88:21, 118:6, 127:16, 135:2, 136:12, 163:5, 170:17
**initial** [2] - 65:12, 68:3
**initiate** [1] - 108:15
**initiative** [1] - 128:10
**input** [1] - 73:21
**inputs** [1] - 102:5
**inside** [1] - 58:11
**insight** [1] - 136:11
**inspection** [1] - 172:14
**instance** [6] - 48:2, 75:16, 85:17, 88:19, 136:13, 159:7
**instances** [4] - 28:3, 47:25, 74:10, 76:23
**Institute** [6] - 19:21, 19:24, 21:15, 21:19, 128:25, 132:12
**institution** [1] - 44:4
**institutions** [2] - 44:7, 44:13
**instructed** [1] - 152:10
**insulated** [1] - 56:8
**insulation** [1] - 47:5
**integrity** [1] - 63:13
**intended** [2] - 42:22, 127:14
**interact** [2] - 47:2, 93:4
**interacting** [1] - 94:18
**interaction** [5] - 47:16, 47:25, 95:9, 105:10, 136:20
**interactions** [1] - 47:18
**Interagency** [4] - 26:11, 39:3, 42:2, 43:9
**interagency** [2] - 27:4, 42:15
**interchangeable** [1] - 85:5
**interest** [9] - 45:14, 56:22, 56:24, 57:6, 57:10, 58:1, 62:5, 64:5
**interested** [1] - 172:12
**interesting** [2] - 91:18, 126:13
**interface** [1] - 118:23
**intermediary** [1] - 165:5
**internal** [4] - 54:11, 59:11, 62:7, 161:20
**interpretation** [3] - 25:23, 25:24, 26:9
**interpretations** [2] - 25:15, 26:1
**interrupt** [2] - 55:3, 129:4
**intranet** [1] - 41:14
**invades** [2] - 14:18, 15:12

**investigated** [2] - 161:12, 161:18
**invoice** [1] - 171:19
**involved** [15] - 67:22, 68:6, 68:9, 91:25, 108:14, 111:2, 118:18, 125:5, 148:5, 149:14, 163:1, 164:8, 164:12, 164:21, 165:2
**involves** [1] - 48:25
**irregularities** [1] - 148:16
**isolation** [1] - 68:8
**issue** [11] - 6:25, 48:9, 67:20, 70:5, 76:3, 78:4, 78:25, 153:5, 153:20, 159:24, 160:1
**issued** [1] - 151:7
**issues** [9] - 68:13, 70:7, 70:16, 72:24, 136:15, 136:22, 153:8, 156:15, 161:8
**item** [1] - 21:15
**items** [3] - 100:2, 137:13, 137:20
**itself** [6] - 40:22, 52:15, 53:4, 56:6, 72:2, 152:19

## J

**January** [1] - 74:22
**Jase** [25] - 2:4, 5:7, 10:7, 12:16, 30:24, 55:4, 58:3, 61:21, 66:20, 71:24, 75:6, 75:19, 77:21, 83:14, 89:25, 108:22, 115:11, 116:10, 128:5, 135:23, 140:13, 144:22, 146:24, 157:12, 171:7
**jase @carterfirm .law** [1] - 2:8
**Jeff** [22] - 30:10, 30:14, 30:17, 30:19, 31:2, 36:19, 37:23, 38:2, 80:19, 80:20, 80:22, 108:9, 108:23, 109:4, 114:24, 117:12, 117:18, 117:25, 118:8, 120:23, 125:21, 164:17
**Jefferson** [1] - 2:5
**Jeffrey** [1] - 32:21
**jeopardize** [1] - 156:18
**Jim** [1] - 165:14
**Joanna** [12] - 108:13, 108:24, 110:1, 115:25, 116:2, 116:15, 116:19, 117:4, 118:9, 118:13, 118:21, 120:4
**job** [9] - 7:5, 22:5, 92:17, 95:14, 139:9, 145:18, 154:21, 154:22
**jobs** [1] - 122:2

**Joe** [27] - 84:25, 85:23, 98:10, 99:23, 102:21, 107:3, 112:14, 122:20, 122:24, 123:3, 123:6, 123:10, 123:13, 123:18, 123:20, 124:3, 124:6, 124:9, 124:18, 125:7, 125:14, 125:19, 132:4, 132:6, 134:17, 148:21, 170:3
**Joe's** [4] - 98:15, 134:18, 149:24, 151:16
**Joseph** [11] - 2:19, 5:8, 6:7, 38:6, 112:8, 117:11, 122:20, 142:19, 151:6, 151:7, 169:22
**JOSEPH** [1] - 1:5
**July** [1] - 101:14
**jump** [1] - 157:17
**June** [2] - 40:25, 131:5

## K

**keep** [5] - 21:14, 38:16, 127:23, 134:25, 156:17
**keeping** [1] - 88:1
**Kim** [1] - 18:8
**KIM** [1] - 18:9
**kind** [14] - 23:22, 24:16, 48:5, 49:20, 52:16, 54:16, 57:1, 62:3, 62:15, 74:5, 90:24, 127:20, 141:25, 167:2
**knowing** [1] - 65:3
**knowingly** [1] - 162:5
**knowled ge** [6] - 13:4, 15:22, 48:1, 104:11, 128:11, 136:13
**knowledgeable** [1] - 18:22
**known** [3] - 19:20, 37:6, 45:1
**knows** [2] - 8:20, 58:8

## L

**ladies'** [1] - 55:6
**landscape** [1] - 43:3
**language** [1] - 48:24
**larger** [1] - 18:2
**last** [20] - 6:24, 14:3, 23:3, 23:10, 32:10, 33:13, 43:12, 43:13, 73:3, 79:12, 100:20, 100:22, 102:24, 105:12, 110:24, 112:20, 122:16, 124:9, 149:9, 168:25
**late** [1] - 141:7
**launched** [1] - 106:4
**Laura** [3] - 30:11, 30:14, 31:1
**law** [1] - 25:21

**Law** [1] - 2:3
**laws** [2] - 25:24, 26:9
**lawsuit** [1] - 12:23
**lawyers** [1] - 8:20
**Lead/Appraisal** [2] - 37:13, 37:16
**leading** [4] - 120:18, 124:9, 124:13, 124:19
**learned** [2] - 133:12, 133:25
**learning** [1] - 133:11
**leasing** [1] - 136:16
**least** [2] - 82:17, 156:13
**leave** [4] - 165:12, 166:11, 166:12, 166:13
**led** [1] - 23:19
**Lee** [1] - 1:18
**left** [6] - 32:6, 113:17, 122:16, 165:10, 165:15, 168:6
**leg** [2] - 92:2, 145:22
**Legal** [1] - 107:23
**legal** [14] - 8:14, 8:15, 8:21, 25:9, 78:7, 78:14, 79:10, 107:24, 108:4, 142:5, 161:14, 163:12, 164:4, 170:5
**legible** [1] - 112:5
**lenders** [1] - 48:18
**lending** [2] - 35:24, 39:17
**length** [1] - 157:19
**less** [5] - 41:18, 41:23, 45:4, 59:1, 94:18
**letter** [1] - 72:7
**letters** [2] - 119:15, 119:20
**level** [18] - 12:17, 30:4, 34:1, 40:15, 41:23, 44:16, 64:11, 85:9, 90:2, 96:14, 127:24, 147:17, 152:5, 154:19, 156:13, 159:11, 161:4, 167:3
**levels** [1] - 19:22
**licenses** [1] - 156:11
**likely** [3] - 73:13, 132:16, 137:7
**likewise** [3] - 5:20, 16:1, 82:7
**Lilly** [1] - 109:24
**limitations** [1] - 75:12
**limited** [1] - 73:22
**line** [9] - 63:6, 96:15, 96:19, 107:22, 113:21, 113:25, 132:3, 136:21, 142:14
**LINE** [1] - 173:4
**lines** [6] - 101:2, 101:8, 101:11, 101:24, 113:17, 113:24
**link** [1] - 171:16
**linked** [1] - 171:15
**Links** [2] - 71:21, 71:24

**List** [1] - 54:19
**list** [9] - 10:19, 14:7, 31:14, 37:21, 44:5, 54:22, 57:18, 57:19, 67:14
**listed** [8] - 9:24, 10:17, 26:14, 43:25, 87:21, 131:12, 131:14, 131:16
**litigation** [1] - 5:9
**livelihood** [2] - 156:17, 157:25
**LLC** [1] - 2:3
**LLP** [1] - 2:11
**loan** [44] - 45:12, 45:22, 46:1, 46:13, 46:21, 47:3, 47:6, 47:10, 47:13, 47:16, 47:25, 48:4, 48:12, 48:14, 49:2, 49:4, 49:5, 49:6, 49:11, 49:14, 51:3, 54:11, 56:21, 57:3, 57:4, 57:10, 57:12, 57:14, 57:16, 57:20, 62:1, 62:2, 62:5, 65:10, 68:15, 72:8, 72:9, 76:9, 93:25, 94:5, 94:15, 136:20
**Loan** [3] - 38:25, 39:10, 39:15
**loans** [8] - 27:10, 28:13, 28:15, 40:16, 45:23, 46:16, 48:19, 48:20
**local** [1] - 126:6
**location** [4] - 54:8, 92:10, 92:11, 92:12
**locked** [4] - 63:8, 63:14, 71:9, 71:10
**log** [1] - 71:14
**lone** [1] - 70:21
**longest** [1] - 91:20
**look** [28] - 9:14, 10:25, 13:12, 14:2, 25:2, 26:7, 26:8, 26:17, 35:11, 58:23, 62:25, 65:2, 65:19, 66:12, 72:11, 90:4, 96:5, 101:17, 119:5, 119:18, 122:14, 123:2, 129:1, 138:20, 148:14, 152:3, 153:7, 153:12
**looked** [11] - 13:13, 13:15, 13:25, 14:5, 21:3, 25:19, 80:17, 102:25, 109:16, 147:12, 151:13
**looking** [12] - 8:5, 13:9, 25:10, 33:5, 41:19, 73:24, 138:7, 138:13, 145:24, 151:23, 152:4
**looks** [15] - 8:1, 24:14, 31:25, 32:5, 99:20, 106:23, 112:7, 114:4, 114:15, 119:15, 120:18, 124:3, 124:17, 131:7, 144:1
**Lorent** [1] - 30:11
**losing** [1] - 156:10

**loss** [2] - 166:8, 167:18
**lost** [1] - 150:24
**loud** [1] - 11:10
**loudly** [1] - 5:23
**Louis** [1] - 2:6
**lower** [1] - 34:1
**lunch** [6] - 55:8, 55:11, 79:16, 83:21, 84:6, 129:5
**lying** [3] - 34:4, 155:23, 156:6

# M

**MAI** [12] - 19:13, 19:15, 19:16, 19:17, 19:18, 19:23, 20:12, 20:20, 20:21, 20:25, 21:2, 21:5
**mailed** [1] - 117:8
**mails** [1] - 12:25
**maintain** [9] - 19:10, 20:15, 60:17, 60:20, 60:22, 61:6, 126:9, 127:5
**maintaining** [1] - 47:2
**maintains** [1] - 154:19
**MAIs** [2] - 23:20, 23:21
**majority** [1] - 89:8
**manage** [13] - 17:1, 30:18, 35:25, 37:10, 39:17, 40:16, 46:3, 46:23, 47:7, 58:18, 58:25, 59:5, 96:1
**managed** [1] - 22:14
**management** [15] - 66:10, 71:23, 78:24, 95:22, 95:24, 149:16, 149:17, 150:9, 150:15, 150:20, 150:22, 152:10, 153:11, 158:8, 164:23
**Management** [1] - 95:19
**management /compliance** [1] - 95:19
**Manager** [1] - 36:14
**manager** [27] - 22:12, 22:13, 22:25, 29:16, 33:12, 33:14, 35:19, 35:20, 36:4, 37:1, 46:24, 63:3, 87:14, 94:8, 96:19, 101:18, 101:19, 101:20, 102:6, 103:1, 103:3, 114:5, 114:8, 136:14, 160:18, 160:19, 165:11
**Manager 's** [1] - 101:8
**manager 's** [3] - 101:12, 101:23, 114:12
**Manager /Senior** [1] - 37:13
**Manager /Supervising** [1] - 37:17
**managers** [20] - 30:10, 30:15, 30:16, 32:22, 32:24,

33:1, 33:3, 35:25, 36:5, 36:13, 37:4, 37:9, 49:6, 49:8, 49:9, 49:17, 50:5, 93:10, 164:15
**managers '** [1] - 50:15
**manages** [1] - 149:14
**managing** [15] - 31:6, 48:17, 50:8, 72:17, 95:24, 120:17, 121:2, 121:6, 121:9, 121:20, 121:24, 122:6, 122:13, 123:2, 123:7
**mandated** [3] - 60:16, 60:20, 60:21
**manner** [1] - 94:23
**manual** [4] - 24:20, 24:22, 24:23, 39:16
**Manual** [3] - 38:25, 39:10, 39:16
**manuals** [1] - 52:7
**March** [1] - 169:4
**marked** [11] - 7:16, 24:4, 28:19, 28:23, 42:11, 79:23, 84:17, 99:12, 102:14, 129:11, 131:1
**market** [4] - 44:17, 73:13, 73:20, 138:6
**Marsh** [1] - 2:12
**MARSH** [195] - 3:9, 7:23, 8:1, 8:5, 8:9, 8:24, 9:8, 9:10, 9:13, 10:1, 10:4, 10:18, 11:9, 11:14, 11:16, 12:13, 12:15, 14:17, 14:22, 14:25, 15:11, 21:10, 24:25, 32:8, 35:4, 36:7, 39:22, 40:8, 41:16, 41:21, 44:8, 44:21, 46:7, 47:20, 49:18, 50:6, 50:18, 51:22, 52:10, 53:14, 54:2, 55:3, 55:12, 55:17, 56:3, 56:11, 56:19, 57:24, 58:2, 58:13, 59:25, 60:8, 60:23, 61:16, 62:10, 63:25, 65:14, 65:21, 66:14, 68:20, 69:5, 69:25, 71:2, 74:14, 74:17, 74:20, 74:24, 75:1, 75:4, 75:11, 75:17, 75:23, 77:5, 78:15, 79:4, 80:1, 81:1, 82:16, 83:23, 84:3, 85:12, 89:6, 90:10, 91:14, 94:1, 94:14, 96:25, 98:16, 98:20, 99:2, 99:5, 100:12, 102:2, 103:12, 103:23, 104:3, 104:7, 104:13, 104:18, 104:25, 105:11, 105:18, 106:2, 106:8, 106:13, 106:19, 107:4, 107:25, 108:17, 109:13, 110:18, 111:7, 111:23, 112:16, 112:25, 113:7, 114:21, 115:9, 115:18,

115:24, 116:8, 116:22, 117:14, 117:21, 119:2, 119:9, 119:17, 120:7, 121:21, 123:8, 123:15, 123:22, 124:23, 125:9, 125:15, 128:4, 128:13, 129:3, 129:23, 131:19, 132:6, 132:20, 133:7, 133:14, 133:16, 134:1, 134:11, 137:9, 138:2, 139:16, 140:10, 140:23, 141:4, 141:10, 142:4, 142:22, 143:1, 143:6, 143:17, 144:5, 144:11, 144:17, 145:5, 145:11, 145:14, 146:3, 146:12, 147:22, 148:25, 149:5, 149:18, 150:17, 150:23, 151:1, 151:9, 151:17, 152:13, 152:25, 153:14, 154:2, 154:10, 155:11, 155:25, 156:22, 157:2, 157:15, 162:1, 162:3, 166:6, 169:13, 169:24, 170:4, 170:14, 170:19, 171:2
**marsh @seyfarth .com** [1] - 2:17
**material** [2] - 83:25, 136:15
**math** [1] - 138:5
**Matt** [3] - 122:22, 122:24, 125:19
**matter** [3] - 10:21, 64:10, 87:5
**matters** [5] - 5:13, 8:15, 9:18, 11:2, 11:3
**Matthew** [2] - 112:7, 112:13
**Mazur** [18] - 30:11, 30:17, 32:8, 32:9, 32:21, 36:19, 37:23, 38:2, 80:19, 108:9, 108:24, 114:24, 117:13, 117:18, 117:25, 125:21, 164:17
**Mazur 's** [1] - 30:19
**McNeil** [3] - 18:8, 18:10, 18:11
**mean** [25] - 10:3, 15:5, 15:18, 27:14, 46:25, 53:20, 55:12, 63:15, 66:11, 66:20, 74:17, 75:19, 76:13, 83:18, 85:8, 104:6, 105:23, 107:23, 118:17, 125:2, 125:11, 129:18, 130:12, 133:20, 134:4
**meaning** [4] - 13:22, 23:7, 27:5, 149:21
**means** [6] - 50:9, 63:16, 66:24, 92:24, 95:22, 143:3
**Measurement** [1] - 93:7

**measurement** [2] - 86:16, 86:19
**measures** [1] - 67:13
**measuring** [1] - 138:24
**meat** [1] - 15:16
**mechanism** [3] - 134:14, 155:19, 155:20
**medication** [1] - 6:17
**Meehan** [23] - 2:19, 5:9, 6:7, 31:12, 38:6, 84:25, 92:20, 99:23, 102:21, 107:3, 112:8, 117:11, 122:20, 142:19, 151:7, 151:8, 162:20, 165:18, 168:6, 169:10, 169:22, 170:3
**MEEHAN** [1] - 1:5
**Meehan 's** [10] - 85:22, 85:25, 86:25, 98:10, 98:19, 112:14, 134:17, 151:13, 151:15, 169:6
**meet** [2] - 93:8, 117:12
**Meeting** [3] - 129:15, 130:11, 131:4
**meeting** [10] - 129:19, 129:21, 130:2, 130:6, 130:14, 131:6, 131:9, 131:15, 131:24, 132:16
**meetings** [6] - 127:8, 127:21, 127:22, 131:18, 134:8, 134:14
**Meets** [2] - 101:6, 101:24
**Mellon** [1] - 22:5
**member** [6] - 19:24, 63:23, 66:10, 77:12, 103:16, 103:19
**members** [5] - 50:14, 89:17, 106:17, 133:24, 153:11
**mention** [1] - 137:1
**mentioned** [15] - 17:9, 25:10, 37:17, 38:20, 57:1, 57:12, 57:19, 61:13, 89:16, 89:22, 112:21, 133:2, 141:21, 158:2, 170:9
**Merit** [2] - 1:16, 172:4
**methodologies** [2] - 65:5, 127:19
**methodology** [1] - 138:5
**metrics** [1] - 85:10
**Michael** [1] - 109:22
**mid** [5] - 99:20, 99:22, 100:11, 101:13, 163:16
**mid-summer** [1] - 163:16
**mid-year** [4] - 99:20, 99:22, 100:11, 101:13
**middle** [6] - 8:21, 94:24, 101:23, 107:13, 114:11, 124:2
**might** [14] - 5:21, 5:22, 15:5, 18:21, 28:14, 29:20, 43:19,

57:21, 68:17, 88:22, 90:18, 100:19, 141:22, 157:10

**mind** [5] - 122:8, 129:3, 135:24, 136:2, 150:7

**minds** [1] - 156:14

**minimal** [2] - 75:14, 75:15

**minimum** [9] - 27:8, 27:14, 27:17, 27:19, 38:23, 44:2, 51:25, 52:1, 152:5

**Minimum** [2] - 38:17, 43:24

**minority** [2] - 90:4, 91:18

**minute** [3] - 55:5, 94:7, 113:20

**Minutes** [1] - 131:5

**minutes** [10] - 55:15, 83:24, 84:1, 129:6, 129:21, 129:24, 131:15, 131:18, 132:2, 132:24

**mischaracterizes** [3] - 147:24, 154:12, 170:20

**miscommunication** [1] - 149:10

**misleading** [1] - 156:4

**Miss** [3] - 104:23, 105:10, 106:18

**missed** [1] - 48:3

**missing** [2] - 43:5, 119:20

**MISSOURI** [1] - 1:1

**misstate** [1] - 117:24

**misstates** [15] - 50:18, 50:19, 60:8, 91:14, 112:25, 116:22, 137:9, 139:16, 140:10, 147:23, 152:25, 153:14, 169:24, 170:14, 170:19

**misunderstood** [1] - 167:15

**mix** [1] - 48:15

**MO** [1] - 2:6

**model** [1] - 163:21

**moment** [2] - 26:24, 110:2

**Monday** [1] - 101:14

**monetarily** [1] - 62:6

**monitor** [2] - 135:9, 155:20

**monitored** [2] - 46:6, 106:1

**monthly** [2] - 86:22, 127:7

**months** [2] - 169:5, 169:8

**morning** [5] - 6:15, 11:21, 11:24, 12:6, 13:4

**most** [8] - 26:11, 32:17, 66:5, 73:13, 90:3, 126:19, 132:15, 156:9

**motivated** [3] - 57:5, 57:15, 62:3

**motivation** [4] - 57:4, 57:10, 72:3, 158:15

**motivations** [1] - 59:2

**mouth** [1] - 170:22

**move** [3] - 66:25, 70:3, 125:4

**moving** [1] - 75:20

**MR** [60] - 3:7, 3:11, 5:6, 7:13, 7:21, 7:24, 8:2, 8:7, 11:11, 12:24, 24:1, 24:7, 28:18, 34:6, 34:14, 42:8, 43:16, 55:7, 55:15, 55:21, 55:22, 58:7, 74:16, 74:19, 74:22, 74:25, 79:15, 80:3, 80:7, 83:20, 84:1, 84:4, 84:8, 84:9, 84:14, 99:9, 99:17, 102:8, 111:8, 129:1, 129:7, 130:1, 130:23, 145:13, 148:19, 149:1, 149:6, 149:7, 150:22, 157:7, 161:24, 165:24, 166:4, 166:18, 169:17, 170:25, 171:4, 171:9, 171:12, 171:16

**MS** [195] - 3:9, 7:23, 8:1, 8:5, 8:9, 8:24, 9:8, 9:10, 9:13, 10:1, 10:4, 10:18, 11:9, 11:14, 11:16, 12:13, 12:15, 14:17, 14:22, 14:25, 15:11, 21:10, 24:25, 32:8, 35:4, 36:7, 39:22, 40:8, 41:16, 41:21, 44:8, 44:21, 46:7, 47:20, 49:18, 50:6, 50:18, 51:22, 52:10, 53:14, 54:2, 55:3, 55:12, 55:17, 56:3, 56:11, 56:19, 57:24, 58:2, 58:13, 59:25, 60:8, 60:23, 61:16, 62:10, 63:25, 65:14, 65:21, 66:14, 68:20, 69:5, 69:25, 71:2, 74:14, 74:17, 74:20, 74:24, 75:1, 75:4, 75:11, 75:17, 75:23, 77:5, 78:15, 79:4, 80:1, 81:1, 82:16, 83:23, 84:3, 85:12, 89:6, 90:10, 91:14, 94:1, 94:14, 96:25, 98:16, 98:20, 99:2, 99:5, 100:12, 102:2, 103:12, 103:23, 104:3, 104:7, 104:13, 104:18, 104:25, 105:11, 105:18, 106:2, 106:8, 106:13, 106:19, 107:4, 107:25, 108:17, 109:13, 110:18, 111:7, 111:23, 112:16, 112:25, 113:7, 114:21, 115:9, 115:18, 115:24, 116:8, 116:22, 117:14, 117:21, 119:2, 119:9, 119:17, 120:7, 121:21, 123:8, 123:15, 123:22, 124:23, 125:9, 125:15, 128:4, 128:13, 129:3, 129:23, 131:19, 132:6, 132:20, 133:7, 133:14, 133:16, 134:1, 134:11,

137:9, 138:2, 139:16, 140:10, 140:23, 141:4, 141:10, 142:4, 142:22, 143:1, 143:6, 143:17, 144:5, 144:11, 144:17, 145:5, 145:11, 145:14, 146:3, 146:12, 147:22, 148:25, 149:5, 149:18, 150:17, 150:23, 151:1, 151:9, 151:17, 152:13, 152:25, 153:14, 154:2, 154:10, 155:11, 155:25, 156:22, 157:2, 157:15, 162:1, 162:3, 166:6, 169:13, 169:24, 170:4, 170:14, 170:19, 171:2

**multiple** [5] - 36:22, 37:20, 38:2, 58:20, 105:12

**mutual** [1] - 95:16

## N

**name** [19] - 5:7, 6:3, 18:6, 32:6, 33:13, 51:15, 100:5, 103:3, 103:7, 105:4, 112:3, 113:18, 114:3, 122:16, 122:17, 122:21, 162:18, 165:13

**names** [7] - 19:23, 32:2, 32:16, 32:18, 112:2, 112:4, 112:6

**National** [4] - 162:11, 162:16, 162:23, 163:2

**nature** [2] - 16:19, 67:5

**NC** [1] - 135:12

**near** [1] - 164:1

**near-term** [1] - 164:1

**necessarily** [4] - 33:25, 88:18, 128:22, 129:18

**necessary** [6] - 25:8, 67:10, 126:9, 143:24, 147:18, 148:9

**need** [22] - 6:21, 10:15, 12:22, 15:20, 31:13, 40:17, 43:16, 56:18, 57:4, 60:3, 63:2, 66:24, 70:9, 70:25, 85:9, 88:20, 101:15, 133:3, 137:20, 142:11, 154:23

**needed** [16] - 25:6, 55:11, 72:8, 78:5, 87:4, 93:19, 107:6, 109:12, 109:18, 126:25, 135:2, 135:15, 153:20, 159:25, 163:21, 165:16

**needs** [11] - 56:6, 62:18, 62:20, 62:25, 65:1, 70:23, 72:2, 93:5, 139:11, 161:9

**negative** [1] - 52:4

**negatively** [2] - 61:14, 61:23

**never** [3] - 6:25, 106:24, 170:21

**new** [3] - 44:3, 67:24, 100:5

**next** [9] - 6:7, 27:7, 32:13, 36:20, 94:24, 99:9, 103:3, 109:19, 110:25

**nice** [1] - 148:16

**nine** [1] - 93:20

**NO** [3] - 1:6, 173:4

**non** [1] - 45:8

**nonanonymous** [1] - 161:8

**nonappraisal** [13] - 27:10, 28:1, 45:6, 45:7, 81:13, 81:15, 82:3, 82:15, 82:21, 82:22, 82:25, 83:5, 166:22

**nonappraisal )** [1] - 27:25

**noncredible** [1] - 162:6

**nonPNC** [8] - 51:8, 51:16, 51:21, 52:6, 53:22, 53:25, 54:15, 59:18

**normal** [5] - 17:16, 78:17, 78:19, 91:23

**normally** [1] - 110:17

**Northern** [1] - 132:11

**Notary** [3] - 1:17, 172:4, 173:24

**note** [1] - 117:25

**noted** [1] - 173:20

**notes** [1] - 82:12

**nothing** [5] - 94:16, 135:24, 136:2, 151:21, 172:6

**Notice** [5] - 8:23, 13:13, 13:25, 14:15, 15:22

**notice** [2] - 125:16, 166:7

**notification** [3] - 164:6, 164:8, 164:10

**notifying** [1] - 164:13

**nuances** [1] - 21:18

**number** [16] - 14:4, 81:6, 81:8, 81:16, 81:18, 81:24, 82:6, 82:8, 82:9, 121:15, 124:2, 157:1, 157:5, 167:12, 167:13

**number 's** [1] - 19:7

**numbered** [1] - 34:10

**numbering** [1] - 34:7

**numbers** [15] - 26:14, 26:15, 34:8, 34:9, 83:13, 83:16, 83:17, 83:18, 107:20, 111:2, 121:12, 121:17, 122:14, 159:15, 165:3

**numerous** [1] - 25:17

**nuts** [1] - 92:25

## O

**object** [7] - 9:8, 9:11, 10:10,

14:18, 15:11, 100:12, 129:23

**objection** [140] - 10:1, 10:5, 10:18, 21:10, 24:25, 35:4, 39:22, 40:8, 41:16, 41:21, 44:8, 44:21, 46:7, 47:20, 49:18, 50:6, 50:18, 51:22, 52:10, 53:14, 54:2, 56:3, 56:11, 56:19, 57:24, 58:13, 59:25, 60:8, 60:23, 61:16, 62:10, 63:25, 65:14, 65:21, 66:14, 68:20, 69:25, 71:2, 74:14, 75:11, 75:17, 75:23, 77:5, 78:15, 79:4, 82:16, 85:12, 89:6, 90:10, 91:14, 94:1, 94:14, 98:16, 98:20, 99:5, 100:18, 102:2, 103:12, 103:23, 104:7, 104:13, 104:19, 104:25, 105:11, 105:18, 106:2, 106:19, 106:20, 107:4, 107:25, 108:17, 109:13, 110:18, 111:23, 112:16, 112:25, 113:7, 114:21, 115:9, 115:18, 115:24, 116:8, 116:22, 117:14, 119:2, 120:7, 121:21, 123:8, 123:15, 123:22, 124:23, 125:9, 125:15, 128:4, 128:13, 131:19, 132:20, 133:7, 133:16, 134:1, 134:11, 137:9, 138:2, 139:16, 140:10, 140:23, 141:4, 141:10, 142:4, 142:22, 143:6, 143:17, 144:5, 144:11, 144:17, 145:5, 146:3, 146:12, 147:22, 149:18, 150:17, 150:18, 151:9, 151:17, 152:13, 152:25, 153:14, 154:2, 154:10, 155:11, 155:25, 156:22, 157:2, 161:24, 165:24, 166:4, 166:18, 170:4, 170:14, 170:19

**objections** [4] - 12:15, 75:4, 106:4, 106:14

**objective** [1] - 50:22

**objects** [1] - 10:12

**obligation** [2] - 48:5, 161:16

**obligations** [3] - 20:11, 21:6, 21:8

**obtaining** [2] - 27:9, 27:24

**obvious** [1] - 28:14

**obviously** [5] - 60:19, 62:22, 137:6, 158:25, 163:7

**OCC** [2] - 26:11, 27:2

**occasion** [1] - 153:11

**occasional** [1] - 152:11

**occasions** [1] - 86:7

**occur** [6] - 62:18, 62:21, 64:10, 144:8, 148:16, 152:1

**occurred** [3] - 41:12, 53:13, 118:20

**occurs** [2] - 97:21, 97:22

**October** [4] - 31:11, 35:19, 164:6, 164:7

**OF** [7] - 1:1, 1:14, 172:2, 172:3, 173:1, 173:2, 173:17

**off-the-record** [4] - 34:12, 58:5, 80:5, 99:15

**office** [2] - 165:12, 172:17

**officer** [6] - 46:1, 46:21, 57:3, 57:12, 57:20, 109:23

**officers** [2] - 47:3, 48:4

**offices** [1] - 1:18

**often** [3] - 135:5, 144:2, 144:14

**Ohio** [1] - 132:12

**ombudsman** [1] - 161:13

**once** [11] - 63:7, 63:9, 63:16, 63:18, 64:24, 72:4, 72:12, 74:3, 97:24, 126:22, 148:11

**one** [58] - 16:15, 21:15, 26:16, 32:15, 33:5, 33:11, 38:6, 40:7, 52:15, 54:23, 58:2, 58:16, 58:18, 62:16, 63:16, 64:15, 64:18, 67:24, 68:1, 69:16, 70:23, 71:12, 71:25, 73:14, 75:9, 86:4, 96:14, 96:18, 97:18, 97:21, 99:9, 106:17, 107:13, 113:4, 120:6, 123:11, 123:13, 123:18, 123:21, 124:9, 125:7, 125:14, 127:15, 131:8, 135:11, 137:14, 137:19, 138:13, 138:19, 142:10, 142:11, 142:14, 143:19, 147:8, 147:24, 151:13, 157:7, 169:18

**One** [1] - 1:18

**one's** [1] - 123:25

**ones** [7] - 63:8, 63:10, 71:11, 71:14, 86:5, 125:7, 125:20

**operations** [1] - 30:20

**opinion** [7] - 59:15, 59:20, 64:12, 69:19, 141:1, 142:5, 154:3

**opinions** [1] - 139:24

**opportunities** [3] - 135:15, 160:24, 161:15

**opportunity** [8] - 45:1, 63:11, 73:17, 78:16, 88:23, 98:23, 136:11, 150:13

**option** [1] - 40:14

**options** [1] - 109:9

**order** [5] - 31:5, 34:7, 54:5, 72:19, 171:11

**ordered** [2] - 46:20, 76:1

**ordering** [2] - 45:25, 46:16

**organization** [3] - 19:20, 31:15, 34:21

**Organizational** [1] - 35:13

**organizational** [7] - 29:13, 30:3, 30:7, 30:9, 31:25, 32:14, 107:14

**organized** [1] - 83:12

**orientation** [2] - 120:18, 123:17

**original** [10] - 25:15, 25:17, 59:10, 61:3, 61:4, 70:14, 148:6, 153:12, 156:7, 158:1

**origination** [1] - 45:23

**otherwise** [2] - 45:15, 173:20

**ourself** [1] - 165:5

**ourselves** [2] - 67:17, 76:5

**outcome** [1] - 58:1

**outline** [1] - 159:8

**outlined** [1] - 27:18

**outlines** [2] - 38:22, 159:5

**output** [1] - 155:20

**outside** [23] - 12:23, 14:23, 28:8, 35:22, 36:1, 56:21, 57:1, 57:2, 57:8, 57:23, 58:10, 61:9, 61:12, 61:25, 125:16, 134:2, 142:6, 154:3, 160:23, 161:24, 165:24, 166:4, 166:18

**outstanding** [1] - 70:7

**overall** [7] - 30:20, 31:15, 40:6, 100:23, 101:3, 120:21, 121:19

**overreaching** [1] - 60:24

**own** [4] - 59:4, 63:13, 128:10, 152:3

## P

**P.M** [1] - 171:23

**PAGE** [2] - 3:4, 173:4

**page** [54] - 8:22, 9:14, 9:19, 26:14, 26:16, 26:17, 27:22, 31:23, 32:14, 32:20, 34:18, 35:14, 35:15, 36:20, 37:25, 38:18, 42:2, 42:22, 42:24, 43:3, 43:8, 43:13, 43:24, 44:14, 54:18, 82:1, 94:24, 95:18, 100:20, 100:22, 101:17, 101:23, 102:24, 107:15, 109:19, 110:5, 110:6, 110:25, 111:6, 111:14, 111:17, 112:20, 112:24, 113:5, 114:11, 120:6, 132:3, 169:1

**pages** [7] - 9:20, 24:14, 41:15, 43:4, 107:13, 107:15, 129:17

**Panel** [1] - 132:4

**panel** [4] - 132:11, 132:17, 133:11, 133:23

**panels** [1] - 132:18

**paper** [1] - 165:7

**paragraph** [6] - 9:25, 11:24, 12:5, 38:22, 39:8, 42:2

**paragraphs** [3] - 9:21, 10:17, 12:10

**pardon** [3] - 30:5, 146:15, 158:14

**paren** [1] - 94:2

**parenthetical** [1] - 93:9

**part** [23] - 18:2, 18:4, 30:12, 50:12, 52:20, 54:14, 72:21, 88:20, 105:6, 118:19, 130:12, 143:18, 144:1, 149:8, 149:11, 152:17, 152:20, 154:21, 156:9, 158:22, 158:23, 165:4, 170:11

**part-time** [1] - 30:12

**participant** [1] - 33:13

**participate** [1] - 126:3

**particular** [13] - 40:7, 51:3, 65:8, 76:23, 85:10, 90:7, 90:21, 112:21, 132:16, 135:9, 143:4, 143:16, 150:3

**parties** [6] - 52:3, 66:19, 67:22, 68:5, 172:12, 172:15

**partner** [1] - 93:1

**parts** [1] - 130:17

**party** [8] - 51:5, 51:7, 59:21, 69:15, 69:17, 69:19, 73:7, 138:25

**pass** [2] - 24:2, 79:18

**past** [4] - 52:16, 52:22, 122:3, 163:25

**path** [1] - 70:9

**pattern** [1] - 120:1

**Paul** [33] - 32:10, 32:11, 32:21, 33:2, 37:15, 87:10, 91:5, 92:6, 113:18, 114:3, 115:1, 115:3, 115:5, 115:7, 115:13, 115:16, 115:19, 115:23, 116:3, 116:7, 117:11, 117:18, 118:2, 118:6, 118:14, 118:25, 119:3, 164:21, 165:2, 165:6, 170:9, 170:16

**pavement** [1] - 73:24

**PDF** [1] - 43:19
**peer** [3] - 70:17, 160:20
**peers** [3] - 64:14, 70:19, 160:21
**pending** [2] - 11:17, 106:11
**Pennsylvania** [10] - 1:15, 1:17, 1:19, 19:2, 19:4, 19:8, 22:15, 92:14, 92:15, 172:5
**PENNSYLVANIA** [2] - 172:2, 173:1
**people** [11] - 26:6, 31:18, 32:16, 68:6, 68:7, 70:9, 88:6, 95:11, 95:14, 134:4, 160:8
**people's** [1] - 67:15
**per** [1] - 83:12
**perceive** [1] - 77:25
**percent** [4] - 89:9, 121:19, 121:22, 121:24
**percentage** [1] - 144:10
**perform** [7] - 22:25, 67:10, 95:14, 141:19, 154:20, 154:21, 156:11
**performance** [21] - 84:11, 84:21, 84:23, 95:5, 99:21, 99:22, 100:11, 100:24, 101:3, 101:13, 102:20, 105:16, 113:11, 120:15, 122:5, 154:22, 168:13, 168:22, 169:10, 169:22, 170:2
**performed** [13] - 28:4, 44:25, 45:2, 48:9, 51:14, 64:25, 65:1, 82:20, 96:10, 96:17, 115:1, 125:23, 138:6
**perhaps** [2] - 90:19, 91:5
**period** [1] - 126:17
**person** [25] - 9:7, 19:8, 31:14, 50:25, 62:16, 70:23, 71:25, 72:22, 88:8, 92:17, 92:18, 95:13, 98:14, 102:5, 103:6, 118:22, 121:18, 143:19, 143:25, 149:25, 150:4, 159:20, 162:6, 165:15
**personal** [3] - 50:15, 131:21, 131:23
**personality** [1] - 62:13
**personnel** [1] - 12:18
**perspective** [4] - 45:24, 89:12, 122:5, 155:1
**pertains** [1] - 40:11
**Petrie** [4] - 30:11, 32:5, 32:21, 37:24
**phrase** [1] - 20:18
**physical** [1] - 9:6
**piece** [1] - 139:8
**pieces** [3] - 75:20, 100:16,

143:23
**Pittsburgh** [3] - 1:19, 92:14, 92:15
**place** [12] - 16:3, 31:18, 40:22, 59:16, 145:23, 147:19, 148:11, 154:8, 156:17, 157:20, 161:19, 172:10
**Place** [1] - 1:18
**placed** [4] - 52:7, 97:25, 105:17, 110:17
**Plaintiff** [2] - 1:6, 2:2
**plaintiff** [2] - 5:8, 6:8
**plan** [11] - 28:21, 29:8, 29:9, 108:3, 108:6, 108:25, 109:4, 114:20, 125:1, 163:10, 165:20
**Plan** [6] - 31:22, 107:9, 107:16, 111:11, 163:11, 170:11
**planning** [1] - 55:8
**plans** [1] - 110:17
**plate** [1] - 88:6
**plateaued** [1] - 167:2
**play** [2] - 52:17, 53:1
**playing** [1] - 18:21
**plus** [1] - 169:8
**PNC** [53] - 1:8, 1:14, 5:9, 9:2, 9:6, 16:24, 17:7, 18:3, 21:1, 21:7, 22:7, 22:9, 24:7, 26:19, 28:20, 34:20, 35:1, 35:7, 36:14, 38:24, 39:1, 39:9, 40:4, 40:6, 44:4, 51:5, 52:7, 52:9, 53:12, 54:23, 59:11, 59:23, 69:4, 69:10, 76:18, 96:5, 103:22, 103:25, 105:22, 109:21, 109:23, 114:9, 137:2, 140:9, 146:21, 154:9, 156:21, 161:3, 162:8, 162:11, 162:16, 168:6
**PNC's** [3] - 107:2, 133:5, 163:3
**PNCMEEHAN 0260** [1] - 110:5
**point** [15] - 5:24, 22:18, 31:8, 32:11, 33:12, 36:4, 65:8, 71:8, 74:3, 76:12, 83:21, 90:24, 100:5, 108:3, 148:10
**points** [2] - 147:18, 159:20
**policies** [7] - 26:20, 34:22, 35:2, 35:8, 39:12, 39:13, 40:6
**Policy** [5] - 38:25, 39:1, 39:10, 39:16, 40:5
**policy** [18] - 26:19, 27:7, 39:18, 39:19, 39:21, 39:24,

40:5, 40:10, 40:15, 40:19, 41:4, 41:7, 41:9, 41:11, 41:15, 41:25, 77:3, 153:10
**policy's** [1] - 40:21
**portions** [1] - 25:6
**portrayed** [1] - 85:17
**position** [16] - 16:24, 16:25, 22:12, 22:13, 22:16, 34:1, 59:6, 65:25, 73:9, 76:5, 87:1, 87:12, 118:2, 155:2, 168:18, 169:6
**positions** [8] - 37:5, 38:6, 109:18, 123:1, 164:14, 165:19, 165:21, 166:9
**positive** [1] - 95:3
**possibility** [1] - 155:6
**possible** [1] - 92:4
**potential** [5] - 47:5, 48:6, 59:4, 67:6, 72:2
**potentially** [3] - 58:22, 70:13, 156:14
**PPG** [1] - 1:18
**practice** [6] - 21:17, 41:13, 52:23, 64:10, 87:5, 134:5
**Practice** [1] - 13:20
**pre** [2] - 64:20, 64:21
**pre-qualified** [2] - 64:20, 64:21
**precise** [1] - 48:24
**predictions** [1] - 55:10
**preference** [2] - 131:22, 131:23
**preferred** [1] - 21:4
**preliminary** [1] - 5:13
**premise** [1] - 57:25
**preparation** [2] - 16:6, 80:16
**prepare** [1] - 15:13
**prepared** [1] - 45:11
**presence** [1] - 95:10
**present** [4] - 19:11, 72:25, 74:18, 166:25
**Present** [1] - 2:19
**presentation** [2] - 135:20, 145:19
**presented** [4] - 153:6, 163:6, 165:5, 165:6
**president** [4] - 17:1, 17:4, 17:20, 22:22
**pressures** [1] - 62:7
**presumes** [1] - 147:20
**pretty** [3] - 15:17, 57:18, 139:23
**prevent** [2] - 6:14, 6:18
**previous** [4] - 25:2, 122:8, 154:12, 154:14
**previously** [6] - 38:20, 41:24, 106:4, 147:12, 164:16, 168:21

**primarily** [1] - 128:24
**primary** [9] - 27:2, 36:6, 36:11, 52:15, 116:1, 116:2, 135:14, 141:14, 141:19
**print** [1] - 43:2
**printed** [5] - 43:20, 79:19, 80:2, 103:10, 106:24
**printout** [1] - 99:21
**priority** [2] - 35:1, 47:17
**privilege** [3] - 14:19, 15:12, 15:20
**problem** [9] - 10:8, 64:16, 69:1, 69:6, 69:7, 69:9, 69:11, 69:14, 147:3
**problems** [6] - 52:16, 76:7, 76:15, 76:19, 155:8, 155:9
**Procedure** [1] - 1:16
**procedure** [9] - 25:5, 25:12, 25:13, 27:1, 28:15, 28:17, 39:25, 41:11, 41:24
**Procedures** [1] - 24:9
**procedures** [18] - 24:20, 26:18, 27:8, 28:2, 34:5, 35:12, 36:4, 39:14, 41:19, 42:6, 43:23, 51:20, 52:8, 54:20, 55:24, 77:7, 82:1, 163:3
**proceed** [1] - 124:25
**proceeded** [1] - 109:9
**process** [60] - 31:7, 31:8, 45:13, 46:2, 46:18, 46:22, 46:23, 48:19, 48:20, 49:8, 49:9, 49:16, 50:5, 50:15, 54:9, 56:5, 58:16, 58:17, 58:18, 58:25, 59:2, 59:5, 59:7, 60:12, 60:18, 61:1, 65:25, 66:3, 66:5, 67:8, 70:3, 71:3, 72:14, 72:17, 72:18, 77:12, 82:23, 88:17, 92:3, 96:2, 109:3, 136:10, 143:16, 143:18, 143:19, 144:1, 144:21, 145:8, 147:10, 149:12, 149:14, 150:1, 150:3, 154:16, 164:9, 164:10, 165:2, 165:4
**Process** [1] - 111:1
**processed** [2] - 81:9
**procure** [2] - 48:20, 61:2
**procured** [1] - 93:25
**procurement** [12] - 30:25, 31:1, 31:6, 37:4, 37:5, 48:12, 48:15, 48:16, 49:2, 57:7, 94:5, 94:15
**Procurement** [1] - 37:16
**produced** [2] - 15:15, 65:3
**product** [7] - 28:2, 45:7, 76:11, 82:21, 89:15, 144:24, 154:25

**production** [22] - 45:13, 45:22, 46:13, 47:6, 47:10, 47:13, 47:16, 49:4, 49:5, 49:12, 49:14, 54:12, 56:22, 57:14, 57:20, 62:1, 62:2, 65:10, 72:9, 76:9, 136:20
**productive** [1] - 64:17
**productivity** [4] - 86:14, 120:17, 123:10, 123:14
**products** [11] - 27:9, 27:24, 45:6, 81:13, 81:15, 81:24, 82:3, 82:9, 82:15, 82:25, 154:1
**Professional** [1] - 13:20
**professional** [3] - 20:4, 21:16, 128:19
**programs** [1] - 127:8
**progression** [1] - 126:14
**prohibit** [1] - 62:8
**project** [2] - 90:13, 90:18
**projects** [11] - 91:2, 91:4, 91:7, 91:9, 135:15, 135:16, 135:17, 135:22, 135:23, 135:25, 141:22
**promote** [1] - 128:18
**promoted** [2] - 22:12, 22:17
**properties** [2] - 22:2, 23:24
**property** [20] - 23:22, 27:11, 28:13, 45:15, 48:1, 48:7, 73:25, 87:18, 87:22, 89:13, 89:23, 90:8, 91:12, 92:1, 92:8, 92:10, 92:12, 92:13, 136:16, 159:6
**prospective** [1] - 45:14
**protect** [1] - 59:3
**protocols** [1] - 163:3
**prove** [1] - 164:1
**provide** [30] - 19:23, 21:13, 48:5, 62:16, 64:23, 71:16, 72:6, 72:23, 73:20, 81:2, 88:21, 93:2, 94:17, 95:11, 115:5, 115:7, 115:16, 116:16, 118:5, 120:5, 128:16, 136:11, 137:5, 138:23, 139:7, 144:9, 156:12, 159:3, 164:17
**provided** [28] - 25:17, 26:4, 42:21, 42:25, 44:10, 52:21, 54:10, 54:11, 63:19, 76:3, 100:8, 108:4, 115:13, 115:19, 115:21, 115:22, 117:6, 119:1, 127:6, 127:7, 127:10, 128:24, 138:12, 140:1, 140:2, 141:1, 148:7, 159:9
**provides** [5] - 139:7, 147:14, 148:9, 148:15, 159:6
**providing** [3] - 93:3, 96:3, 143:15

**public** [1] - 41:6
**Public** [3] - 1:17, 172:4, 173:24
**publish** [1] - 25:9
**pull** [2] - 34:15, 107:8
**pulled** [2] - 94:21, 170:17
**purpose** [2] - 48:18, 51:19
**pursuant** [1] - 165:20
**pursue** [1] - 78:8
**put** [12] - 26:10, 53:1, 59:5, 65:25, 76:4, 107:1, 108:3, 108:5, 135:19, 163:5, 170:22
**putting** [2] - 10:5, 59:16

## Q

**qualifications** [2] - 60:16, 67:10
**qualified** [6] - 64:20, 64:21, 64:25, 67:9, 76:1, 153:24
**qualify** [1] - 147:8
**quality** [15] - 76:20, 76:21, 142:12, 142:20, 142:24, 143:3, 143:10, 144:20, 145:3, 145:25, 150:9, 150:16, 151:4, 151:16, 152:11
**quarter** [1] - 126:22
**questioning** [1] - 157:23
**questions** [14] - 10:19, 10:21, 12:21, 18:20, 29:18, 29:20, 52:8, 136:18, 142:15, 148:3, 148:20, 157:9, 157:11, 169:14
**quick** [1] - 129:5
**quickly** [2] - 92:3, 159:13
**quite** [3] - 16:17, 76:6, 138:10

## R

**raise** [5] - 48:8, 88:11, 88:24, 127:20, 136:18
**raised** [1] - 70:5
**ran** [1] - 76:6
**range** [1] - 167:10
**ranges** [1] - 159:9
**rapport** [1] - 68:9
**rare** [2] - 75:22, 75:25
**rate** [1] - 113:11
**rather** [1] - 157:19
**rating** [4] - 100:24, 101:3, 101:14
**ratings** [1] - 113:12
**Ratio** [1] - 111:1
**read** [54] - 10:24, 11:7, 11:9,

11:14, 11:18, 12:2, 13:3, 13:11, 26:18, 26:22, 27:12, 27:23, 32:2, 32:6, 32:15, 34:24, 39:5, 45:10, 45:16, 86:13, 88:19, 95:6, 97:18, 100:25, 101:11, 106:11, 110:7, 110:9, 110:12, 110:20, 112:2, 112:6, 112:10, 113:13, 113:18, 114:2, 114:5, 114:8, 114:10, 119:6, 119:7, 119:14, 122:17, 136:8, 136:21, 137:1, 143:21, 144:2, 144:15, 148:2, 151:14, 173:18
**READING** [1] - 173:17
**reading** [9] - 12:3, 12:9, 12:13, 15:24, 119:12, 139:10, 146:1, 159:20, 172:14
**reads** [4] - 38:22, 62:2, 148:8, 163:22
**ready** [2] - 13:8, 148:23
**real** [35] - 17:2, 17:9, 17:11, 18:18, 24:7, 27:11, 28:13, 32:1, 36:14, 39:19, 40:10, 45:20, 45:24, 48:16, 51:4, 51:5, 54:6, 55:24, 83:2, 90:25, 118:1, 126:16, 127:22, 127:25, 134:20, 135:11, 136:5, 136:6, 136:25, 139:8, 141:15, 143:4, 162:17, 162:23, 163:23
**Real** [9] - 24:8, 36:17, 38:1, 38:24, 39:1, 39:9, 39:15, 40:4, 81:4
**realized** [1] - 163:19
**really** [8] - 32:4, 49:25, 50:24, 52:17, 53:19, 53:20, 110:7, 110:12
**Realtime** [2] - 1:17, 172:4
**REASON** [1] - 173:4
**reason** [2] - 107:2, 121:17
**reasonable** [2] - 76:11, 159:11
**reasonableness** [1] - 159:14
**reasonably** [1] - 140:1
**reasons** [2] - 90:20, 92:9
**reassigned** [1] - 67:3
**receive** [2] - 88:15, 111:12
**received** [11] - 14:6, 123:3, 123:6, 123:11, 123:13, 123:18, 123:20, 124:3, 124:7, 124:10, 124:19
**recertification** [1] - 126:19
**recess** [4] - 55:19, 84:6, 129:9, 149:3
**recognition** [1] - 109:5

**recognize** [8] - 8:10, 24:10, 29:1, 29:4, 80:8, 99:18, 110:6, 110:14
**recollection** [10] - 109:15, 111:15, 115:20, 116:14, 117:3, 117:7, 118:10, 118:12, 118:21, 120:9
**recommend** [5] - 62:23, 71:7, 136:24, 137:17, 141:1
**recommendation** [3] - 66:25, 72:23, 77:8
**recommended** [3] - 71:17, 137:8
**recommending** [2] - 71:18, 71:19
**recommends** [2] - 66:22, 143:20
**reconnaissance** [1] - 48:5
**record** [14] - 6:6, 10:5, 11:10, 15:14, 34:12, 55:21, 58:5, 80:5, 84:8, 97:1, 99:15, 149:6, 171:11, 172:9
**record's** [1] - 7:6
**recorded** [1] - 172:7
**recurring** [1] - 120:1
**recycling** [1] - 126:18
**redirect** [1] - 157:11
**reduced** [1] - 172:7
**refer** [10] - 17:15, 17:17, 36:5, 38:6, 38:24, 39:8, 40:6, 52:1, 59:17
**reference** [1] - 39:18
**references** [2] - 50:24, 51:1
**referring** [17] - 14:12, 17:18, 27:19, 29:10, 33:4, 37:19, 39:11, 44:19, 51:8, 51:11, 51:16, 51:21, 54:15, 57:2, 89:17, 93:24, 112:23
**refers** [2] - 51:9, 100:2
**refused** [1] - 74:11
**refuses** [1] - 73:7
**regard** [1] - 80:24
**regarding** [33] - 5:13, 11:23, 13:2, 16:5, 26:8, 29:18, 42:4, 50:11, 51:11, 56:9, 68:2, 68:13, 69:20, 71:1, 75:10, 77:13, 77:18, 85:5, 89:4, 94:15, 107:14, 108:16, 108:25, 109:4, 115:17, 116:17, 125:7, 128:12, 140:7, 142:16, 163:3, 163:14, 171:19
**regardless** [1] - 70:7
**region** [1] - 22:19
**regional** [1] - 23:19
**Registered** [2] - 1:16, 172:4
**regular** [4] - 64:11, 151:21, 152:11, 156:8

**regularly** [2] - 126:10
**regulated** [2] - 27:3, 44:4
**regulation** [13] - 25:21, 26:4, 44:11, 51:24, 52:14, 52:23, 53:1, 53:4, 60:25, 62:2, 154:7, 154:11
**regulations** [18] - 25:4, 25:7, 25:11, 25:13, 25:14, 26:3, 26:9, 26:25, 27:17, 28:8, 28:10, 39:3, 45:10, 52:6, 56:24, 127:17, 127:18, 127:25
**regulator** [1] - 27:2
**regulators** [1] - 60:18
**Regulatory** [1] - 39:2
**regulatory** [9] - 26:21, 26:25, 34:23, 35:3, 35:9, 38:21, 43:25, 44:3, 53:3
**reject** [5] - 66:1, 66:9, 67:23, 69:18, 143:8
**relate** [2] - 77:7, 95:8
**related** [5] - 16:15, 16:16, 27:8, 56:5, 161:9
**relates** [3] - 52:13, 77:3, 93:1
**relating** [1] - 47:10
**relations** [2] - 36:1, 161:13
**relationship** [10] - 35:19, 35:20, 35:25, 36:3, 36:5, 36:12, 46:24, 93:10, 94:8, 136:14
**relative** [24] - 14:2, 21:18, 29:7, 40:1, 45:3, 48:6, 54:7, 74:5, 96:1, 109:9, 122:1, 122:3, 126:25, 127:17, 127:18, 127:24, 136:23, 148:11, 148:17, 153:4, 153:8, 153:21, 172:11, 172:12
**relevant** [5] - 26:11, 89:10, 168:17, 169:23, 170:3
**reliable** [1] - 93:1
**reliance** [1] - 145:25
**rely** [1] - 59:21
**relying** [1] - 59:6
**remain** [1] - 94:12
**remained** [1] - 54:1
**remaining** [1] - 23:17
**remember** [11] - 15:24, 40:22, 67:7, 75:16, 75:25, 110:15, 111:14, 115:13, 117:8, 120:2, 125:6
**remembered** [1] - 116:25
**remind** [1] - 161:16
**render** [1] - 59:20
**repeat** [7] - 5:21, 10:15, 11:22, 82:11, 106:9, 145:6, 158:25
**rephrase** [3] - 49:21, 143:1, 154:13

**replaced** [1] - 165:21
**Report** [1] - 111:18
**report** [66] - 17:21, 17:23, 17:24, 18:6, 25:23, 30:21, 32:17, 48:7, 64:19, 64:25, 65:6, 66:1, 67:20, 67:23, 69:7, 69:8, 69:9, 69:10, 69:12, 69:18, 69:23, 70:16, 72:23, 73:14, 76:3, 77:17, 77:22, 78:13, 78:16, 83:13, 83:18, 88:19, 98:5, 98:9, 111:21, 112:1, 112:13, 112:19, 134:6, 136:8, 136:22, 137:1, 137:14, 138:1, 138:11, 138:24, 139:3, 139:9, 143:20, 144:3, 144:15, 146:2, 146:9, 146:19, 148:9, 149:25, 152:4, 152:20, 158:2, 158:19, 159:24, 160:7, 160:10, 160:13
**report's** [2] - 71:6, 153:6
**reported** [2] - 132:10, 148:17
**reporter** [1] - 106:11
**REPORTER** [7] - 7:12, 34:9, 97:2, 138:18, 159:17, 171:10, 171:14
**Reporter** [4] - 1:16, 1:17, 172:4
**Reporter-Certified** [2] - 1:16, 172:4
**Reporters** [1] - 1:18
**reporting** [12] - 31:2, 31:3, 32:12, 33:11, 33:14, 68:18, 77:11, 77:13, 77:20, 88:5, 88:14, 133:20
**reports** [8] - 30:13, 132:25, 140:15, 147:5, 153:13, 156:16, 156:18, 156:21
**representative** [1] - 59:13
**representing** [1] - 9:2
**request** [6] - 35:24, 49:9, 81:7, 82:9, 91:21, 157:5
**requested** [1] - 9:19
**requests** [11] - 14:14, 81:6, 81:8, 81:18, 83:6, 91:19, 166:21, 166:25, 167:4, 167:6, 167:18
**require** [5] - 20:14, 44:24, 45:11, 140:20, 141:8
**required** [26] - 21:2, 21:4, 28:4, 28:6, 46:11, 52:2, 56:10, 60:6, 71:4, 74:11, 122:12, 126:5, 126:15, 126:20, 127:3, 127:4, 130:13, 135:5, 135:9, 136:5, 136:8, 158:3, 158:6, 158:9, 161:6
**requirement** [9] - 20:23,

20:24, 47:17, 51:24, 126:21, 126:22, 132:1, 136:14, 138:23
**requirements** [9] - 20:17, 21:7, 28:10, 38:23, 40:2, 40:12, 44:13, 44:24, 60:15
**requires** [6] - 58:19, 72:5, 140:14, 140:17, 153:10, 159:8
**requiring** [2] - 77:3, 88:18
**resend** [1] - 43:18
**reserve** [1] - 171:2
**Reserve** [1] - 27:4
**reside** [1] - 19:2
**residential** [4] - 23:14, 23:16, 23:23, 28:15
**resolution** [7] - 65:18, 65:20, 66:12, 69:17, 73:2, 73:5, 73:6
**resolve** [1] - 70:6
**resolved** [4] - 66:20, 66:21, 67:21, 156:16
**resources** [6] - 20:8, 76:16, 108:7, 108:12, 128:16, 149:24
**respect** [8] - 12:16, 12:17, 12:21, 60:9, 95:16, 157:20, 163:2, 166:24
**respectful** [1] - 94:19
**respective** [1] - 172:15
**response** [2] - 115:20, 115:21
**responsibilities** [4] - 30:17, 30:19, 35:17, 38:3
**responsibility** [10] - 22:19, 46:9, 46:15, 47:4, 50:2, 95:25, 114:25, 152:18, 152:22, 153:17
**responsible** [13] - 22:15, 31:4, 31:6, 45:24, 47:1, 48:17, 50:8, 72:17, 87:2, 137:21, 138:4, 150:2, 152:21
**rest** [2] - 111:16, 133:12
**restate** [6] - 35:6, 53:17, 108:21, 133:3, 137:12, 139:19
**restated** [1] - 35:12
**restricts** [1] - 151:22
**restructure** [4] - 29:8, 29:9, 107:7, 124:25
**Restructuring** [6] - 31:22, 107:9, 107:16, 111:11, 163:11, 170:11
**restructuring** [10] - 28:21, 108:16, 108:25, 109:4, 110:17, 114:20, 163:9, 163:14, 165:16, 165:20
**result** [1] - 47:6

**results** [2] - 86:13, 125:22
**retail** [2] - 23:24, 90:6
**retained** [1] - 162:25
**retirement** [1] - 166:9
**Review** [2] - 37:12, 132:4
**review** [189] - 22:7, 22:8, 23:4, 23:10, 25:8, 30:21, 30:23, 30:25, 31:3, 31:7, 32:12, 33:21, 33:22, 33:23, 38:12, 43:14, 46:22, 47:1, 47:10, 47:16, 47:19, 48:7, 49:23, 50:3, 50:13, 56:1, 56:9, 56:17, 57:7, 59:8, 59:22, 60:2, 60:6, 60:15, 60:21, 61:14, 61:24, 62:8, 62:23, 62:25, 63:4, 63:6, 63:7, 63:9, 63:16, 63:21, 63:22, 63:24, 65:12, 65:25, 66:8, 66:21, 67:3, 67:18, 68:1, 68:3, 68:24, 69:2, 69:11, 69:24, 70:13, 70:15, 70:25, 71:4, 71:9, 71:11, 71:20, 72:4, 72:11, 72:12, 72:21, 72:22, 73:1, 73:13, 73:18, 73:20, 74:3, 74:4, 74:11, 75:10, 77:8, 77:14, 77:15, 77:19, 78:4, 78:11, 78:13, 80:15, 82:24, 83:1, 84:22, 84:24, 85:3, 85:22, 86:4, 86:5, 86:7, 87:5, 87:6, 87:15, 89:12, 89:19, 89:20, 91:23, 96:11, 96:17, 96:20, 97:12, 97:18, 99:21, 99:22, 105:6, 108:4, 126:10, 131:11, 132:11, 133:13, 134:19, 134:24, 135:11, 136:5, 136:6, 136:9, 136:17, 136:19, 136:22, 137:2, 137:4, 137:5, 137:7, 137:14, 137:15, 137:20, 137:24, 139:9, 140:25, 141:15, 141:20, 142:25, 143:12, 143:16, 143:21, 144:21, 144:22, 144:25, 145:15, 145:16, 145:20, 145:24, 146:1, 146:11, 147:4, 147:9, 147:13, 148:1, 148:8, 148:12, 148:13, 148:17, 149:11, 149:12, 150:1, 151:4, 151:15, 151:24, 152:1, 152:6, 152:7, 152:12, 152:19, 153:2, 153:9, 153:21, 153:25, 154:18, 155:3, 158:11, 158:22, 158:23, 166:11, 166:14
**reviewed** [15] - 15:14, 40:23, 72:20, 87:4, 91:10, 96:22,

97:5, 97:12, 109:15, 143:4, 144:23, 144:25, 158:19, 159:22

**reviewer** [42] - 33:25, 38:11, 48:12, 58:12, 64:9, 75:9, 78:23, 86:19, 88:7, 88:18, 88:19, 92:14, 134:17, 134:18, 135:11, 136:6, 137:17, 137:25, 138:20, 139:2, 139:13, 139:21, 141:14, 143:4, 143:15, 143:20, 144:4, 144:23, 147:6, 147:16, 147:21, 153:24, 155:7, 155:20, 155:23, 158:18, 159:8, 160:3, 160:5, 160:7, 160:9, 164:24

**reviewer 's** [6] - 47:23, 144:24, 153:21, 153:25, 154:25, 159:24

**reviewers** [20] - 33:19, 33:24, 49:17, 50:2, 56:15, 61:5, 88:24, 90:1, 127:12, 134:19, 135:21, 140:8, 140:20, 141:8, 142:16, 142:17, 142:21, 150:10, 150:16, 158:3

**reviewers '** [1] - 153:12

**reviewing** [13] - 11:8, 11:12, 12:4, 12:12, 24:18, 29:3, 31:5, 83:2, 136:25, 140:21, 145:3, 145:16, 159:4

**reviews** [14] - 23:1, 50:14, 74:9, 77:2, 77:4, 77:7, 84:11, 87:3, 90:3, 120:15, 142:20, 147:1, 163:4, 163:24

**revised** [1] - 126:23

**REVS** [94] - 17:10, 17:12, 17:14, 17:15, 17:19, 17:21, 18:2, 29:10, 29:13, 29:14, 30:7, 31:9, 35:18, 35:21, 36:23, 41:9, 44:2, 45:18, 46:17, 49:1, 49:6, 49:13, 49:16, 53:24, 63:23, 66:10, 68:12, 68:13, 69:21, 77:13, 79:3, 79:9, 79:12, 82:15, 83:12, 84:11, 85:8, 85:11, 89:17, 89:21, 90:21, 91:11, 95:4, 95:9, 98:6, 103:16, 103:19, 104:24, 105:8, 122:9, 126:1, 126:3, 126:21, 127:8, 128:1, 128:8, 129:15, 129:22, 130:11, 130:12, 130:16, 131:4, 131:9, 132:15, 132:17, 133:22, 133:25, 134:10, 135:18, 136:1, 142:18, 146:10, 149:16,

150:9, 150:15, 150:20, 150:22, 153:11, 154:1, 156:25, 157:20, 158:8, 158:15, 160:24, 163:10, 164:23, 165:10, 165:22, 166:2, 166:15, 166:24, 169:7

**rework** [1] - 76:8

**Risk** [1] - 95:18

**risk** [12] - 18:4, 95:19, 95:22, 95:24, 95:25, 96:1, 120:17, 121:7, 121:20, 121:24, 153:24, 156:10

**risk-based** [1] - 153:24

**risks** [5] - 121:3, 122:6, 122:13, 123:2, 123:7

**RMR** [1] - 173:19

**roadmap** [2] - 41:24, 159:3

**Robinson** [11] - 108:13, 108:25, 110:1, 115:25, 116:2, 116:15, 117:5, 118:9, 118:13, 118:21, 120:5

**Robyn** [4] - 2:12, 7:21, 13:6, 58:8

**rogue** [2] - 58:24, 72:3

**role** [4] - 31:18, 85:15, 85:18, 96:5

**roles** [2] - 22:18, 34:21

**Room** [1] - 1:19

**room** [1] - 55:6

**row** [1] - 33:3

**Rule** [2] - 8:23, 134:3

**RULE** [1] - 1:15

**rules** [2] - 40:1, 40:2

**Rules** [1] - 1:15

**run** [1] - 111:21

## S

**safeguard** [4] - 59:15, 70:21, 72:2, 142:9

**safeguards** [3] - 47:9, 47:12, 157:19

**sales** [1] - 159:7

**Salvo** [1] - 109:24

**sample** [2] - 153:25, 154:8

**satisfaction** [1] - 123:17

**satisfied** [1] - 63:1

**saved** [2] - 98:1, 98:3

**saw** [3] - 26:6, 111:13, 113:2

**scenario** [2] - 58:24, 66:8

**schedule** [3] - 88:22, 88:25, 136:16

**Schedule** [3] - 9:15, 9:16, 9:17

**Schoenberg** [17] - 33:13, 33:16, 85:24, 85:25, 96:9,

96:11, 96:23, 97:6, 98:13, 101:22, 102:7, 131:15, 132:4, 132:10, 149:23, 151:7, 151:13

**Schoenberg 's** [1] - 98:14

**scope** [9] - 12:23, 106:3, 106:4, 125:16, 134:2, 154:3, 165:24, 166:4, 166:18

**scoping** [1] - 50:9

**score** [1] - 121:19

**Scott** [1] - 33:10

**seal** [1] - 172:17

**seasoned** [1] - 127:16

**second** [10] - 27:23, 28:11, 32:7, 38:21, 43:8, 58:3, 126:17, 132:3, 141:25, 157:7

**secondary** [6] - 134:21, 141:18, 142:1, 144:21, 144:22, 153:25

**section** [3] - 86:12, 92:20, 95:18

**Section** [2] - 38:24, 39:9

**sections** [1] - 46:5

**secured** [2] - 27:11, 28:13

**see** [33] - 8:22, 9:21, 32:19, 33:9, 35:18, 43:21, 68:6, 70:20, 92:21, 94:2, 95:1, 100:6, 100:10, 101:2, 101:5, 101:9, 102:23, 103:1, 106:16, 113:15, 113:23, 114:16, 119:9, 119:11, 121:10, 124:4, 124:10, 124:12, 132:5, 133:10, 147:19, 148:21, 159:13

**seem** [4] - 18:21, 22:1, 28:19, 159:11

**selected** [3] - 64:22, 100:24, 125:14

**selecting** [1] - 46:15

**Selection** [1] - 111:1

**selection** [4] - 46:3, 46:5, 46:8, 46:12

**seminars** [3] - 126:7, 126:11, 128:23

**senior** [11] - 17:1, 17:3, 17:20, 22:21, 25:8, 32:23, 33:1, 36:24, 37:1, 109:21, 118:2

**sense** [4] - 76:14, 76:22, 92:16, 152:5

**sent** [8] - 7:25, 12:16, 71:20, 79:17, 79:19, 110:10, 114:10, 117:4

**sentence** [9] - 26:18, 27:7, 27:23, 28:12, 38:21, 38:23, 39:7, 42:1, 48:25

**separate** [3] - 28:17, 48:19, 118:7

**September** [6] - 107:23, 111:19, 163:12, 164:5, 165:9, 166:3

**service** [8] - 36:12, 92:21, 92:23, 93:1, 93:3, 93:13, 93:15, 94:17

**Services** [4] - 24:8, 32:1, 36:15, 81:5

**services** [4] - 17:11, 45:21, 54:6, 81:19

**SERVICES** [2] - 1:8, 1:14

**set** [18] - 27:8, 27:17, 28:10, 58:17, 62:15, 63:21, 70:20, 86:10, 86:11, 114:23, 114:24, 120:10, 120:25, 142:7, 145:15, 147:13, 155:19, 172:17

**sets** [3] - 40:1, 44:1, 44:3

**several** [4] - 9:20, 23:6, 23:7, 41:17

**severed** [2] - 31:12, 122:25

**severity** [1] - 78:6

**Seyfarth** [1] - 2:11

**sharing** [1] - 133:12

**Shaw** [1] - 2:11

**Sheet** [1] - 173:20

**SHEET** [1] - 173:1

**shelf** [1] - 88:1

**short** [1] - 15:16

**short-circuit** [1] - 15:16

**shorthand** [1] - 17:17

**show** [2] - 88:14, 145:20

**shown** [2] - 38:13, 168:21

**shows** [1] - 123:19

**shrunk** [1] - 43:7

**side** [4] - 35:24, 57:14, 76:14, 136:20

**sign** [3] - 70:25, 71:4, 124:21

**signature** [5] - 112:23, 114:12, 119:6, 171:21

**signed** [7] - 72:12, 111:14, 112:22, 113:4, 114:14, 115:11, 165:7

**significance** [1] - 107:20

**significant** [1] - 167:1

**signing** [4] - 71:19, 111:14, 158:24, 172:14

**signs** [1] - 158:18

**similar** [10] - 21:17, 31:14, 31:17, 60:16, 73:19, 85:18, 102:24, 120:14, 143:11

**similarly** [2] - 32:20, 44:6

**single** [5] - 31:14, 33:10, 33:12, 33:14, 38:8

**sits** [1] - 92:15

**sitting** [1] - 73:22

**situated** [1] - 44:6
**situation** [11] - 16:16, 67:17, 68:23, 69:4, 70:4, 70:8, 70:11, 95:25, 109:10, 138:11, 162:7
**situations** [4] - 44:23, 90:4, 91:18, 127:10
**sixth** [1] - 110:5
**small** [1] - 142:14
**snapshot** [4] - 145:17, 147:14, 148:16, 159:10
**so..** [2] - 8:6, 75:21
**solution** [1] - 64:7
**someone** [27] - 17:16, 33:11, 35:22, 45:2, 51:14, 57:25, 62:5, 62:14, 62:16, 70:12, 71:14, 73:12, 74:13, 86:8, 88:15, 88:21, 90:15, 91:6, 94:8, 96:21, 97:4, 97:11, 97:17, 103:4, 134:5, 156:6, 159:10
**sometime** [1] - 163:16
**sometimes** [3] - 8:19, 72:24, 127:2
**somewhere** [2] - 134:5, 167:22
**sorry** [34] - 7:10, 17:24, 31:10, 36:9, 43:10, 55:3, 68:16, 73:3, 74:20, 75:5, 78:9, 82:11, 83:11, 92:11, 93:23, 95:20, 97:1, 98:24, 99:2, 100:3, 110:24, 111:8, 115:6, 116:24, 117:1, 117:3, 118:15, 133:3, 138:18, 140:15, 141:7, 146:9, 146:24, 159:17
**sort** [4] - 25:23, 57:21, 76:25, 161:1
**sound** [1] - 28:14
**sounds** [1] - 164:20
**sources** [1] - 26:8
**South** [1] - 2:13
**space** [1] - 58:9
**speaking** [5] - 68:6, 87:25, 120:4, 156:25, 160:15
**specialist** [1] - 118:2
**speciality** [1] - 91:11
**specialized** [3] - 89:13, 91:6, 127:10
**specific** [2] - 15:18, 62:3
**specifically** [11] - 30:20, 31:16, 41:2, 56:9, 68:12, 75:19, 80:22, 85:21, 118:9, 134:16, 151:6
**speculate** [1] - 155:15
**speculation** [4] - 66:16, 155:12, 155:16, 156:1
**spending** [2] - 34:3, 111:4
**spoken** [3] - 38:16, 97:17,

141:13
**SS** [1] - 172:2
**St** [1] - 2:6
**staff** [21] - 22:10, 25:9, 61:4, 87:3, 89:18, 89:21, 127:7, 127:14, 127:21, 128:2, 131:11, 132:15, 132:18, 133:22, 133:25, 134:10, 135:19, 152:10, 160:22, 166:8, 166:9
**staffing** [2] - 109:16, 163:21
**stand** [1] - 13:18
**standard** [2] - 127:20, 140:6
**Standard** [1] - 13:19
**Standards** [2] - 38:18, 43:24
**standards** [19] - 21:16, 26:20, 27:8, 27:15, 27:16, 27:18, 27:20, 34:23, 35:2, 35:8, 44:2, 44:4, 44:5, 44:10, 45:3, 52:1, 139:5, 158:21
**standing** [1] - 63:13
**stands** [3] - 13:19, 19:18, 62:19
**start** [3] - 69:8, 109:5, 140:16
**started** [1] - 163:15
**starting** [2] - 9:19, 67:7
**starts** [1] - 83:15
**state** [12] - 6:2, 18:25, 19:1, 19:2, 20:14, 20:21, 20:24, 21:9, 99:3, 134:25, 135:9, 138:22
**statement** [1] - 35:10
**statements** [1] - 10:20
**STATES** [1] - 1:1
**states** [5] - 32:20, 101:6, 123:12, 126:19, 141:17
**status** [4] - 112:10, 112:14, 135:13
**stayed** [1] - 26:3
**stays** [1] - 161:18
**stenotype** [1] - 172:7
**step** [4] - 64:19, 75:25, 118:5, 137:19
**steps** [2] - 71:24, 148:8
**sticking** [1] - 34:8
**still** [11] - 8:7, 10:4, 10:14, 22:25, 34:6, 49:6, 55:10, 76:25, 151:2, 155:9, 165:16
**stipulated** [1] - 12:20
**stop** [1] - 152:19
**stopped** [1] - 22:2
**stopping** [1] - 83:21
**stressed** [1] - 101:14
**strike** [10] - 20:17, 26:7, 78:9, 93:23, 95:20, 96:24, 114:18, 115:6, 133:3, 140:15

**strong** [1] - 139:23
**structure** [7] - 29:13, 29:23, 31:9, 31:13, 31:17, 68:18, 107:14
**Structure** [1] - 35:13
**stuff** [2] - 90:25, 107:1
**subdivisions** [1] - 23:24
**subject** [10] - 11:21, 12:15, 12:18, 75:11, 79:6, 106:6, 106:13, 106:21, 161:22, 168:12
**submit** [2] - 115:23, 158:20
**submits** [1] - 147:6
**Submitted** [1] - 107:22
**submitted** [15] - 97:6, 97:24, 100:17, 107:24, 116:3, 116:7, 116:12, 144:4, 146:8, 146:10, 146:20, 146:21, 156:21, 163:12, 164:4
**submitting** [1] - 158:2
**subordinate 's** [1] - 144:15
**subordinates** [5] - 145:4, 147:1, 147:5, 147:11
**Subscribed** [1] - 173:22
**subsection** [1] - 86:17
**subset** [1] - 49:25
**subtotal** [2] - 124:2, 124:13
**successful** [1] - 76:9
**suffering** [1] - 6:17
**suggest** [2] - 101:18, 131:11
**suggested** [2] - 74:12, 154:7
**Suite** [1] - 2:14
**summarize** [1] - 159:19
**summarized** [1] - 147:14
**summarizes** [3] - 80:12, 153:3, 159:13
**Summary** [6] - 31:22, 107:9, 107:16, 111:11, 163:11, 170:11
**summary** [12] - 93:12, 100:11, 102:20, 105:16, 111:12, 113:9, 159:6, 163:22, 169:10, 169:22, 170:2
**summer** [1] - 163:16
**supervise** [1] - 150:3
**supervised** [1] - 37:2
**supervising** [33] - 36:25, 37:6, 37:10, 56:14, 59:7, 60:2, 60:13, 61:5, 62:24, 63:3, 66:23, 69:13, 72:6, 72:15, 77:9, 78:22, 143:22, 144:25, 145:7, 145:8, 145:21, 147:9, 147:10, 149:22, 150:2, 151:22, 152:2, 152:17, 153:18, 155:2, 160:15
**supervisor** [27] - 11:13, 64:9,

65:13, 66:10, 70:6, 72:11, 78:20, 86:1, 86:8, 86:11, 97:25, 98:23, 98:25, 99:4, 144:2, 146:1, 147:1, 147:6, 149:13, 149:20, 149:21, 149:22, 149:23, 149:24, 155:8, 159:3, 161:14
**supervisors** [8] - 86:3, 96:6, 96:11, 97:19, 98:6, 144:14, 145:3, 147:2
**supervisory** [7] - 149:11, 150:21, 158:5, 159:23, 160:2, 160:6, 160:19
**support** [2] - 44:17, 74:7
**supported** [1] - 141:2
**supports** [1] - 140:1
**supposed** [2] - 53:7, 120:16
**surprised** [2] - 106:16, 106:20
**switch** [2] - 55:1, 55:4
**switching** [1] - 55:13
**sworn** [3] - 5:3, 172:6, 173:22
**system** [24] - 70:20, 71:22, 71:23, 72:8, 72:14, 76:6, 83:17, 88:14, 96:14, 98:1, 98:3, 100:1, 105:21, 105:24, 105:25, 134:22, 134:25, 135:1, 135:6, 135:12, 137:3, 141:16, 142:1, 142:7
**System** [1] - 71:22
**system 's** [2] - 62:15, 83:18
**systems** [1] - 88:5

## T

**table** [11] - 43:10, 43:11, 110:14, 110:15, 119:7, 119:8, 119:19, 120:3, 120:6, 120:11, 122:15
**tables** [1] - 110:16
**tabulating** [1] - 111:2
**talks** [4] - 42:2, 86:12, 92:20, 132:24
**tax** [1] - 90:13
**Team** [5] - 37:12, 37:16, 129:15, 130:11, 131:4
**team** [40] - 30:21, 30:23, 31:3, 31:4, 31:8, 32:12, 47:6, 47:25, 50:1, 50:3, 50:5, 50:7, 50:13, 54:12, 56:22, 56:23, 58:20, 63:23, 65:1, 68:7, 69:21, 72:9, 72:21, 76:17, 78:7, 87:15, 105:8, 106:17, 126:24, 129:19, 131:5, 134:8, 134:14, 136:11, 136:14,

146:11, 153:11, 157:20, 158:15
**team's** [1] - 31:6
**teams** [6] - 26:2, 30:22, 30:24, 31:2, 39:17, 65:10
**teamwork** [3] - 120:18, 123:25, 124:3
**technical** [33] - 134:17, 134:18, 134:19, 135:10, 136:6, 137:25, 138:19, 139:2, 139:13, 139:20, 140:8, 141:14, 142:16, 142:17, 142:21, 143:4, 143:14, 144:4, 144:23, 144:24, 147:6, 147:20, 150:9, 150:16, 155:7, 155:23, 158:2, 158:18, 158:24, 160:3, 160:5, 160:7, 160:8
**ten** [7] - 17:6, 22:24, 55:15, 79:12, 89:1, 93:19, 124:2
**tenant** [1] - 48:3
**tendency** [1] - 91:20
**term** [2] - 49:7, 164:1
**terminated** [1] - 125:8
**terms** [5] - 20:9, 48:15, 62:4, 138:8, 149:21
**test** [4] - 119:12, 119:13, 150:16, 152:11
**tested** [1] - 150:9
**testified** [5] - 5:4, 13:22, 37:25, 42:14, 169:21
**testify** [6] - 11:1, 11:3, 11:20, 11:23, 12:5, 13:4
**testifying** [1] - 60:5
**testimony** [21] - 42:19, 50:19, 60:9, 79:20, 91:15, 113:1, 116:23, 133:4, 137:10, 139:17, 140:11, 147:24, 153:1, 153:15, 154:12, 169:24, 170:15, 170:20, 172:9, 173:3, 173:18
**THE** [19] - 1:1, 7:19, 9:12, 10:3, 11:15, 12:14, 14:20, 14:23, 75:3, 75:6, 104:4, 138:18, 143:2, 150:24, 157:12, 162:2, 171:3, 171:7
**themes** [1] - 52:15
**themselves** [4] - 50:25, 56:20, 72:25, 76:21
**theory** [1] - 44:12
**thinking** [1] - 30:2
**third** [16] - 9:14, 38:23, 39:7, 42:1, 51:5, 51:7, 52:3, 59:21, 69:15, 69:17, 69:19, 73:7, 113:20, 113:25, 138:25, 144:18

**third-party** [8] - 51:5, 51:7, 59:21, 69:15, 69:17, 69:19, 73:7, 138:25
**thoughts** [4] - 50:15, 125:6, 125:13, 148:22
**three** [8] - 33:9, 109:11, 109:18, 124:10, 124:19, 148:5, 166:10, 169:8
**throughout** [1] - 73:16
**ties** [1] - 146:24
**timely** [1] - 93:5
**title** [5] - 8:24, 30:15, 119:8, 119:19, 130:11
**Title** [1] - 39:1
**titled** [1] - 24:7
**today** [10] - 6:9, 9:2, 9:6, 10:22, 29:18, 29:21, 29:24, 74:23, 80:16, 150:7
**together** [7] - 65:17, 65:20, 68:8, 108:3, 108:5, 135:20
**ton** [2] - 52:6, 76:16
**took** [6] - 16:3, 22:5, 55:5, 115:1, 127:10, 154:8
**tooth** [1] - 94:20
**top** [19] - 9:15, 9:17, 22:20, 30:3, 30:6, 32:1, 32:5, 34:20, 35:14, 39:13, 81:4, 99:24, 100:23, 107:16, 107:19, 112:23, 113:14, 131:8, 156:23
**topics** [2] - 9:24, 134:3
**total** [4] - 74:25, 81:21, 86:20, 167:5
**totally** [1] - 153:9
**trained** [1] - 154:19
**training** [19] - 125:25, 126:1, 126:3, 127:7, 127:8, 127:11, 127:13, 127:23, 127:24, 128:2, 134:9, 134:15, 135:17, 136:1, 154:20, 161:6, 161:7, 163:1
**trainings** [1] - 132:14
**tran** [1] - 171:13
**transaction** [1] - 45:15
**transcribed** [1] - 173:19
**transcript** [1] - 173:18
**transferred** [3] - 67:25, 74:13, 75:9
**transmittal** [1] - 72:7
**transpired** [1] - 68:10
**trend** [1] - 166:24
**trick** [1] - 100:15
**true** [5] - 20:13, 63:20, 164:2, 172:9, 173:19
**truth** [3] - 172:6, 172:6
**try** [4] - 66:17, 76:19, 147:24, 171:7
**trying** [15] - 14:24, 15:4,

49:21, 53:18, 65:24, 100:15, 117:24, 120:2, 137:13, 146:5, 146:6, 146:25, 153:16, 170:22
**Tuesday** [1] - 1:19
**turn** [6] - 44:14, 48:8, 54:18, 100:20, 110:4, 110:24
**twice** [2] - 16:12, 127:9
**two** [31] - 28:19, 30:22, 30:24, 37:22, 52:15, 64:4, 69:16, 70:9, 71:24, 77:24, 82:17, 85:4, 101:8, 101:11, 101:24, 112:4, 112:11, 122:24, 124:1, 124:3, 124:7, 125:14, 126:20, 129:17, 134:25, 135:10, 135:12, 135:14, 137:14, 149:21
**type** [16] - 25:19, 78:6, 87:18, 87:21, 89:14, 89:23, 90:8, 91:12, 91:19, 92:1, 92:8, 95:13, 95:16, 118:23, 133:23, 134:9
**types** [3] - 91:21, 118:23, 134:7
**typewriting** [1] - 172:7
**typical** [4] - 66:3, 66:5, 66:18, 105:5
**typically** [2] - 66:2, 118:22

## U

**ultimate** [2] - 70:22, 138:8
**ultimately** [15] - 47:24, 50:9, 59:9, 62:18, 66:23, 67:19, 71:16, 77:8, 137:7, 139:5, 139:11, 140:25, 142:25, 164:22, 165:7
**umbrella** [1] - 61:3
**unable** [1] - 63:19
**unanswered** [1] - 148:3
**under** [9] - 33:5, 33:8, 36:24, 61:2, 93:7, 114:3, 121:9, 167:11, 172:7
**underlying** [8] - 68:2, 69:21, 71:1, 139:14, 144:3, 146:7, 151:14, 155:9
**underneath** [8] - 32:20, 32:25, 33:2, 33:16, 81:5, 101:5, 119:6, 121:5
**undertook** [1] - 109:4
**undue** [5] - 47:5, 56:8, 61:7, 61:8, 61:23
**unethical** [1] - 78:1
**unfortunately** [2] - 110:22, 127:1
**Uniform** [1] - 13:19
**uniqueness** [1] - 90:14

**unit** [1] - 30:20
**UNITED** [1] - 1:1
**unless** [3] - 10:12, 147:3, 173:20
**unlock** [1] - 63:11
**unpack** [1] - 136:4
**unrevised** [1] - 64:24
**up** [42] - 11:4, 19:10, 30:21, 31:2, 31:3, 31:10, 44:1, 44:3, 58:17, 62:15, 63:13, 63:21, 67:9, 70:21, 76:16, 76:17, 78:17, 78:24, 86:10, 86:11, 92:2, 99:9, 101:24, 107:8, 114:17, 114:23, 114:24, 117:17, 118:1, 120:3, 120:10, 121:3, 127:3, 129:21, 142:7, 145:15, 145:20, 145:22, 147:13, 155:19, 157:11, 171:19
**update** [6] - 25:6, 134:22, 135:5, 135:12, 141:15, 142:1
**updated** [6] - 25:7, 25:20, 126:23, 135:1, 135:2, 142:8
**updates** [1] - 141:19
**uses** [1] - 142:3
**USPAP** [30] - 13:12, 13:15, 13:18, 13:21, 13:25, 14:15, 21:17, 39:4, 64:13, 126:15, 126:20, 126:22, 126:25, 140:5, 140:7, 140:14, 140:17, 140:20, 141:8, 156:12, 157:22, 158:3, 158:6, 158:9, 158:16, 158:21, 161:20, 161:22, 161:23, 162:4
**utilize** [2] - 72:9, 92:17
**utilized** [1] - 65:9
**utilizes** [1] - 137:15
**utilizing** [3] - 31:7, 136:9, 137:2

## V

**vague** [3] - 79:5, 125:10, 125:17
**Valore** [1] - 33:10
**valuation** [12] - 27:9, 27:24, 36:22, 37:2, 56:25, 74:6, 81:6, 81:7, 157:5, 166:21, 166:25, 167:5
**Valuation** [2] - 36:21, 81:5
**valuations** [6] - 17:2, 17:10, 74:7, 162:23, 163:23, 167:19
**value** [10] - 44:18, 57:5,

Deposition of Adam Barone

20

59:12, 59:20, 139:24, 141:2, 159:9, 159:16, 159:19
**values** [1] - 164:22
**various** [9] - 38:21, 43:25, 59:16, 113:10, 122:11, 141:16, 143:13, 161:7, 161:14
**vendor** [2] - 94:9, 146:22
**vendors** [1] - 93:10
**Veronica** [1] - 33:12
**version** [3] - 25:3, 53:8, 100:7
**versus** [5] - 26:5, 73:23, 149:22, 166:23, 167:3
**vested** [6] - 56:22, 56:23, 57:10, 58:1, 62:4, 64:5
**vetted** [1] - 67:15
**Via** [2] - 2:2, 2:19
**via** [2] - 1:17, 130:20
**vice** [4] - 17:1, 17:3, 17:20, 22:22
**Videoconference** [2] - 2:2, 2:19
**videoconference** [2] - 1:18, 5:14
**view** [1] - 26:5
**violation** [5] - 77:13, 77:18, 77:20, 78:12, 161:1
**violations** [2] - 77:12, 79:13
**voice** [1] - 160:9
**volume** [9] - 14:4, 14:13, 14:16, 15:23, 89:20, 109:16, 163:24, 164:1, 167:20
**vow** [2] - 128:2, 128:10
**VS** [1] - 1:7

## W

**Wacker** [1] - 2:13
**wait** [3] - 11:16, 94:7, 113:20
**Waived** [1] - 171:21
**waived** [1] - 172:15
**walk** [1] - 100:19
**walking** [1] - 43:23
**ways** [9] - 43:4, 53:12, 53:24, 54:23, 56:18, 142:10, 142:11, 150:15, 161:8
**weaknesses** [2] - 154:25, 155:3
**week** [1] - 6:24
**weight** [7] - 120:21, 120:23, 121:1, 121:10, 121:18, 122:7, 124:16
**weighted** [3] - 121:19, 121:22, 122:4
**weighting** [1] - 122:11

**weights** [2] - 164:17, 164:22
**Western** [1] - 22:15
**WESTMORELAND** [2] - 172:3, 173:2
**WHEREOF** [1] - 172:17
**whole** [6] - 42:21, 46:18, 49:11, 57:25, 128:8, 172:6
**William** [1] - 109:20
**willingness** [1] - 95:12
**Witness** [6] - 11:8, 11:12, 12:4, 12:12, 24:18, 29:3
**witness** [3] - 172:5, 172:9, 172:15
**WITNESS** [18] - 1:15, 7:19, 9:12, 10:3, 11:15, 12:14, 14:20, 14:23, 75:3, 75:6, 104:4, 143:2, 150:24, 157:12, 162:2, 171:3, 171:7, 172:17
**wonderful** [1] - 102:12
**wondering** [1] - 128:9
**word** [7] - 13:21, 62:19, 85:3, 85:4, 93:22, 106:20, 139:23
**words** [4] - 43:13, 85:4, 119:12, 170:22
**worker** [2] - 94:3, 94:8
**workers** [2] - 93:10, 94:5
**workflow** [14] - 14:3, 15:23, 36:23, 37:8, 37:11, 39:17, 48:17, 50:8, 81:2, 88:9, 107:7, 109:6, 163:19, 163:20
**workgroup** [1] - 22:14
**workload** [3] - 14:11, 87:6
**works** [2] - 72:16, 95:17
**world** [1] - 18:22
**worst** [1] - 58:23
**writing** [1] - 24:24
**written** [3] - 96:7, 148:13, 154:24
**wrote** [4] - 96:12, 101:16, 102:1, 129:21
**WRP** [1] - 107:19

## X

**XI** [1] - 39:2

## Y

**year** [35] - 19:5, 23:16, 40:23, 41:1, 42:16, 81:9, 81:17, 81:19, 82:7, 83:12, 85:1, 85:14, 85:20, 85:23, 99:20, 99:22, 100:11, 101:13, 102:10, 102:20, 105:16,

127:9, 161:5, 162:14, 163:25, 166:12, 167:12, 167:21, 167:22, 168:2, 168:8, 168:13, 168:14, 168:22, 169:22
**year-end** [5] - 102:20, 105:16, 168:13, 168:22, 169:22
**year-to-date** [3] - 82:7, 167:12, 167:21
**yearly** [2] - 126:1, 126:2
**years** [21] - 14:3, 14:14, 17:6, 22:11, 22:12, 22:24, 23:6, 23:7, 23:8, 23:9, 23:21, 74:16, 74:24, 74:25, 79:13, 80:13, 83:8, 83:9, 83:14, 126:2, 126:20
**yesterday** [3] - 14:7, 79:17, 80:21
**yourself** [2] - 12:2, 82:12