# EXHIBIT J

Case: 4:17-cv-02876-PLC    Doc. #:  64-10    Filed: 03/20/19    Page: 2 of 49 PageID #: 1209

# Interagency

# Appraisal and Evaluation

# Guidelines

**(December 2, 2010)**

**Interagency Appraisal and Evaluation Guidelines**

**Table of Contents**

I.      Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

III.    Supervisory Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

IV.     Appraisal and Evaluation Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

V.      Independence of the Appraisal and Evaluation Program . . . . . . . . . . . . . . . . . . . . . . .  3

VI.     Selection of Appraisers or Persons Who Perform Evaluations . . . . . . . . . . . . . . . . . .  5

        A.   Approved Appraiser List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        B.   Engagement Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

VII.    Transactions That Require Appraisals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

VIII.   Minimum Appraisal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

IX.     Appraisal Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

X.      Appraisal Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

XI.     Transactions That Require Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

XII.    Evaluation Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

XIII.   Evaluation Content . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

XIV.    Validity of Appraisals and Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

XV.     Reviewing Appraisals and Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.  Reviewer Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.  Depth of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        C.  Resolution of Deficiencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        D.  Documentation of the Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i

XVI.    Third Party Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

XVII.   Program Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        A.  Monitoring Collateral Values  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.  Portfolio Collateral Risk  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        C.  Modifications and Workouts of Existing Credits. . . . . . . . . . . . . . . . . . . . . . . . . 22

XVIII. Referrals  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Appendix A, Appraisal Exemptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Appendix B, Evaluations Based on Analytical Methods and Technological Tools . . . . . . . . 31

Appendix C, Deductions and Discounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Appendix D, Glossary of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Interagency Appraisal and Evaluation Guidelines**

### I.     Purpose

The Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (FRB), the Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the National Credit Union Administration (NCUA) (the Agencies) are jointly issuing these Interagency Appraisal and Evaluation Guidelines (Guidelines), which supersede the 1994 Interagency Appraisal and Evaluation Guidelines. These Guidelines, including their appendices, address supervisory matters relating to real estate appraisals and evaluations used to support real estate-related financial transactions.[1] Further, these Guidelines provide federally regulated institutions and examiners clarification on the Agencies' expectations for prudent appraisal and evaluation policies, procedures, and practices.

### II.    Background

Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA)[2] requires each Agency to prescribe appropriate standards for the performance of real estate appraisals in connection with "federally related transactions,"[3] which are defined as those real estate-related financial transactions that an Agency engages in, contracts for, or regulates and that require the services of an appraiser.[4] The Agencies' appraisal regulations must require, at a minimum, that real estate appraisals be performed in accordance with generally accepted uniform appraisal standards as evidenced by the appraisal standards promulgated by the Appraisal Standards Board, and that such appraisals be in writing.[5] An Agency may require compliance with additional appraisal standards if it makes a determination that such additional standards are required to properly carry out its statutory responsibilities.[6] Each of the Agencies has adopted additional appraisal standards.[7]

The Agencies' real estate lending regulations and guidelines,[8] issued pursuant to section 304 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA),[9] require each institution to adopt and maintain written real estate lending policies that are consistent with principles of safety and soundness and that reflect consideration of the real estate lending guidelines issued as an appendix to the regulations.[10]

---

[1]   These Guidelines pertain to all real estate-related financial transactions originated or purchased by a regulated institution or its operating subsidiary for its own portfolio or as assets held for sale, including activities of commercial and residential real estate mortgage operations, capital markets groups, and asset securitization and sales units.

[2]   Pub. L. 101-73, Title XI, 103 Stat. 511 (1989); 12 U.S.C. 3331, *et seq*.

[3]   12 U.S.C. 3339

[4]   12 U.S.C. 3350(4).

[5]   Supra Note 3.

[6]   Id.

[7]   OCC: 12 CFR part 34, subpart C; FRB: 12 CFR part 208, subpart E, and 12 CFR part 225, subpart G; FDIC: 12 CFR part 323; OTS: 12 CFR part 564; and NCUA: 12 CFR part 722.

[8]   OCC: 12 CFR part 34, subpart C; FRB: 12 CFR part 208, subpart E; FDIC: 12 CFR part 365; and OTS: 12 CFR 560.100 and 560.101.

[9]   Pub. L. 102-242, § 304, 105 Stat. 2354; 12 U.S.C. 1828(o).

[10]  NCUA's general lending regulation addresses residential real estate lending by federal credit unions, and its member business loan regulation addresses commercial real estate lending. 12 CFR 701.21; 12 CFR part 723.

The real estate lending guidelines state that an institution's real estate lending program should include an appropriate real estate appraisal and evaluation program.

## III.    Supervisory Policy

An institution's real estate appraisal and evaluation policies and procedures will be reviewed as part of the examination of the institution's overall real estate-related activities. Examiners will consider the size and the nature of an institution's real estate-related activities when assessing the appropriateness of its program.

While borrowers' ability to repay their real estate loans according to reasonable terms remains the primary consideration in the lending decision, an institution also must consider the value of the underlying real estate collateral in accordance with the Agencies' appraisal regulations. Institutions that fail to comply with the Agencies' appraisal regulations or to maintain a sound appraisal and evaluation program consistent with supervisory guidance will be cited in supervisory letters or examination reports and may be criticized for unsafe and unsound banking practices. Deficiencies will require appropriate corrective action.

When analyzing individual transactions, examiners will review an appraisal or evaluation to determine whether the methods, assumptions, and value conclusions are reasonable. Examiners also will determine whether the appraisal or evaluation complies with the Agencies' appraisal regulations and is consistent with supervisory guidance as well as the institution's policies. Examiners will review the steps taken by an institution to ensure that the persons who perform the institution's appraisals and evaluations are qualified, competent, and are not subject to conflicts of interest.

## IV.    Appraisal and Evaluation Program

An institution's board of directors or its designated committee is responsible for adopting and reviewing policies and procedures that establish an effective real estate appraisal and evaluation program. The program should:

- Provide for the independence of the persons ordering, performing, and reviewing appraisals or evaluations.

- Establish selection criteria and procedures to evaluate and monitor the ongoing performance of appraisers and persons who perform evaluations.

- Ensure that appraisals comply with the Agencies' appraisal regulations and are consistent with supervisory guidance.

- Ensure that appraisals and evaluations contain sufficient information to support the credit decision.

- Maintain criteria for the content and appropriate use of evaluations consistent with safe and sound banking practices.

- Provide for the receipt and review of the appraisal or evaluation report in a timely manner to facilitate the credit decision.

- Develop criteria to assess whether an existing appraisal or evaluation may be used to support a subsequent transaction.

- Implement internal controls that promote compliance with these program standards, including those related to monitoring third party arrangements.

- Establish criteria for monitoring collateral values.

- Establish criteria for obtaining appraisals or evaluations for transactions that are not otherwise covered by the appraisal requirements of the Agencies' appraisal regulations.

## V.   Independence of the Appraisal and Evaluation Program

For both appraisal and evaluation functions, an institution should maintain standards of independence as part of an effective collateral valuation program for all of its real estate lending activity. The collateral valuation program is an integral component of the credit underwriting process and, therefore, should be isolated from influence by the institution's loan production staff. An institution should establish reporting lines independent of loan production for staff who administer the institution's collateral valuation program, including the ordering, reviewing, and acceptance of appraisals and evaluations. Appraisers must be independent of the loan production and collection processes and have no direct, indirect or prospective interest, financial or otherwise, in the property or transaction.[11] These standards of independence also should apply to persons who perform evaluations.

For a small or rural institution or branch, it may not always be possible or practical to separate the collateral valuation program from the loan production process. If absolute lines of independence cannot be achieved, an institution should be able to demonstrate clearly that it has prudent safeguards to isolate its collateral valuation program from influence or interference from the loan production process. In such cases, another loan officer, other officer, or director of the institution may be the only person qualified to analyze the real estate collateral. To ensure their independence, such lending officials, officers, or directors must abstain from any vote or approval involving loans on which they ordered, performed, or reviewed the appraisal or evaluation.[12]

---

[11] The Agencies' appraisal regulations set forth specific appraiser independence requirements that exceed those set forth in the Uniform Standards of Professional Appraisal Practice (USPAP). Institutions also should be aware of separate requirements on conflicts of interest under Regulation Z (Truth in Lending), 12 CFR 226.42(d).

[12] NCUA has recognized that it may be necessary for credit union loan officers or other officials to participate in the appraisal or evaluation function although it may be sound business practice to ensure no single person has the sole authority to make credit decisions involving loans on which the person ordered or reviewed the appraisal or evaluation. 55 FR 5614, 5618 (February 16, 1990), 55 FR 30193, 30206 (July 25, 1990).

Communication between the institution's collateral valuation staff and an appraiser or person performing an evaluation is essential for the exchange of appropriate information relative to the valuation assignment. An institution's policies and procedures should specify methods for communication that ensure independence in the collateral valuation function. These policies and procedures should foster timely and appropriate communications regarding the assignment and establish a process for responding to questions from the appraiser or person performing an evaluation.

An institution may exchange information with appraisers and persons who perform evaluations, which may include providing a copy of the sales contract[13] for a purchase transaction. However, an institution should not directly or indirectly coerce, influence, or otherwise encourage an appraiser or a person who performs an evaluation to misstate or misrepresent the value of the property.[14] Consistent with its policies and procedures, an institution also may request the appraiser or person who performs an evaluation to:

- Consider additional information about the subject property or about comparable properties.

- Provide additional supporting information about the basis for a valuation.

- Correct factual errors in an appraisal.

An institution's policies and procedures should ensure that it avoids inappropriate actions that would compromise the independence of the collateral valuation function,[15] including:

- Communicating a predetermined, expected, or qualifying estimate of value, or a loan amount or target loan-to-value ratio to an appraiser or person performing an evaluation.

- Specifying a minimum value requirement for the property that is needed to approve the loan or as a condition of ordering the valuation.

- Conditioning a person's compensation on loan consummation.

- Failing to compensate a person because a property is not valued at a certain amount.[16]

---

[13]   Refer to USPAP Standards Rule 1-5(a) and the Ethics Rule.

[14]   For mortgage transactions secured by a consumer's principal dwelling, refer to 12 CFR 226.36(b) under Regulation Z (Truth in Lending) through March 31, 2011. Also refer to 12 CFR 226.42, which is mandatory beginning on April 1, 2011. Regulation Z also prohibits a creditor from extending credit when it knows that the appraiser independence standards have been violated, unless the creditor determines that the value of the property is not materially misstated.

[15]   See 12 CFR 226.42(c).

[16]   This provision does not preclude an institution from withholding compensation from an appraiser or person who provided an evaluation based on a breach of contract or substandard performance of services under a contractual provision.

Page 4 of 45

- Implying that current or future retention of a person's services depends on the amount at which the appraiser or person performing an evaluation values a property.

- Excluding a person from consideration for future engagement because a property's reported market value does not meet a specified threshold.

After obtaining an appraisal or evaluation, or as part of its business practice, an institution may find it necessary to obtain another appraisal or evaluation of a property and would be expected to adhere to a policy of selecting the most credible appraisal or evaluation, rather than the appraisal or evaluation that states the highest value. (Refer to the *Reviewing Appraisals and Evaluations* section in these Guidelines for additional information on determining and documenting the credibility of an appraisal or evaluation.) Further, an institution's reporting of a person suspected of non-compliance with the Uniform Standards of Professional Appraisal Practice (USPAP), and applicable federal or state laws or regulations, or otherwise engaged in other unethical or unprofessional conduct to the appropriate authorities would not be viewed by the Agencies as coercion or undue influence. However, an institution should not use the threat of reporting a false allegation in order to influence or coerce an appraiser or a person who performs an evaluation.

## VI.    Selection of Appraisers or Persons Who Perform Evaluations

An institution's collateral valuation program should establish criteria to select, evaluate, and monitor the performance of appraisers and persons who perform evaluations. The criteria should ensure that:

- The person selected possesses the requisite education, expertise, and experience to competently complete the assignment.

- The work performed by appraisers and persons providing evaluation services is periodically reviewed by the institution.

- The person selected is capable of rendering an unbiased opinion.

- The person selected is independent and has no direct, indirect, or prospective interest, financial or otherwise, in the property or the transaction.

- The appraiser selected to perform an appraisal holds the appropriate state certification or license at the time of the assignment. Persons who perform evaluations should possess the appropriate appraisal or collateral valuation education, expertise, and experience relevant to the type of property being valued. Such persons may include appraisers, real estate lending professionals, agricultural extension agents, or foresters.[17]

---

[17]    Although not required, an institution may use state certified or licensed appraisers to perform evaluations. Institutions should refer to USPAP Advisory Opinion 13 for guidance on appraisers performing evaluations of real property collateral.

An institution or its agent must directly select and engage appraisers.  The only exception to this requirement is that the Agencies' appraisal regulations allow an institution to use an appraisal prepared for another financial services institution provided certain conditions are met.  An institution or its agents also should directly select and engage persons who perform evaluations.  Independence is compromised when a borrower recommends an appraiser or a person to perform an evaluation.  Independence is also compromised when loan production staff selects a person to perform an appraisal or evaluation for a specific transaction.  For certain transactions, an institution also must comply with the provisions addressing valuation independence in Regulation Z (Truth in Lending).[18]

An institution's selection process should ensure that a qualified, competent and independent person is selected to perform a valuation assignment.  An institution should maintain documentation to demonstrate that the appraiser or person performing an evaluation is competent, independent, and has the relevant experience and knowledge for the market, location, and type of real property being valued.  Further, the person who selects or oversees the selection of appraisers or persons providing evaluation services should be independent from the loan production area.  An institution's use of a borrower-ordered or borrower-provided appraisal violates the Agencies' appraisal regulations.  However, a borrower can inform an institution that a current appraisal exists, and the institution may request it directly from the other financial services institution.

### A.    Approved Appraiser List

If an institution establishes an approved appraiser list for selecting an appraiser for a particular assignment, the institution should have appropriate procedures for the development and administration of the list.  These procedures should include a process for qualifying an appraiser for initial placement on the list, as well as periodic monitoring of the appraiser's performance and credentials to assess whether to retain the appraiser on the list.  Further, there should be periodic internal review of the use of the approved appraiser list to confirm that appropriate procedures and controls exist to ensure independence in the development, administration, and maintenance of the list.  For residential transactions, loan production staff can use a revolving, pre-approved appraiser list, provided the development and maintenance of the list is not under their control.

### B.    Engagement Letters

An institution should use written engagement letters when ordering appraisals, particularly for large, complex, or out-of-area commercial real estate properties.  An engagement letter facilitates communication with the appraiser and documents the expectations of each party to the appraisal assignment.  In addition to the other information, the engagement letter will identify the intended use and user(s), as defined in USPAP.  An engagement letter also may specify whether there are any legal or contractual restrictions on the sharing of the appraisal with other parties.  An institution should include the engagement letter in its credit file.  To avoid the appearance of any conflict of interest, appraisal or evaluation development work should not commence until the institution has selected and engaged a person for the assignment.

---

[18]   See 12 CFR 226.42.

## VII.   Transactions That Require Appraisals

Although the Agencies' appraisal regulations exempt certain real estate-related financial transactions from the appraisal requirement, most real estate-related financial transactions over the appraisal threshold are considered federally related transactions and, thus, require appraisals.[19]   The Agencies also reserve the right to require an appraisal under their appraisal regulations to address safety and soundness concerns in a transaction.  (See Appendix A, *Appraisal Exemptions*.)[20]

## VIII.   Minimum Appraisal Standards

The Agencies' appraisal regulations include minimum standards for the preparation of an appraisal.  (See Appendix D, *Glossary of Terms*, for terminology used in these Guidelines.)  The appraisal must:

- Conform to generally accepted appraisal standards as evidenced by the USPAP promulgated by the Appraisal Standards Board of the Appraisal Foundation unless principles of safe and sound banking require compliance with stricter standards.  Although allowed by USPAP, the Agencies' appraisal regulations do not permit an appraiser to appraise any property in which the appraiser has an interest, direct or indirect, financial or otherwise in the property or transaction.  Further, the appraisal must contain an opinion of market value as defined in the Agencies' appraisal regulations.  (See discussion on the definition of market value below.)  Under USPAP, the appraisal must contain a certification that the appraiser has complied with USPAP.  An institution may refer to the appraiser's USPAP certification in its assessment of the appraiser's independence concerning the transaction and the property.  Under the Agencies' appraisal regulations, the result of an Automated Valuation Model (AVM), by itself or signed by an appraiser, is not an appraisal, because a state certified or licensed appraiser must perform an appraisal in conformance with USPAP and the Agencies' minimum appraisal standards.  Further, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act)[21] provides "[i]n conjunction with the purchase of a consumer's principal dwelling, broker price opinions may not be used as the primary basis to determine the value of a piece of property for the purpose of loan origination of a residential mortgage loan secured by such piece of property."[22]

---

[19]   In order to facilitate recovery in designated major disaster areas, subject to safety and soundness considerations, the Depository Institutions Disaster Relief Act of 1992 provides the Agencies with the authority to waive certain appraisal requirements for up to three years after a Presidential declaration of a natural disaster.  Pub. L. 102-485, § 2, 106 Stat. 2771 (October 23, 1992); 12 U.S.C. 3352.

[20]   As a matter of policy, OTS uses its supervisory authority to require problem associations and associations in troubled condition to obtain appraisals for all real estate-related transactions over $100,000 (unless the transaction is otherwise exempt).  NCUA requires a written estimate of market value for all real estate-related transactions valued at the appraisal threshold or less, or that involve an existing extension of credit where there is either an advancement of new monies or a material change in the condition of the property.  12 CFR 722.3(d).

[21]   Pub. L. 111-203, 124 Stat. 1376 (2010).

[22]   Dodd-Frank Act, Section 1473(r).

- Be written and contain sufficient information and analysis to support the institution's decision to engage in the transaction._  An institution should obtain an appraisal that is appropriate for the particular federally related transaction, considering the risk and complexity of the transaction.  The level of detail should be sufficient for the institution to understand the appraiser's analysis and opinion of the property's market value.  As provided by the USPAP Scope of Work Rule, appraisers are responsible for establishing the scope of work to be performed in rendering an opinion of the property's market value.  An institution should ensure that the scope of work is appropriate for the assignment.  The appraiser's scope of work should be consistent with the extent of the research and analyses employed for similar property types, market conditions, and transactions.  Therefore, an institution should be cautious in limiting the scope of the appraiser's inspection, research, or other information used to determine the property's condition and relevant market factors, which could affect the credibility of the appraisal.

  According to USPAP, appraisal reports must contain sufficient information to enable the intended user of the appraisal to understand the report properly.  An institution should specify the use of an appraisal report option that is commensurate with the risk and complexity of the transaction.  The appraisal report should contain sufficient disclosure of the nature and extent of inspection and research performed by the appraiser to verify the property's condition and support the appraiser's opinion of market value.  (See Appendix D, *Glossary of Terms*, for the definition of appraisal report options.)

  Institutions should be aware that provisions in the Dodd-Frank Act address appraisal requirements for a *higher-risk mortgage* to a consumer.[23]  To implement these provisions, the Agencies recognize that future regulations will address the requirement that the appraiser conduct a physical property visit of the interior of the mortgaged property.[24]

- Analyze and report appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units._  Appraisers must analyze, apply, and report appropriate deductions and discounts when providing an estimate of market value based on demand for real estate in the future.  This standard is designed to avoid having appraisals prepared using unrealistic assumptions and inappropriate methods in arriving at the property's market value.  (See Appendix C, *Deductions and Discounts*, for further explanation on deductions and discounts.)

---

[23]  Under the law, the provisions are effective 12 months after final regulations to implement the provisions are published.  See Dodd-Frank Act, Section 1400(c)(1).

[24]  Section 1471 of the Dodd-Frank Act added a new section 129H to the Truth-in-Lending Act (15 U.S.C. 1631 *et seq.*).

- Be based upon the definition of market value set forth in the appraisal regulation. Each appraisal must contain an estimate of market value, as defined by the Agencies' appraisal regulations.  The definition of market value assumes that the price is not affected by undue stimulus, which would allow the value of the real property to be increased by favorable financing or seller concessions.  Value opinions such as "going concern value," "value in use," or a special value to a specific property user may not be used as market value for federally related transactions.  An appraisal may contain separate opinions of such values so long as they are clearly identified and disclosed.

  The estimate of market value should consider the real property's actual physical condition, use, and zoning as of the effective date of the appraiser's opinion of value. For a transaction financing construction or renovation of a building, an institution would generally request an appraiser to provide the property's current market value in its "as is" condition, and, as applicable, its prospective market value upon completion and/or prospective market value upon stabilization.[25]  Prospective market value opinions should be based upon current and reasonably expected market conditions. When an appraisal includes prospective market value opinions, there should be a point of reference to the market conditions and time frame on which the appraiser based the analysis.[26]  An institution should understand the real property's "as is" market value and should consider the prospective market value that corresponds to the credit decision and the phase of the project being funded, if applicable.

- Be performed by state certified or licensed appraisers in accordance with requirements set forth in the appraisal regulation.  In determining competency for a given appraisal assignment, an institution must consider an appraiser's education and experience.  While an institution must confirm that the appraiser holds a valid credential from the appropriate state appraiser regulatory authority, a state certification or license is a minimum credentialing requirement.  Appraisers are expected to be selected for individual assignments based on their competency to perform the appraisal, including knowledge of the property type and specific property market.

  As stated in the Agencies' appraisal regulations, a state certified or licensed appraiser may not be considered competent solely by virtue of being certified or licensed.  In communicating an appraisal assignment, an institution should convey to the appraiser that the Agencies' minimum appraisal standards must be followed.

---

[25]  Under NCUA regulations, "market value" of a construction and development project is the value at the time a commercial real estate loan is made, which includes "the appraised value of land owned by the borrower on which the project is to be built, less any liens, plus the cost to build the project."  68 FR 56537, 56540 (October 1, 2003) (referring to Office of General Counsel Opinion 01-0422 (June 7, 2001)); 12 CFR 723.3(b).

[26]  See USPAP, Statement 4 on Prospective Value Opinions, for further explanation.

## IX.    Appraisal Development

The Agencies' appraisal regulations require appraisals for federally related transactions to comply with the requirements in USPAP, some of which are addressed below.  Consistent with the USPAP Scope of Work Rule,[27] the appraisal must reflect an appropriate scope of work that provides for "credible" assignment results.  The appraiser's scope of work should reflect the extent to which the property is identified and inspected, the type and extent of data researched, and the analyses applied to arrive at opinions or conclusions.  Further, USPAP requires the appraiser to disclose whether he or she previously appraised the property.

While an appraiser must comply with USPAP and establish the scope of work in an appraisal assignment, an institution is responsible for obtaining an appraisal that contains sufficient information and analysis to support its decision to engage in the transaction.  Therefore, to ensure that an appraisal is appropriate for the intended use, an institution should discuss its needs and expectations for the appraisal with the appraiser.  Such discussions should assist the appraiser in establishing the scope of work and form the basis of the institution's engagement letter, as appropriate.  These communications should adhere to the institution's policies and procedures on independence of the appraiser and not unduly influence the appraiser.  An institution should not allow lower cost or the speed of delivery time to inappropriately influence its appraisal ordering procedures or the appraiser's determination of the scope of work for an appraisal supporting a federally related transaction.

As required by USPAP, the appraisal must include any approach to value (that is, the cost, income, and sales comparison approaches) that is applicable and necessary to the assignment.  Further, the appraiser should disclose the rationale for the omission of a valuation approach.  The appraiser must analyze and reconcile the information from the approaches to arrive at the estimated market value.  The appraisal also should include a discussion on market conditions, including relevant information on property value trends, demand and supply factors, and exposure time.  Other information might include the prevalence and effect of sales and financing concessions, the list-to-sale price ratio, and availability of financing.  In addition, an appraisal should reflect an analysis of the property's sales history and an opinion as to the highest and best use of the property.  USPAP requires the appraiser to disclose whether or not the subject property was inspected and whether anyone provided significant assistance to the appraiser signing the appraisal report.

## X.    Appraisal Reports

An institution is responsible for identifying the appropriate appraisal report option to support its credit decisions.  The institution should consider the risk, size, and complexity of the transaction and the real estate collateral when determining the appraisal report format to be specified in its appraisal engagement instructions to an appraiser.

---

[27]  See USPAP, Scope of Work Rule, Advisory Opinions 28 and 29.

USPAP provides various appraisal report options that an appraiser may use to present the results of appraisal assignments.  The major difference among these report options is the level of detail presented in the report.  A report option that merely states, rather than summarizes or describes the content and information required in an appraisal report, may lack sufficient supporting information and analysis to explain the appraiser's opinions and conclusions.

Generally, a report option that is restricted to a single client and intended user will not be appropriate to support most federally related transactions.  These reports lack sufficient supporting information and analysis for underwriting purposes.  These less detailed reports may be appropriate for real estate portfolio monitoring purposes.  (See Appendix D, *Glossary of Terms*, for the definition of appraisal report options.)

Regardless of the report option, the appraisal report should contain sufficient detail to allow the institution to understand the scope of work performed.  Sufficient information should include the disclosure of research and analysis performed, as well as disclosure of the research and analysis typically warranted for the type of appraisal, but omitted, along with the rationale for its omission.

## XI.    Transactions That Require Evaluations

The Agencies' appraisal regulations permit an institution to obtain an appropriate evaluation of real property collateral in lieu of an appraisal for transactions that qualify for certain exemptions.  These exemptions include a transaction that:

- Has a transaction value equal to or less than the appraisal threshold of $250,000.

- Is a business loan with a transaction value equal to or less than the business loan threshold of $1 million, and is not dependent on the sale of, or rental income derived from, real estate as the primary source of repayment.[28]

- Involves an existing extension of credit at the lending institution, provided that:

    o   There has been no obvious and material change in market conditions or physical aspects of the property that threaten the adequacy of the institution's real estate collateral protection after the transaction, even with the advancement of new monies; or

    o   There is no advancement of new monies other than funds necessary to cover reasonable closing costs.[29]

For more information on real estate-related financial transactions that are exempt from the appraisal requirement, see Appendix A, *Appraisal Exemptions*.  For a discussion on changes in market conditions, see the section on *Validity of Appraisals and Evaluations* in these Guidelines.

---

[28]   NCUA regulations do not contain an exemption from the appraisal requirements specific to member business loans.

[29]   NCUA's appraisal regulation requires credit unions to meet both conditions to avoid the need for an appraisal as set forth in 12 CFR 722.3(d).

Although the Agencies' appraisal regulations allow an institution to use an evaluation for certain transactions, an institution should establish policies and procedures for determining when to obtain an appraisal for such transactions.  For example, an institution should consider obtaining an appraisal as an institution's portfolio risk increases or for higher risk real estate-related financial transactions, such as those involving:

- Loans with combined loan-to-value ratios in excess of the supervisory loan-to-value limits.

- Atypical properties.

- Properties outside the institution's traditional lending market.

- Transactions involving existing extensions of credit with significant risk to the institution.

- Borrowers with high risk characteristics.

## XII.   Evaluation Development

An evaluation must be consistent with safe and sound banking practices and should support the institution's decision to engage in the transaction.  An institution should be able to demonstrate that an evaluation, whether prepared by an individual or supported by an analytical method or a technological tool, provides a reliable estimate of the collateral's market value as of a stated effective date prior to the decision to enter into a transaction.  (Refer to Appendix B, *Evaluations Based on Analytical Methods or Technological Tools*.)

A valuation method that does not provide a property's market value or sufficient information and analysis to support the value conclusion is not acceptable as an evaluation.  For example, a valuation method that provides a sales or list price, such as a broker price opinion, cannot be used as an evaluation because, among other things, it does not provide a property's market value.  Further, the Dodd-Frank Act provides "[i]n conjunction with the purchase of a consumer's principal dwelling, broker price opinions may not be used as the primary basis to determine the value of a piece of property for the purpose of loan origination of a residential mortgage loan secured by such piece of property."[30]  Likewise, information on local housing conditions and trends, such as a competitive market analysis, does not contain sufficient information on a specific property that is needed, and therefore, would not be acceptable as an evaluation.  The information obtained from such sources, while insufficient as an evaluation, may be useful to develop an evaluation or appraisal.

An institution should establish policies and procedures for determining an appropriate collateral valuation method for a given transaction considering associated risks.  These policies and procedures should address the process for selecting the appropriate valuation method for a transaction rather than using the method that renders the highest value, lowest cost, or fastest turnaround time.

---

[30]   Dodd-Frank Act, Section 1473(r).

A valuation method should address the property's actual physical condition and characteristics as well as the economic and market conditions that affect the estimate of the collateral's market value.  It would not be acceptable for an institution to base an evaluation on unsupported assumptions, such as a property is in "average" condition, the zoning will change, or the property is not affected by adverse market conditions.  Therefore, an institution should establish criteria for determining the level and extent of research or inspection necessary to ascertain the property's actual physical condition, and the economic and market factors that should be considered in developing an evaluation.  An institution should consider performing an inspection to ascertain the actual physical condition of the property and market factors that affect its market value.  When an inspection is not performed, an institution should be able to demonstrate how these property and market factors were determined.

## XIII.   Evaluation Content

An evaluation should contain sufficient information detailing the analysis, assumptions, and conclusions to support the credit decision.  An evaluation's content should be documented in the credit file or reproducible.  The evaluation should, at a minimum:

- Identify the location of the property.

- Provide a description of the property and its current and projected use.

- Provide an estimate of the property's market value in its actual physical condition, use and zoning designation as of the effective date of the evaluation (that is, the date that the analysis was completed), with any limiting conditions.

- Describe the method(s) the institution used to confirm the property's actual physical condition and the extent to which an inspection was performed.

- Describe the analysis that was performed and the supporting information that was used in valuing the property.

- Describe the supplemental information that was considered when using an analytical method or technological tool.

- Indicate all source(s) of information used in the analysis, as applicable, to value the property, including:

  o External data sources (such as market sales databases and public tax and land records);

  o Property-specific data (such as previous sales data for the subject property, tax assessment data, and comparable sales information);

  o Evidence of a property inspection;

- o   Photos of the property;

- o   Description of the neighborhood; or

- o   Local market conditions.

- Include information on the preparer when an evaluation is performed by a person, such as the name and contact information, and signature (electronic or other legally permissible signature) of the preparer.

(See Appendix B, *Evaluations Based on Analytical Methods or Technological Tools*, for guidance on the appropriate use of analytical methods and technological tools for developing an evaluation.)

## XIV.   Validity of Appraisals and Evaluations

The Agencies allow an institution to use an existing appraisal or evaluation to support a subsequent transaction in certain circumstances.  Therefore, an institution should establish criteria for assessing whether an existing appraisal or evaluation continues to reflect the market value of the property (that is, remains valid).  Such criteria will vary depending upon the condition of the property and the marketplace, and the nature of the transaction.  The documentation in the credit file should provide the facts and analysis to support the institution's conclusion that the existing appraisal or evaluation may be used in the subsequent transaction.  A new appraisal or evaluation is necessary if the originally reported market value has changed due to factors such as:

- Passage of time.

- Volatility of the local market.

- Changes in terms and availability of financing.

- Natural disasters.

- Limited or over supply of competing properties.

- Improvements to the subject property or competing properties.

- Lack of maintenance of the subject or competing properties.

- Changes in underlying economic and market assumptions, such as capitalization rates and lease terms.

- Changes in zoning, building materials, or technology.

- Environmental contamination.

**XV.   Reviewing Appraisals and Evaluations**

The Agencies' appraisal regulations specify that appraisals for federally related transactions must contain sufficient information and analysis to support an institution's decision to engage in the credit transaction.  For certain transactions that do not require an appraisal, the Agencies' regulations require an institution to obtain an appropriate evaluation of real property collateral that is consistent with safe and sound banking practices.

As part of the credit approval process and prior to a final credit decision, an institution should review appraisals and evaluations to ensure that they comply with the Agencies' appraisal regulations and are consistent with supervisory guidance and its own internal policies.  This review also should ensure that an appraisal or evaluation contains sufficient information and analysis to support the decision to engage in the transaction.

Through the review process, the institution should be able to assess the reasonableness of the appraisal or evaluation, including whether the valuation methods, assumptions, and data sources are appropriate and well-supported.  An institution may use the review findings to monitor and evaluate the competency and ongoing performance of appraisers and persons who perform evaluations.  (See the discussion in these Guidelines on *Selection of Appraisers or Persons Who Perform Evaluations*.)

When an institution identifies an appraisal or evaluation that is inconsistent with the Agencies' appraisal regulations and the deficiencies cannot be resolved with the appraiser or person who performed the evaluation, the institution must obtain an appraisal or evaluation that meets the regulatory requirements prior to making a credit decision.  Though a reviewer cannot change the value conclusion in the original appraisal, an appraisal review performed by an appropriately qualified and competent state certified or licensed appraiser in accordance with USPAP may result in a second opinion of market value.  An institution may rely on the second opinion of market value obtained through an acceptable USPAP-compliant appraisal review to support its credit decision.

An institution's policies and procedures for reviewing appraisals and evaluations, at a minimum, should:

- Address the independence, educational and training qualifications, and role of the reviewer.

- Reflect a risk-focused approach for determining the depth of the review.

- Establish a process for resolving any deficiencies in appraisals or evaluations.

- Set forth documentation standards for the review and the resolution of noted deficiencies.

## A.  Reviewer Qualifications

An institution should establish qualification criteria for persons who are eligible to review appraisals and evaluations.  Persons who review appraisals and evaluations should be independent of the transaction and have no direct or indirect interest, financial or otherwise, in the property or transaction, and be independent of and insulated from any influence by loan production staff.  Reviewers also should possess the requisite education, expertise, and competence to perform the review commensurate with the complexity of the transaction, type of real property, and market.  Further, reviewers should be capable of assessing whether the appraisal or evaluation contains sufficient information and analysis to support the institution's decision to engage in the transaction.

A small or rural institution or branch with limited staff should implement prudent safeguards for reviewing appraisals and evaluations when absolute lines of independence cannot be achieved.  Under these circumstances, the review may be part of the originating loan officer's overall credit analysis, as long as the originating loan officer abstains from directly or indirectly approving or voting to approve the loan.

An institution should assess the level of in-house expertise available to review appraisals for complex projects, high-risk transactions, and out-of-market properties.  An institution may find it appropriate to employ additional personnel or engage a third party to perform the reviews.  When using a third party, an institution remains responsible for the quality and adequacy of the review process, including the qualification standards for reviewers.  (See the discussion in these Guidelines on *Third Party Arrangements*.)

## B.  Depth of Review

An institution should implement a risk-focused approach for determining the depth of the review needed to ensure that appraisals and evaluations contain sufficient information and analysis to support the institution's decision to engage in the transaction.  This process should differentiate between high- and low-risk transactions so that the review is commensurate with the risk.  The depth of the review should be sufficient to ensure that the methods, assumptions, data sources, and conclusions are reasonable, well-supported, and appropriate for the transaction, property, and market.  The review also should consider the process through which the appraisal or evaluation is obtained, either directly by the institution or from another financial services institution.  The review process should be commensurate with the type of transaction as discussed below:

- **Commercial Real Estate**.  An institution should ensure that appraisals or evaluations for commercial real estate transactions are subject to an appropriate level of review.  Transactions involving complex properties or high-risk commercial loans should be reviewed more comprehensively to assess the technical quality of the appraiser's analysis.  For example, an institution should perform a more comprehensive review of transactions involving large-dollar credits, loans secured by complex or specialized properties, and properties outside the institution's traditional lending market.  Persons performing such reviews should have the appropriate expertise and knowledge relative to the type of property and its market.

The depth of the review of appraisals and evaluations completed for commercial properties securing lower risk transactions may be less technical in nature, but still should provide meaningful results that are commensurate with the size, type, and complexity of the underlying credit transaction. In addition, an institution should establish criteria for when to expand the depth of the review.

- **1-to-4 Family Residential Real Estate**. The reviews for residential real estate transactions should reflect a risk-focused approach that is commensurate with the size, type, and complexity of the underlying credit transaction, as well as loan and portfolio risk characteristics. These risk factors could include debt-to-income ratios, loan-to-value ratios, level of documentation, transaction dollar amount, or other relevant factors. With prior approval from its primary federal regulator, an institution may employ various techniques, such as automated tools or sampling methods, for performing pre-funding reviews of appraisals or evaluations supporting lower risk residential mortgages. When using such techniques, an institution should maintain sufficient data and employ appropriate screening parameters to provide adequate quality assurance and should ensure that the work of all appraisers and persons performing evaluations is periodically reviewed. In addition, an institution should establish criteria for when to expand the depth of the review.

  An institution may use sampling and audit procedures to verify the seller's representations and warranties that the appraisals for the underlying loans in a pool of residential loans satisfy the Agencies' appraisal regulations and are consistent with supervisory guidance and an institution's internal policies. If an institution is unable to confirm that the appraisal meets the Agencies' appraisal requirements, then the institution must obtain an appraisal prior to engaging in the transaction.

- **Appraisals from Other Financial Services Institutions**.[31] The Agencies' appraisal regulations specify that an institution may use an appraisal that was prepared by an appraiser engaged directly by another financial services institution, provided the institution determines that the appraisal conforms to the Agencies' appraisal regulations and is otherwise acceptable. An institution should assess whether to use the appraisal prior to making a credit decision. An institution should subject such appraisals to at least the same level of review that the institution performs on appraisals it obtains directly for similar properties and document its review in the credit file. The documentation of the review should support the institution's reliance on the appraisal. Among other considerations, an institution should confirm that:

  - The appraiser was engaged directly by the other financial services institution.

  - The appraiser had no direct, indirect, or prospective interest, financial or otherwise, in the property or transaction.

---

[31] An institution generally should not rely on an evaluation prepared by or for another financial services institution because it will not have sufficient information relative to the other institution's risk management practices for developing evaluations.

   o The financial services institution (not the borrower) ordered the appraisal.  For example, an engagement letter should show that the financial services institution, not the borrower, engaged the appraiser.

   An institution must not accept an appraisal that has been readdressed or altered by the appraiser with the intent to conceal the original client.  Altering an appraisal report in a manner that conceals the original client or intended users of the appraisal is misleading, does not conform to USPAP, and violates the Agencies' appraisal regulations.

## C. **<u>Resolution of Deficiencies</u>**

   An institution should establish policies and procedures for resolving any inaccuracies or weaknesses in an appraisal or evaluation identified through the review process, including procedures for:

- Communicating the noted deficiencies to and requesting correction of such deficiencies by the appraiser or person who prepared the evaluation.  An institution should implement adequate internal controls to ensure that such communications do not result in any coercion or undue influence on the appraiser or person who performed the evaluation.

- Addressing significant deficiencies in the appraisal that could not be resolved with the original appraiser by obtaining a second appraisal or relying on a review that complies with Standards Rule 3 of USPAP and is performed by an appropriately qualified and competent state certified or licensed appraiser prior to the final credit decision.

- Replacing evaluations prior to the credit decision that do not provide credible results or lack sufficient information to support the final credit decision.

## D. **<u>Documentation of the Review</u>**

   An institution should establish policies for documenting the review of appraisals and evaluations in the credit file.  Such policies should address the level of documentation needed for the review, given the type, risk and complexity of the transaction.  The documentation should describe the resolution of any appraisal or evaluation deficiencies, including reasons for obtaining and relying on a second appraisal or evaluation.  The documentation also should provide an audit trail that documents the resolution of noted deficiencies or details the reasons for relying on a second opinion of market value.

## XVI. **Third Party Arrangements**

   An institution that engages a third party to perform certain collateral valuation functions on its behalf is responsible for understanding and managing the risks associated with the arrangement.  An institution should use caution if it engages a third party to administer any part of its appraisal and evaluation function, including the ordering or reviewing of appraisals and evaluations, selecting an appraiser or person to perform evaluations, or providing access to analytical methods or technological tools.

An institution is accountable for ensuring that any services performed by a third party, both affiliated and unaffiliated entities, comply with applicable laws and regulations and are consistent with supervisory guidance.[32]  Therefore, an institution should have the resources and expertise necessary for performing ongoing oversight of third party arrangements.

An institution should have internal controls for identifying, monitoring, and managing the risks associated with using a third party arrangement for valuation services, including compliance, legal, reputational, and operational risks.  While the arrangement may allow an institution to achieve specific business objectives, such as gaining access to expertise that is not available internally, the reduced operational control over outsourced activities poses additional risk.  Consistent with safe and sound practices, an institution should have a written contract that clearly defines the expectations and obligations of both the financial institution and the third party, including that the third party will perform its services in compliance with the Agencies' appraisal regulations and consistent with supervisory guidance.

Prior to entering into any arrangement with a third party for valuation services, an institution should compare the risks, costs, and benefits of the proposed relationship to those associated with using another vendor or conducting the activity in-house.  The decision to outsource any part of the collateral valuation function should not be unduly influenced by any short-term cost savings.  An institution should take into account all aspects of the long-term effect of the relationship, including the managerial expertise and associated costs for effectively monitoring the arrangement on an ongoing basis.

If an institution outsources any part of the collateral valuation function, it should exercise appropriate due diligence in the selection of a third party.  This process should include sufficient analysis by the institution to assess whether the third party provider can perform the services consistent with the institution's performance standards and regulatory requirements.  An institution should be able to demonstrate that its policies and procedures establish effective internal controls to monitor and periodically assess the collateral valuation functions performed by a third party.

An institution also is responsible for ensuring that a third party selects an appraiser or a person to perform an evaluation who is competent and independent, has the requisite experience and training for the assignment, and thorough knowledge of the subject property's market. Appraisers must be appropriately certified or licensed, but this minimum credentialing requirement, although necessary, is not sufficient to determine that an appraiser is competent to perform an assignment for a particular property or geographic market.

---

[32]  See, for example, FFIEC *Statement on Risk Management of Outsourced Technology Service* (November 28, 2000) for guidance on the assessment, selection, contract review, and monitoring of a third party that provides services to a regulated institution.  Refer to the institution's primary federal regulator for additional guidance on third party arrangements:  OCC Bulletin 2001-47, *Third-Party Relationships* (November 1, 2001); OTS Thrift Bulletin 82a, *Third Party Arrangements* (September 1, 2004); NCUA Letter to Credit Unions: 01-CU-20, *Due Diligence Over Third Party Service Arrangements* (November 2001), 07-CU-13, Supervisory Letter-*Evaluation Third Party Relationships* (December 2007), 08-CU-09, *Evaluating Third Party Relationships Questionnaire* (April 2008); and FDIC Financial Institution Letter 44-2008, *Guidance for Managing Third-Party Risk* (June 2008).

An institution should ensure that when a third party engages an appraiser or a person who performs an evaluation, the third party conveys to that person the intended use of the appraisal or evaluation and that the regulated institution is the client. For example, an engagement letter facilitates the communication of this information.

An institution's risk management system should reflect the complexity of the outsourced activities and associated risk. An institution should document the results of ongoing monitoring efforts and periodic assessments of the arrangement(s) with a third party for compliance with applicable regulations and consistency with supervisory guidance and its performance standards. If deficiencies are discovered, an institution should take remedial action in a timely manner.

## XVII.  Program Compliance

Deficiencies in an institution's appraisal and evaluation program that result in violations of the Agencies' appraisal regulations or contraventions of the Agencies' supervisory guidance reflect negatively on management. An institution's appraisal and evaluation policies should establish internal controls to promote an effective appraisal and evaluation program. The compliance process should:

- Maintain a system of adequate controls, verification, and testing to ensure that appraisals and evaluations provide credible market values.

- Insulate the persons responsible for ascertaining the compliance of the institution's appraisal and evaluation function from any influence by loan production staff.

- Ensure the institution's practices result in the selection of appraisers and persons who perform evaluations with the appropriate qualifications and demonstrated competency for the assignment.

- Establish procedures to test the quality of the appraisal and evaluation review process.

- Use, as appropriate, the results of the institution's review process and other relevant information as a basis for considering a person for a future appraisal or evaluation assignment.

- Report appraisal and evaluation deficiencies to appropriate internal parties and, if applicable, to external authorities in a timely manner.

### A.  Monitoring Collateral Values

Consistent with the Agencies' real estate lending regulations and guidelines,[33] an institution should monitor collateral risk on a portfolio and on an individual credit basis.

---

[33]  OCC: 12 CFR part 34, subpart D; FRB: 12 CFR part 208, subpart E; FDIC: 12 CFR part 365; OTS: 12 CFR 560.100 and 560.101; and NCUA: 12 CFR 701.21.

Therefore, an institution should have policies and procedures that address the need for obtaining current collateral valuation information to understand its collateral position over the life of a credit and effectively manage the risk in its real estate credit portfolios.  The policies and procedures also should address the need to obtain current valuation information for collateral supporting an existing credit that may be modified or considered for a loan workout.

Under their appraisal regulations, the Agencies reserve the right to require an institution to obtain an appraisal or evaluation when there are safety and soundness concerns on an existing real estate secured credit.  Therefore, an institution should be able to demonstrate that sufficient information is available to support the current market value of the collateral and the classification of a problem real estate credit.  When such information is not available, an examiner may direct an institution to obtain a new appraisal or evaluation in order to have sufficient information to understand the current market value of the collateral.  Examiners would be expected to provide an institution with a reasonable amount of time to obtain a new appraisal or evaluation.

### B.  Portfolio Collateral Risk

Prudent portfolio monitoring practices include criteria for determining when to obtain a new appraisal or evaluation.  Among other considerations, the criteria should address deterioration in the credit since origination or changes in market conditions.  Changes in market conditions could include material changes in current and projected vacancy, absorption rates, lease terms, rental rates, and sale prices, including concessions and overruns and delays in construction costs.  Fluctuations in discount or direct capitalization rates also are indicators of changing market conditions.

In assessing whether changes in market conditions are material, an institution should consider the individual and aggregate effect of these changes on its collateral protection and the risk in its real estate lending programs or credit portfolios.  Moreover, as an institution's reliance on collateral becomes more important, its policies and procedures should:

- Ensure that timely information is available to management for assessing collateral and associated risk.

- Specify when new or updated collateral valuations are appropriate or desirable to understand collateral risk in the transaction(s).

- Delineate the valuation method to be employed after considering the property type, current market conditions, current use of the property, and the relevance of the most recent appraisal or evaluation in the credit file.

Consistent with sound collateral valuation monitoring practices, an institution can use a variety of techniques for monitoring the effect of collateral valuation trends on portfolio risk. Sources of relevant information may include external market data, internal data, or reviews of recently obtained appraisals and evaluations.  An institution should be able to demonstrate that it has sufficient, reliable, and timely information on market trends to understand the risk associated with its lending activity.

### C. Modifications and Workouts of Existing Credits

An institution may find it appropriate to modify a loan or to engage in a workout with an existing borrower. The Agencies expect an institution to consider current collateral valuation information to assess its collateral risk and facilitate an informed decision on whether to engage in a modification or workout of an existing real estate credit. (See the discussion above on *Portfolio Collateral Risk.)*

- **Loan Modifications.** A loan modification to an existing credit that involves a limited change(s)[34] in the terms of the note or loan agreement and that does not adversely affect the institution's real estate collateral protection after the modification does not rise to the level of a new real estate-related financial transaction for purposes of the Agencies' appraisal regulations. As a result, an institution would not be required to obtain either a new appraisal or evaluation to comply with the Agencies' appraisal regulations, but should have an understanding of its collateral risk. For example, institutions can use automated valuation models or other valuation techniques when considering a modification to a residential mortgage loan. An institution should have procedures for ensuring an alternative collateral valuation method provides reliable information. In addition, an institution should be able to demonstrate that a modification reflects prudent underwriting standards and is consistent with safe and sound lending practices. Examiners will assess the adequacy of valuation information an institution uses for loan modifications.

- **Loan Workouts.** As noted under "Monitoring Collateral Values," an institution's policies and procedures should address the need for current information on the value of real estate collateral supporting a loan workout. A loan workout can take many forms, including a modification that adversely affects the institution's real estate collateral protection after the modification, a renewal or extension of loan terms, the advancement of new monies, or a restructuring with or without concessions. These types of loan workouts are new real estate-related financial transactions.

  If the loan workout does not include the advancement of new monies other than reasonable closing costs, the institution may obtain an evaluation in lieu of an appraisal. For loan workouts that involve the advancement of new monies, an institution may obtain an evaluation in lieu of an appraisal provided there has been no obvious and material change in market conditions and no change in the physical aspects of the property that threatens the adequacy of the institution's real estate collateral protection after the workout.[35]

---

[34]  A loan modification that entails a decrease in the interest rate or a single extension of a limited or short-term nature would not be viewed as a subsequent transaction. For example, an extension arising from a short-term delay in the full repayment of the loan when there is documented evidence that payment from the borrower is forthcoming, or a brief delay in the scheduled closing on the sale of a property when there is evidence that the closing will be completed in the near term.

[35]  Under the NCUA's appraisal regulation, a credit union must meet both conditions to avoid the need for an appraisal. If a transaction does not involve an advancement of new monies and there have been no obvious and material changes in market or property conditions, a credit union must obtain a written estimate of market value that is consistent with the standards for evaluations as discussed in these Guidelines. 12 CFR 722.3(d).

In these cases, an institution should support and document its rationale for using this exemption.  An institution must obtain an appraisal when a loan workout involves the advancement of new monies and there is an obvious and material change in either market conditions or physical aspects of the property, or both, that threatens the adequacy of the institution's real estate collateral protection after the workout (unless another exemption applies)[36].  (See also Appendix A, *Appraisal Exemptions*, for transactions where an evaluation would be allowed in lieu of an appraisal.)

- **Collateral Valuation Policies for Modifications and Workouts.**  An institution's policies should address the need for obtaining current collateral valuation information for a loan modification or workout.  The policies should specify the valuation method to be used and address the need to monitor collateral risk on an ongoing basis taking into consideration changing market conditions and the borrower's repayment performance.  An institution also should be able to demonstrate that the collateral valuation method used is reliable for a given credit or loan type.

  Further, for loan workouts, an institution's policies should specify conditions under which an appraisal or evaluation will be obtained.  As loan repayment becomes more dependent on the sale of collateral, an institution's policies should address the need to obtain an appraisal or evaluation for safety and soundness reasons even though one is not otherwise required by the Agencies' appraisal regulations.

## XVIII. Referrals

An institution should file a complaint with the appropriate state appraiser regulatory officials when it suspects that a state certified or licensed appraiser failed to comply with USPAP, applicable state laws, or engaged in other unethical or unprofessional conduct.  In addition, effective April 1, 2011, an institution must file a complaint with the appropriate state appraiser certifying and licensing agency under certain circumstances.[37]

An institution also must file a suspicious activity report (SAR) with the Financial Crimes Enforcement Network of the Department of the Treasury (FinCEN) when suspecting fraud or identifying other transactions meeting the SAR filing criteria.[38]  Examiners finding evidence of unethical or unprofessional conduct by appraisers should instruct the institution to file a complaint with state appraiser regulatory officials and, when required, to file a SAR with FinCEN.  If there is a concern regarding the institution's ability or willingness to file a complaint or make a referral, examiners should forward their findings and recommendations to their supervisory office for appropriate disposition and referral to state appraiser regulatory officials and FinCEN, as necessary.

---

[36] For example, if the transaction value is below the appraisal threshold of $250,000.

[37] See 12 CFR 226.42(g).

[38] Refer to federal regulations at FRB: 12 CFR 208.62, 211.5(k), 211.24(f), and 225.4(f); FDIC: 12 CFR part 353; NCUA: 12 CFR part 748; OCC: 12 CFR 21.11; OTS: 12 CFR 563.180; and FinCEN: 31 CFR 103.18.  Refer also to the *Federal Financial Institutions Examination Council Bank Secrecy Act/Anti-Money Laundering Examination Manual* (Revised April 29, 2010) to review the general criteria, but note that instructions on filing a SAR through the Financial Crime Enforcement Network (FinCEN) of the Department of the Treasury are attached to the SAR form.  The SAR form is available on FinCEN's website.

## Appendix A
## Appraisal Exemptions

Under Title XI of FIRREA, the Agencies were granted the authority to identify categories of real estate-related financial transactions that do not require the services of an appraiser to protect federal financial and public policy interests or to satisfy principles of safe and sound lending. Therefore, in their appraisal regulations, the Agencies identified certain real estate-related financial transactions that do not require the services of an appraiser and that are exempt from the appraisal requirement. This appendix provides further clarification on the application of these regulatory exemptions and should be read in the context of each Agency's appraisal regulation. If an institution has a question as to whether a particular transaction qualifies for an exemption, the institution should seek guidance from its primary federal regulator. For those transactions qualifying for the appraisal threshold, existing extensions of credit, or the business loan exemptions, an institution is exempted from the appraisal requirement, but still must, at a minimum, obtain an evaluation consistent with these Guidelines.[39]

## 1.  Appraisal Threshold

For transactions with a transaction value equal to or less than $250,000, the Agencies' appraisal regulations, at a minimum, require an evaluation consistent with safe and sound banking practices.[40] If an institution enters into a transaction that is secured by several individual properties that are not part of a tract development, the estimate of value of each individual property should determine whether an appraisal or evaluation would be required for that property. For example, an institution makes a loan secured by seven commercial properties in different markets with two properties valued in excess of the appraisal threshold and five properties valued less than the appraisal threshold. An institution would need to obtain an appraisal on the two properties valued in excess of the appraisal threshold and evaluations on the five properties below the appraisal threshold, even though the aggregate loan commitment exceeds the appraisal threshold.

## 2.  Abundance of Caution

An institution may take a lien on real estate and be exempt from obtaining an appraisal if the lien on real estate is taken by the lender in an abundance of caution. This exemption is intended to have limited application, especially for real estate loans secured by residential properties in which the real estate is the only form of collateral. In order for a business loan to qualify for the abundance of caution exemption, the Agencies expect the extension of credit to be well supported by the borrower's cash flow or collateral other than real property. The institution's credit analysis should verify and document the adequacy and reliability of these repayment sources and conclude that knowledge of the market value of the real estate on which the lien will be taken as an abundance of caution is unnecessary in making the credit decision.

---

[39] NCUA's regulations do not provide an exemption from the appraisal requirements specific to member business loans.

[40] NCUA's appraisal regulation requires a written estimate of market value, performed by a qualified and experienced person who has no interest in the property, for transactions equal to or less than the appraisal threshold and transactions involving an existing extension of credit. 12 CFR 722.3(d).

An institution should not invoke the abundance of caution exemption if its credit analysis reveals that the transaction would not be adequately secured by sources of repayment other than the real estate, even if the contributory value of the real estate collateral is low relative to the entire collateral pool and other repayment sources. Similarly, the exemption should not be applied to a loan or loan program unless the institution verifies and documents the primary and secondary repayment sources. In the absence of verification of the repayment sources, this exemption should not be used merely to reduce the cost associated with obtaining an appraisal, to minimize transaction processing time, or to offer slightly better terms to a borrower than would be otherwise offered.

In addition, prior to making a final commitment to the borrower, the institution should document and retain in the credit file the analysis performed to verify that the abundance of caution exemption has been appropriately applied. If the operating performance or financial condition of the company subsequently deteriorates and the lender determines that the real estate will be relied upon as a repayment source, an appraisal should then be obtained, unless another exemption applies.

### 3.  Loans Not Secured by Real Estate

An institution is not required to obtain an appraisal on a loan that is not secured by real estate, even if the proceeds of the loan are used to acquire or improve real property.[41] For loans covered by this exemption, the real estate has no direct effect on the institution's decision to extend credit because the institution has no legal security interest in the real estate. This exemption is not intended to be applied to real estate-related financial transactions other than those involving loans. For example, this exemption should not be applied to a transaction such as an institution's investment in real estate for its own use.

### 4.  Liens for Purposes Other Than the Real Estate's Value

This exemption allows an institution to take liens against real estate without obtaining an appraisal to protect legal rights to, or control over, other collateral. Institutions frequently take real estate liens to protect legal rights to other collateral rather than because of the contributory value of the real estate as an individual asset. For example, an institution making a loan to a logging operation may take a lien against the real estate upon which the timber stands to ensure its access to the timber in the event of default. To apply the exemption, the institution should determine that the market value of the real estate as an individual asset is not necessary to support its decision to extend credit.

---

[41] NCUA's regulations do not provide an exemption from the appraisal requirements specific to loans not secured by real estate.

## 5. Real Estate-Secured Business Loans

This exemption applies to business loans with a transaction value of $1 million or less when the sale of, or rental income derived from, real estate is not the primary source of repayment.[42]  To apply this exemption, the Agencies expect the institution to determine that the primary source of repayment for the business loan is operating cash flow from the business rather than rental income or sale of real estate.  For this type of exempted loan, under the Agencies' appraisal regulations, an institution may obtain an evaluation in lieu of an appraisal.

This exemption will not apply to transactions in which the lender has taken a security interest in real estate, but the primary source of repayment is provided by cash flow or sale of real estate in which the lender has no security interest.  For example, a transaction in which a loan is secured by real estate for one project, in which the lender has taken a security interest, but will be repaid with the cash flow from real estate sales or rental income from other real estate projects, in which the lender does not have a security interest, would not qualify for the exemption.  (See Appendix D, *Glossary of Terms*, for a definition of business loan.)

## 6. Leases

An institution is required to obtain appraisals of leases that are the economic equivalent of a purchase or sale of the leased real estate.  For example, an institution must obtain an appraisal on a transaction involving a capital lease, as the real estate interest is of sufficient magnitude to be recognized as an asset of the lessee for accounting purposes.  Operating leases that are not the economic equivalent of the purchase or sale of the leased property do not require appraisals.

## 7. Renewals, Refinancings, and Other Subsequent Transactions

Under certain circumstances, renewals, refinancings, and other subsequent transactions may be supported by evaluations rather than appraisals.  The Agencies' appraisal regulations permit an evaluation for a renewal or refinancing of an existing extension of credit at the institution when either:

(i) There has been no obvious and material change in market conditions or physical aspects of the property that threatens the adequacy of the institution's real estate collateral protection after the transaction, even with the advancement of new monies; or

(ii) There is no advancement of new monies, other than funds necessary to cover reasonable closing costs.[43]

---

[42]  NCUA's appraisal regulation, 12 CFR 722, does not define "business loan."  A "member business loan" is regulated under 12 CFR 723.

[43]  Under the NCUA's appraisal regulation, a credit union must meet both conditions to avoid the need for an appraisal.  If a transaction does not involve an advancement of new monies and there have been no obvious and material changes in market or property conditions, a credit union must obtain a written estimate of market value that is consistent with the standards for evaluations as discussed in these Guidelines.  12 CFR 722.3(d).

A subsequent transaction is exempt from the appraisal requirement if no new monies are advanced (other than funds necessary to cover reasonable closing costs) even when there has been an obvious and material change in market conditions or the physical aspects of the property that threatens the adequacy of the institution's real estate collateral protection. Conversely, when new monies are advanced (other than funds necessary to cover reasonable closing costs) and there has been an obvious and material change in market conditions or the physical aspects of the property that threaten the adequacy of the institution's real estate collateral protection, the institution must obtain an appraisal unless another exemption applies.

For the purposes of these Guidelines, an institution is considered to have advanced new monies (excluding reasonable closing costs) when there is an increase in the principal amount of the loan over the amount of principal outstanding before the renewal or refinancing.  For example, an institution originated a 15-year term loan for $3 million and, in year 14, the outstanding principal is $2.5 million.  In year 14, the borrower seeks to refinance the loan at a lower interest rate and requests a loan of $2.8 million.  The $300,000 would be considered new monies.  On the other hand, an institution has provided a $5 million revolving line of credit to a borrower for two years and, at the end of year two, renews the $5 million line for another two years.  At the time of renewal, the borrower has drawn down $1 million.  In this example, the amount of the line remains unchanged even though the amount available on the line is less than the line commitment.  Renewing the line of credit at its original amount would not be considered an advancement of new monies.  Further, when an institution advances funds to protect its interest in a property, such as to repair damaged property, a new appraisal or evaluation would not be required because these funds would be used to restore the damaged property to its original condition.

To satisfy the condition for no obvious and material change in market conditions or the physical aspects of the property, the current or planned future use of the property should be consistent with the use identified in the existing appraisal or evaluation.  For example, if a property has reportedly increased in value because of a planned change in use of the property resulting from rezoning, an appraisal should be performed unless another exemption applies.

If an evaluation is permitted under this exemption, an institution may use an existing appraisal or evaluation as long as the institution verifies and documents that the appraisal or evaluation continues to be valid.  (See the discussion in the *Validity of Appraisals and Evaluations* section of these Guidelines.)  Even if a subsequent transaction qualifies for this exemption, an institution should consider the risk posed by the transaction and may wish to consider obtaining a new appraisal.

**Loan Workouts or Restructurings.**  Loan workouts, debt restructurings, loan assumptions, and similar transactions involving the addition or substitution of borrowers may qualify for the exemption for renewals, refinancings and other subsequent transactions.  Use of this exemption depends on meeting the conditions listed in (i) and (ii) at the beginning of the discussion on Renewals, Refinancings, and Other Subsequent Transactions.  An institution also should consider such factors as the quality of the underlying collateral and the validity of the existing appraisal or evaluation.

If a loan workout involves acceptance of new real estate collateral that facilitates the orderly collection of the credit, or reduces the institution's risk of loss, an appraisal or evaluation of the existing and new collateral may be prudent, even if it is obtained after the workout occurs and the institution perfects its security interest.

**8.  <u>Transactions Involving Real Estate Notes</u>**

This exemption applies to appraisal requirements for transactions involving the purchase, sale, investment in, exchange of, or extension of credit secured by a loan or interest in a loan, pooled loans, or interests in real property, including mortgage-backed securities.  If each note or real estate interest meets the Agencies' regulatory requirements for appraisals at the time the real estate note was originated, the institution need not obtain a new appraisal to support its interest in the transaction.  The institution should employ audit procedures and review a representative sample of appraisals supporting pooled loans or real estate notes to determine that the conditions of the exemption have been satisfied.

Principles of safe and sound banking practices require an institution to determine the suitability of purchasing or investing in existing real estate-secured loans and real estate interests.  These transactions should have been originated according to secondary market standards and have a history of performance.  The information from these sources, together with original documentation, should be sufficient to allow an institution to make appropriate credit decisions regarding these transactions.

An institution may presume that the underlying loans in a marketable, mortgage-backed security satisfy the requirements of the Agencies' appraisal regulations whenever an issuer makes a public statement, such as in a prospectus, that the appraisals comply with the Agencies' appraisal regulations.  A marketable security is one that may be sold with reasonable promptness at a price that corresponds to its fair value.

If the mortgages that secure the mortgage warehouse loan are sold to Fannie Mae or Freddie Mac, the sale itself may be used to demonstrate that the underlying loans complied with the Agencies' appraisal regulations.  In such cases, the Agencies expect an institution to monitor its borrower's performance in selling loans to the secondary market and take appropriate steps, such as increasing sampling and auditing of the loans and the supporting documentation, if the borrower experiences more than a minimal rate of loans being put back by an investor.

**9.  <u>Transactions Insured or Guaranteed by a U.S. Government Agency or U.S. Government-sponsored Agency</u>**

This exemption applies to transactions that are wholly or partially insured or guaranteed by a U.S. government agency or U.S. government-sponsored agency.  The Agencies expect these transactions to meet all the underwriting requirements of the federal insurer or guarantor, including its appraisal requirements, in order to receive the insurance or guarantee.

**10. <u>Transactions that Qualify for Sale to, or Meet the Appraisal Standards of, a U.S. Government Agency or U.S. Government-sponsored Agency</u>**

This exemption applies to transactions that either (i) qualify for sale to a U.S. government agency or U.S. government-sponsored agency,[44] or (ii) involve a residential real estate transaction in which the appraisal conforms to Fannie Mae or Freddie Mac appraisal standards applicable to that category of real estate.  An institution may engage in these transactions without obtaining a separate appraisal conforming to the Agencies' appraisal regulations.  Given the risk to the institution that it may have to repurchase a loan that does not comply with the appraisal standards of the U.S. government agency or U.S. government-sponsored agency, the institution should have appropriate policies to confirm its compliance with the underwriting and appraisal standards of the U.S. government agency or U.S. government-sponsored agency.

**10(i)**   An institution that relies on exemption 10(i) should maintain adequate documentation that confirms that the transaction qualifies for sale to a U.S. government agency or U.S. government-sponsored agency.  If the qualification for sale is not adequately documented, the transaction should be supported by an appraisal that conforms to the Agencies' appraisal regulations, unless another exemption applies.

**10(ii)**   To qualify for this exemption, transactions that do not conform to all of Fannie Mae or Freddie Mac underwriting standards, such as jumbo or other residential real estate loans, must be supported by an appraisal that meets these government-sponsored agencies' appraisal standards for the applicable property type and is documented in the credit file or reproducible.

**11. <u>Transactions by Regulated Institutions as Fiduciaries</u>**

An institution acting as a fiduciary is not required to obtain appraisals under the Agencies' appraisal regulations if an appraisal is not required under other laws governing fiduciary responsibilities in connection with a transaction.[45]  For example, if no other law requires an appraisal in connection with the sale of a parcel of real estate to a beneficiary of a trust on terms specified in a trust instrument, an appraisal is not required under the Agencies' appraisal regulations.  However, when a fiduciary transaction requires an appraisal under other laws, that appraisal should conform to the Agencies' appraisal requirements.

---

[44]   These government-sponsored agencies include Banks for Cooperatives; Federal Agriculture Mortgage Corporation; Federal Farm Credit Banks; Federal Home Loan Banks; Freddie Mac; Fannie Mae; and Tennessee Valley Authority.

[45]   Generally, credit unions have limited fiduciary authority and NCUA's appraisal regulation does not specifically exempt transactions by fiduciaries.

**12. <u>Appraisals Not Necessary to Protect Federal Financial and Public Policy Interests or the Safety and Soundness of Financial Institutions</u>**

The Agencies retain the authority to determine when the services of an appraiser are not required in order to protect federal financial and public policy interests or the safety and soundness of financial institutions.  This exemption is intended to apply to individual transactions on a case-by-case basis rather than broad categories of transactions that would otherwise be addressed by an appraisal exemption.  An institution would need to seek a waiver from its supervisory federal agency before entering into the transaction.

**Appendix B**
**Evaluations Based on Analytical Methods or Technological Tools**

The Agencies' appraisal regulations permit an institution to use an evaluation in lieu of an appraisal for certain transactions. An institution may use a variety of analytical methods and technological tools for developing an evaluation, provided the institution can demonstrate that the valuation method is consistent with safe and sound banking practices and these Guidelines (see sections on *Evaluation Development and Evaluation Content*).[46] An institution should not select a method or tool solely because it provides the highest value, the lowest cost, or the fastest response or turnaround time.

An institution should establish policies and procedures that provide a sound process for using various methods or tools. Such policies and procedures should:

- Ensure staff has the requisite expertise and training to manage the selection, use, and validation of an analytical method or technological tool. If an institution does not have the in-house expertise relative to a particular method or tool, then an institution should employ additional personnel or engage a third party. (See the *Third Party Arrangements* section in these Guidelines.)

- Address the selection, use, and validation of the valuation method or tool.

- Establish criteria for determining whether a particular valuation method or tool is appropriate for a given transaction or lending activity, considering associated risks. These risks include, but are not limited to, transaction size and purpose, credit quality, and leverage tolerance (loan-to-value).

- Specify criteria when a market event or risk factor would preclude the use of a particular method or tool.

- Address standards for the use of multiple methods or tools, if applicable, for valuing the same property or to support a particular lending activity.

- Provide criteria for ensuring that the institution uses a method or tool that produces a reliable estimate of market value that supports the institution's decision to engage in a transaction.

- Address the extent to which:

  o An inspection or research is necessary to ascertain the property's actual physical condition, and

  o Supplemental information is needed to assess the effect of market conditions or other factors on the estimate of market value.

---

[46] For example, the sole use of data from the Internet or other public sources would not be an evaluation under these Guidelines. Additionally, valuation methods that do not contain sufficient information and analysis or provide a market value conclusion would not be acceptable as evaluations.

An institution should establish an effective system of controls for verifying that a valuation method or tool is employed in a manner consistent with internal policies and procedures.  Moreover, the institution's staff responsible for internal controls should have the skills commensurate with the complexity or sophistication of the method or tool.  Examiners will review an institution's policies, procedures, and internal controls to ensure that an institution's use of a method or tool is appropriate and consistent with safe and sound banking practices.

**Automated Valuation Models (AVMs)**

AVMs are computer programs that estimate a property's market value based on market, economic, and demographic factors.  Institutions may employ AVMs for a variety of uses such as loan underwriting and portfolio monitoring.  An institution may not rely solely on the results of an AVM to develop an evaluation unless the resulting evaluation is consistent with safe and sound banking practices and these Guidelines.  (See the *Evaluation Development* and *Evaluation Content* sections.)  For example, to be consistent with the standards for an evaluation, the results of an AVM would need to address a property's actual physical condition, and therefore, could not be based on an unsupported assumption, such as a property is in "average" condition.

Institutions should establish policies and procedures that govern the use of AVMs and specify the supplemental information that is required to develop an evaluation.  When the supplemental information indicates the AVM is not an acceptable valuation tool, the institution's policies and procedures should require the use of an alternative method or tool.

**<u>Selecting an AVM(s)</u>**

When selecting an AVM or multiple AVMs, an institution should:

- Perform the necessary level of due diligence on AVM vendors and their models, including how model developers conducted performance testing as well as the sample size used and the geographic level tested (such as, county level or zip code).

- Establish acceptable minimum performance criteria for a model prior to and independent of the validation process.

- Perform a detailed validation of the model(s) considered during the selection process and document the validation process.

- Evaluate underlying data used in the model(s), including the data sources and types, frequency of updates, quality control performed on the data, and the sources of the data in states where public real estate sales data are not disclosed.

- Assess modeling techniques and the inherent strengths and weaknesses of different model types (such as hedonic, index, and blended) as well as how a model(s) performs for different property types (such as condominiums, planned unit developments, and single family detached residences).

- Evaluate the vendor's scoring system and methodology for the model(s).  Determine whether the scoring system provides an appropriate indicator of model reliability by property types and geographic locations.

Following the selection of an AVM(s), an institution should develop policies and procedures to address the appropriate use of an AVM(s) and its monitoring and ongoing validation processes.

## Determining AVM Use

An institution should establish policies and procedures for determining whether an AVM can be used for a particular transaction.  The institution should:

- Maintain AVM performance criteria for accuracy and reliability in a given transaction, lending activity, and geographic location.[47]

- Establish internal confidence score[48] minimums, or similar criteria, for when each model can be used.

- Implement controls to preclude "value shopping" when more than one AVM is used for the same property.

- Establish procedures for obtaining an appraisal or using a different valuation method to develop an evaluation when an AVM's resulting value is not reliable to support the credit decision.  For example, in areas that have experienced a high incidence of fraud, the institution should consider whether the AVM may be relied upon for the transaction or another valuation method should be used.

- Identify circumstances under which an AVM may not be used, including:

  - When market conditions warrant, such as during the aftermath of a natural disaster or a major economic event;

  - When a model's performance is outside of specified tolerances for a particular geographic market or property price-tier range; or

  - When a property is non-homogeneous, such as atypical lot sizes or property types.

---

[47] For example, an institution should establish a level of acceptable core accuracy and limit exposure to a model's systemic tendency to over value properties (commonly referred to as "tail risk").

[48] A "confidence score" generally refers to a vendor's own method of quantifying how reliable a model value is by using a rank ordering process.  The scale and components of a confidence score are not standardized. Therefore an institution needs to understand how a confidence score was derived and the extent to which a confidence score correlates to model accuracy.  If multiple AVMs are used, an institution should understand how the combination of models affects overall accuracy.

Page 33 of 45

**<u>Validating AVM Results</u>**

An institution should establish standards and procedures for independent and ongoing monitoring and model validation, including the testing of multiple AVMs, to ensure that results are credible.[49]  An institution should be able to demonstrate that the depth and extent of its validation processes are consistent with the materiality of the risk and the complexity of the transaction.  Validation can be performed internally or with the assistance of a third party, as long as the validation is conducted by qualified individuals that are independent of the model development or sales functions.  An institution should not rely solely on validation representations provided by an AVM vendor.  An institution should perform appropriate model validation regardless of whether it relies on AVMs that are supported by value insurance or guarantees.  If there are insurance or guarantee components of any particular AVM, the institution is responsible for understanding the extent and limitations of the insurance policy or guarantee, and the claim process and financial strength of the insurer.

An institution should ensure that persons who validate an AVM on an ongoing basis are independent of the loan production and collection processes and have the requisite expertise and training.  In the AVM validation procedures, an institution should specify, at a minimum:

- Expectations for an appropriate sample size.

- Level of geographic analysis.

- Testing frequency and criteria for re-testing.

- Standards of performance measures to be used.

- Range of acceptable performance results.

To ensure unbiased test results, an institution should compare the results of an AVM to actual sales data in a specified trade area or market prior to the information being available to the model.  If an institution uses more than one AVM, each AVM should be validated.  To assess the effectiveness of its AVM practices, an institution should verify whether loans in which an AVM was used to establish value met the institution's performance expectations relative to similar loans that used a different valuation process.  An institution should document the results of its validation and audit findings.  An institution should use these findings to analyze and periodically update its policies and procedures for an AVM(s) when warranted.

---

[49]  See, for example, OCC Bulletin 2000-16, *Risk Modeling – Model Validation* (May 30, 2000).

**Tax Assessment Valuations (TAVs)**

An institution may not rely solely on the data provided by local tax authorities to develop an evaluation unless the resulting evaluation is consistent with safe and sound banking practices and these Guidelines. (See the *Evaluation Development* and *Evaluation Content* sections.) Since analytical methods such as TAVs generally need additional support to meet these Guidelines, institutions should develop policies and procedures that specify the level and extent of supplemental information that should be obtained to develop an evaluation. Such policies and procedures also should require the use of an alternate valuation method when such information does not support the transaction.

An institution may use a TAV in developing an evaluation when it can demonstrate that a valid correlation exists between the tax assessment data and the market value. In using a TAV to develop an evaluation, an institution should:

- Determine and document how the tax jurisdiction calculates the TAV and how frequently property revaluations occur.

- Perform an analysis to determine the relationship between the TAV and the property market values for properties within a tax jurisdiction.

- Test and document how closely TAVs correlate to market value based on contemporaneous sales at the time of assessment and revalidate whether the correlation remains stable as of the effective date of the evaluation.

## Appendix C
## Deductions and Discounts

The Agencies' appraisal regulations require an appraiser to analyze and report appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units.  For such transactions, an appraisal must include the market value of the property, which should reflect the property's actual physical condition, use, and zoning designation (referred to as the "as is" value of the property), as of the effective date of the appraisal.  Therefore, if the highest and best use of the property is for development to a different use, the cost of demolition and site preparation should be considered in the analysis.

**Proposed Construction or Renovation**

For properties where improvements are to be constructed or rehabilitated, an institution may request a prospective market value upon completion and a prospective market value upon stabilization.  While an institution may request the appraiser to provide the sum of retail sales for a proposed development, the result of such calculation is not the market value of the property for purposes of the Agencies' appraisal regulations.

**Partially Leased Buildings**

For proposed and partially leased rental developments, the appraiser must make appropriate deductions and discounts to reflect that the property has not achieved stabilized occupancy.  The appraisal analysis also should include consideration of the absorption of the unleased space.  Appropriate deductions and discounts should include items such as leasing commission, rent losses, tenant improvements, and entrepreneurial profit, if such profit is not included in the discount rate.

**Non-market Lease Terms**

For properties subject to leases with terms that do not reflect current market conditions, the appraisal must clearly state the ownership interest being appraised and provide a discussion of the leases that are in place.  If the leased fee interest is being appraised and contract rent is less than market rent on one or more long term lease(s) to a highly rated tenant, the market value of the leased fee interest would be less than the market value of the unencumbered fee simple interest in the property.[50]  In these situations, the market value of the leased fee interest should be used.

---

[50]  Fee simple interest refers to the most complete ownership unencumbered by any leases or other interests.  It is subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat.  Leased fee interest, on the other hand, refers to a landlord's ownership that is encumbered by one or more leases.

**Tract Developments with Unsold Units**

A tract development is defined in the Agencies' appraisal regulations as a project of five units or more that is constructed or is to be constructed as a single development. Appraisals for these properties must reflect deductions and discounts for holding costs, marketing costs, and entrepreneurial profit supported by market data. In some cases entrepreneurial profit may be included in the discount rate. The applicable discount rate is developed based on investor requirements and the risk associated with the physical and financial characteristics of the property. In some markets, entrepreneurial profit is treated as a line item deduction while in other markets it is reflected as a component of the discount rate.

Regardless of how entrepreneurial profit is handled in the appraisal analysis, an appropriate explanation and discussion should be provided in the appraisal report. The projected sales prices and absorption rate of units should be supported by anticipated demand at the time the units are expected to be exposed for sale. Anticipated demand for the units should be supported and presented in the appraisal. A reader of the appraisal report should be able to understand the risk characteristics associated with the subject property and the market, including the anticipated supply of competing properties.

- **Raw Land.** The appraiser must provide an opinion of value for raw land based on its current condition and existing zoning. If an appraiser employs a developmental approach to value the land that is based on projected land sales or development and sale of lots, the appraisal must reflect appropriate deductions and discounts for costs associated with developing and selling lots in the future. These costs may be incurred during the permitting, construction or selling stages of development. Appropriate deductions and discounts should include items such as feasibility studies, permitting, engineering, holding costs, marketing costs, and entrepreneurial profit and other costs specific to the property. If sufficient market data exists to perform both the sales comparison and developmental approaches to value, the appraisal report should detail a reconciliation of these two approaches in arriving at a market value conclusion for the raw land.

- **Developed Lots.** For existing or proposed developments of five or more residential lots in a single development, the appraiser must analyze and report appropriate deductions and discounts. Appropriate deductions and discounts should reflect holding costs, marketing costs, and entrepreneurial profit during the sales absorption period for the sale of the developed lots. The estimated sales absorption period should reflect the appraiser's estimate of the time frame for the actual development and sale of the lots, starting on the effective date of value and ending as of the expected date of the last lot sale. The absorption period should be based on market demand for lots in light of current and expected competition for similar lots in the market area.

- **<u>Attached or Detached Single-family Homes</u>**.  For proposed construction and sale of five or more attached or detached single-family homes in the same development, the appraiser must analyze and report appropriate deductions and discounts.  Appropriate deductions and discounts should reflect holding costs, marketing costs, and entrepreneurial profit during the sales absorption period of the completed units.  If an institution finances construction on an individual unit basis, an appraisal of the individual units may be used if the institution can demonstrate through an independently obtained feasibility study or market analysis that all units collateralizing the loan can be constructed and sold within 12 months.  However, the transaction should be supported by an appraisal that analyzes and reports appropriate deductions and discounts if any of the individual units are not completed and sold within the 12-month time frame.

- **<u>Condominiums</u>**.  For proposed construction and sale of a condominium building with five or more units, the appraisal must reflect appropriate deductions and discounts.  Appropriate deductions and discounts should include holding costs, marketing costs, and entrepreneurial profit during the sales absorption period of the completed units.  If an institution finances construction of a single condominium building with less than five units or a condominium project with multiple buildings with less than five units per building, the institution may rely on appraisals of the individual units if the institution can demonstrate through an independently obtained feasibility study or market analysis that all units collateralizing the loan can be constructed and sold within 12 months.  However, the transaction should be supported by an appraisal that analyzes and reports appropriate deductions and discounts if any of the individual units are not completed and sold within the 12-month time frame.

**Appendix D**
**Glossary of Terms**

**Agent** – The Agencies' appraisal regulations do not specifically define the term "agent." However, the term is generally intended to refer to one who undertakes to transact business or to manage business affairs for another. According to the Agencies' appraisal regulations, fee appraisers must be engaged directly by the federally regulated institution or its agent,[51] and have no direct or indirect interest, financial or otherwise, in the property or the transactions. The Agencies do not limit the arrangements that federally regulated institutions have with their agents, provided those arrangements do not place the agent in a conflict of interest that prevents the agent from representing the interests of the federally regulated institution.

**Appraisal** – As defined in the Agencies' appraisal regulations, a written statement independently and impartially prepared by a qualified appraiser (state licensed or certified) setting forth an opinion as to the market value of an adequately described property as of a specific date(s), supported by the presentation and analysis of relevant market information.

**Appraisal Management Company** – The Agencies' appraisal regulations do not define the term appraisal management company. For purposes of these Guidelines, an "appraisal management company" includes, but is not limited to, a third-party entity that provides real property valuation-related services, such as selecting and engaging an appraiser to perform an appraisal based upon requests originating from a regulated institution. The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) has a specific definition for this term in connection with transactions secured by a consumer's principal dwelling or mortgage secondary market transactions. See the *Third Party Arrangements* section in these Guidelines.

**Appraisal Report Options** – Refer to the definitions for Restricted Use Appraisal Report, Self-Contained Appraisal Report, and Summary Appraisal Report.

**Appraisal Threshold** – An appraisal is not required on transactions with a transaction value of $250,000 or less. As specified in the Agencies' appraisal regulations, an institution must obtain an evaluation of the real property collateral, if no other appraisal exemption applies.

**Approved Appraiser List** – A listing of appraisers who an institution has determined to be generally qualified and competent to perform appraisals and may address the appraiser's expertise in a particular market and property type.

**"As Completed" Market Value** – Refer to the definition for Prospective Market Value.

**"As Is" Market Value** – The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal's effective date.

**"As Stabilized" Market Value** – Refer to the definition for Prospective Market Value.

---

[51] Except that the regulated institution also may accept an appraisal that was prepared by an appraiser engaged directly by another financial services institution in certain circumstances as set forth in the Agencies' appraisal regulations.

Page 39 of 45

**Automated Valuation Model** – A computer program that estimates a property's market value based on market, economic, and demographic factors.  Hedonic models generally use property characteristics (such as square footage and room count) and methodologies to process information, often based on statistical regression.  Index models generally use geographic repeat sales data over time rather than property characteristic data.  Blended or hybrid models use elements of both hedonic and index models.

**Broker Price Opinion (BPO)** – An estimate of the probable sales or listing price of the subject property provided by a real estate broker, sales agent, or sales person.  A BPO generally provides a varying level of detail about a property's condition, market, and neighborhood, as well as comparable sales or listings.  A BPO is not by itself an appraisal or evaluation, but could be used for monitoring the collateral value of an existing loan, when deemed appropriate.  Further, the Dodd-Frank Act provides "[i]n conjunction with the purchase of a consumer's principal dwelling, broker price opinions may not be used as the primary basis to determine the value of a piece of property for the purpose of loan origination of a residential mortgage loan secured by such piece of property."[52]

**Business Loan** – As defined in the Agencies' appraisal regulations, a loan or extension of credit to any corporation, general or limited partnership, business trust, joint venture, syndicate, sole proprietorship, or other business entity.[53]  A business loan includes extensions to entities engaged in agricultural operations, which is consistent with the Agencies' real estate lending guidelines definition of an improved property loan that include loans secured by farmland, timberland, and ranchland committed to ongoing management and agricultural production.

**Business Loan Threshold** – A business loan with a transaction value of $1,000,000 or less does not require an appraisal if the primary source of repayment is not dependent on the sale of, or rental income derived from, real estate.  As specified in the Agencies' appraisal regulations, an institution must obtain an evaluation of the real property collateral.[54]

**Client** – According to USPAP, the party or parties who engage(s) an appraiser by employment or contract for a specific appraisal assignment.  For the purposes of these Guidelines, the appraiser should be aware that the client is the regulated institution.  (Refer to the section on *Third Party Arrangements* in these Guidelines.)

**Credible (Appraisal) Assignment Results** – According to USPAP, credible means "worthy of belief" used in the context of the Scope of Work Rule.  Under this rule, credible assignment results depend on meeting or exceeding both (1) the expectations of parties who are regularly intended users for similar assignments, and (2) what an appraiser's peers' actions would be in performing the same or a similar assignment.

---

[52] Dodd-Frank Act, Section 1473(r).

[53] NCUA's appraisal regulation, 12 CFR 722, does not define "business loan."  A "member business loan" is regulated under 12 CFR 723.

[54] NCUA's appraisal regulation, 12 CFR 722, does not provide a higher appraisal threshold for loans defined as "member business loans" under 12 CFR 723.

**Credit File** – A hardcopy or electronic record that documents all information necessary to (1) analyze the credit before it is granted and (2) monitor the credit during its life.  An institution may use a computerized or manual system to manage the information in its credit files.

**Date of the Appraisal Report** – According to USPAP, the date of the appraisal report indicates when the appraisal analysis was completed.

**Effective Date of the Appraisal** – USPAP requires that each appraisal report specifies the effective date of the appraisal and the date of the report.  The date of the report indicates the perspective from which the appraiser is examining the market.  The effective date of the appraisal establishes the context for the value opinion.  Three categories of effective dates—retrospective, current, or prospective—may be used, according to the intended use of the appraisal assignment.

**Effective Date of the Evaluation –** For the purposes of the Agencies' appraisal regulations and these Guidelines, the effective date of an evaluation is the date that the analysis is completed.

**Engagement Letter** – An engagement letter between an institution and an appraiser documents the expectations of each party to the appraisal assignment.  For example, an engagement letter may specify, among other items:  (i) the property's location and legal description; (ii) intended use and users of the appraisal; (iii) the requirement to provide an opinion of the property's market value; (iv) the expectation that the appraiser will comply with applicable laws and regulations, and be consistent with supervisory guidance; (v) appraisal report format; (vi) expected delivery date; and (vii) appraisal fee.

**Evaluation** – A valuation permitted by the Agencies' appraisal regulations for transactions that qualify for the appraisal threshold exemption, business loan exemption, or subsequent transaction exemption.

**Exposure Time** – As defined in USPAP, the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.  Exposure time is always presumed to precede the effective date of the appraisal.  Exposure time is a function of price, time, and use – not an isolated opinion of time alone.  (See USPAP Standard 1-2(c) and Statement 6.)

**Extraordinary Assumption** – As defined in USPAP, an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions regarding the property's market value.  An example of an extraordinary assumption is when an appraiser assumes that an application for a zoning change will be approved and there is no evidence to suggest otherwise.

**Federally Regulated Institution** – For purposes of the Agencies' appraisal regulations and these Guidelines, an institution that is supervised by a federal financial institutions regulatory agency. This includes a national or a state-chartered bank and its subsidiaries, a bank holding company and its non-bank subsidiaries, a federal savings association and its subsidiaries, a federal savings and loan holding company and its subsidiaries, and a credit union.

**Federally Related Transaction** – As defined in the Agencies' appraisal regulations, any real estate-related financial transaction in which the Agencies or any regulated institution engages or contracts for, and that requires the services of an appraiser.

**Financial Services Institution** – The Agencies' appraisal regulations do not contain a specific definition of the term "financial services institution." The term is intended to describe entities that provide services in connection with real estate lending transactions on an ongoing basis, including loan brokers.

**Going Concern Value** – The value of a business entity rather than the value of the real property. The valuation is based on the existing operations of the business and its current operating record, with the assumption that the business will continue to operate.

**Hypothetical Condition** – As defined in USPAP, a condition that is contrary to what exists but is supposed for the purpose of analysis. An example of a hypothetical condition is when an appraiser assumes a particular property's zoning is different from what the zoning actually is.

**Loan Production Staff** – Generally, all personnel responsible for generating loan volume or approving loans, as well as their subordinates and supervisors. These individuals would include any employee whose compensation is based on loan volume (such as processing or approving of loans). An employee is not considered loan production staff just because part of their compensation includes a general bonus or profit sharing plan that benefits all employees. Employees responsible solely for credit administration or credit risk management are not considered loan production staff.

**Marketing Time** – According to USPAP Advisory Opinion 7, the time it might take to sell the property interest at the appraised market value during the period immediately after the effective date of the appraisal. An institution may request an appraiser to separately provide an estimate of marketing time in an appraisal. However, this is not a requirement of the Agencies' appraisal regulations.

**Market Value** – As defined in the Agencies' appraisal regulations, the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**Presold Unit** – A unit may be considered presold if a buyer has entered into a binding contract to purchase the unit and has made a substantial and non-refundable earnest money deposit.  Further, the institution should obtain sufficient documentation that the buyer has entered into a legally binding sales contract and has obtained a written prequalification or commitment for permanent financing.

**Prospective Market Value "as Completed" and "as Stabilized"** – A prospective market value may be appropriate for the valuation of a property interest related to a credit decision for a proposed development or renovation project.  According to USPAP, an appraisal with a prospective market value reflects an effective date that is subsequent to the date of the appraisal report.  Prospective value opinions are intended to reflect the current expectations and perceptions of market participants, based on available data.  Two prospective value opinions may be required to reflect the time frame during which development, construction, and occupancy will occur.  The prospective market value "as completed" reflects the property's market value as of the time that development is expected to be completed.  The prospective market value "as stabilized" reflects the property's market value as of the time the property is projected to achieve stabilized occupancy.  For an income-producing property, stabilized occupancy is the occupancy level that a property is expected to achieve after the property is exposed to the market for lease over a reasonable period of time and at comparable terms and conditions to other similar properties.  (See USPAP Statement 4 and Advisory Opinion 17.)

**Put Back** – Represents the ability of an investor to reject mortgage loans from a mortgage originator if the mortgage loans do not comply with the warranties and representations in their mortgage purchasing agreement.

**Raw Land** – A parcel or tract of land with no improvements, for example, infrastructure or vertical construction.  When an appraisal of raw land includes entitlements, the appraisal should disclose when such entitlements will expire if improvements are not completed within a specified time period and the potential effect on the value conclusion.

**Real Estate-Related Financial Transaction** – As defined in the Agencies' appraisal regulations, any transaction involving:

- The sale, lease, purchase, investment in or exchange of real property, including interests in property, or the financing thereof;

- The refinancing of real property or interests in real property; or

- The use of real property or interests in property as security for a loan or investment, including mortgage-backed securities.

**Regulated Institution** – Refer to the definition of Federally Regulated Institution.

**Restricted Use Appraisal Report** – According to USPAP Standards Rule 2-2(c), a restricted use appraisal report briefly states information significant to solve the appraisal problem as well as a reference to the existence of specific work-file information in support of the appraiser's opinions and conclusions.  The Agencies believe that the restricted use appraisal report will not be appropriate to underwrite a significant number of federally related transactions due to the lack of supporting information and analysis in the appraisal report.  However, it may be appropriate to use this type of appraisal report for ongoing collateral monitoring of an institution's real estate transactions and other purposes.

**Sales Concessions** – A cash or noncash contribution that is provided by the seller or other party to the transaction and reduces the purchaser's cost to acquire the real property.  A sales concession may include, but is not limited to, the seller paying all or some portion of the purchaser's closing costs (such as prepaid expenses or discount points) or the seller conveying to the purchaser personal property which is typically not conveyed with the real property.  Sales concessions do not include fees that a seller is customarily required to pay under state or local laws.  In developing an opinion of market value, an appraiser must take into consideration the effect of any sales concessions on the market value of the real property.  (See "market value" above and USPAP Standards Rule 1-2(c).)

**Sales History and Pending Sales** – According to USPAP Standards Rule 1-5, when the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser in the normal course of business, analyze: (1) all current agreements of sale, options, and listings of the subject property as of the effective date of the appraisal, and (2) all sales of the subject property that occurred within three years prior to the effective date of the appraisal.

**Scope of Work** – According to USPAP Scope of Work Rule, the type and extent of research and analyses in an appraisal assignment.  (See the Scope of Work Rule in USPAP.)

**Self-contained Appraisal Report** – According to USPAP Standards Rule 2-2(a), a self-contained appraisal report is the most complete and detailed appraisal report option.

**Sum of Retail Sales** – A mathematical calculation of the sum of the expected sales prices of several individual properties in the same development to an individual purchaser.  The sum of retail sales is not the market value for purposes of meeting the minimum appraisal standards in the Agencies' appraisal regulations.

**Summary Appraisal Report** – According to USPAP Standards Rule 2-2(b), the summary appraisal report summarizes all information significant to the solution of an appraisal problem while still providing sufficient information to enable the client and intended user(s) to understand the rationale for the opinions and conclusions in the report.

**Tract Development** – As defined in the Agencies' appraisal regulations, a project of five units or more that is constructed or is to be constructed as a single development.  For purposes of these Guidelines, "unit" refers to:  a residential or commercial building lot, a detached single-family home, an attached single-family home, and a residence in a condominium, cooperative, or timeshare building.

**Transaction Value** – As defined in the Agencies' appraisal regulations:

- For loans or other extensions of credit, the amount of the loan or extension of credit;

- For sales, leases, purchases, and investments in or exchanges of real property, the market value of the real property interest involved; and

- For the pooling of loans or interests in real property for resale or purchase, the amount of the loan or market value of the real property calculated with respect to each such loan or interest in real property.

For purposes of this definition, the transaction value for loans that permit negative amortization should be the institution's total committed amount, including any potential negative amortization.

**Uniform Standards of Professional Appraisal Practice (USPAP)** – USPAP identifies the minimum set of standards that apply in all appraisal, appraisal review, and appraisal consulting assignments.  These standards are promulgated by the Appraisal Standards Board of the Appraisal Foundation and are incorporated as a minimum appraisal standard in the Agencies' appraisal regulations.

**Unsold Units** – An unsold unit is a unit that does not meet the conditions listed in the definition of Presold Units.

**Value of Collateral (for Use in Determining Loan-to-Value Ratio)** – According to the Agencies' real estate lending standards guidelines, the term "value" means an opinion or estimate set forth in an appraisal or evaluation, whichever may be appropriate, of the market value of real property, prepared in accordance with the Agencies' appraisal regulations and these Guidelines.  For loans to purchase an existing property, "value" means the lesser of the actual acquisition cost or the estimate of value.