A UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOSEPH MEEHAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:17-CV-2876 PLC |
| | ) |
| PNC FINANCIAL SERVICES | ) |
| GROUP, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court[1] on Defendant PNC Financial Services Group, Inc.'s ("PNC") motion for summary judgment on the action for wrongful discharge in violation of public policy filed by Plaintiff Joseph Meehan. [ECF No. 49] Meehan opposes the motion. [ECF No. 62] For the reasons set forth below, the Court grants the motion.

**I.    Background**

The record establishes the following facts, which are undisputed, except as noted: Meehan, a state-certified general appraiser, began working as an appraisal reviewer for National City Bank in 2004. [ECF No. 63 at ¶¶ 2, 3] PNC acquired National City Bank in 2009, and Meehan transitioned to PNC's Real Estate Valuation Services (REVS) Group. [Id. at ¶¶ 5, 17]

PNC's REVS Group consisted of two teams – the procurement team and review team – which served "as a system of checks and balances to avoid any improper indication of bias in the real estate valuation process." [Id. at ¶ 18] The procurement team ordered real estate appraisals from a list of approved, third-party certified appraisers and managed the process from beginning

---

[1] The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). [ECF No. 14]

to end, utilizing the review team at a certain point in the process before final submission. [Id. at ¶ 19] The review team was solely responsible for reviewing appraisals to ensure compliance with federal regulations and the Uniform Standards of Professional Appraisal Practice (USPAP).[2] [Id. at ¶ 20] Meehan was an appraisal reviewer and member of the review team until he was discharged on October 20, 2015.

Meehan's job as an appraisal reviewer was to "ensure that the appraisal report," completed by the third-party appraiser, "conforms to the regulations, USPAP, and [PNC] Policy and provides a reasonable opinion(s) of value." [Id. at ¶ 27 (quoting REVS Commercial Real Estate Procedure Guide)] Upon completion of an appraisal review, an appraisal reviewer could: (1) accept the appraisal report; (2) address concerns with the appraiser; or (3) reject the report. [Id. at ¶ 28] If the appraisal reviewer accepted an appraiser's report, a supervising appraiser from the procurement group would review the report, "so that there is another check in the process to ensure that 'all the things that were necessary to be addressed were addressed.'" [Id. at ¶ 31; see also ECF No. 64-2 at 10, 19, 37]

In his petition, Meehan alleged that "PNC supervisors would routinely require him to ignore [state, federal, and professional licensing] standards when reviewing appraisals" and his "refusal to do so contributed to his termination." [ECF No. 4 at ¶ 13] For example, Meehan claimed that, in January and April 2011, PNC "removed" Meehan from appraisal reviews after

---

[2] "The USPAP is an evolving set of professional standards developed by the Appraisal Standards Board of the Appraisal Foundation, which is authorized by the U.S. Congress as the independent source of appraisal standards and appraiser qualifications." Dwiggins v. Missouri Real Estate Appraisers Commission, 515 S.W.3d 765, 767 (Mo. App. 2016) (citing §§ 12 U.S.C. 3332(a)(5), (b)). Under Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), real estate appraisals must be written and performed in accordance with the generally accepted standards outlined in the USPAP. [ECF No. 4 at ¶¶ 7-8 citing 12 U.S.C. § 3339] Missouri adopted the USPAP "in order to comply with Title XI of the [FIRREA.]" Id. (citing 12 U.S.C. §§ 3331–3351). See Mo. Rev. Stat. § 339.535.

2

he "expressed serious concerns" about one appraisal and "refused to approve" another.[3] [ECF No. 64 at ¶¶ 7-8, 10]

In September 2015, PNC assigned Meehan to review the appraisals of two childcare properties in New Jersey. [ECF No. 63 at ¶ 71] According to Meehan, the appraisals were deficient "because the appraiser did not address or identify the licensed capacity of the facilit[ies] as regulated and authorized by the State of New Jersey, nor did he apply the most appropriate and recognized methodology for analyzing the market value, price per licensed child." [ECF No. 4 at ¶ 14] At Meehan's direction, the appraiser revised the appraisals, calculating the properties' values based on price per licensed child, as opposed to price per square foot, which lowered the property valuations from $5.8 million to $5.4 million and $2.1 million to $1.9 million, respectively. [Id. at ¶¶ 14-15]

Diana Pockar, PNC's supervisory appraiser, questioned the revised appraisals for the daycare facilities. [ECF No. 51-14] Pockar explained her concerns to Meehan in an email dated October 15, 2015, stating:

> I was thinking more about this report over the last day and actually called the vendors based on our conversation last evening…that properties in this market do not sell on a per child license basis. I am concerned that the valuation is not significantly supported, as the analysis appears to not be supported.
>
> …This is a strong market and I am afraid that if the appraiser's [sic] have not seen analysis like this, ever, it is just not credible. I am not able to get my arms around it entirely, but was just thinking, what if the number of licenses change, either for the property or the comparables, the value is a moving target. Do the licenses get issued to the business or do they run with the real estate? One of the comps, page 50 states that the property is licensed for 457 children, but rent is based on actual enrollment, which we know can change at any time.

---

[3] Meehan also presented copies of four email exchanges with other REVS Group employees and outside appraisers, dated 2011 and 2013, in which he questioned appraisals. In these instances, his supervisors rejected Meehan's suggestions and approved the appraisals. [See ECF Nos. 64-23, 64-24, 64-25, 64-26]

[Id. at 3-4] Based on these considerations, Pockar "suggest[ed]" Meehan "revert back to the original analysis and accept the basis for which the appraisers originally concluded." [Id. at 3] She concluded her email: "Please let me know if we have your approval to just go back to the original analysis, which is what was completed last year." [Id. at 4]

Meehan "continued to push back" [ECF No. 4 at ¶ 16], responding that "[t]he [relationship manager] is OK with the lower value" and reiterating his position that licensed capacity was the proper basis for valuing childcare facilities. [ECF No. 51-14 at 2-3] The next day, Meehan learned that one of the daycare properties had been reassigned to Paul Higgins, the appraisal review team's supervisory manager, for "a second review[.]" [ECF No. 64-12 at 32] Higgins completed another appraisal review, in which he mentioned that PNC had considered and rejected a price per licensed student sales comparison approach:

> An additional sales comparable analysis based on a sale price per licensed child in addition to sales price per square foot of GBA was initially requested during the review process. However, this analysis was later determined not necessary to fill the evaluation requirement of this request. In addition, the sale price per licensed child did not consider the mix of infant, toddler, or pre-school day care, nor did it have credible impact on the value conclusion. The appraisal as currently presented adequately supports the value conclusion.

[Id. at 29] The final appraisal report did not include the price per student analysis recommended by Meehan. [ECF Nos. 51-1 at 43; 64-12 at 49-131] At his deposition, Meehan testified that while he could have reported ethical concerns to his superiors in the REVS Group and/or PNC's ethics department,[4] he did not do so. [Id. at 13, 23]

---

[4] PNC's Code of Business Conduct and Ethics, which applied to all of PNC's employees and directors, provided:
> Remember, if you have a question or concern about what is proper conduct for you or anyone else, you may always talk to your supervisor, the Employee Relations Information Center ("ERIC") at 1-877-968-7762, or the Corporate Ethics Office at 412-768-8507. You may also report possible violations by calling the PNC Business Conduct and Ethics Hotline at 1-866-785-9753,

4

The record reflects that, in the months preceding Meehan's termination, the REVS Group experienced a decreased volume of appraisals and, in August 2015, Meehan's supervisor mentioned to Meehan the possibility of a reduction in force, or work restructuring plan ("WRP"). [ECF No. 63 at ¶¶ 77-78]  Adam Barone, the senior vice president responsible for managing the REVS Group, and Jeff Mazur, the review team's manager, together with PNC's human resources department, "reviewed the work volume and looked at the staffing that we had and came away with an understanding that we no longer needed three positions," specifically two REVS specialist positions and a part-time administrative position. [ECF Nos. 64-2 at 29; 63 at ¶ 79]

To implement the WRP, Barone and Mazur identified and weighed the "core competencies" upon which each REVS specialist would be rated. [ECF No. 63 at ¶ 80]  Higgins rated the ten individuals on his team by the identified core competencies. [Id. at ¶ 83]  Meehan received the lowest ratings for teamwork and customer orientation/service/satisfaction, and tied another appraisal reviewer for the lowest productivity score. [See ECF No. 53-2]

On October 20, 2015, PNC terminated Meehan and another appraisal reviewer, the two appraisal reviewers with the lowest scores.  [ECF No. 68 at ¶ 63]  According to Barone's deposition testimony, PNC did not replace either Meehan or the other appraisal reviewer after their terminations.  [ECF No. 51-2 at 43]  The REVS Group's workload and number of

---

where you may choose to remain anonymous.
[ECF No. 64-9 at 12; see also ECF No. 63 at ¶¶ 34, 36].  The Court refers to all available reporting locations in PNC as "ethics department."

In his deposition, Meehan stated that Adam Barone, the senior vice president responsible for managing the REVS Group, directed appraisal reviewers to address any questions or concerns with their supervisors before bringing them to either Barone or Jeff Mazur, manager of the review team. [ECF No. 51-1 at 22]  Meehan acknowledged that, if he "didn't like what [his] supervisor said," he "could have gone to the next level up, [to] Jeff Mazur or Adam Barone," but Meehan "didn't feel like I was supposed to bother them." [Id. at 23]  Meehan testified that he did not report ethical concerns to PNC's ethics department or "any…federal authority," because "[i]t wasn't my responsibility[.]" [Id. at 46-47]

5

employees continued to decrease through the date of Barone's deposition in December 2018. [ECF Nos. 64-2 at 44; 63 at ¶ 88]

Meehan filed a petition in the Circuit Court of St. Louis County seeking monetary relief for wrongful termination in violation of public policy. [ECF No. 4] PNC removed the case to federal court on the basis of diversity of citizenship and filed a motion to dismiss for failure to state a claim. [ECF Nos. 1, 8] The Court denied PNC's motion. [ECF No. 31] PNC now moves for summary judgment on Meehan's wrongful discharge action.[5] [ECF No. 49]

## II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-movant must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 792 (8th Cir. 2012).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

---

[5] PNC also filed a motion to strike Meehan's opposition to summary judgment and statement of additional material facts on the grounds that they lack corresponding citations to the record, in violation of Rule 56(e) and Local Rule 7-4.01(E). [ECF No. 69] Given PNC's success on the merits as discussed herein, the Court will deny as moot PNC's motion to strike. See, e.g., GuideOne Mut. Ins. Co. v. Cote Brilliante Presbyterian Church, No. 4:18-CV-738-AGF, 2019 WL 1452929, at *1 n. 1 (E.D. Mo. Apr. 2, 2019).

there is no genuine issue for trial." Id. (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. Discussion

PNC asserts that it is entitled to summary judgment on Meehan's wrongful discharge claim because Meehan presented no evidence that: (1) either PNC or Meehan violated a specific law or public policy; (2) Meehan "ever, in fact, blew the proverbial 'whistle' on PNC for the alleged violations of law or public policy"; or (3) there exists "any causal connections between Meehan's alleged 'whistleblowing' and the termination of employment." [ECF No. 50 at 3 (emphasis in original)] Meehan opposes summary judgment on the ground that he "is protected by Missouri's common law public policy exemption" to the employment at-will doctrine and "genuine issues of material fact remain between the parties." [ECF No. 62 at 1]

The parties do not dispute that Meehan's employment was at will. Under Missouri law, an employer may terminate an at-will employee for any reason or for no reason. Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 92 (Mo. banc 2010). However, "Missouri recognizes a 'very narrowly drawn' public policy exception to at-will employment." United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494, 506 (8th Cir. 2016) (quoting Frevert v. Ford Motor Co., 614 F.3d 466, 471 (8th Cir. 2010)). The public policy exception prohibits termination of an at-will employee for either: (1) "refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body"; or (2) "reporting wrongdoing or violations of law to superiors or public authorities, also known as 'whistleblowing.'" Newsome v. Kansas City, Mo. Sch. Dist., 520 S.W.3d 769, 777 (Mo. banc 2017) (quoting Fleshner, 304 S.W.3d at 92).

7

Meehan's claim falls into the first category protecting an at-will employee – namely, protection from discharge for an at-will employee who refuses to violate the law or a well-established and clear mandate of public policy. To succeed on his claim, Plaintiff must demonstrate: (1) the conduct required of him by the employer would have violated a statute, regulation, or public policy; and (2) his refusal to perform the unlawful conduct was a contributing factor in his termination. Sherman v. Berkadia Commercial Mortg. LLC, No. 4:17-CV-2183-RWS, 2019 WL 195125, at *11 (E.D. Mo. Jan. 15, 2019) (applying Missouri law) (citing Bazzi v. Tyco Healthcare Group, LP, 652 F.3d 943, 947 (8th Cir. 2011)). "Also, he 'must show both that [he] harbored a good-faith belief that the conduct in question violated the public policy at issue, and that this good faith belief was objectively reasonable.'" Watson v. Air Methods Corp., No. 4:14-CV-1667-RLW, 2018 WL 580631, at *1 (E.D. Mo. Jan. 25, 2018) (applying Missouri law) (quoting Graham v. Hubbs Mach. & Mfg., Inc., 92 F.Supp.3d 935, 942 (E.D. Mo. 2015) (internal quotation omitted)). See also Bazzi, 652 F.3d at 948.

Meehan alleges that PNC "pressured [him] to ignore" the following rules, obligations, and ethical mandates under [USPAP],"[6] which have been adopted by the Missouri and United States Legislatures:

USPAP Standard 1

In developing a real property appraisal, an appraiser must identify the problem to be solved, determine the scope of work necessary to solve the problem, and

---

[6] In his memorandum, Meehan also alleged that he was "pressured to ignore…USPAP rules about misleading appraisals." [ECF No. 62 at 7] However, Meehan failed to identify a specific rule. The Court notes that, in his petition, Meehan cited statements from the "Conduct" section of the USPAP Ethics Rule, which prohibited an appraiser from "communicat[ing] assignment results with the intent to mislead or to defraud" or "knowingly permit[ting] an employee or other person to communicate a misleading or fraudulent report." [ECF No. 4 at ¶ 8; see No. 64-4 at 18]

8

correctly complete research and analyses necessary to produce a credible[7] appraisal.

<u>USPAP Standards Rule 3-4</u>

Each written or oral Appraisal Review Report must be separated from the work under review and must:
(a) clearly and accurately set forth the appraisal review in a manner that will not be misleading;
(b) contain sufficient information to enable the intended users of the appraisal review to understand the [appraised property that is the subject of the appraisal review report]…..

<u>USPAP Ethics Rule</u>

An appraiser must promote and preserve the public trust inherent in appraisal practice by observing the highest standards of professional ethics.

An appraiser must comply with USPAP when obligated by law or regulation, or by agreement with the client or intended users. In addition to these requirements, an individual should comply any time that individual represents that he or she is performing the service as an appraiser.

[ECF No. 4 at ¶ 8; <u>see</u> ECF No. 64-4 at 18, 27, 45 (footnote added)] Federal and Missouri law requires real estate appraisers to comply with USPAP standards. <u>See</u> 12 U.S.C. §§ 3331–3351; Mo. Rev. Stat. § 339.535. Pursuant to Mo. Rev. Stat. § 339.546, a state-certified real-estate appraiser's knowing violation of USPAP is a class B misdemeanor.

The Court acknowledges that these USPAP standards and ethics rule set forth a clear public policy requiring real estate appraisers to perform appraisals in a manner that is independent, impartial, and objective. However, aside from his own conclusory testimony, Meehan has not presented any evidence showing that his belief that certain PNC-approved appraisal reports violated public policy was objectively reasonable. <u>See, e.g.</u>, <u>Bazzi v. Tyco Healthcare Group, LP</u>, No. 4:08-CV-2034-CEJ, 2010 WL 1260141, at *4-5 (Apr. 1, 2010), aff'd,

---

[7] The USPAP defines "credible" to mean "worthy of belief." [ECF No. 64-4 at 14] The Comment to the definition provides: "Credible assignment results require support, by relevant evidence and logic, to the degree necessary for the intended use." [<u>Id.</u>]

652 F.3d 943 (8th Cir. 2011). The record contains no expert testimony or case law supporting Meehan's claim that a violation of USPAP occurred or would have occurred had he approved the challenged appraisal reports that PNC approved. See, e.g., Bazzi, 2010 WL 1260141, at *4; Fruits v. LS Constr. Servs. of Kan., Inc., No. 4:12-CV-W-DGK, 2013 WL 3664629, at *4 (W.D. Mo. July 12, 2013).

As Meehan acknowledged at his deposition, "there are many different ways to value a commercial property" and appraisers following proper appraisal theory and methodology may arrive at different values based on what they deem relevant and appropriate under USPAP. [See ECF No. 51-1 at 44, 48] Nothing in the record (apart from Meehan's statements) suggests that PNC knew or should have known that the appraisal reports it accepted without Meehan's approval were, in fact, noncompliant with USPAP and, therefore a violation of Mo. Rev. Stat. § 339.535. See Bazzi, 2010 WL 1260141, at *5 ("[E]vidence that the employer knew or should have known an activity was illegal has been present in every public policy action upheld in Missouri thus far."). To the contrary, the emails Meehan submitted reveal that, before PNC approved the appraisal reports Meehan deemed noncompliant, the appraisers generally provided detailed, reasoned explanations for their valuations. [See ECF Nos. 64-25 at 2-8, 64-26 at 12-14] Similarly, in regard to the New Jersey daycare properties, Pockar's email to Meehan shows that Pockar and the appraiser carefully considered Meehan's appraisal review, and she explained her reluctance to adopt Meehan's valuation. [ECF No. 51-14 at 3]

The Court cannot rely solely on Meehan's unsupported contention that PNC's appraisal reports violated the USPAP "especially...where complex and technical regulatory compliance is at issue and [the] plaintiff's employment centered around compliance duties." Bazzi, 2010 WL 1260141, at *7. Consequently, Meehan failed to demonstrate an objectively reasonable belief

that the appraisal reports he deemed deficient, but felt "pressured" to approve, violated USPAP standards as adopted by Missouri. See, e.g., Id., 2010 WL 1260141, at *4; Fruits, 2013 WL 3664692, at *4.

## IV. Conclusion

Based on the above, the Court finds that Meehan failed to demonstrate a genuine issue of material fact on the threshold issue of whether his belief that certain appraisal reports were non-USPAP-compliant was objectively reasonable.[8] The Court therefore grants PNC summary judgment on Meehan's wrongful discharge claim.

**IT IS HEREBY ORDERED** that PNC's motion for summary judgment [ECF No. 49] is **GRANTED**.

**IT IS FURTHER ORDERED** that PNC's motion to strike Meehan's opposition to summary judgment and statement of additional material facts [ECF No. 69] is **DENIED as moot**.

A separate judgment in accordance with this order will be entered this same date.

                                          *Patricia L. Cohen*
                                          PATRICIA L. COHEN
                                          UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of June, 2019

---

[8] Because this finding is dispositive, the Court does not address PNC's remaining arguments.